**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| DESKTOP METAL, INC., *et al.*, | Case No. 25-90268 (CML) |
| | (Joint Administration Requested) |
| Debtors.[1] | |

**DECLARATION OF ANDREW HINKELMAN
IN SUPPORT OF CHAPTER 11 PETITIONS AND PRIVATE SALE MOTION**

I, Andrew Hinkelman, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that:

1.     I am a Senior Managing Director of FTI Consulting, Inc. ("FTI"), a restructuring advisory firm with numerous offices throughout the United States and abroad. FTI has been retained as financial advisor by each of the above captioned debtors and debtors in possession (collectively, the "Debtors"). I have also been appointed the Debtors' chief restructuring officer (the "CRO"). Prior to and since becoming the Debtors' CRO, I also led the FTI team who served as financial advisor to the Debtors beginning in April 2025.

2.     On the date hereof (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court").

---

[1]   The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are: Adaptive3D LLC (3990); Adaptive 3D Technologies, LLC (5893); Beacon Bio, Inc. (9005); Brewer Tafla Dental Technologies, LLC (6452); Dental Arts Laboratories, Inc. (8905); Desktop Labs, Inc. (5344); Desktop Metal Operating, Inc. (7659); Desktop Metal Securities Corporation (9007); Desktop Metal, Inc. (4042); EnvisionTEC US LLC (2483); ExOne Americas LLC (3443); ExOne Operating, LLC (8851); Figur Machine Tools LLC (2489); Larry Brewer Dental Lab Inc. (0215); May Dental Arts, LLC (8558); and The Syzygy Memory Plastics Corp. (8063). The location of the Debtors' corporate headquarters and the Debtors' service address is: 63 Third Avenue, Burlington, MA 01803.

3.      I am authorized to submit this Declaration on behalf of the Debtors. I am over twenty-one (21) years of age, and, if called upon to testify, I would testify competently to the facts and opinions set forth herein. All facts and opinions set forth in this declaration (the "Declaration") are based upon: (i) my knowledge of the Debtors' day-to-day operations, business and financial affairs, books and records, and employees; (ii) information I learned from my review of relevant documents, including unaudited financial documents; (iii) information supplied to me or verified by other members of the management team of Desktop Metal, Inc. ("Desktop," and, together with its Debtor and non-Debtor subsidiaries, the "Company"), and the Company's third-party advisors; and/or (iv) my opinions based upon experience and knowledge. Unless otherwise indicated, any financial information contained in this Declaration is subject to change but is true and correct as of the date of this Declaration. Such financial information is presented on a consolidated basis for the Company, except where specifically noted.

4.      The Debtors have filed a motion seeking approval of a private sale of certain foreign subsidiaries and related assets (the "Private Sale Motion"). I have reviewed the Private Sale Motion, and I believe the relief requested therein is necessary to avoid immediate and irreparable harm to the Debtors' estates in these chapter 11 cases (the "Chapter 11 Cases"). As set forth below and described in greater detail in the Gilligan Declaration[2], I also submit that without immediate approval of the proposed private sale, the Debtors would suffer immediate and irreparable harm.

5.      This Declaration is organized into four parts. Part I provides background information on the Company and its operations. Part II provides an overview of the Debtors' prepetition capital structure. Part III describes the challenges the Company has faced and strategies

---

[2]      The *Declaration of Daniel Gilligan in Support of Private Sale Motion* (the "Gilligan Declaration"), filed contemporaneously herewith, shall be incorporated herein by reference.

the Company has implemented in response to such challenges. Part IV discusses the relief requested in and the factual bases supporting the Private Sale Motion.

**I.      SUMMARY**[3]

6.      The Company is, in sum and substance, a research and development company, which – although it has generated significant revenue – has historically struggled to generate a profit or positive operating cash flow. Notwithstanding its challenges, the Company has historically attracted significant investment because of the enormous potential upside in its technology, which could revolutionize the manufacturing industry. Nano was one such investor, and in July 2024, the Company and Nano executed the Merger Agreement pursuant to which Nano agreed to purchase the Company for $183 million (subject to adjustment).

7.      Initially, Nano refused to consummate the Merger, which forced the Company to sue for specific performance. The Company prevailed in its suit, and Nano was forced to close the Merger in April 2025. The lawsuit and the uncertainty over whether the Merger would close, however, left the Company with over $40 million in asserted and unpaid legal and professional fees and significant liquidity issues. In addition, the Merger ultimately affected an event of default under the Convertible Senior Notes Indenture. As of the date hereof, the Company has not made the required payments to the Convertible Senior Noteholders.

8.      Shortly after the close of the Merger, the Company appointed independent members to its Board and retained FTI and Piper to analyze the Company's cash flows and to evaluate potential strategic and financing alternatives, among other things. The Company also appointed me as CRO and Chas Harvick as CTO.

---

[3]      All capitalized terms used but not defined in this Summary have the meanings given to them below.

9.    The Independent Directors, FTI, and Piper faced a Herculean task. The Company, because of the nature of its business, has never been profitable, and, in the years prior to the Merger, the Company explored, but failed to close, a potential business combination. The Company's troubled merger into Nano further exacerbated the Company's cash flow issues. Following the closing of the Merger in April 2025, the Company still faced financial difficulties and liquidity concerns. After initially advancing certain operational funds and funding the Nano Secured Note of $12 million, Nano determined in June 2025 that it would no longer support the Company's operations. Because the Nano Lender would not provide additional financing, the Company approached the Company's prepetition unsecured senior noteholders who agreed to supplement the Company's liquidity through the First Lien AHG Note. Even with this support, the Company's runway was limited – the proceeds from the First Lien AHG Note and Nano Secured Note were consumed by the Company's negative cash flow from operations.

10.    Concurrently with its efforts to obtain financing from its prepetition lenders, the Company, with the assistance of Piper, was also actively pursuing financing from third-party capital providers and a potential sale of the Company. Notwithstanding the Company's challenges, the Company succeeded in obtaining interest from a number of parties. However, this interest only extended to certain business lines or required timetables which extended beyond the Company's liquidity horizon without the necessary bridge financing, among other issues, and would have forced the Company to cease operations and immediately terminate approximately 780 employees.

11.    Ultimately, the Company found a potential buyer who was willing to acquire the Company's assets and finance the bankruptcy process on the timetable necessitated by the Company's liquidity constraints. However, that potential buyer withdrew its proposal after further assessing the DIP financing requirements and determining that they were not feasible on July 24,

2025. The Company was left facing an imminent liquidity cliff, the inability to pay employees, and potential insolvency proceedings of its foreign subsidiaries.

12.     To address these immediate needs, the Company, with the assistance of its professionals, re-engaged with Anzu Special Acquisition Corp II (the "Buyer") – a party that had previously expressed interest in buying a substantial portion of the Company's assets. The Buyer has agreed to purchase the Company's German, Italian, and Japanese subsidiaries, including certain related U.S. assets, in a private sale for total consideration of $10 million (the "Private Sale Transaction"). If approved, the Debtors intend to request use of the proceeds from the sale to finance these cases and provide the cash needed to sell the balance of the Company's assets – which were fully marketed prepetition – in a public auction to be held as soon as next week. The Company does not have sufficient liquidity to fund a longer process.

13.     The Debtors urgently seek approval of the Private Sale Transaction at the first day hearing in these cases because the Debtors' foreign subsidiaries are at risk of commencing foreign insolvency proceedings, which then likely would yield no value for these estates. The Debtors also have no other funding sources available aside from closing the Private Sale Transaction and accessing the proceeds therefrom, subject to this Court's approval, for the benefit of these estates in order to pursue a comprehensive sale process with respect to the remainder of the Debtors' assets. Without Court approval of the Private Sale Transaction on or before July 29, 2025, the Debtors have been informed by the director of their non-Debtor German subsidiaries that such entities will commence German insolvency proceedings. The Debtors expect that their other foreign subsidiaries are likely to file their own insolvency proceedings thereafter, eliminating the $10 million in value for such foreign non-Debtor subsidiaries for the Debtors' estates generated by the Private Sale Transaction.

14.     The Company recognizes the extraordinary nature of these cases, but it is simply out of alternatives and liquidity. **Absent the Private Sale Transaction and the sale of the balance of its assets at auction in short order, the Company will need immediately to convert these cases to Chapter 7 and commence liquidation.**

## II.     THE COMPANY'S BUSINESSES

15.     The Company is a pioneer in the additive manufacturing business. Additive manufacturing (more commonly known as 3D printing) is a relatively new technology, with a range of applications across a variety of industries. The Company offers additive manufacturing solutions to its customers in the form of hardware, software, materials, and services. It serves customers in industries including automotive, healthcare and dental, consumer products, heavy industry, aerospace, machine design, and research and development, and provides services across the product life cycle, from product development to mass production and aftermarket operations.

16.     The Company's headquarters is in Burlington, Massachusetts, and its operations are conducted through its subsidiaries, which have significant operations throughout the United States, including in Texas, Oklahoma, Michigan, Missouri, Illinois, New Jersey, and Pennsylvania, and in five foreign jurisdictions, including Canada, Germany, Italy, Taiwan, and Japan.

### A.     The Company's History and Operations

17.     Desktop was formed in 2020 through the de-SPAC merger of the pre-combination Desktop Metal Operating, Inc. ("Legacy Desktop Metal") and Trine Acquisition Corp. ("Trine"). Trine was a special purpose acquisition company incorporated in Delaware in September 2018, and Legacy Desktop Metal was incorporated in Delaware in 2015. The Company rapidly expanded in late 2020 and 2021, acquiring the FIGUR, EnvisionTEC, Adaptive 3D, Dental Arts Lab, A.I.D.R.O. Srl, Brewer Dental Lab, May Dental Lab, ExOne, and Meta Additive businesses between December 2020 and the end of November 2021.

18.     The Company provides its customers with products and services related to additive manufacturing. These products and services fall into silos comprising: manufacturing – including metal additive manufacturing systems, photopolymer additive manufacturing systems, digital casting additive manufacturing systems, and biofabrication additive manufacturing systems; consumable materials; software; and dental products. In addition to manufacturing, the Company focuses heavily on research and development and markets its products and services through its in-house sales and marketing departments.

19.     The Company's manufacturing systems use additive manufacturing technology to print products made of materials like metal, resin, sand, and photopolymer (a polymer that changes its properties when exposed to light), among others, for use across a variety of industries. Its biofabrication additive manufacturing systems process biocompatible and photopolymer materials for potential computer-aided tissue engineering applications, like bone and cartilage regeneration, soft tissue fabrication, drug release, and organ printing.

20.     In addition to its manufacturing business, the Company also sells consumable materials to be used with its additive manufacturing systems, including proprietary resins, steel, titanium, copper, ceramics, sands, binders, and biocompatible materials. Sales of these consumable materials provide the Company with recurring revenue streams from its additive manufacturing customers. The Company also provides software products for use as part of its additive manufacturing processes.

21.     The Company's Desktop Metal, ExOne, A.I.D.R.O., and FIGUR businesses are engaged, both domestically and internationally, in metal manufacturing, including metal and fiber 3D printing. The ExOne business also provides digital (sand) casting products and services. The EnvisionTEC, Dental Arts Lab, Brewer Dental Lab, and May Dental Lab businesses provide

products and services within the healthcare industry. EnvisionTEC, along with the Adaptive 3D business, is also engaged in industrial polymer manufacturing.

**B.      The Company's Merger with Nano**

22.      As discussed in greater detail below, on July 2, 2024, Desktop entered into a merger agreement (the "Merger Agreement") between Desktop, Nano Dimension Ltd. ("Nano"), an Israeli company, and Nano US I, Inc. ("Merger Sub"), a U.S. subsidiary of Nano, pursuant to which (i) Merger Sub was to be merged with and into Desktop with Desktop continuing as the surviving entity and (ii) each share of outstanding Desktop common stock was to be converted into the right to receive a fixed per-share merger consideration, subject to certain adjustments. The closing of the Merger Agreement was subject to certain conditions, including receipt of certain regulatory approvals.

23.      After the Merger Agreement was executed, Nano failed to comply with its obligation to satisfy certain conditions to closing and refused to close the merger transaction (the "Merger"). The Company filed suit against Nano in the Delaware Court of Chancery in December 2024, seeking specific performance of Nano's closing obligations. In March 2025, after a lengthy trial, the Delaware Court of Chancery awarded specific performance and ordered Nano to close the Merger. Ultimately, the Company's attorneys at Quinn Emanuel Urquhart & Sullivan LLP ("Quinn") asserted a claim for approximately $29.2 million in unpaid legal fees incurred in connection with this lawsuit. Latham & Watkins, LLP ("Latham") and Stifel Financial Corp. ("Stifel") also asserted claims for outstanding professional fees in the approximate amount of $8.6 million and $2.8 million, respectively.

24.      As directed by the Delaware Court of Chancery, on April 2, 2025, the Merger closed and (i) Nano paid to the exchange agent under the Merger Agreement the per-share merger consideration of $5.295, or approximately $179.3 million in total, and (ii) Desktop merged with

and into Merger Sub, with Desktop emerging as the surviving entity. Desktop and its subsidiaries thus each became indirect, wholly owned subsidiaries of Nano.

### C.      The Company's Prepetition Management

25.      Immediately post-Merger, Desktop's board of directors (the "Board") consisted of Ofir Baharav and Julien Lederman, two officers of Nano. On April 10, 2025, the Board appointed Robert Warshauer as an independent director to serve as a member of the Board and formed a special committee of the Board (the "Special Committee"), with Mr. Warshauer as the sole initial member, to, among other things, evaluate and negotiate potential strategic transactions involving the Company.

26.      On May 5, 2025, the Board appointed Paul Aronzon (together with Mr. Warshauer, the "Independent Directors") as a second independent director to serve as a member of the Board and of the Special Committee. On May 14, 2025, Ofir Baharav and Julien Lederman tendered their resignations from the Board, such that thereafter the Board was composed solely of the Independent Directors, and, as a result, the Special Committee was disbanded.[4]

27.      The Company retained FTI as financial advisor in mid-April 2025, and, on May 7, 2025, I was appointed the Company's CRO and my colleague at FTI, Chas E. Harvick, was appointed the Company's Chief Transformation Officer ("CTO"). Mr. Harvick and I report directly to the Board.

---

[4]      Mr. Warshauer and Mr. Aronzon are also the sole members of the board of directors of the following Debtors in addition to Desktop: Desktop Metal Operating, Inc.; The Syzygy Memory Plastics Corp.; Desktop Metal Securities Corporation; Beacon Bio, Inc.; Desktop Labs, Inc.; Dental Arts Laboratories, Inc.; and Larry Brewer Dental Lab, Inc.

### D.      The Company's Organizational Structure

28.      The Company's organizational structure consists of twenty-four entities. As a result of the Merger, Nano is the ultimate parent and owner of the Company.[5] Sixteen of the Company entities are Debtors in these Chapter 11 Cases, which include the borrower and each United States-based entity that is a guarantor under the Debtors' secured funded debt (as discussed below). **The Company entities incorporated outside of the United States are not Debtors**. The non-Debtors are Desktop's foreign subsidiaries (the "<u>Foreign Non-Debtors</u>"). None of the Foreign Non-Debtors are guarantors or borrowers under the Debtors' funded debt. A simplified legal structure chart of the Company, with the Debtor entities highlighted in yellow, is attached as **<u>Exhibit A</u>**.

## III.    PREPETITION CAPITAL STRUCTURE[6]

29.      As of the Petition Date, the Debtors' funded debt liabilities total approximately $138 million in principal amount outstanding. The Debtors' significant funded debt obligations include:

---

[5]    Desktop's ultimate parent company, Nano, as well as Nano Dimension USA, Inc. ("<u>Nano USA</u>"), the owner of 100% of the equity interests of Desktop and a wholly owned subsidiary of Nano, are not guarantors or borrowers on any of the Company's funded debt.

[6]    The following description of the Debtors' prepetition capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements, including, but not limited to, the Nano Secured Note, the Convertible Senior Notes Documents, the First Lien AHG Secured Note, and the Third Lien AHG Secured Roll-Up Note.

| Facility | Maturity | Total Approx. Principal Amount Outstanding |
|---|---|---|
| First Lien AHG Secured Note | June 12, 2025 | $10,000,000 |
| Third Lien AHG Secured Roll-Up Note | June 12, 2025 | $31,035,163 |
| Nano Secured Note | April 14, 2026 | $12,000,000 |
| Convertible Senior Notes | May 15, 2027 | $85,000,000 |
| *Total Debt* | | $138,035,163 |

### A.  Nano Secured Note

30.     In early April 2025, shortly after the closing of the Merger, the Board recognized that the Company had substantial near-term liquidity needs, including requirements to fund payroll and other critical payments in or around mid-April. As noted above, the Special Committee was formed on April 10, 2025. Given the timing of the financing needs, the Special Committee determined that the need for financing was immediate, and that Nano – as the new owner of the Company, and having just spent nearly $180 million to close the Merger – was the most likely if not the only practical source of funding on the required timeline.

31.     Nano agreed to provide emergency funding of up to $12 million so long as such loan was secured and guaranteed by substantially all of the Company's assets. Accordingly, the Special Committee directed the Company's counsel, Vinson & Elkins LLP ("V&E") to negotiate the documentation for that certain Secured Promissory Note by and among Desktop, as borrower, and Nano USA, a subsidiary of Nano, as lender (the "Nano Lender") (as amended, supplemented or otherwise modified prior to the Petition Date, the "Nano Secured Note"), pursuant to which the Nano Lender agreed to extend up to $12 million in delayed draw term loans with a maturity of one year.

32.     The Company, at the direction of the Special Committee, and through V&E, negotiated with counsel to the Nano Lender and obtained certain important terms, including a lower interest rate (ultimately 8.0% per annum), an option for the Company to elect payment-in-kind ("PIK") interest payments instead of cash interest, and relief in the timing of putting in place certain security and guaranties at the subsidiaries. The Special Committee was extensively involved in the evaluation and negotiation of this emergency financing. The Company entered into the Nano Secured Note on April 14, 2025, and the Nano Lender provided initial funding in the amount of $5 million to the Company concurrently therewith.

33.     On April 24, 2025,[7] the Special Committee determined that the Company required additional liquidity and a made request to the Nano Lender for the additional $7 million of discretionary availability under the Nano Secured Note. The Nano Lender agreed and provided the additional $7 million in funding to the Company on April 29, 2025.

34.     The Nano Secured Note provides for a term loan in the aggregate principal amount of $12 million. Interest under the Nano Secured Note accrues daily at a rate of 8.0% per annum, which interest is payable at the borrower's election as PIK interest. As required by the Nano Secured Note, Desktop and all of its domestic subsidiaries executed that certain Guaranty and Security Agreement dated as of April 30, 2025, by and among Desktop, its domestic subsidiaries, and the Nano Lender (the "Nano GSA"). Pursuant to the Nano GSA, to the Nano Secured Note itself, and that certain Letter Agreement, dated as of June 5, 2025 (the "Intercreditor Letter Agreement"), made by and among the Nano Lender, the AHG Lenders, and Wilmington Savings Fund Society, FSB ("WSFS"), executed in connection with the AHG Financing Transaction each,

---

[7]     By this date, the Company had retained FTI to serve as its financial advisor and Piper (as defined below) to serve as its investment banker.

as defined below), the Nano Secured Note is secured by second priority liens and security interests in substantially all of the Debtors' assets.

35.      As of the Petition Date, the Debtors' aggregate principal outstanding funded debt obligations under the Nano Secured Note total $12 million, and an Event of Default exists under the Nano Secured Note.

**B.      Convertible Senior Notes**

36.      Pursuant to that certain indenture (the "Convertible Senior Notes Indenture") for the 6.0% convertible senior notes due 2027 (the "Convertible Senior Notes"), dated as of May 13, 2022, as supplemented by that certain supplemental indenture, dated as of April 2, 2025 (the "Supplemental Indenture") (the Convertible Senior Notes Indenture, the Convertible Senior Notes, and the Supplemental Indenture, collectively with any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time prior to the Petition Date, the "Convertible Senior Notes Documents") by and among Desktop and U.S. Bank Trust Company, National Association, as trustee (the "Convertible Senior Notes Trustee") for the benefit of the holders of the Convertible Senior Notes (the "Convertible Senior Noteholders"), Desktop issued the Convertible Senior Notes to the Convertible Senior Noteholders under the Convertible Senior Notes Documents in the aggregate principal amount of $115 million. The only obligor on the Convertible Senior Notes is Desktop, but not any other Company entity. Interest on the Convertible Senior Notes is 6.0% per annum, accruing and paid in arrears semi-annually. The maturity date of the Convertible Senior Notes is May 15, 2027.

37.      The closing of the Merger pursuant to the Merger Agreement constituted a "Fundamental Change," a "Business Combination Event," a "Common Stock Change Event," and a "Make-Whole Fundamental Change" under and as defined in the Convertible Senior Notes

Indenture, upon which Desktop was required to both (1) provide the Convertible Senior Noteholders with the option to convert their Convertible Senior Notes into the right to receive a cash payment equal to the product of the per-share merger consideration in the Merger Agreement and the conversion ratio then in effect pursuant to the Supplemental Indenture, and (2) make an offer to purchase the entire outstanding issue of the Convertible Senior Notes at a price equal to par plus accrued interest. Pursuant to the Convertible Senior Notes Indenture, on April 2, 2025, Desktop provided the Convertible Senior Notes Trustee with a notice for delivery to the Convertible Senior Noteholders informing them of the "Business Combination Event," "Common Stock Change Event" and "Make-Whole Fundamental Change" that occurred as a result of the Merger, Desktop's entry into the Supplemental Indenture, and the Convertible Senior Noteholders' right to convert their Convertible Senior Notes for a payment of approximately $318.50 per $1,000 principal amount of Convertible Senior Notes (the "Conversion Right Notice").

38.     On April 22, 2025, as required by the Convertible Senior Notes Indenture, Desktop provided the Convertible Senior Notes Trustee with a notice for delivery to the Convertible Senior Noteholders of the "Fundamental Change" that occurred as a result of the Merger (the "Fundamental Change Notice") and the related offer to purchase the Convertible Senior Notes at par plus accrued interest and the procedures to accept such offer. The Fundamental Change Notice also stated that Desktop's ability to repurchase any Convertible Senior Notes that were tendered was uncertain due to the Company's liquidity constraints. The Conversion Right Notice and the Fundamental Change Notice stated June 10, 2025 as the deadline for the Convertible Senior Noteholders to request either conversion (at the rate of $318.5 per $1,000 principal amount) or repurchase at par plus accrued of the Convertible Senior Notes. In addition, the semi-annual interest payment on the Convertible Senior Notes became due on May 15, 2025 but was not paid.

The grace period for the missed interest payment ended on June 14, 2025, at which point the missed payment became an Event of Default under the Convertible Senior Notes Indenture.

39.    As of the Petition Date, the aggregate principal amount outstanding under the Convertible Senior Notes totals approximately $85 million plus unpaid interest.

**C.    First Lien AHG Secured Note**

40.    In early May 2025, certain of the Convertible Senior Noteholders formed an ad hoc group (the "Ad Hoc Noteholder Group" or the "AHG"). Around the same time, the Board, recognizing that the proceeds of the Nano Secured Note would not be sufficient, in combination with the Company's operational cash flows and other available sources of liquidity, to meet the Company's near-term liquidity needs, directed the Company's professionals to engage in discussions with various parties, including Nano and the Ad Hoc Noteholder Group, to identify potential sources of additional new-money investment. As set forth more fully in the Gilligan Declaration, the Company's professionals engaged in discussions with the Ad Hoc Noteholder Group, Nano, and various third parties around potential bridge and/or DIP financing.

41.    These discussions ultimately resulted in a comprehensive transaction between the Company and certain members of the Ad Hoc Noteholder Group (such transaction, the "AHG Financing Transaction"), which involved entry into that certain First Lien Secured Promissory Note dated June 5, 2025 (as amended, supplemented or otherwise modified prior to the Petition Date, the "First Lien AHG Secured Note"), by and among Desktop, as borrower, and certain members of the Ad Hoc Noteholder Group, as lenders (the "AHG Lenders"), pursuant to which the AHG Lenders agreed to provide a term loan in the aggregate principal amount of $10 million. On June 5, 2025, the AHG Lenders provided the $10 million in new-money financing to the Company.

42.     The First Lien AHG Secured Note provides for a term loan in the aggregate principal amount of $10 million. Interest under the First Lien AHG Secured Note accrues daily at a rate of SOFR plus 10.0% per annum, which interest is payable at the borrower's election as PIK interest. As required by the First Lien AHG Secured Note, Desktop and all of its domestic subsidiaries executed that certain First Lien Guaranty and Security Agreement dated as of June 5, 2025 (the "First Lien GSA"), by and among Desktop, its domestic subsidiaries, and WSFS, as administrative and collateral agent for the AHG Lenders. Pursuant to the First Lien GSA the First Lien AHG Secured Note, and the Intercreditor Letter Agreement, the First Lien AHG Secured Note is secured by first priority liens and security interests in substantially all of the Debtors' assets.

43.     In addition, the First Lien AHG Secured Note matured on June 12, 2025, upon which the Debtors' failure to pay became an Event of Default under the First Lien AHG Secured Note.

44.     As of the Petition Date, the Debtors' aggregate principal outstanding funded debt obligations under the First Lien AHG Secured Note total $10 million.

**D.      Third Lien AHG Secured Roll-Up Note**

45.     As the second part of the AHG Financing Transaction, the AHG Lenders required and Desktop agreed to roll up $30 million in aggregate principal amount of the Convertible Senior Notes held by the AHG Lenders, plus $1,035,163 in accrued interest, into that certain Third Lien Secured Promissory Note dated June 5, 2025 (as amended, supplemented or otherwise modified prior to the Petition Date, the "Third Lien AHG Secured Roll-Up Note"), made by Desktop in favor of the AHG Lenders.

46.     Interest under the Third Lien AHG Secured Roll-Up Note accrues daily at a rate of SOFR plus 10.0% per annum, which interest is payable at the borrower's election as PIK interest.

As required by the Third Lien AHG Secured Roll-Up Note, Desktop and all of its domestic subsidiaries executed that certain Third Lien Guaranty and Security Agreement dated as of June 5, 2025 (the "Third Lien GSA"), by and among Desktop, its domestic subsidiaries, and WSFS as administrative and collateral agent for the AHG Lenders. Pursuant to the Third Lien GSA and to the Third Lien AHG Secured Roll-Up Note itself, the Third Lien AHG Secured Roll-Up Note is secured by third priority liens and security interests in substantially all of the Debtors' assets. In addition, the Third Lien AHG Secured Roll-Up Note matured on June 12, 2025, upon which the Debtors' failure to pay the amounts due became an Event of Default.

47.     As of the Petition Date, the Debtors' aggregate principal outstanding funded debt obligations under the Third Lien AHG Secured Roll-Up Note total approximately $31 million.

### E.     Trade Claims and Other Unsecured Claims

48.     The Debtors' operations involve a complex supply chain of equipment, materials, and services, all of which require regular maintenance, repair, replacement, and/or replenishment. As such, the Debtors rely on numerous trade vendors who provide these essential goods and services to operate their businesses.

49.     The Company is also subject to certain significant unsecured claims alleged by professionals who provided services to Desktop and not in connection with the Chapter 11 Cases. In particular, and as discussed above, Quinn is seeking approximately $29.2 million in legal fees allegedly incurred representing Desktop in its litigation to compel Nano to comply with its obligations under the Merger Agreement. Latham has asserted a claim against Desktop for outstanding professional fees in the approximate amount of $8.6 million, and Stifel has asserted a claim for outstanding professional fees in the approximate amount of $2.8 million.

50.     As of the Petition Date, approximately $40.0 million in unsecured claims on account of trade and other obligations exist against the Debtors, exclusive of the amounts

associated with the Convertible Senior Notes or the amounts asserted by Quinn, Latham, and Stifel described above.

## IV.    EVENTS LEADING TO THE CHAPTER 11 CASES

### A.    Challenges Facing the Company

51.    I understand that the Company has historically struggled to achieve profitability in a highly competitive industry. Despite its expansion and efforts to acquire a portfolio of subsidiaries with valuable assets and operations in the additive manufacturing space, Desktop and its subsidiaries struggled to effectively integrate their operations, and, up to and including the Petition Date, the Company has remained largely a "roll-up" business comprised of multiple subsidiaries operating mostly independently. In addition to its internal challenges, I understand that the Company faced challenging macroeconomic conditions, including supply chain disruptions and delays as a result of the COVID-19 pandemic, rising interest rates and inflation, and reduced access to capital due to volatility in the global capital markets. These financial challenges resulted in the Company regularly experiencing high "cash burn," as its costs of business well exceeded revenues brought in by the Company's various operations.

52.    In June 2022, I understand that the Company launched an initiative intended to address these issues by better integrating its newly acquired subsidiaries and minimizing its costs via various cost-saving measures, including a global workforce reduction, facilities consolidation, and other operational savings measures. The Company overhauled its purchase order and collections processes and increased its focus on cash management while continuing to consolidate its operations and trim its workforce. While I understand that these efforts significantly reduced the Company's deficit, it continued to operate with negative cash flows. I understand that by the end of 2022, Desktop's senior management had begun to consider a sale of the Company in the

hope that the business could become profitable through a consolidation with a more profitable buyer.

**B.      Nano Merger and Subsequent Litigation**

53.      Nano initially approached Desktop about acquiring its business in 2022, but negotiations stalled. Nano resumed the merger discussions in late September 2023, and this time the negotiations resulted in an agreement for Nano to purchase Desktop for total consideration of approximately $183 million, subject to certain adjustments. As noted above, the parties executed the Merger Agreement on July 2, 2024, and closing of the Merger was conditioned on receipt of certain regulatory approvals and other closing conditions. This included approval from the Committee on Foreign Investment in the United States ("CFIUS"), which was necessary because Nano is a foreign business entity. The Merger Agreement contained certain interim covenants (the "Closing Covenants") which further conditioned the closing on Desktop having performed or complied in all material respects with the Closing Covenants until closing.

54.      These Closing Covenants, coupled with the Company's historic cash burn rate and other challenges, put the Company in an increasingly difficult position as it waited for CFIUS approval to be granted and the Merger to close. Increasing the Company's difficulties, Nano refused to honor its obligations under the Merger Agreement or close the Merger. On December 16, 2024, the Company filed suit against Nano in the Delaware Court of Chancery seeking specific performance of Nano's closing obligations, including its "hell or high water" obligation to obtain CFIUS approval. Nano asserted that it was in compliance with its obligations under the Merger Agreement and that certain conditions to closing in the Merger Agreement had not been satisfied. After an expedited trial, on March 24, 2025, the Delaware Court of Chancery awarded the Company specific performance of the Merger Agreement and ordered Nano to close the Merger.

55.     As ordered by the Delaware Court of Chancery, the parties closed the Merger on April 2, 2025, and Desktop became an indirect wholly owned subsidiary of Nano. As a result of the Merger, holders of Desktop's shares received the per-share cash consideration of $5.295.

56.     The Merger ultimately did not alleviate Desktop's difficult financial position. Desktop had incurred significant professional fees, including the approximately $30 million allegedly owed to Quinn for enforcing the Merger Agreement, and such fees were not paid in connection with the closing of the Merger.[8] Additionally, following Nano Merger, CEO, CFO and former General counsel all resigned their positions.

57.     As noted, the closing of the Merger also triggered the 'Fundamental Change' provision of the Convertible Senior Notes Indenture, which triggered Desktop's obligation to make an offer to repurchase the entire outstanding issue of the Convertible Senior Notes at a price equal to par plus accrued interest.

### C.     Liquidity Constraints and Near-Term Financial Obligations

58.     Prior to the Petition Date, the Company primarily depended on cash flow from operations and the proceeds of funded indebtedness as its sources of cash and liquidity. As previously stated, the Company historically operated in a cash-negative position and continued to do so substantially even after the implementation of the liquidity preserving measures. As of the Petition Date, the Company's cash flows from operations totaled approximately negative $4 million per month.

59.     These operational and liquidity challenges – in addition to the outstanding Convertible Senior Notes repurchase obligation, missed interest payment under the Convertible

---

[8]     On July 21, 2025, Quinn obtained an Order of attachment solely with respect to Debtor Desktop Metal, Inc. ("DMI"), which, *inter alia*, expressly excluded any assets owned by any subsidiary of DMI and any cash, bank accounts, or receivables of DMI.

Senior Notes Indenture, defaults under the Nano Secured Note, the First Lien AHG Secured Note, and Third Lien AHG Secured Roll-Up Note – have left the Debtors in a position where, absent meaningful new money investment, it is highly unlikely that they will have sufficient liquidity to sustain operations while also meeting their funded debt and other outstanding obligations.

**D.**    **Prepetition Liquidity Preservation Strategies and Hiring Advisors**

60.    The challenging conditions described above adversely impacted the Company's liquidity position in the months leading up to the Petition Date. While the Company was heavily focused in 2024 on closing the Merger with Nano, it continued its ongoing efforts to maintain liquidity levels sufficient to meet the Company's debt and other financial commitments and address its near-term financial obligations, including by continuing its efforts to (i) minimize capital expenditures, (ii) aggressively manage working capital, and (iii) reduce recurring operating expenses.

61.    Despite these efforts, the Company's financial situation following the April 2, 2025 closing of the Merger remained challenged. The Company quickly decided to engage advisors to explore potential deleveraging options and/or transactions. In early April 2025, the Company initially retained V&E as restructuring counsel and appointed the Special Committee. In mid-April 2025, the Company retained Piper, Sandler & Co. ("Piper") as investment banker to explore strategic alternatives and solutions for the Company's balance sheet and liquidity challenges, and to consider other potential liability management transactions. At approximately the same time, the Company also engaged FTI, as financial advisor, to work with the Company on forecasting cash flow, analyzing and preserving liquidity and implementing contingency planning for a potential in-court process in the event the Company was unsuccessful in consummating a comprehensive

out-of-court solution. In July 2025, the Company retained Pachulski Stang Ziehl & Jones LLP ("PSZJ") as restructuring counsel.[9]

62.     As discussed above, the Special Committee, with the assistance of the Company's professionals, immediately began exploring ways to fix the Company's liquidity issues. The Company actively began negotiating with its largest creditor and to manage its liquidity. The Company, the Board, and Company management also began assessing the Company's options to raise short- or long-term financing and to sell the Company – either as a whole or in parts – as a going concern either in or out of court.

63.     As noted above, the Company's options with respect to financing were limited. Yet, within weeks of its appointment, the Special Committee, together with its Advisors, completed negotiation of the terms of the Nano Secured Note on April 14, 2025.

64.     In mid-May 2025, the Board had also began investigating the Company's potential claims. To facilitate that investigation, the Board retained Weil, Gotshal & Manges LLP ("Weil") as special counsel to investigate and assess potential claims arising out of (i) the governance and management of the Debtors and transactions between or among the Debtors, their affiliates, and/or any related parties, including requesting and reviewing documents from the Debtors and their advisors, interviewing witnesses and seeking cooperation of third parties and (ii) Nano's conduct in connection with the Merger.[10]

65.     The Board, with the assistance of the Company's professionals, also continued to assess the Company's liquidity needs, and determined, by late May, that additional financing was

---

[9]     The scope of V&E's work for the Company was modified to special corporate counsel in July 2025 in connection with PSZJ's retention.

[10]    Weil's investigation has been commenced but paused in light of the Company's ongoing liquidity challenges.

necessary. As a result, the Company obtained $10 million in connection with the AHG Financing Transaction in early June 2025.

66.     Shortly after closing the AHG Financing Transaction, the Board instructed the Company's professionals to focus their efforts on (a) advancing a marketing process for the sale of all or a portion of the Company's assets, and (b) obtaining DIP or bridge financing sufficient to support the continuation of such sale process either in-court or out-of-court.

67.     As more fully described in the Gilligan Declaration, the Board, with the assistance of Piper, engaged with Nano, the Ad Hoc Noteholder Group, and numerous potential third party capital providers, including both traditional and non-traditional capital providers, to solicit financing proposals, starting on April 28, 2025. The Board, with Piper's assistance, also began formally marketing for sale all or a portion of the Company's equity interests and assets. Piper identified numerous potential financial and strategic buyers and promptly began engaging with such parties. As a result of Piper's efforts, the Company received multiple, non-binding indications of interest. At the direction of the Board, Piper continued to engage with potential buyers, and four potential bidders progressed to assessing a potential stalking horse bid.  However, because of the Company's inability to procure appropriate financing, none of these parties were able to reach agreement regarding a stalking horse bid.

68.     On July 9, 2025, Piper was notified by a party under an NDA that another party was interested in being a potential bidder for some or all of the Company's assets and businesses. Around this time, Piper approached the third-party lender who had previously provided a non-binding term sheet to see if it would provide DIP financing based on the terms of the proposed acquisition. The advisors to the Ad Hoc Noteholder Group were also approached with this request. This third party and the Ad Hoc Noteholder Group each declined to provide DIP financing. With

that, the third-party buyer indicated that it would be willing to fund a DIP facility in connection with its acquisition of the Company's assets. The proposed buyer, however, withdrew its proposal on July 24, 2025 after assessing the DIP financing requirements and determining that they were not economically feasible.

69.     On that same date and following this withdrawal, faced with an imminent liquidity crisis and the liquidation of its German subsidiaries under German insolvency law, the Company, with the assistance of its advisors, re-engaged with Anzu Special Acquisition Corp II (i.e., the Buyer). After intense negotiation, the Buyer agreed to enter into that *Share and Asset Purchase Agreement*, dated as of July 27, 2025 (together with all other agreements, documents, and instruments deliverable thereunder, attached thereto, or referenced therein, and as may be amended, modified, or supplemented, the "APA"), pursuant to which the Buyer agreed to purchase certain of the Company's foreign subsidiaries and related U.S. assets in a private sale for $10 million, plus the dollar equivalent of any excess cash held in the Debtors' foreign subsidiaries, but which is expected to yield $0. The execution of the APA prevented the commencement of insolvency proceedings of the Company's German subsidiaries and the loss of significant value to the Debtors' estates. However, if the Private Sale Motion is not approved by July 29, 2025, the German subsidiaries may nonetheless proceed with the commencement of insolvency proceedings.

70.     The closing of the Private Sale Transaction is expected to occur in two tranches: (a) an initial sale closing of certain assets by no later than July 30, 2025, for $4 million in cash payable by Buyer to the Debtors' estates and then (b) a subsequent sale closing of certain additional assets by no later than August 11, 2025, for $6 million in cash payable by Buyer to the Debtors' estates. The Buyer has also agreed to take the risk that foreign regulatory approval will not be obtained.

71.     All or part of the consideration from the Private Sale Transaction will be used to fund the Company's cases – subject to this Court's approval – and to provide the cash needed to sell the balance of the Company's assets, which were fully marketed prior to the Petition Date as set forth above. Assuming that the Private Sale Transaction is approved, the Company will seek approval of the sale of the Company's remaining assets pursuant to bid procedures that will be filed.

72.     As set forth above, the Company, with Piper's assistance, engaged in extensive prepetition marketing of the Company and its assets. Only the Buyer has stepped up with a proposal that will add significant value to the Debtors' estate and provide the funds necessary to fund the sale of the Company's remaining assets and avoid the loss of value associated with the Debtors' non-Debtor foreign subsidiaries filing insolvency proceedings.

73.     The Debtors are thus urgently seeking approval of the Private Sale Transaction at the first day hearing in these cases because the Debtors have no other funding sources aside from closing the Private Sale Transaction and accessing the proceeds therefrom, subject to this Court's approval, for the benefit of these estates in order to pursue a comprehensive sale process with respect to the remainder of the Debtors' assets. Moreover, without Court approval of the Private Sale Transaction on or before July 29, 2025, the Debtors expect that their foreign subsidiaries will commence insolvency proceedings of their own, eliminating the $10 million in value that would be generated for the Debtors' estates from the Private Sale Transaction.

74.     After evaluating all options, the Company and its Board believe that the Private Sale Transaction is the highest and best offer available to the Company for the assets covered by the APA, in the best interests of the Debtors and their estates, and a reasonable exercise of the Debtors' business judgment.

75.     Accordingly, for the reasons set forth herein , the Court should grant the relief requested in the Private Sale Motion.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 28, 2025

*/s/ Andrew Hinkelman*
Andrew Hinkelman
Chief Restructuring Officer of the Debtors

**EXHIBIT A**

**Organizational Chart of the Company**

