IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| DESKTOP METAL, INC., *et al.*, | Case No. 25-90268 (CML) |
| Debtors.[1] | (Joint Administration Requested) |

**DECLARATION OF DANIEL GILLIGAN IN SUPPORT OF PRIVATE SALE MOTION**

I, Daniel Gilligan, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am an Executive Director in the Restructuring Group of Piper Sandler & Co. ("Piper"). I am authorized on behalf of Piper to submit this declaration (the "Declaration").[2] I submit this Declaration in support of the Private Sale Motion.

2. Piper is the proposed investment banker for the debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases. Piper is a leading global investment bank with over 125 years of experience in financial advisory and capital markets services. With more than 60 offices around the world, Piper's corporate advisory practice is focused on providing clients, across a wide range of industries, with advice related to mergers and acquisitions, financial restructurings and raising capital. Piper's financial restructuring practice

---

[1] The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are: Adaptive3D LLC (3990); Adaptive 3D Technologies, LLC (5893); Beacon Bio, Inc. (9005); Brewer Tafla Dental Technologies, LLC (6452); Dental Arts Laboratories, Inc. (8905); Desktop Labs, Inc. (5344); Desktop Metal Operating, Inc. (7659); Desktop Metal Securities Corporation (9007); Desktop Metal, Inc. (4042); EnvisionTEC US LLC (2483); ExOne Americas LLC (3443); ExOne Operating, LLC (8851); Figur Machine Tools LLC (2489); Larry Brewer Dental Lab Inc. (0215); May Dental Arts, LLC (8558); and The Syzygy Memory Plastics Corp. (8063). The location of the Debtors' corporate headquarters and the Debtors' service address is: 63 Third Avenue, Burlington, MA 01803.

[2] Capitalized terms used but not defined in this Declaration shall have the meaning set forth in the *Declaration of Andrew Hinkelman in Support of Chapter 11 Petitions and Private Sale Motion* (the "Hinkelman Declaration"), filed contemporaneously herewith and incorporated herein by reference.

works with companies, creditors, investors, regulators/governmental authorities and other parties in interest in turn-around and distressed situations.

3. Piper and its professionals have extensive experience working with financially troubled companies, creditors and other stakeholders across a variety of industries in complex financial restructurings, both out-of-court and in chapter 11 cases. Piper and its professionals have been retained as investment bankers and financial advisors in numerous cases, including, among others: *In re Mondee Holdings, Inc.*, Case No. 25-10047 (JKS) (Bankr. D. Del. Jan. 14, 2025); *In re Lifesize Inc.*, Case No. 23-50038 (DRJ) (Bankr. S.D. Tex. May 16, 2023); *In re Tuesday Morning Corp.*, Case No. 23-90001 (ELM) (Bankr. N.D. Tex. Feb. 14, 2023); *In re HONX, Inc.*, Case No. 22-90035 (MI) (Bankr. S.D. Tex. May 17, 2022); *In re Cypress Environmental Partners, L.P.*, Case No. 22-90039 (MI) (Bankr. S.D. Tex. May 8, 2022); *In re GWG Holdings, Inc.*, Case No. 22-90032 (MI) (Bankr. S.D. Tex. Apr. 20, 2022); *In re GTT Communications, Inc.*, Case No. 21-11880 (MEW) (Bankr. S.D.N.Y. Oct. 31, 2021); *In re Ditech Holding Corp.*, Case No. 19-10412 (JLG) (Bankr. S.D.N.Y. Feb. 11, 2019).

4. I personally have more than twenty-five (25) years of restructuring experience and have advised companies, creditors, investors and financial sponsors on complex transactions including out-of-court and in-court restructurings, financings and sales of businesses and assets. I received a B.S. in 1988 from Boston College and an M.B.A. in 1993 from New York University. I joined Piper in 2021 as part of its acquisition of TRS Advisors LLC ("TRS"). Prior to joining TRS in early 2018, I spent the vast majority of my restructuring career as a member of the restructuring advisory group at Rothschild & Co. During my career, I have been involved in numerous significant chapter 11 cases, including Mondee Holdings, Inc., GTT Communications, Inc.; Nine West Holdings, Inc.; Pyxus International, Inc.; Remy International, Inc.; Xerium

Technologies Inc.; NanoString Technologies, Inc.; MPower Holding Corp.; RHI Entertainment Inc.; and Globe Manufacturing Corp., among others.

5. I am over the age of twenty-one (21) years, and if called upon to testify, I would testify competently to the facts and opinions set forth in this Declaration. All statements in this Declaration are based upon: (a) my personal knowledge, belief, or opinion, (b) information learned from my review of the Company's records maintained in the ordinary course of its business, (c) information supplied to me or verified by the management team and employees of Desktop Metal, Inc. (collectively with its Debtor and non-Debtor subsidiaries, the "Company"), the Company's third-party advisors, and/or employees of Piper working with me or under my supervision, direction, or control, and/or (d) my knowledge, skill, education, experience, and/or training concerning financial restructurings and capital-raising activities.

## PIPER'S RETENTION

6. The Company engaged Piper as investment banker in mid-April 2025 to explore strategic alternatives and solutions for the Company's balance sheet and liquidity challenges. Since that time, members of the Piper team and I have worked closely with the Debtors' management and the Debtors' other advisors(such advisors, collectively with Piper, the "Advisors") and have been integrally involved in the negotiations with the Debtors' creditors and stakeholders, as well as third parties.

7. To date, Piper has provided a variety of investment banking services, including among other things: (a) reviewing and analyzing the Company's business, operations, and financial projections; (b) advising the Company on strategies for negotiating with the holders of existing funded debt; (c) rendering financial advice to the Company and participating in meetings and negotiations with certain creditors and stakeholders; (d) advising and assisting the Company in conducting a capital raise process for bridge and/or DIP financing; (e) advising and assisting

the Company in evaluating potential financing transactions; (f) assisting the Company with and participating in due diligence and negotiations with such potential candidates; (g) soliciting interest in, and conducting a process to sell, some or all of the Company's assets and/or businesses; (h) negotiating the Private Sale Transaction; and (i) preparing for the commencement of these chapter 11 cases.

8.  As a result of our engagement in these processes, the members of the Piper team and I have become familiar with the Debtors' financial affairs, business operations, capital structure, liquidity needs, key stakeholders, financing arrangements, and related matters.

### EFFORTS TO OBTAIN FINANCING AND MARKET THE COMPANY

9.  Following Piper's retention, and as discussed in the Hinkelman Declaration, I learned that the Company's liquidity and projected cash flows would be insufficient to pay the Company's near-term funded debt obligations, sustain long-term operations, or support an in-court or out-of-court restructuring process without additional financing.

10. After the Merger with Nano closed in early April 2025, the Debtors immediately engaged with Nano regarding the Company's liquidity needs. As discussed in the Hinkelman Declaration, these discussions resulted in the Nano Secured Note, executed on April 14, 2025, pursuant to which the Nano Lender agreed to extend up to $12 million in delayed draw term loans to the Company. However, despite the liquidity provided by the Nano Secured Note, the Company required additional funding by late May 2025 in order to continue to operate and work towards a restructuring or other strategic alternative over a reasonable timeline. Accordingly, the Advisors engaged with Nano, the Ad Hoc Noteholder Group, and potential third-party capital providers to explore potential financing transactions to provide the Company with sufficient capital to pursue, and potentially consummate a comprehensive restructuring transaction, either in-court or out-of-court.

11.     On May 9, 2025, the Company, through its counsel, submitted a request to the Nano Lender for an additional $12 million in incremental funding. On May 13, 2025, the Company met with certain members of the Ad Hoc Noteholder Group and its advisors and communicated the urgent need for additional funding. On May 15, 2025, Nano declined to provide additional financing while the Ad Hoc Noteholder Group provided the Company and the Advisors with a term sheet for a proposed financing, the terms of which, including the request for the Nano Lender to subordinate its loan position, were not attainable for the Company. Over the following two days, the Company, with the assistance of the Advisors, prepared a modified financing proposal, including potential terms for DIP financing, and, on May 17, 2025, at the direction of the Board, submitted in parallel its proposal to the Nano Lender, Ad Hoc Noteholder Group, and certain third parties that had signed NDAs. Neither the Nano Lender nor the Ad Hoc Noteholder Group accepted the proposal or provided a counterproposal at that time.

12.     Concurrently with its efforts to obtain financing from its prepetition Convertible Senior Notes, the Company, with the assistance of Piper, also actively pursued financing from third-party capital providers, starting on April 28, 2025. The process to seek financing from parties continued up through the days leading to the Petition Date. As part of this process Piper, on behalf of the Debtors, contacted approximately twenty-five potential new capital providers. The capital providers involved in this marketing process included well-known commercial banks and specialty institutions that routinely provide asset-based and cash flow-based financing, as well as certain parties that were identified as potentially having an interest in making a strategic investment in the Company. Piper identified these parties based on a number of factors, including, among other things, their ability to complete diligence in a timely manner, their experience and interest in providing distressed financing, and/or their familiarity with the Debtors' industry. As part of the

third-party financing process, Piper conducted telephonic conferences with the third-party capital providers to describe the Company's current situation and liquidity needs, including the expected financing needs, potential collateral coverage, and process timing.

13. Although approximately ten of the third parties contacted entered into customary non-disclosure agreements ("NDAs") and were granted access to due diligence materials to explore potential financing options, none submitted binding financing proposals due to a number of factors, including the Company's financial position, the difficulty in structuring a new financing within the Debtors' prepetition capital structure, and their unwillingness to fund into a potential non-consensual priming financing process or on a junior basis.[3] One party submitted a non-binding term sheet for debtor-in-possession financing which required, among other things, (i) a super-priority administrative claim and first priority lien on all of the assets of the Company and its U.S. subsidiaries and (ii) stalking horse bid(s) satisfactory to this prospective lender. At the time the non-binding financing term sheet was received, the Company did not have any stalking horse bids. Nevertheless, Piper remained in frequent contact with the financing party that had submitted the term sheet right up until just prior to the Petition Date.

14. Without actionable financing, and faced with a legitimate risk of a chapter 7 liquidation, the Advisors encouraged counsel to the Nano Lender and the Ad Hoc Noteholder Group to engage in discussions regarding the Company's potential alternatives. On May 21, 2025, extensive in-person meetings were conducted among the Company and the Advisors, the Nano Lender, the Ad Hoc Noteholder Group, and their respective advisors, to determine potential

---

[3] Substantially all of the Debtors' US-based assets are encumbered under the Nano Secured Note, the First Lien AHG Secured Note, and the Third Lien AHG Secured Roll-Up Note and, as a result, the Debtors have virtually no assets to attract potential third-party capital providers without the need for such third-parties to either (a) lend on a junior basis, (b) obtain the requisite consents to prime the AHG Lenders and Nano Lender, or (c) increase the size of the financing to paydown the existing prepetition secured debt.

resolutions and alternatives with respect to the Company's liquidity situation. Following such meeting, it became clear to the Company, the Advisors, and the Board that no additional new-money financing, including bridge and/or DIP financing, would be obtained from Nano, at least at this time.

15. Shortly thereafter, the Ad Hoc Noteholder Group submitted a proposal for a comprehensive transaction between the Company and certain members of the Ad Hoc Noteholder Group, which contemplated new-money bridge financing. The Company and the Advisors, at the direction of the Board, extensively negotiated the terms of such proposal and, on June 5, 2025, entered into the First Lien AHG Secured Note and the Third Lien AHG Secured Roll-Up Note (collectively, such transaction, the "AHG Financing Transaction"). Pursuant to the Ad Hoc Financing Transaction, the AHG Lenders agreed to provide $10 million of new-money financing under the First Lien AHG Secured Note in exchange for certain terms, including that: (i) the First Lien AHG Secured Note would be super senior in priority and prime the Nano Secured Note, and (ii) an aggregate principal amount of approximately $31 million of the unsecured Convertible Senior Notes would be rolled up into the Third Lien AHG Secured Roll-Up Note. The AHG Lenders funded the additional $10 million in new-money financing to the Company on June 5, 2025. Importantly, the Company's cash flow forecast at the time showed that more than $10 million would be needed to complete even an expedited sale process.

16. In anticipation of the closing of the AHG Financing Transaction, the Company, with the assistance of Piper, actively began pursuing a potential sale of all or substantially all of the Company's assets and businesses, formally launching a sale process on or around June 2, 2025. Well in advance of this launch date, the Advisors, working with the Company, began dedicating a significant amount of resources preparing for the sale process, including developing: (i) a deep

understanding of the Company's businesses, through multiple diligence meetings with management and review of historical financials; (ii) a financial model for each of the Company's businesses in line with management's longer-term forecast; (iii) a confidential information memorandum; (iv) a public-only e-mail teaser; (v) a potential buyer's list; (vi) a digital dataroom and (vii) a form of NDA.

17. The Company, with the assistance of Piper, initially identified approximately 110 – and eventually nearly 140 – potential financial and strategic buyers, including Nano, that Piper believed, based on its experience and discussions with the Company and in consultation with the advisors to the Ad Hoc Noteholder Group, had the requisite interest and financial wherewithal to purchase all or a portion of the Company's assets or businesses. The Ad Hoc Noteholder Group had indicated that they had no intention of participating as a potential bidder in any sale process.

18. On June 6, 2025, in anticipation of the need for additional financing to complete the sale process, the Company, through Piper, sent a request to the advisors to Nano and the Ad Hoc Noteholder Group asking for a proposal for bridge or debtor-in-possession financing by June 13, 2025. Neither Nano nor the Ad Hoc Noteholder Group submitted a financing proposal on this date or any date thereafter, though multiple subsequent requests were made directly and/or through each parties' advisors.

19. Overall, as part of the sale process, over fifty potential purchasers signed NDAs and received access to confidential information in a digital data room to conduct due diligence. Subsequently, Piper held "deep dive" conversations with several parties. Despite the compressed timeline, Piper worked with each of the interested prospective buyers to respond to their information requests, and all prospective buyers who had signed NDAs were asked to provide non-binding indications of interest ("IOIs") by June 25, 2025.

20. The Company received a non-binding proposal from Nano to acquire certain of the Company's assets and ten IOIs from third parties. Of these proposals, three potential bidders – Nano plus two other parties – progressed to assessing a potential stalking horse bid; however, none of the potential stalking horse bidders would commit to providing DIP financing. The Ad Hoc Noteholder Group also advised the Company that they would not provide DIP financing based on the status of bids, given a combination of uncertainty to closing and insufficient value to support the size of the DIP financing needed. The cash flow forecast around this time (late June 2025) showed that the Company would run out of liquidity in early July 2025. On July 2, 2025, Nano informed the Company and the Ad Hoc Noteholder Group that Nano had determined not to move forward with any bid or financing proposal as part of this ongoing process.

21. Soon thereafter, Piper was notified by a party under an NDA that another party was interested in being a potential bidder for some or all of the Company's assets and businesses. Around this time, Piper approached the third-party lender who had previously provided a non-binding term sheet to see if it would provide DIP financing based on the terms of the proposed acquisition. The advisors to the Ad Hoc Noteholder Group were also approached with this request. This third party and the Ad Hoc Noteholder Group each declined to provide DIP financing. With that, the third-party buyer indicated that it would be willing to fund a DIP facility in connection with its acquisition of the Company's assets. The proposed buyer, however, withdrew its proposal on July 24, 2025.

22. Faced with an imminent liquidity crisis and the liquidation of its German subsidiaries under German insolvency law, the Company, with the assistance of its advisors, immediately re-engaged with Anzu Special Acquisition Corp II, one of the parties that had previously submitted a non-binding indication of interest, and ultimately entered into the APA,

pursuant to which the Buyer agreed to purchase certain of the Company's foreign subsidiaries and related U.S. assets in a private sale for $10 million, plus the dollar equivalent of any excess cash held in the Debtors' foreign subsidiaries, but which is expected to yield $0.

23. All or part of the consideration from the Private Sale Transaction will be used to fund the Company's cases – subject to this Court's approval – and to provide the cash needed to sell the balance of the Company's assets, which were fully marketed prior to the Petition Date as set forth above.

24. As set forth above, the Company, with Piper's assistance, engaged in extensive prepetition marketing of the Company and its assets. Only the Buyer has provided an actionable agreement that will add significant value to the Debtors' estate and provide the funds necessary to fund the sale of the Company's remaining assets.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 28, 2025

/s/ *Daniel Gilligan*
Daniel Gilligan
Executive Director