```
1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF TEXAS
2                          HOUSTON DIVISION

3   Desktop Metal, Inc.          )  CASE NO:  25-90268
                                 )
4                                )  Houston, Texas
                                 )
5            Debtor.             )  Thursday,
                                 )  July 31, 2025
6                                )
    -----------------------------)  11:00 AM to 12:23 PM
7

8                              TRIAL

9          BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ

10             UNITED STATES BANKRUPTCY JUDGE


11
    APPEARANCES:
12
    For Interested Party, Quinn Emanuel:
13                           PATRICIA B. TOMASCO
                             Quinn Emanuel Urquhart & Sullivan
14                           700 Louisiana Street, Suite 3900
                             Houston, TX 77002
15


16  For the Debtors and Debtors in Possession,
    Desktop Metal, Inc.:    RICHARD M. PACHULSKI
17                          GREGORY V. DEMO
                            MAXIM B. LITVAK
18                          Pachulski Stang Ziehl & Jones LLP
                            700 Louisiana Street, Suite 4500
19                          Houston, TX 77002

20
    For Trustee, U.S. Bank Trust Company, National Association:
21                           KATHLEEN M LAMANNA
                             Shipman & Goodwin LLP
22                           One American Row
                             Hartford, CT 06103-2819
23

24

25
```

```
 1    For Nano Dimension:        KEN ZIMAN
                                 Paul, Weiss, Rifkind,
 2                               Wharton & Garrison LLP
                                 1285 Avenue Of The Americas, Fl 21
 3                               New York, NY 10019-6028


 4
      The United States Trustee:
 5                               JANA SMITH WHITWORTH
                                 Office of the U.S. Trustee
 6                               515 Rusk Street, Suite 3516
                                 Houston, TX 77002

 7

 8    For Wilmington Savings Fund Society, FSB, as Super Senior
      Agent and Third Lien Agent:
 9                               JOHN R. ASHMEAD
                                 Seward Kissel, LLP
10                               One Batter Park Plaza
                                 New York, NY 10004

11

12    For Ad Hoc Group of Secured and Convertible Noteholders:
                                 DAN FLIMAN
13                               Paul Hastings LLP
                                 2001 Ross Ave., Suite 2700
14                               Dallas, TX 75201

15

16    Court Reporter:

17    Courtroom Deputy:

18    Transcribed by:            Veritext Legal Solutions
                                 330 Old Country Road, Suite 300
19                               Mineola, NY 11501
                                 Tel: 800-727-6396
20

21

22    Proceedings recorded by electronic sound recording;
      Transcript produced by transcription service.
23

24

25
```

1              <u>HOUSTON, TEXAS; THURSDAY, JULY 31, 2025</u>

2                       (Call to Order)

3         THE COURT:  Okay.  Good morning, everyone.  This is

4    Judge Lopez.  Today is July 31st.  I'm going to call the 11

5    a.m., Desktop Metal, Inc., 25-90268.

6              This is a virtual hearing, so no one is in the

7    courtroom.  Please hit 5-star, and I will unmute your line.

8    I would also ask parties to just please make an electronic

9    appearance.  Just jump on the Southern District of Texas

10   webpage, and you'll find my page, you'll find a place to

11   make an electronic appearance in Complex Cases.

12             All righty.  I'm just going to go in the order in

13   which I see them.  Here is a 202 number.

14             MR. LOFTON:  Yes, good morning, Your Honor.  Dan

15   Lofton, I'm (indiscernible) counsel for Andrew.

16             THE COURT:  Okay.  Good morning.

17             A 713 number.

18             MS. TOMASCO:  Good morning, Your Honor.  This is

19   Patty Tomasco with Quinn Emanuel, on behalf of Quinn

20   Emanuel.

21             THE COURT:  Good morning.

22             And a 713 number.  Wait -- actually, hold on.

23   Yes, the 713 number.

24             MR. WALLEN:  (indiscernible) Pachulski Stang Ziehl

25   & Jones on behalf of the Debtors.  Judge, I am joined by my

1    colleagues Richard Pachulski, Greg Demo, and Max Litvak

2    today.

3           THE COURT:  Okay.  Good morning.

4           A 310 number.

5           MR. PACHULSKI:  Good morning, Your Honor.  Richard

6    Pachulski of Pachulski Stang Ziehl & Jones, on behalf of the

7    Debtors and Debtors in Possession.

8           THE COURT:  Okay.  Good morning.

9           All right, just give me one second.  Here is a 860

10   number.

11          MS. LAMANNA:  Good morning, Your Honor.  Katie

12   LaManna of Shipman & Goodwin, representing U.S. Bank as

13   Trustee.

14          THE COURT:  Okay.  Good morning.

15          And next a 212 number.

16          MR. ZIMAN:  Your Honor, I think you might have

17   tagged me.  It's Ken Ziman of Paul, Weiss, Rifkind, Wharton

18   & Garrison LLP, on behalf of Nano Dimension and

19   (indiscernible)

20          THE COURT:  Okay.  Good morning.

21          MR. ZIMAN:  Good morning.

22          And a 415 number.

23          MR. LITVAK:  Good morning, Your Honor.  Max

24   Litvak, Pachulski Stang Ziehl & Jones, on behalf of the

25   Debtors.

1          THE COURT:  Okay.

2          And a 312 number.

3          MR. DEMO:  Good morning, Your Honor.  Greg Demo,

4     Pachulski Stang Ziehl & Jones, on behalf of the Debtors.

5          THE COURT:  Okay.

6          A 202 number.

7          MS. WHITWORTH:  Good morning, again, Judge Lopez.

8     Jana Whitworth, on behalf of the United States Trustee.

9          THE COURT:  Good morning.

10          A  212 number.

11          MR. ASHMEAD:  Thank you, Your Honor.  Good

12     morning.  it's John Ashmead of Seward & Kissel, on behalf of

13     Wilmington Savings Fund Society as Agent on the 1L and 3L

14     secured facilities.

15          THE COURT:  Good morning.

16          And a 678 number.

17          MR. FLIMAN:  Good morning, Your Honor.  Dan Fliman

18     with Paul Hastings, representing the Ad Hoc Group of Holders

19     of Secured Notes and Unsecured Convertible Notes.

20          THE COURT:  Okay.  Anyone else wish to make an

21     appearance?  Good morning.

22          All right.  For the lines who I have unmuted, I

23     would ask that you just please keep yourselves on mute, and

24     monitor yourselves.  I'll keep your lines open just so we

25     can all hear each other.

1         Let me turn this over to Debtors' counsel.  Good

2   morning.

3         MR. PACHULSKI:  Good morning, Your Honor.  Again

4   Richard Pachulski of Pachulski, Stang Ziehl & Jones, on

5   behalf of the Debtors and Debtors in Possession.

6         (indiscernible) Your Honor (indiscernible) for

7   arranging this, allowing us to have this hearing today.

8   Just as a quick aside, Your Honor, I had another emergency

9   matter before Judge Shannon this morning, and when I asked

10  him to allow me to go first, not only did he do that, he

11  asked me to send his regards.  So I wanted to at least pass

12  that on, Your Honor.

13        THE COURT:  Oh, thank you very much.

14        MR. PACHULSKI:  So I've had a busy morning.

15        So Your Honor, let me begin by stating that we

16  have filed as Docket number 66 the presentation that we

17  would usually do, at least I would usually do.  And in light

18  of the fact that we'd like to try to get this done at the

19  initial time you've given us, and not take advantage of the

20  second time, I think that most of what's in there has

21  effectively been described in the status conference that we

22  had a couple of days ago.  But just so people know that it

23  is Docket number 66, if they'd like to take a look at it,

24  they are certainly welcome to, and we are happy to answer

25  any questions regarding it offline.  But unless Your Honor

1    thought otherwise, it is not how I typically do first days.

2    I also don't have status conference before the first day.

3    So I'm trying to pivot, based on that.

4              THE COURT:  Yeah.

5              MR. PACHULSKI:  So if that is okay with you

6    (indiscernible) begin.

7              THE COURT:  Unless anyone thinks otherwise, I

8    think it just makes sense, we'll just jump into the motions.

9              MR. PACHULSKI:  Okay.  So before we quite jump in,

10   Your Honor, I do want to do a couple of things.  One is tell

11   you where we stand currently, because as you know, typically

12   first days, it's always kind of a  very evolutionary

13   process.  Two, to very quickly try to explain what we're

14   trying to achieve in this case, I know I did some of that,

15   but just to kind of reinforce where that's going.  And

16   third, which I'll probably do as the second matter, but the

17   third thing is to introduce some parties who I think have

18   worked very hard in this process, and I think at least

19   deserve a couple of minutes of attention, so Your Honor will

20   know when they appear in, hopefully, other parts of this

21   case, assuming we can get that far.

22              In terms of the status, Your Honor, I believe the

23   -- I think all parties have worked hard, but I want to give

24   a particular mention to counsel for what we refer to as the

25   1Ls, the 2Ls, Quinn Emanuel, and the Anzu Buyer's counsel.

1   All of them have worked very hard, very disparate interests,

2   as Your Honor heard at the status conference, and we have

3   come up with I believe among those parties in particular a

4   consensual arrangement.  I don't believe they will be

5   objecting to any of the matters today.  I could be off, but

6   we've been following it pretty closely, and we had some very

7   intense conversations yesterday to get to that position, so

8   -- and everybody has gotten there.  So I will ultimately go

9   to who in our firm will be arguing what, but I don't think

10  you will hear any objections from those four parties that

11  I've mentioned.

12          With respect to where we stand on the motions in

13  general, the following is what I know, and there are three

14  different sets of objections -- or statements.  I'm not sure

15  they're technically objections.  The United States Trustee

16  intends to object on a specific issue with the claims bar

17  date, which is Agenda Item 13.  I know Mr. Wallen, who has

18  really (indiscernible) the United States Trustee, and we

19  thank the United States Trustee and its counsel's efforts

20  here in trying to get as much result as possible, and she

21  has definitely done that, and so I appreciate the efforts

22  there.

23          But she does intend to object to that.  My

24  understanding is she does not intend to object to anything

25  else.  And I'm not quite sure, because I sent an email,

1   because we've been corresponding this morning fairly early,

2   that she does want to ask -- I suspect it will be

3   (indiscernible) but I don't know, which we'll get to in a

4   minute, some questions about the private sale.  I understand

5   that, but I don't know specifically what categories there

6   will be.

7          Also, within the last hour, we have gotten from

8   Mr. Ashmead, who does a great deal of (indiscernible)

9   trustee work, and is well known for it, he had some comments

10  (indiscernible) cash collateral (indiscernible) and Mr.

11  Litvak will be responding to that.  We're hopeful that we

12  can kind of punt that for another day because we want to get

13  the order entered today, but that will be between Mr.

14  Ashmead and Mr. Litvak, when we get to that.

15         So I think we're, I would say, in very good shape

16  to hopefully get this done within the time that you've

17  allotted in the first session.  But those are the only three

18  to my knowledge that there is an issue, unless you have any

19  questions before I go on to the next part, Your Honor.

20         THE COURT:  Nope.

21         MR. PACHULSKI:  Let's keep going.  Okay.  So let

22  me do some very quick introductions, because I think it's

23  important.  And again, I'm not quite sure in all cases who

24  have been able to appear and who haven't, but if they're not

25  on, I at least think that they're worthy of being mentioned.

1           So Your Honor, we do have today the Chief

2      Operating Officer of Management.  Management has done an

3      extraordinary job (indiscernible) all the professionals.

4      Tom Nogueira is I believe in the virtual courtroom.  Also,

5      Phil Lane, who is Deputy General Counsel.  They've been

6      instrumental in the sales process and the operational

7      issues, and frankly, it would have been very difficult to

8      get where we are with respect to the filing and the sale

9      today without them.

10          We also have in the virtual courtroom

11     representatives of FTI.  I mention them specifically because

12     they will potentially testify, or their declarations will be

13     requested into evidence, Mr. Andrew Hinkelman and Mr. Chas

14     Harvick.  Mr. Hinkelman is the CIO, aside from being the

15     Senior Managing Director, and Mr. Harvick is the CTO, and

16     the Managing Director of FTI.

17          I would also like to mention, because this is very

18     important for today's hearing, Mr. Eric Bader.  Mr. Bader is

19     both the German director and (indiscernible) and he is on

20     the phone to monitor the matter, to figure out if he has

21     made the right decision, and not simply in insolvency.  So

22     we're all hoping that we can get past that today, but I

23     believe (indiscernible) the virtual courtroom.  And I

24     believe Mr. Wilshour and Mr. Aronson, who are directors, who

25     have spent, for having dealt with a lot of directors in my

1    career, spent an annoying amount of time on this, including

2    multiple weekly board meetings, and during the process, and

3    in the crash, everybody has been participating.

4           But additionally, without going through everybody,

5    just because we don't have the time for it, I do want to

6    thank my colleagues at our law firm, who have spent a huge

7    amount of time, the lawyers at Vinson & Elkins, who are

8    special corporate counsel, have been very helpful in

9    assisting us in transitioning into the process.  At Piper

10   Sandler, in particular I'd also like to acknowledge Mr.

11   Gilligan partly again because his declaration is being

12   submitted., and frankly, he is probably going to be cross-

13   examined (indiscernible) firm, who is representatives of

14   their firm, who have also been extremely helpful in their

15   representation of the Independent Directors.

16          So there are a lot of people (indiscernible)

17          THE COURT:  Mr. Pachulski, there's too much, too

18   much love in the air.  Let's get to the motion.

19   (indiscernible) too much love for me.

20          MR. PACHULSKI:  I am sorry.  Your Honor, if I

21   could just have two minutes on where we're going?

22          THE COURT:  Okay

23          MR. PACHULSKI:  If you want, I'll skip it

24   (indiscernible)

25          THE COURT:  That works.

1           MR. PACHULSKI:  So I understand you want me move

2     it along, so I apologize.

3           So in terms of the issues, the major issues today

4     (indiscernible) various motions, there is funding to get us

5     through the four weeks -- I'm sorry, the three weeks, which

6     is $4.5 million of funding.  We will also be paying to 1Ls

7     $5.5 million.  With respect to the bid procedures, which I

8     know Your Honor has reviewed, just so we get the dates in

9     line because we may need some dates from Your Honor, we have

10    August 8th is for the bidding, August 11th for the auction.

11    I believe Mr. Demo will be asking for a sale hearing on

12    August 13th.

13          We might need to get a TSA, Your Honor, with

14    respect to the bid procedures, because we will be selling.

15    But we may need to close, and then enter into some form of

16    service agreement with any of the buyers.  We will be

17    sending out, which is a little different than usual, the

18    care notices on August 15th, if this is all approved,

19    because there are 3,000 contracts that a combination of

20    management and FTI have to go through to get this done in

21    terms of the sale, and there will be cure objections by

22    August 25th.  So I just wanted to give Your Honor that in

23    context.

24          If we don't get the sales, as I've mentioned,

25    status conference, there would be conversion.  If we do get

1    sales, one of two things will happen.  They will be

2    sufficient to get us the 1Ls paid, but we then have to see

3    whether we close the deals, have cash collateral to get them

4    closed, but we'll still have to convert because it's not

5    sufficient to get to a plan.  Our goal is to get to plan

6    confirmation, and that the sales would be sufficient to do

7    that.  And you know, the Board is very focused on, if at all

8    possible, to get jobs, the remaining jobs for the give or

9    take 800 employees, and get the litigation claims not really

10   involved through the process, but put into a litigation

11   trust.

12          So that's basically what we have, Your Honor, in

13   terms of the general goals.  In terms of the matters for

14   today, I will be taking a lead with respect to the sale

15   motion.  Cash collateral is next, because we think that's

16   the obvious next choice, which will be Mr. Litvak.  Then

17   will be wages, which will be Mr. Wallen, because we want to

18   make sure at a minimum, even if we can't finish in time,

19   that we get wages paid immediately.  And then we would have

20   bid procedures with Mr. Demo, because we would like to get

21   Mr. Gilligan and his team pushing that process.  And then we

22   will come back to Mr. Demo for cash management.

23          After that, Your Honor, with respect to Items 6

24   through 12, which are taxes, utilities, insurance, personal

25   identifiable motion, the (indiscernible) automatic stay,

1    extending the time for schedules and statements and other

2    related documents, those will end the bar date motion, which

3    is the one that will be objected to I believe, which is

4    number 13, will all be dealt with by Mr. Wallen.  Right now,

5    Your Honor, number 13, the parole motion, has actually been

6    an order that has been entered.  The complex case notice has

7    also been -- the order with respect to that has been

8    entered, and the joint (indiscernible) has also been

9    admitted.  So we basically have 13 matters, most of which

10   are consensual, with no objection.  The only ones I

11   mentioned are the bar date, potentially the sale by the U.S.

12   Trustee, and cash collateral by Wilmington Savings.

13           For right now, Your Honor, I would ask before we

14   start with the (indiscernible) admission of the four

15   declarations into evidence.  Docket number 16 is the

16   declaration of Andrew Hinkelman, which his testimony is with

17   respect to primarily the sale motion, and also background

18   for cash collateral and bid procedures.  Mr. Gilligan is

19   Docket number 17, also with respect to the sale motion, and

20   background for cash collateral and bid procedures.  Then,

21   Docket number 62, the declaration of Chaz Harvick, who is

22   going -- his declaration is primarily bolstering the

23   evidence with respect to first day.  And the last is the

24   declaration of Dan Gilligan, again (indiscernible)

25   declarations, and this is specifically with respect to the

1    bid procedures.

2           So at this time, Your Honor, I would ask for the

3    entry of those declarations, unless there is any objection

4    to that.

5           THE COURT:  Any objection to the admission of any

6    of these declarations for today, purposes of today's

7    hearing?

8           Okay.  They're admitted.

9           MR. PACHULSKI:  Okay.  Your Honor, I don't know

10   whether the preference is, and I'm happy to do it either

11   way, to go through my short presentation of the sale motion,

12   which is the first matter, or whether we want to allow the

13   U.S. Trustee, or anyone else to cross-examine either Mr.

14   Hinkelman or Mr. Gilligan.  As I said, probably most likely

15   Mr. Gilligan.

16          THE COURT:  Why don't you go ahead and put on your

17   presentation, and then I'll turn to see if anyone wishes to

18   present anything in connection with the motion, or ask any

19   questions.

20          MR. PACHULSKI:  Okay.  Thank you, Your Honor.  I

21   think I can make this relatively efficient.

22          As Your Honor has seen in the papers, we have an

23   offer of $10 million from Anzu Acquisition Corp II.  Their

24   intent is to hopefully get approved today, and close

25   tomorrow the first phase of a two-phase process to purchase

1    the German, Italian, and Japanese subsidiaries of Desktop.

2    And the first phase would be for $4 million, the second

3    phase would be for $6 million.  The second phase would close

4    no later than August 11th, the first phase by tomorrow if at

5    all possible, based on the timing, Your Honor.

6         With respect to, and just sliding into the major

7    part of the Hinkelman declaration, with respect to Mr.

8    Hinkelman as the COO, he has testified, among other things,

9    that there is -- that there has been no significant

10   liquidity for quite some time now, that if we did not get

11   approval, there would be a very likely German insolvency

12   proceeding, with no value coming up to any of the Debtor

13   entities, and that at the end of the day it's basically what

14   value would be lost, and we would at that point have really

15   no choice but to convert (indiscernible)

16        Mr. Gilligan, who was heavily involved in the sale

17   process as Executive Director in restructuring all of Piper

18   Sandler, his testimony is that the sale process began in

19   early June.  There were also 10 parties who signed NDAs for

20   financing, but no offers came in, which makes this case

21   extremely difficult because we have no traditional DIP

22   financing.  He had -- his group had pursued and identified

23   140 particular buyers, more than 50 had executed NDAs.  He

24   also testified there was no liquidity as of early July.

25        The attempt was to get Nano, represented by Mr.

1    Ziman, to purchase the company and provide a DIP.  They, in

2    early July, were very clear that that was not going to

3    happen, and that -- There was a buyer that came about

4    approximately July 12th.  That buyer was intensely in

5    negotiations with us until July 24th.  That buyer was the

6    only one left at that point, walked away from the

7    transaction, and fortunately we contacted Anzu right after

8    that, that same evening, on July 24th.  They agreed, and

9    they worked as hard as probably any buyer I've seen, with

10   basically three days over a weekend, on a very complex

11   transaction, and they took significant risk, including

12   regulatory risk.

13           So that was with Mr. Gilligan's high point of his

14   negotiation.  Obviously, Bankruptcy Rule 6004(f)(1) allows

15   for private sale.  We know it's not traditional.  But under

16   the circumstances, and the testimony of Mr. Hinkelman and

17   Mr. Gilligan, I don't think there was really an option.  We

18   believe that is reflected in the declarations, there's a

19   good business reason, and that it meets the 363(f)

20   requirements.  Anzu by all means (indiscernible) purchaser

21   should get the 362(m) finding.  We've complied with -- we

22   think we have complied with notice of 6004(a), and we're

23   asking for the exclusion of the 14-day stay under

24   6004(h)(1).

25           Just to kind of complete it, Your Honor, there was

1    an original sale order that was lodged as Docket number 13-

2    1.  There was a new sale order that was lodged, after some

3    discussion, as Docket number 70.  There are two major --

4    well, there are two changes to the initial order.  One is

5    making it very clear, and as Your Honor has heard, it's a

6    big deal, that Anzu is not in any way seeking to purchase

7    any of the commercial torts, and there will frankly be no

8    distribution without a court order, but if we get cash

9    collateral approved today, that would actually satisfy that

10   provision of the sale order.

11          With that, Your Honor, I have no further comments

12   with respect to the sale motion.  It is obviously the key to

13   the building blocks of trying to get this case moving, and

14   on that, I will rest (indiscernible) presentation and the

15   evidence now before you, Your Honor.

16          THE COURT:  Thank you.  Let me just ask, anyone

17   wish to question any of the witnesses?

18          MS. WHITWORTH:  Good morning Judge Lopez.  Jana

19   Whitworth for the U.S. Trustee.

20          May I be heard, Judge?

21          THE COURT:  Absolutely.

22          MS. WHITWORTH:  Your Honor, I just have a few

23   quick questions for Mr. Gilligan in connection with the sale

24   process.  The Debtors were very gracious in providing

25   answers to some of the questions my client had mentioned

```
1    earlier (indiscernible) but I just on the record, I just

2    want to have a clear record of some of the issues that were

3    brought up, If I may.

4              THE COURT:  Sure.

5              Mr. Gilligan, can you hear me okay?  Here, let me

6    unmute your line.

7              MR. GILLIGAN:  Thank you, Your Honor.

8              THE COURT:  Okay.  Mr. Gilligan, I'm going to have

9    you raise your right hand.

10             Do you swear to tell the truth, the whole truth,

11   and nothing but the truth?

12             MR. GILLIGAN:  I do.

13             THE COURT:  Okay.  Then you can put your hand

14   down. And you understand the oath that you took is the same

15   if you were live, on the witness stand, here with me?

16             MR. GILLIGAN:  I do, Your Honor.

17             THE COURT:  Okay.  Ms. Whitworth, you may proceed.

18             MS. WHITWORTH:  Thank you, Judge.

19             Mr. Gilligan --

20             MR. LITVAK:  Your Honor (indiscernible)

21             THE COURT:  Yes, Mr. Litvak?

22             MR. LITVAK:  I apologize, Your Honor.  Yeah, Max

23   Litvak for the Debtors, Your Honor.

24             I'll defend, if that's okay.

25             THE COURT:  Fine with me.
```

1          MR. LITVAK:  Thank you.

2          THE COURT:  All righty.  Go ahead.

3          MS. WHITWORTH:  Hi, Mr. Gilligan.  My name is Jana

4    Whitworth.  I'm a lawyer representing the United States

5    Trustee in this matter, and I'm speaking to you virtually.

6    I just have a couple of quick questions in connection with

7    the sale, and your testimony.

8          When exactly did the formal sale process launch?

9          MR. GILLIGAN:  We began formal launch

10   (indiscernible) in early June, June 2nd.  Prior to that, we

11   spent several weeks with the company and fellow advisors,

12   preparing for the sale process.  And we did have some

13   conversations with parties.  As Mr. Pachulski said, we were

14   speaking to some financing parties prior to that, and some

15   of those financing parties had expressed an interest in a

16   broader transaction.  But the formal launch was June 2nd.

17         MS. WHITWORTH:  Thank you.  And were the assets

18   that are being sold, or requested to be sold today for the

19   $10 million, were those assets included in this formal

20   launch?

21         MR. GILLIGAN:  They were.

22         MS. WHITWORTH:  And --

23         Your Honor, I pass the witness.  I didn't really

24   have any other questions, other than those two specific

25   questions.  I did have questions on the use of the cash

1    collateral, when that issue comes up.

2              THE COURT:  Okay.  Thank you.

3              MS. WHITWORTH:  Thank you, Judge.

4              THE COURT:  Thank you.  Anyone else have any

5    questions for this witness?

6              Okay.  Mr. Gilligan, you are off the virtual

7    witness stand.  Thank you.

8              MR. GILLIGAN:  Thank you, Your Honor.

9              THE COURT:  Okay.  Anyone else wish to be heard

10   either way in connection with this motion?

11             Okay.  Anyone else wish to be heard one way or the

12   other in connection with this motion, before the Court

13   rules?

14             Okay.  I would note before the Court is an

15   emergency motion filed at Docket number 13, seeking entry of

16   an order approving a private sale of the Debtor's purchased

17   assets to the proposed purchaser.  These cases were filed a

18   few days ago, and the Court conducted a status conference on

19   July 29th, and set the hearing for today.  The Court is

20   going to grant emergency consideration of the motion.  We're

21   going to find that there's been proper notice and service

22   under the circumstances in which we find ourselves.

23             The Court considers a proposed sale to a proposed

24   buyer, and the requested relief is to allow the sale to

25   occur free and clear under Section 363 of the Bankruptcy

1   Code.  The Court has considered the evidence that is

2   presented, and did have an opportunity to review Mr.

3   Gilligan's declarations, and also statements of Counsel.

4   Court also takes great comfort, under the circumstances,

5   that the primary secure parties are here, and have had

6   notice, which was very important to me when considering kind

7   of this asset, the sale proposed today.  The standards under

8   Section 363 which requires the Debtors to establish sound

9   business judgment is the case law that is developed here.  I

10  do find the Debtors have exercised business judgment here in

11  selling the asset, based upon the declaration before me.

12  It's also the highest, and otherwise best offer for that

13  asset.

14          I do find, based upon Mr. Gilligan's declarations

15  and his statements here, that there was a thorough review, a

16  thorough process that was run pre-petition, and that this is

17  the best deal, under the circumstances, and there is also a

18  pressing need to conduct a sale today.  I've reviewed the

19  proposed order, and it crystallizes and it permits a sale

20  under the circumstances.

21          I do find, based on the circumstances and the

22  facts before me, that the sale is warranted, and should be

23  approved.  And based on the evidence before me, the Buyer is

24  a good faith purchaser, and entitled to those protections.

25  I note that the Buyer is not an insider, and they've got no

1    evidence of any collusion, or concerns that way.  And I know

2    the Debtor needs the money, but I think the standard, the

3    Debtor needing the money is a consideration, but business

4    judgment as to the sale to the Buyer, the process, is the

5    most important consideration, I think, for me, as I approve

6    it.  And under the circumstances, I'm going to approve the

7    sale.

8           Under these circumstances, I do find that the

9    Debtor finds itself in extraordinary circumstances.  I think

10   the proposed order that has been presented to me I know has

11   a good number, I think just approves the sale, and allows

12   the purchaser to have the assets free and clear, and allows

13   the parties to close in an expeditious manner, but at the

14   same time kind of preserves big issues of which the

15   Purchaser doesn't need to be involved in, but still will

16   continue in connection with this case.

17          So I have reviewed the proposed order at 70, and

18   I'm going to get that signed, and it should hit the docket

19   shortly.  I know the parties really kind of want it to hit

20   the docket as soon as possible.

21          Let me just see, let me just take a look at

22   something.

23          I think all the blanks have been filled in, and

24   it's the -- Exhibit 1 has been attached to the order

25   (indiscernible) That's what I'm really checking right now so

1   that -- Okay, I'm signing it.  It will hit the docket

2   shortly.

3            Where do we go next?

4            MR. PACHULSKI:  Your Honor, the next is cash

5   collateral.  Mr. Litvak is going to -- And I was unaware,

6   frankly, that the United States Trustee was going to cross-

7   examine anyone.  Which is (indiscernible) obviously, but

8   there were two parties to that, two declarations relating to

9   that, so we'll have to figure out if it will be Mr.

10  Hinkelman or Mr. Harvick will be dealing with that.

11  Depending -- I'm not sure, again, what Counsel for the U.S.

12  Trustee is looking for.

13           THE COURT:  Okay.

14           MR. PACHULSKI:  (indiscernible)

15           THE COURT:  (indiscernible) I think you have your

16  hand up.  Is there anything you wish to tell me?

17           COUNSEL:  Yeah, I just wanted to say thank you

18  very much for the (indiscernible) consideration for

19  (indiscernible) quickly.  I will leave during the -- I don't

20  think I'm involved in the rest of this.  But I just wanted

21  to say thank you very much to the Court, and your staff.

22           THE COURT:  Okay.  Thank you.  You should check

23  the docket in about five or six minutes.  It should be on.

24           COUNSEL  Thank you, Your Honor.  Thank you,

25  everybody.

```
 1              THE COURT:  Thank you.  All right.  And if anyone
 2    wants to drop off at any point throughout the hearing
 3    because your matters are covered, you're more than free to
 4    do so.
 5              Okay.  Mr. Demo, I'll turn it over to you, sir.
 6              MR. LITVAK:  Your Honor, I'm going to handle
 7    (indiscernible)
 8              THE COURT:  Or Mr. Litvak.  Sorry.  Mr. Litvak, I
 9    apologize.  I was looking at Demo, and thought Litvak, and I
10    should have taken a couple of breaths.  I apologize.
11              Go ahead, Mr. Litvak.
12              MR. LITVAK:  No problem, Your Honor, at all.  Max
13    Litvak, Pachulski Stang Ziehl & Jones, on behalf of the
14    Debtors.
15              Your Honor, we have a cash collateral motion that
16    was filed last night at Docket number 71.
17              THE COURT:  Mm-hmm.
18              MR. LITVAK:  We submitted a redline form of order
19    today at Docket number 77 that incorporated the U.S.
20    Trustees' issues.  But just before the hearing, as Mr.
21    Pachulski mentioned, maybe a half hour before the hearing,
22    we got some comments from Wilmington Savings Fund, which is
23    the first lien and third lien agent.  And I talked to Mr.
24    Ashmead, and he agreed that the issue with respect to their
25    fees, their professional fees, will be pushed to a final
```

1    hearing, so we don't need to address that now in the order.

2    But he had some other technical changes which I don't think

3    change anything of substance.  I sent the comments on to the

4    other Secured Creditors so they can see it.

5            And what I would suggest, Your Honor, is if Your

6    Honor is inclined to approve the order in the form that we

7    submitted at Docket number 77, that we would then -- Maybe

8    during the remaining course of the hearing, I'll make the

9    remaining edits that Mr. Ashmead asked me to make, and then

10   we would file a further redline and a further claim, if that

11   would be acceptable to the Court at that point.

12           THE COURT:  Okay.  Let's proceed, and see where it

13   goes.

14           MR. LITVAK:  Yes, sir.

15           So Your Honor, we do have a resolution with the

16   1Ls, 2Ls, and Quinn Emanuel.  All those parties are

17   asserting liens on certain of the Debtors' assets, and with

18   respect to the 1Ls and 2Ls in particular, they're asserting

19   liens on cash collateral.  And we're seeking authority from

20   the Court to use cash collateral pursuant to the terms of

21   this proposed order, and in accordance with the budget

22   that's attached to that order, which runs for approximately

23   three weeks, Your Honor, through August 15th.  And I'll be

24   asking for a final hearing maybe the week after that.  We

25   can extend the budget with the consent of the secured

1    parties without need for leave of Court, but I'll come back

2    around to that.

3            Your Honor, the proposed order does contemplate

4    adequate protections subject to a carve-out to the extent of

5    diminution in favor of the 1Ls, the 2Ls, and Quinn Emanuel,

6    which includes liens on all the Debtor's assets except for

7    avoidance actions, and the proceeds of avoidance actions

8    pending a final hearing.

9            To the extent of diminution, the lenders -- And by

10   the way, they will preserve -- The same priorities that they

11   have as of the petition date they have with respect to all

12   of this adequate protection.  We're not trying to change

13   around any priorities that existed as of the petition date.

14   But further, as adequate protection to the extent of any

15   proven diminution, the applicable Secured Creditors would

16   also have super priority claims against the applicable

17   Debtors' estates.

18           And as further adequate protection with respect to

19   the 1Ls, and the first lien lenders in particular, as Mr.

20   Pachulski mentioned briefly, we are including in this order

21   a provision that $1.5 million from the initial sale closing

22   with Anzu, the initial sale closing is $4 million, so we

23   would take $1.5 million of that once it comes in, and pay it

24   over to the 1L holders on account of their pre-petition

25   secured claims, and then they would be paid $4 million from

1    the second closing.  There are two closings under this Anzu

2    sale transaction.  The second closing is for $6 million, so

3    they would take $4 million of that.

4              $5.5 million total would be the adequate

5    protection payments, and that is subject to a 45-day

6    challenge period.  So 45 days after entry of the interim

7    cash collateral order, anyone other than the Debtors could

8    challenge the liens and claims of the first lien lenders.

9    And this is the addition that the U.S. Trustee wanted, is if

10   a Chapter 7 Trustee is appointed, then such trustee would

11   have the benefit of a challenge period that is the later of

12   75 days after entry of this interim order, or 30 days after

13   the appointment of such trustee.  So if a trustee is

14   appointed as we go, they will have a little bit extra time

15   to decide whether they want to assert a challenge.

16             Your Honor, any additional sale proceeds separate

17   from the Anzu sale transaction -- And the reality is that we

18   don't expect there to be any additional sale proceeds

19   received by August 15th, where we actually get court

20   approval and the sale closes by August 15th.  But in case we

21   do, if something changes for the Debtor and we do get that

22   approved, then the order, the proposed order, the cash

23   collateral order also contemplates that any sales proceeds

24   that the Debtors realize from additional sales will also be

25   paid to the first lien lenders, up to $8.1 million, which

1    will effectively pay off their claim, provided that we would

2    reserve $600,000 on account of a portion of the success fees

3    that would otherwise be payable to certain advisors that the

4    first lien lenders were -- there might be some dispute

5    between the Debtors and the first lien lenders about whether

6    that amount is legitimately owed by the Debtors, and so we

7    would reserve for that.

8            And to the extent there were any excess sale

9    proceeds, if we were only so lucky to get above the $8.1

10   million plus the $600,  or $8.1 million -- or $8.7 million

11   above the Anzu sale price, then the remainder would be held

12   in reserve pending further order of the Court.

13           Your Honor, the proposed order also proposes the

14   funding of an estate professional fee trust account, which

15   would be our firm's trust account, for the benefit of estate

16   professionals, debtor professionals, as well as any

17   committee professionals that may be appointed.  And Your

18   Honor, there are no stipulations or waivers that you would

19   typically see in this order in favor of the 1Ls, 2Ls, or

20   Quinn.  But as I mentioned, given that the Debtors are

21   prepared to pay out all of these monies on account of the 1L

22   debt, we're basically standing back, and will not be

23   challenging the 1L claims, but other parties do have the

24   benefit of the challenge period that I mentioned.

25           And Your Honor, we obviously, from the Debtor's

1    perspective, and as reflected in the declarations that have

2    been submitted, very much need the money.  We need to use

3    the cash collateral as soon as possible to make payroll, to

4    make vendor payments, to keep the business operating so that

5    the remaining assets can be sold in an orderly fashion, and

6    in order to maximize value, and we would ask the Court to

7    enter the proposed form of order once it's submitted.

8         THE COURT:  Okay.  Anyone wish to be heard in

9    connection with the cash collateral motion?

10        MS. WHITWORTH:  Jana Whitworth for the U.S.

11   Trustee, Your Honor.

12        THE COURT:  Okay.

13        MS. WHITWORTH:  The presentation and information

14   that I finally had a chance to look at, I don't really have

15   any questions.  The only thing I would ask is that the

16   Debtors provide an actual (indiscernible) reports on the

17   budget-to-actuals, to verify the payments that is going out

18   actually match up with the budget, in a short period of

19   time.  We're specifically concerned about the administrative

20   solvency of this case, and we don't want to get too far down

21   the road with admin claims adding up, Judge.

22        So that's my only ask on this, on behalf of the

23   U.S. Trustee, is a budget-to-actual report.

24        THE COURT:  That sounds reasonable to me.

25        MR. LITVAK:  That's not a problem, Your Honor.

1    I'm sure FTI will do that in the ordinary course, and we'll

2    provide it to the Secured Creditors, and I'm happy to

3    provide it to the U.S. Trustee.  And frankly, I'll just add

4    a sentence to that effect in the proposed form of order that

5    we submit.

6              THE COURT:  Okay.  And tell me, just a technical

7    question, the final hearing date, because I know you're

8    going to have to think about this I guess in connection with

9    another one or two of these.  When did you want a final

10   hearing date?

11             MR. LITVAK:  Your Honor, Mr. Pachulski can correct

12   me, but what I was going to suggest is the week after August

13   15th.  August 15th is a Friday, so the week of August 18th.

14             THE COURT:  All right.  Now, I don't have anything

15   on August 20th.  Do you think we can do, like, August 20th,

16   at 1 p.m.?  Wednesday, August 20th, at 1 p.m.?

17             MR. LITVAK:  That's fine for me.

18             THE COURT:  Why don't we just go with that,

19   Wednesday, August 20th, at 1 p.m.  Why don't we give

20   everyone, since -- Why don't we give everyone an objection

21   deadline of the 13th, August 13th, at -- just August 13th,

22   whatever normal time you put them in.

23             MR. LITVAK:  Yes, Your Honor.  I'll put in 5 p.m.

24   Central time.

25             THE COURT:  Okay.  Let me write this down, before

1     I forget.

2          Okay.  Anyone else wish to be heard?

3          Okay.  The Court --

4          MR. ASHMEAD:  Hey, Your Honor?  It's John Ashmead.

5     Can you hear me?

6          THE COURT:  Yes, just fine, Mr. Ashmead.

7          MR. ASHMEAD:  Hey -- Good afternoon again, Your

8     Honor.  It's John Ashmead at Seward, for Wilmington Savings

9     Fund Society, which is the Agent and Collateral Agent on the

10    1L and 3L.

11         Wilmington holds the lien on the collateral,

12    including that that's being sold today, and the proceeds

13    being dealt with under the cash collateral order.  I'm sure,

14    because of the flood of activity over the last 24 hours,

15    which we appreciate how hard the professionals are working,

16    long story short, we were not included in discussions, or

17    given drafts of the cash collateral order, despite having

18    asked for it.  We saw this morning that was filed last

19    night, and we sent some very light but important comments

20    this morning, which we understand, as Mr. Litvak said, are,

21    you know, acceptable to the Debtors, and I'm sure they're

22    acceptable to the Ad Hoc.  I can't imagine they wouldn't be

23    to the other parties, as it doesn't affect them, with one

24    point, and that's the budget for professional fees, which

25    we've agreed to punt, as Mr. Litvak said, until after this

1    hearing, and before the other hearings.  So just to give you

2    the background on that.

3           But I assume we're going to work this out, as you

4    said, and let's see where it goes.  But if not, obviously

5    we'll have to have a discussion.  But it's hard for me to

6    imagine that will happen.

7           THE COURT:  Thank you.

8           Okay.  The Court considers an emergency motion for

9    an interim order authorizing the use of cash collateral,

10   providing adequate protection to Secured Parties, and

11   providing a final hearing.

12          I'm going to grant emergency consideration of this

13   motion.  There is obviously a need for the use of cash

14   collateral.  It is consensual for purposes of today,

15   everyone's rights are preserved in connection with the

16   final, and today is just an interim order, and I'm going to

17   approve the use of cash collateral under the circumstances.

18   I do appreciate that no one tried to get too fancy with this

19   interim order, and put too many bells and whistles on it.

20   This was kind of just to get to a final, which I thought was

21   really smart, and allows the Debtors to make -- allow the

22   opportunity to make important payments to parties to keep

23   the business going, but at the same time providing

24   protection, adequate protection to Secured Parties.

25          Mr. Litvak, can you just -- and I know you are

1    going to tweak something -- Oh, and what I would just ask is

2    by you filing it, you're giving me -- kind of letting me

3    know, and Ms. Saldana, my case manager, that everything has

4    been approved in terms of consensual.  If there are any

5    issues, let's talk about it at the end of the hearing, if

6    anything, if we need to kind of tweak it.  But if it hits

7    the docket, I'm assuming that it's clean, and it's ready for

8    me to sign.  Okay?  And if you can plug in the final hearing

9    date, I'd like to -- If everything is consensual, I just

10   want to sign it.  Okay?  But you should consider the relief

11   request is approved, everyone's rights in connection with

12   the final are preserved.  Okay?

13            MR. LITVAK:  Yes, Your Honor.  Would you also like

14   us to file a redline against the last version?

15            THE COURT:  Yes.  But just, if you can --

16            MR. LITVAK:  Okay.

17            THE COURT:  Whatever is easier.  But if you can,

18   if it's easier to run a full redline against -- What I'd

19   like to do is just have it against the filed version, like

20   the version you just filed now, kind of like a further

21   redline I think would be helpful for me.  And quite frankly

22   --

23            MR. LITVAK:  Yes, Your Honor.  We'll do that.

24            THE COURT:  Okay.

25            MR. LITVAK:  We'll run that by the other parties

1    first, and I would just ask everyone to keep an eye out on

2    their emails in the next half hour, so that we can get that

3    (indiscernible) on file with the Court as soon as possible.

4            And thank you very much, Your Honor, for your

5    consideration.

6            THE COURT:  Okay.  If we can kind of continue?

7    Because I know we're -- Well, let's do -- what's next?

8    Which one are we taking up next?

9            MR. LITVAK:  (indiscernible)

10           THE COURT:  Bid procedures?  Is it wages, or is it

11    bid procedures?  Oh, wages.

12           MR. WALLEN:  (indiscernible) Ben Wallen, Pachulski

13    Stang Ziehl & Jones.

14           We're going to go ahead and take up the wages, if

15    that's okay with you, Judge?

16           THE COURT:  Okay.

17           MR. WALLEN:  (indiscernible)

18           THE COURT:  Well, let me just ask, does anyone

19    object to wages?  I reviewed the motion, and I've reviewed

20    the proposed order here.  It's -- I've reviewed it.  It's

21    the pay, and quite frankly, it's a bunch of independent

22    folks who are employees, that's where the bulk is going.  My

23    understanding is that none of this -- no one's going to get

24    paid over the cap.  Is that right, Mister --

25           MR. WALLEN:  (indiscernible) Judge.

```
 1           THE COURT:  Okay.  Any objection to me approving
 2    this, this motion?.
 3           Okay.  Is it still the order at 59?
 4           MR. WALLEN:  Yes, Judge.
 5           THE COURT:  Or -- okay.  All right.  I'm going to
 6    get this one signed and on the docket, so folks can let the
 7    employees know they are going to get paid tomorrow.  He has
 8    -- yeah, bills are due tomorrow, and I want to make sure
 9    that folks can get the comfort that they are going to get
10    paid today, and that they're not going to have to worry
11    about this, and I want the word to go out as soon as
12    possible.
13           So I will sign the wages motion.
14           MR. WALLEN:  Thank you, Judge.
15           THE COURT:  All right.  One question that I've
16    got, because I'm thinking about other motions as we kind of
17    go down the line, and we'll take up bid procedures next, but
18    just -- And maybe it's going to kind of I think identify
19    what I think is the U.S. Trustee's objection, but you're
20    asking for a schedules extension through September the 11th,
21    but you want a bar date of September 2nd.  Which is
22    effectively going to force everybody to file a proof of
23    claim, but the bar date motion is telling me that they don't
24    have to file one if they agree with the schedules, but
25    they'll never see the schedules.  So effectively we're
```

1    telling everyone to file a -- I just want everyone to kind

2    of think about those dates.  We don't have to get there, but

3    I think that's what Ms. Whitworth is identifying, is that

4    you are asking me for kind of relief, and then you are going

5    to send out a package that people --

6            To me, I'm -- I don't know how the dates line up

7    in terms of what you all are thinking, but I also think

8    procedurally, it would be confusing if someone got a bar

9    date notice telling you you've got to file something by

10   September 2nd, and then all of a sudden got schedules, and

11   they either agree or disagree with the schedules in terms of

12   how all that got dealt with, just for logistic.  But that's

13   not now.  I just want people thinking about that as we go

14   now.  I think I do share the concern.  But bid procedures is

15   the next one up, and I just wanted to kind of let folks

16   start to think about that one.  But there may be other

17   things, but I just, I know that's one that jumped out to me

18   that we can start thinking about as we kind of move down the

19   line.

20           But let's take up bid procedures now.

21           MR. DEMO:  Thank you, Your Honor.  If you can hear

22   me, it's Greg Demo of Pachulski Stang Ziehl & Jones, on

23   behalf of the Debtor.

24           THE COURT:  Okay.

25           MR. DEMO:  Bid procedures is at Docket number 61,

1    the form of order is at 61-1, and the various notices are

2    attached as exhibits to the form of order.  The motion is

3    supported by the declaration of Mr. Gilligan of Piper

4    Sandler, which was at Docket number 62, and which was

5    previously admitted.  It's also supported by the additional

6    background in the declarations of Mr. Hinkelman and Mr.

7    Gilligan in support of the private sale motion, and those

8    are Docket numbers 16 and 17, and they have also been

9    admitted into evidence.

10          There are no objections to the bid procedures

11   motion, Your Honor.  As discussed in the declarations, the

12   Debtors conducted a fulsome marketing process for their

13   assets in the months leading up to the petition date.  This

14   process resulted in the sale of a certain number of foreign

15   subsidiaries to the private sales motion, and the marketing

16   efforts also drove interest in the Debtors' remaining

17   assets.

18          The Debtors are seeking to sell those remaining

19   assets at public auction, in accordance with the bid

20   procedures that we're discussing now.  These procedures will

21   provide for the Debtors to seek bids, and have them

22   submitted by August 8th, and to conduct an auction on August

23   11th.  We are seeking an objection deadline to the sales of

24   August 12th, and a sale hearing on August 13th.  All of

25   these dates are driving to the outside closing date of the

1    sales, which is August 15th, which is also, as Mr. Pachulski

2    mentioned, the date that the Estates run out of liquidity.

3         Notice of the sales will be served on the notice

4    parties, who are listed out in paragraph 20 of the motion.

5    Those parties include the U.S. Trustee, the 30 largest

6    Creditors, and all parties asserting a lien on the assets to

7    be sold, among others.  The notice will also be posted on

8    the website maintained by Kroll so that all parties can see

9    it.

10        Because of the timing of the sales, and the

11   structure of the bid procedures, as Mr. Pachulski mentioned,

12   the assumption and assignment of contracts needed by a

13   purchaser is somewhat unique.  Once we understand the

14   universe of bids, we intend to serve cure notices both

15   directly to contract counterparties, and by posting on the

16   Kroll website within 18 days of the petition date, which is

17   August 15th.  The notices will include proposed cure

18   amounts, and parties will have the ability to object to the

19   cure amounts, among other matters, and all objections will

20   be due within 10 days of receipt of the cure notice.

21        The form of notice is attached to the proposed

22   order, and as Mr. Pachulski also mentioned, to the extent

23   necessary to bridge any operational issues, the parties are

24   considering entering into transition services agreements.

25        The auction and assessment of bids will be done,

```
 1    again, in accordance with the bid procedures, which are
 2    attached to the form of order as Exhibit 1, and the Debtors
 3    will consult with the Consultation Parties in assessing the
 4    bids, and the Consultation Parties include the statutory
 5    committees appointed in this case, the Ad Hoc Noteholder
 6    Group, Nano, the second lien lenders, and Quinn Emanuel.
 7             We are asking Your Honor to approve the bidding
 8    procedures, and we are also seeking waiver of Rule 6004(H)
 9    to have the order become effective immediately.  Unless Your
10    Honor has any questions, if Your Honor would indulge me, I
11    would ask Your Honor to set the hearing now, and to take
12    control of the order and enter into it manually as we go
13    through this.
14             THE COURT:  Yeah, let me just ask if anyone wishes
15    to be heard in connection with the bidding procedures.  So
16    again, we're not approving an actual sale today, we're just
17    approving procedures.
18             Okay.  I've reviewed the bidding procedures, and I
19    --
20             There's someone who's got me on speaker.  If you
21    can just place your phone on mute?
22             I reviewed the bidding procedures, and I know that
23    we're -- This is moving on an expedited timeframe, but I --
24    Mr. Gilligan has assured me that they have been working and
25    sending, that there has been a process underway now, and I
```

1    take comfort that the Secured Creditors are here.  And

2    again, I am just approving a process by which parties will

3    have an opportunity to provide a bid, and conduct an

4    auction.

5            I'm going to approve the bid procedures.  I'm

6    going to set the sale hearing on August 13th, at 2 p.m.

7    Central.

8            MR. DEMO:  And would you like to manually adjust

9    that, or should we submit a final proposed order?

10           THE COURT:  No, I've already entered it.

11           MR. DEMO:  Okay.

12           THE COURT:  What I'm not going to do is --

13           Again, someone's got me on speaker.  If you could

14   just place your phones on mute?  I can just -- I can hear

15   it, because I can hear myself.

16           If you can -- I'm signing the order, and the order

17   has the date, but I'm not going to flow through the

18   exhibits.  Somebody will then adjust -- We'll let, I don't

19   know, Kroll or whoever kind of get it in the form.  The form

20   will have it blank, but it will be in the order itself.

21   That's as far as I trust myself (indiscernible)

22           MR. DEMO:  Absolutely (indiscernible) Thank you,

23   Your Honor.

24           THE COURT:  Okay.

25           All right.  Where do we go next?

1          MR. DEMO:  All right.  Next up, unless somebody

2     corrects me, is cash management, which is at Docket number

3     60.

4          THE COURT:  Okay.

5          MR. DEMO:  For this one, Your Honor, we are at

6     this time only seeking interim relief.  We have had some

7     back and forth with the U.S. Trustee on this motion, but we

8     believe that all of the issues that the U.S. Trustee has

9     raised have been resolved.

10          The cash management system consists of 23 bank

11     accounts, at eight different banks.  Desktop Metal's primary

12     accounts are at Silicon Valley Bank, which is now a division

13     of First Citizens, and Desktop Dental's primary accounts are

14     at PMC.  We attached a schematic of the cash management

15     system to our motion, but generally cash from operations

16     flows into collection accounts, and is then swept into

17     operating accounts, which are used to pay ordinary course

18     expenses, including wages.  Desktop Metal also maintains a

19     master account at Silicon Valley, and all cash from its

20     operating accounts in excess of $250,000 are swept into that

21     master account.  On the petition date, the total cash in the

22     system was approximately $2.7 million, and the fees for

23     maintaining the cash management system are approximately

24     $25,000 per month.

25          Five of the eight banks used by the Debtors are on

1    the U.S. Trustee's approved depository list.  We believe

2    that the remaining three banks are well capitalized, but

3    have agreed to work with the U.S. Trustee to bring those

4    remaining counts into compliance with U.S. Trustee's

5    guidelines by September 10th (indiscernible)

6              THE COURT:  Counsel (indiscernible) Is the order

7    at 60?  Does that include all the language that you want?

8    Or is there a further revised order?

9              MR. DEMO:  Yes, Your Honor.  No, that's it.  It's

10   60-1, yes.

11             THE COURT:  Ms. Whitworth, are you okay with 60,

12   the order -- the language?

13             MS. WHITWORTH:  Yes, Judge.  Thank you.

14             THE COURT:  Okay.

15             All right.  I'm approving the cash management

16   motion.  It's an interim order, and preserves cash.  It

17   preserves the system that's in place, subject to further

18   discussions with the Office of the United States Trustee.

19   This is just to allow the Debtor to ease into the Chapter 11

20   process without material disruption to its cash management,

21   but the schematic does provide the transparency that the

22   Court needs.  So the proposed final order, it says that you

23   all will file this separately noticed.  So you know you're

24   going to use the August 20th at 1 p.m., August 13th dates

25   that we have in terms of the objection deadline.  Or what

1    date are we using?  Are we using this August 20th, August

2    13th?  Or what date did you -- Because I think that's the

3    date we set for the interim, isn't it?

4         MR. DEMO:  I believe that it's the date we used

5    for the cash collateral.  Unless Mr. Pachulski tells me

6    otherwise, we're fine with using that.

7         For this date, you know, we are not seeking the

8    final hearing yet.  We need to kind of assess, and see where

9    the case is before we come back to Your Honor with that.

10   But --

11        THE COURT:  Okay.  Okay.  Okay.  But I will tell

12   you if you want to, you can use that date, and we can see

13   where we are.

14        MR. DEMO:  Okay.

15        THE COURT:  If you need to enter a further interim

16   or something, we'll see where that goes.  Okay?

17        MR. DEMO:  Okay.  Thank you, Your Honor.

18        THE COURT:  All right.  Where do we go next?

19        MR. WALLEN:  Judge, it's back to me, with the

20   balance of the motions we have today.  Up next on the

21   agenda, if it works for you, Judge, is the tax motion, filed

22   at Docket number 55.  I will be brief.

23        Judge, the Debtor believes that they are

24   substantially current on all of their tax obligations, and

25   by the tax motion, we're seeking to pay amounts which became

1    -- which become due post-petition, but accrued pre-petition.

2    The Debtors, right before the petition date, found out about

3    some asserted property taxes which they're in the process of

4    evaluating.  They believe that those are the only accrued

5    but unpaid amounts.  And again, by this motion, we would

6    simply seek approval to continue to pay taxes in the

7    ordinary course of business, regardless of whether they

8    accrued pre or post-petition.

9             We did visit with Ms. Whitworth, I understand, and

10   she's signed off on the proposed form of order

11   (indiscernible)

12            THE COURT:  Does anyone object to the taxes

13   motion?

14            All right, I'm approving it.  Pay your taxes.

15            Where do we go now?

16            MR. WALLEN:  Judge, up next we've got the utility

17   motion at Docket number 53.  The utility (indiscernible)

18            THE COURT:  I'll take lead on this one.

19            Anyone object to the utilities motion?  It's

20   routine, and I suspect no internet provider is here, but --

21            Anyone object to a utility, and me approving the

22   utilities motion.  For purposes of today, the proposed

23   adequate assurance is, what is it, two weeks' deposit?  Are

24   you doing that?

25            MR. WALLEN:  Correct, Judge.  It's going to be

1    $84,000 deposited in a segregated account.  The procedures

2    are ones the Court is familiar with.

3              THE COURT:  Okay.  Anyone wish to be heard on the

4    utilities motion?

5              MR. BYRNE:  Judge -- Yeah, this is Brandon Byrne

6    with Point 5.

7              THE COURT:  Ah -- fantastic.  A utility, yes.

8              MR. BYRNE:  (indiscernible) One quick question.

9    So we're a managed service provider that resells internet to

10   Desktop Metal, and we're just -- I'm just not 100% clear on

11   kind of the process for us.  I understand that we're kind of

12   obligated to provide services.  However, we are not

13   technically a utility.  We are a managed services provider.

14   So we contract with utilities, and then we resell it to

15   Desktop Metal.

16             Currently Desktop Metal is, what is this, for

17   June, which is past due, July, which is past due as of

18   tomorrow -- So just trying to understand, and look at what

19   we should expect from a payment perspective, to put it

20   simply, I guess.

21             THE COURT:  Can you identify your client again one

22   more time?

23             MR. BYRNE:  So this is Brandon Byrne with Point 5.

24             THE COURT:  Point 5 --

25             MR. BYRNE:  And the client is Desktop Metal.

```
 1                THE COURT:  Okay.  All right.

 2           Mr. Wallen?

 3                MR. WALLEN:  So Judge, we would -- Mr. Byrne, if

 4      you would like to reach out to me regarding your questions

 5      regarding the utility order, I'm happy to answer them

 6      offline.  But Judge, this would prohibit the disconnection,

 7      consistent with the automatic stay of any amounts related to

 8      the pre-petition period.

 9                And Mr. Byrne, what this would do is establish a

10      procedure for you to request an adequate assurance deposit

11      in connection with Section 366 of the Bankruptcy Code.  If

12      we're not able to reach an agreement regarding the amount of

13      the adequate assurance deposit for the post-petition

14      services, you would have the opportunity to come back to

15      this Court, and Judge Lopez here would decide the proper

16      amount.

17                THE COURT:  Right.  I think he's also wondering

18      whether he's a utility.

19                MR. WALLEN:  I think that was my understanding.

20      But if we have to visit more with Mr. Byrne about that, we

21      could potentially take him off the utility lists.  But we're

22      happy to remove him (indiscernible)

23                THE COURT:  So Mr. Byrne, here's what I'll do --

24      So really, what I'm asking for is kind of -- By me signing

25      this order, I'm going to kind of just -- Because you're on
```

1   the list doesn't mean that -- It's just going to say that

2   you can't -- To the extent that you were -- you had the

3   ability to cut off services that the Debtor is using in

4   terms of the form of a utility, I'm going to kind of make

5   sure that no one cuts the Debtor off during the next 20

6   days, essentially.

7          In connection with that, and they're going to be

8   required to put up a deposit, but what I would ask is that

9   you speak to Mr. Wallen to -- And everybody's rights are

10  reserved in terms of whether you are kind of technically a

11  utility, a service provider or something else.  And

12  everyone's rights would be preserved, and you could come

13  back on the 20th, and come tell me that you are not a

14  utility, or that you think -- anything in connection with

15  the motion.  All of your rights would be preserved at this

16  time.  But I'm going to make sure that -- I'm just going to

17  ask that you reach out to Mr. Wallen to just start the

18  discussions.

19         MR. BYRNE:  Okay.  Yes, sir.  Thank you.

20         THE COURT:  Thank you.

21         All right.  Where do we go next, Mr. Wallen?

22         MR. WALLEN:  Judge, up next would be the insurance

23  motion, filed at Docket 56.  By this motion, they're seeking

24  -- its traditional insurance motion relief, seeking to

25  continue their insurance program, pay any accrued unpaid

1    amounts with respect to their insurance, including broker's

2    fees, that would also apply to the Debtor's customs bond

3    program, and to seek to amend, renew, and replace any

4    insurance or customs bonds in the ordinary course.

5            Judge, the Debtors do believe that they are

6    current on all of those obligations, and they don't have any

7    premium financing.  We have reviewed this proposed form of

8    order with Ms. Whitworth's office, and believe that they are

9    unopposed to it.

10           Unless, Judge, you've got any questions for me, we

11   would respectfully request entry of the proposed order,

12   filed at Docket 56-1.

13           THE COURT:  Anyone wish to be heard in connection

14   with the insurance motion?

15           Okay.  I've reviewed the motion, the relief

16   request that it's important to maintain insurance.  It's

17   also a requirement.  The U.S. Trustee guidelines maintain to

18   have insurance, so it is important to maintain it, and I am

19   approving the motion.

20           Where do we go next?

21           MR. WALLEN:  Judge, up next on the calendar we've

22   got the Debtor's personal information motion and notice of

23   commencement motion, filed at Docket number 50.  By this

24   motion, Judge, the Debtors seek to redact certain personally

25   identifiable information of individuals, pursuant to Section

1   107 of the Bankruptcy Code.  The Debtors believe that ample

2   cause exists, given the size and prominence of these cases,

3   to go ahead and redact the address and other contact

4   information.  But we've unredacted the names of individual

5   creditors, consistent with common practice in cases of this

6   kind.

7          Additionally, Judge, by this motion, the Debtors

8   are seeking approval of their notice of commencement, and

9   notice of certain events in these cases, pursuant to Section

10   2002 of the Bankruptcy Code, including the notice of

11   commencement which gives notice of the Debtor's initial 341A

12   meeting.  In these cases, a proposed form of notice of

13   commencement is attached to the proposed order as Exhibit A.

14          Additionally, Judge, as part of this motion, the

15   Debtors are requesting that the Court approve a limitation

16   on the notice requirements of Bankruptcy Rule 2002(a)(2) and

17   (a)(3) with respect to sale motions, or really any of the

18   use, sale, or lease provisions of the Code, or settlement

19   motions.  The request here is to not require service on the

20   entire creditor matrix, which would require service on over

21   20,000 parties, many of whom are individual former

22   customers.  Providing notice here would be exceptionally

23   costly, given the universe of folks,, and unlikely to

24   meaningfully aid in the efficient administration of the

25   cases (indiscernible)

```
 1              THE COURT:  So my understanding is -- my
 2   understanding is that you're going to try to -- you just, or
 3   individual, these things that don't pertain to a party, but
 4   if there's something that could affect them, that creditor
 5   or that counterparty would receive notice, notice of the bar
 6   date, they would receive notice of the commencement of the
 7   case, matters related to confirmation, if there is, if we
 8   get there.  The big stuff that's required for everyone to
 9   receive, but if there's a settlement between two parties,
10   then not require that to be served on everyone.
11              That makes sense to me.  I will approve the
12   motion.
13              MR. WALLEN:  Thank you, Judge.
14              THE COURT:  Okay.
15              MR. WALLEN:  Judge, up next we have a worldwide
16   stay motion at Docket number 51, seeking to restate but not
17   amend or enhance or otherwise alter the provisions of
18   Section 362 of the Bankruptcy Code, or for example,
19   365(e)(1)(B) regarding ipso facto clauses.
20              The Debtors do have international operations, and
21   having the worldwide stay order often helps address
22   confusion of Creditors who may not be as familiar with U.S.
23   bankruptcy law at the outset, before issues grow, which
24   could be costly and disruptive.  We have previewed this with
25   the Office of the United States Trustee, who we understand
```

 1    is unopposed to entry of the order.

 2           THE COURT:  All right.  The thing is this is just

 3    tracking the Code.  It's -- I guess what I grew up, as a

 4    baby lawyer, being called as a comfort order.  And I've

 5    reviewed it.  This tracks 362, and doesn't grant any

 6    additional relief.  So I'll sign the order.

 7           Now we get to the important ones.  Not the

 8    important ones, the ones that we've got to kind of work

 9    through it a little bit.  So let's talk about the next, the

10    last two.

11           MR. WALLEN:  Yes, Judge.  We've got a scheduled

12    extension motion and bar date motion that seems like maybe

13    we just talk about these as a group, if that works for you,

14    Judge?

15           THE COURT:  I think that makes sense.

16           MR. WALLEN:  We are requesting a schedules

17    extension to September 11th, which is an extension -- or

18    excuse me, September -- yeah, September 11th, apologies,

19    which is an extension of 31 days, for a total of 45 days to

20    prepare their schedules and statements.

21           While I heard Your Honor's comments, frankly,

22    regarding the whole thing, and when the Court takes the time

23    to raise an issue at the outset, we want to be receptive to

24    it, on the schedule side of the house, Judge, frankly, I

25    think that everybody heard Your Honor's comments.  We're

1    going to try and get the schedules done sooner, I think more

2    than typical.  But the reality of it is we'll have a sale

3    process that will be active, and that will -- folks will

4    have to spend their time focused on the sale process in

5    part.  And so I think that the schedules extension

6    (indiscernible) back to the bar date.

7              In particular, the purpose here, Judge, as you see

8    in our paper, is to (indiscernible)

9              THE COURT:  Just tell me how the logistics work,

10   you know?  I mean, they can -- Back in the day, they would

11   have just sent you in a box somewhere, and you would have

12   just cranked them out over a weekend if that's what we had

13   to do.  It's just -- I'm not worried.  Pachulski can get the

14   stuff done if they needed to, it's just going to be a lot of

15   work.  I just want to know how we're going to make both of

16   the times work.  I can't have a bar date where someone's --

17             You know, effectively, by giving you a schedule

18   extension, I'm forcing everyone to file a proof of claim.

19   That's the issue I've got.  So we've just got to -- I don't

20   mind the schedules extension.  You can have whatever date

21   you want, we've just got to -- Just tell me why you need

22   September 2nd as the bar date.  That is really the issue of

23   the day, and whether there is flexibility there.  If you can

24   give me some comfort on just -- Creditors have to be able to

25   see it, just to know whether they need to have the ability

1    to file a proof of claim, it's really the issue that I have

2    to get comfortable with.  That is really it.

3            Ms. Whitworth, there may be other things that you

4    are concerned about, but that is the one that just jumped

5    out at me.

6            I don't mind giving a schedules extension, and I

7    think you ought to get it right.  They're going to be signed

8    under penalty of perjury -- so there are a lot of reasons to

9    do this, and give the extension, to get it right.  Quite

10   frankly, transparency and accuracy are the keys to

11   schedules.  But the bar date, it's just the date itself I

12   think we just have to think through a little bit more than

13   anything else, Mr. Waller.

14           MR. WALLEN:  Yeah, no, I hear you, Judge, and we

15   did confer after your comments here.  We feel like the goal

16   here, and the reason for setting the bar date, frankly, is

17   we need to have an option to complete a plan process.

18           THE COURT:  Mm-hmm.

19           MR. WALLEN:  If things go well at the sale,,

20   right, we're going to need to have a plan process, to be

21   able to exit so we can avoid conversion or dismissal.  To

22   get Creditor support, and to get Creditors involved, we need

23   to set a prompt bar date for that purpose, and we need --

24   The liquidity here, as you've heard over and over again, is

25   pretty tight.  So that means we're going to have to

1   immediately pivot to a fast plan process, or at least get

2   the plan process going quickly.  Rather is probably a better

3   way to say that.

4           The concern is that if we set the bar date out too

5   far, folks won't be filing their proofs of claim, there will

6   be less Creditor participation.  Creditor participation in

7   the plan process is absolutely key.  And so (indiscernible)

8           THE COURT:  So what date are you proposing?

9           MR. WALLEN:  September 2nd for the bar date.

10          THE COURT:  So you can't do it.  Then I can't give

11  it to you.  Then I -- The concern about a potential

12  conversion, and Creditor participation can't trump

13  transparency, and -- so it just can't.  They have to have an

14  opportunity to see the schedules, to see whether they need

15  to file a proof of claim.  If not, I'm forcing everyone to

16  file a proof of claim.  Or they're going to file a proof of

17  claim, and then they're going to see the schedules, and

18  maybe they like what the schedules say, and we're going to

19  have a -- and then you are going to have to resend stuff

20  out.  And then if you amend the schedules, then they get

21  another 30 days on top of that.  You are going to have to be

22  flexible on this, or get the schedules out fast.

23          You get the schedules out -- Maybe the answer is,

24  you know, 20 days after the schedules are filed.  But there

25  has to be that opportunity to do so.  So if you get it out

1   faster, we don't -- I can't sign a bar date order where the

2   schedules won't be on file.  I just can't do it.  So we're

3   just going to have to think through that.  And I understand

4   the concerns, but we're going to have to --

5           You know, based on your schedules extension, and

6   the outside date is September 30th, but maybe if you get

7   them on file earlier, it's just 20 days after whenever you

8   get them on file, or maybe -- well, 25 days, because you're

9   going to have to mail them out.  You're going to have to

10  give people an opportunity to see them.  So --

11          MR. WALLEN:  Understood, Judge.

12          THE COURT:  In other words, if you get them out in

13  the next two weeks, then it will be early September, and we

14  won't have a problem.  But I don't -- It's a lot of work,

15  and there's a lot of Debtors, and I don't want to jam

16  anyone.

17          MR. WALLEN:  Well, Judge, I (indiscernible) would

18  -- I suppose providing notice (indiscernible) the bar date -

19  - If we were to give notice of a bar date, of a fixed date

20  from the latest date of our schedules, of say, seven days,

21  so folks would have the opportunity to know that it's

22  coming, they'll be aware of it, would --

23          And I'll ask Mr. Pachulski (indiscernible)

24          THE COURT:  No, seven days means that you are

25  going to file it, and then -- but then they won't see it.

1   Then they're going to have to on to Kroll to go find it.

2   It's just not going to work.

3          So we can think about this a little bit more, but

4   I think what you have to -- I'm happy to give you the

5   extension.  But maybe what makes the most sense is -- I

6   don't know, I give you a date early next week, and then we

7   finalize kind of when you think you're really going to get

8   the schedules on file, and then we just give you a firm date

9   there.  I've got to (indiscernible)

10         MR. WALLEN:  I think that makes the most sense.

11  Let me go visit, and see what we can do in light of the

12  Court's comments, and maybe we can come back (indiscernible)

13         THE COURT:  Maybe it can be done on a rolling

14  basis.  Yeah, I'm just, I'm open to it, but I've got to give

15  Creditors an opportunity to see it, or have the opportunity

16  to see it, or to understand it.

17         MR. WALLEN:  Understood, Judge.  When might be a

18  good time we would come back early next week?

19         THE COURT:  Oh no, I'll give you time whenever you

20  want.  I'll give you time whenever you want.  If you want to

21  -- What may make the most sense is Monday.  I don't want to,

22  like, waste a lot of time.  Maybe we can come back --

23         How about 11:30 a.m. on Monday?

24         MR. WALLEN:  Judge, that works (indiscernible) And

25  we'll visit with the relevant folks, and visit with Ms.

1  Whitworth, and we'll be back to you with an update on

2  Monday.

3          THE COURT:  We'll just pick a date, and -- we'll

4  just pick a date, and -- and get it going.

5          Okay.  Anything else?

6          MR. PACHULSKI:  Your Honor, it's Richard

7  Pachulski.  I apologize, Your Honor.  May I ask a question

8  about this issue?  (indiscernible)

9          THE COURT:  Yeah.  Yeah, yeah, absolutely.

10          MR. PACHULSKI:  Thank you so much, Your Honor.  I

11  think when we have the hearing, it would be helpful for me

12  to understand what the dates would be that you would find

13  acceptable in terms of plan confirmation.  Because whether

14  we like it or not, my deepest concern is this -- A, we have

15  to get the right number to even have this opportunity, and

16  we don't have a lot of time.  So if you tell us we have to

17  get the schedules done by X-date to get our confirmation,

18  then we're going to just have to live with it.  I mean,

19  that's just the bottom line.  So we almost have to know -- I

20  mean, to give people 25 days, we won't be able to do it

21  (indiscernible) the plan.

22          THE COURT:  Well --

23          MR. PACHULSKI:  And so we're all fighting

24  (indiscernible) but we just need (indiscernible) we'll take

25  the risk.  But --

```
 1              THE COURT:  That's what I'm saying (indiscernible)
 2    I'm just thinking out loud with you here.  If schedules went
 3    out, if you could get the schedules on, let me see --
 4              Give me a second Mr. Pachulski.  Let me take a
 5    look at something here.
 6              And I don't know if this is possible or not.
 7    Obviously, you're all going to huddle up.  But if the
 8    schedules got on file by August 22nd, right, which is giving
 9    everyone three weeks, and I know that's a lot of work, then
10    I don't see why the bar day couldn't be September 5th.  And
11    that will keep you close.  I just don't know if that's
12    possible.  But --
13              MR. PACHULSKI:  Your Honor, we're going to have to
14    make it work.  I guess one thing I don't have in front of me
15    is (indiscernible)
16              THE COURT:  Or the 25th.  Or Monday the 25th, you
17    know, at the latest.  But there's got to be some time, you
18    know?  And my concern is, thinking out loud, but if
19    something happens, and all of a sudden -- you know, then
20    everybody's got to file one of these, you filed -- you know,
21    you filed your claim late, and it's going to jam them on the
22    front end, and then on the back end they're going to be
23    penalized because who knows when they got a letter, that
24    kind of stuff.  And so I'm trying to be sensitive to all
25    those issues.
```

 1          But I think on Monday, just tell me -- we'll pick

 2     a date.  I get the issue, and maybe I can be flexible.  But

 3     someone give me a realistic sense as to when these

 4     schedules, or the bulk of them could go out, you know?  So

 5     like, the main ones, where all the Creditors sit.  That

 6     would just be helpful for me.

 7          But I got it, you've got to keep the dates close,

 8     and -- yeah, let's just think.  Let's just all do a little

 9     bit more thinking on it.  And if you find the answer

10     tomorrow, then we'll just have an emergency hearing

11     tomorrow, and we can figure this out, and we can pick a

12     date, and people can get to started to working on it.

13          But Monday, at 11:30.  If that works for you, it

14     will work for me, just to talk about it.

15          MR. PACHULSKI:  (indiscernible) we will absolutely

16     make it work, Your Honor.  And I think what we may want to

17     do is go into more detail, because again, unfortunately, we

18     have the horse before the cart in this case, because we have

19     to give you dates, and make sure you're okay with the plan,

20     because if we don't, if that doesn't work, then we have a

21     different problem.  So we're going to have to work through

22     the plan dates, similar to the recent case Your Honor had in

23     which our firm was involved, so that it matches the bar

24     date.  (indiscernible)

25          THE COURT:  Mm-hmm.  It all makes sense to me.

1        MR. PACHULSKI:  -- it may not, but we're going to

2    give it our best shot to make sure they work.

3        I totally get where Your Honor is coming from.  We

4    don't want to squeeze anyone.  But we also don't want to

5    force a conversion where the claims then must become

6    irrelevant.  So we're trying to thread a needle, and we

7    totally understand where you're coming from, and we just

8    have to work on it.  And that's why Your Honor said we don't

9    have to think about it, but that's our concern, because this

10   is not one where we're going to be able to use dates that we

11   traditionally would like, because except we knock it out of

12   the park with respect to the auction, just we're not going

13   to have that ability.  So we --

14       THE COURT:  No.  Let's all give it some thought,

15   and maybe on Monday, you'll either come up with a -- I'll

16   give it some thought, and maybe we can just kind of put our

17   heads together, and maybe we can think of some language or

18   something that kind of works, and makes it work for

19   everyone.  Ms. Whitworth, I'm sure, will give it some

20   thought as well.

21       MR. PACHULSKI:  We will do that (indiscernible)

22   the United States Trustee's Office, Your Honor.  So we will

23   look forward to seeing Your Honor on Monday.

24       The only other point I might make, I don't know

25   whether I missed it during the presentation, I don't think

1  so, is whether we set a sale hearing date so it's at least

2  on your calendar, which we thought was August 15th.  I don't

3  recall if that was raised, but I don't recall it was.  So I

4  just want to make sure we've got a date for the sale hearing

5  (indiscernible)

6          THE COURT:  I think you do.  I think you do.  I

7  think you do.  I think I was told -- I think we put August

8  13th, at 2 p.m. as the sale day.  And then, August 15th

9  would be like the outside closing date, if I remember the

10  way the procedures worked correctly.

11          MR. PACHULSKI:  Yes.  I just wanted to -- I just

12  hadn't heard that, Your Honor, so I apologize.

13          THE COURT:  Yep, yep.  No, no, no, no worries.  At

14  least that's what I put in the proposed order, was August

15  13th, at 2 p.m.  So that's what's in there now as your sale

16  date.  It's set.

17          MR. PACHULSKI:  Thank you, Your Honor.

18          THE COURT:  All right, folks --

19          MR. PACHULSKI:  And thank you (indiscernible)

20  today.  This has been a really great process for a really

21  difficult case, so we cannot thank -- The entire group

22  thanks Your Honor for that.

23          THE COURT:  Thank you very much.  Y'all have a

24  good afternoon.  Thank you.

25          So Mr. Pachulski, my understanding is there's no

1   need to come back.  Right?  I think we've covered everything

2   on the agenda?

3             MR. PACHULSKI:  Correct.  Right?  Yeah.

4             THE COURT:  Okay.  Okay.

5             MR. PACHULSKI:  (indiscernible) by the 12:30 time,

6   and we did it by eight minutes, so I feel very good about

7   it.

8             THE COURT:  All right.  Thank you very much.  Have

9   a good day.

10

11             (Proceedings adjourned.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         <u>CERTIFICATION</u>

2

3

4       I certify that the foregoing is a correct transcript from

5       the electronic sound recording of the proceedings in the

6       above-entitled matter.

7

8

9

10

11      Lindsay Peacock

12

13

14

15

16

17

18

19      Veritext Legal Solutions

20      330 Old Country Road

21      Suite 300

22      Mineola, NY 11501

23

24      Date:  August 4, 2025

25