United States Bankruptcy Court
Southern District of Texas

**ENTERED**

September 04, 2025

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| DESKTOP METAL, INC., *et al.*, | Case No. 25-90268 (CML) |
| Debtors.[1] | (Jointly Administered) |

### ORDER (I) APPROVING (A) SALE OF CERTAIN ASSETS
### FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND
### OTHER INTERESTS AND (B) ASSUMPTION AND ASSIGNMENT OF
### CERTAIN CONTRACTS AND LEASES AND (II) GRANTING RELATED RELIEF

Upon the *Debtors' Emergency Motion for Entry of an Order (I) Approving (A) Sale of Remaining Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests and (B) Assumption and Assignment of Certain Contracts and Leases and (II) Granting Related Relief*, dated July 30, 2025 [Docket No. 61] (the "Motion"),[2] filed by the above-referenced debtors and debtors in possession (collectively, the "Debtors") seeking, among other things, entry of an order (this "Order") (i) authorizing the sale of certain assets free and clear of all Liens, Claims, Encumbrances, and Interests (as defined herein) pursuant to the terms of that certain *Asset Purchase Agreement*, dated as of August 26, 2025 (as attached hereto as **Exhibit 1** and together with all other agreements, documents, instruments, deliverable thereunder or attached thereto or

---

[1]   The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are:  Adaptive3D LLC (3990); Adaptive 3D Technologies, LLC (5893); Beacon Bio, Inc. (9005); Brewer Tafla Dental Technologies, LLC (6452); Dental Arts Laboratories, Inc. (8905); Desktop Labs, Inc. (5344); Desktop Metal Operating, Inc. (7659); Desktop Metal Securities Corporation (9007); Desktop Metal, Inc. (4042); EnvisionTEC US LLC (2483); ExOne Americas LLC (3443); ExOne Operating, LLC (8851); Figur Machine Tools LLC (2489); Larry Brewer Dental Lab Inc. (0215); May Dental Arts, LLC (8558); and The Syzygy Memory Plastics Corp. (8063). The location of the Debtors' corporate headquarters and the Debtors' service address is: 63 Third Avenue, Burlington, MA 01803.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or APA, as applicable.

reference therein, and as may be amended, modified, or supplemented, the "<u>APA</u>") by and among Debtors Desktop Metal, Inc., Desktop Metal Operating, Inc., Adaptive 3D LLC, Adaptive 3D Technologies, LLC, Desktop Metal Securities Corporation, ExOne Operating LLC, and ExOne Americas LLC, as Sellers,[3] and Arc Impact Acquisition Corp. ("<u>Buyer</u>," and such sale, the "<u>Sale Transaction</u>"), with liens to attach to the proceeds of the Sale Transaction, (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases to be identified and noticed pursuant the APA (the "<u>Assumed Contracts</u>") in accordance with the Assumption and Assignment Procedures; and (iii) granting related relief, all as more fully set forth in the Motion; and upon consideration of the evidence submitted in support of the Motion; and upon Buyer and the applicable Debtors having agreed to the terms of the APA with respect to the Sale Transaction; and the Court having jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. § 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that the Court may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that proper and adequate notice of the Motion and hearing thereon has been given and that no other or further notice is necessary; and the Court having conducted a hearing on September 4, 2025 (the "<u>Sale Hearing</u>") to consider the relief requested in the Motion as set forth in this Order; and all parties in interest having been heard or having had the opportunity to be heard regarding the Motion, the Sale Transaction, the APA, and all relief set forth herein; and all objections, if any, to the Motion having been withdrawn, resolved, or overruled on the merits; and upon the record of the Sale Hearing and all of the proceedings had before this Court; and the Court having determined that the

---

[3]   References to the Debtors herein shall be to the Debtor Sellers under the APA, as applicable.

legal and factual basis set forth in the Motion establish just cause for the relief granted herein; and the Court having determined that the sale of the Acquired Assets to Buyer is in the best interests of the Debtors, their estates, creditors, and other parties in interests; and the Court having found that proper and adequate notice of the Motion and hearing thereon has been given and that no other or further notice is necessary, it is HEREBY FOUND AND DETERMINED THAT:

A.    **Findings and Conclusions.**    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.    **Jurisdiction.**  The Court has jurisdiction to hear and determine the Motion and to grant the relief requested in the Motion pursuant to 28 U.S.C. § 1334 and the Standing Order of Reference from the United States District Court for the Southern District of Texas, dated May 24, 2012.  Without limiting the generality of the foregoing, this Court has exclusive *in rem* jurisdiction over the Acquired Assets pursuant to 28 U.S.C. § 1334(e), as such Acquired Assets are property of the Debtors' chapter 11 estates, and, as a result of such jurisdiction, this Court has all necessary power and authority to grant the relief contained herein.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b), and as such, this Court has the authority to enter a final order.

C.    **Venue.**  Venue of these chapter 11 cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

D.    **Statutory Predicates.**  The statutory and legal predicates for the relief requested in the Motion are sections 105, 363, and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006, and 9007, and the applicable Local Rules.

E.  **Notice.**  Proper, timely, adequate, and sufficient notice of the Motion, the Sale Transaction, the Sale Hearing, and the deadlines related thereto was provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006, and 9007, to each party entitled to such notice.  The foregoing notices were good, sufficient, and appropriate under the circumstances.

F.  **Acquired Assets Property of the Estate.**  The Acquired Assets sought to be sold and assigned by the Debtors to Buyer pursuant to the APA are property of the Debtors' estates and title thereto is vested in the Debtors' estates.

G.  **Sufficiency of Marketing.**  The Debtors and their professionals adequately marketed the Acquired Assets and conducted the marketing and sale process as set forth in the Motion and conducted a fair and open sale process.  The sale process was non-collusive, duly noticed, and provided a full, fair, and reasonable opportunity for any entity to make an offer to purchase the Acquired Assets, and there was no other transaction available or presented that would have yielded a higher or better result for the Acquired Assets.  Based upon the record of these proceedings, all creditors and other parties in interest and all prospective bidders have been afforded a reasonable and fair opportunity to bid for the Acquired Assets and/or to object to the Sale Transaction.

H.  **Highest or Otherwise Best Offer.**  The Debtors have determined, in a valid and sound exercise of their business judgment and after a robust and extensive marketing process, the transactions contemplated by the APA represented the highest or otherwise best bid and afforded a full, fair, and reasonable opportunity for any entity or person to make a higher or otherwise better offer for the Acquired Assets. The Debtors have demonstrated that (i) the APA is the highest or otherwise best offer for the Acquired Assets, (ii) the APA and the closing thereon presents the best

opportunity to realize the maximum value of the Acquired Assets, and (iii) the Debtors' entry into the APA and consummation of the Sale Transaction (the "Closing," and the date of such Closing, the "Closing Date") is a sound exercise of the Debtors' business judgment.

I.      **Business Justification; Fiduciary Duties.**  The Debtors have demonstrated that entry into the APA and consummation of the Sale Transaction constitute the exercise by the Debtors and their directors, managers, and officers of their fiduciary duties and sound business judgment, and such acts are in the best interests of the Debtors, their estates, and creditors, and all parties in interest.  The Court finds that the Debtors have articulated good and sufficient business reasons justifying the sale of the Acquired Assets to Buyer pursuant to the terms and conditions set forth in the APA.

J.      The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assumed Contracts to Buyer in connection with the consummation of the Sale Transaction and in accordance with the Assumption and Assignment Procedures, and that the assumption and assignment of the Assumed Contracts, in accordance with the Assumption and Assignment Procedures, is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.  The Assumed Contracts being assigned to Buyer, subject to compliance with the Assumption and Assignment Procedures, are an integral part of the Sale Transaction, and, accordingly, their assumption and assignment is reasonable and an enhancement to the value of the Debtors' estates.

K.      Because the entry into and consummation of the APA constitutes the exercise by the Debtors of sound business judgment, the Debtors and their respective current and former members, managers, officers, directors, employees, advisors, professionals, and agents shall have or incur no liability to the estates or any holder of a Claim against or interest in the Debtors for

any act or omission in connection with, related to, or arising out of the negotiations of the APA or the consummation of the Sale Transaction contemplated thereunder, other than liability of the Debtors arising out of or relating to any willful misconduct or fraud, in each case as determined by a court of competent jurisdiction.

L.    **Corporate Authority.**  The Debtors (i) have full corporate or other organizational power and authority to execute the APA and all other documents contemplated thereby, (ii) have all of the power and authority necessary to consummate the Sale Transaction, and (iii) have taken all corporate or other organizational action necessary to authorize and approve the APA and any actions required to be performed by the Debtors to consummate the Sale Transaction.  No further consents or approvals of the Debtors are required for the Debtors to consummate the Sale Transaction.

M.    **Arm's-Length Sale and Buyer's Good Faith.**  The APA was negotiated and is undertaken by the Debtors and Buyer at arm's length, without collusion or fraud, and in good faith within the meaning of section 363(m) of the Bankruptcy Code.  Buyer recognizes that the Debtors were free to deal with any other party interested in acquiring the Acquired Assets.  All payments to be made by Buyer and other agreements or arrangements entered into by Buyer in connection with the Sale Transaction have been disclosed, and Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction.  As a result of the foregoing, Buyer is a "good faith" Buyer within the meaning of section 363(m) of the Bankruptcy Code, and as such, is entitled to all of the protections afforded thereby, including in the event this Order or any portion thereof is reversed or modified on appeal.

N.    **No Fraudulent Transfer.**  The total consideration provided by Buyer pursuant to the APA constitutes reasonably equivalent value and fair consideration under the Bankruptcy

Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and any other applicable law, and may not be avoided under section 363(n) of the Bankruptcy Code or any other applicable law.  The APA was not entered into, and the Sale Transaction is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  Neither the Debtors nor Buyer has entered into the APA or is consummating the Sale Transaction with any fraudulent or otherwise improper purpose.

O.      **Free and Clear Transfer Required by Buyer**.  Buyer would not have entered into the APA and would not consummate the Sale Transaction, thus adversely affecting the Debtors, their estates, their creditors, their employees, and other parties in interest, if the sale of the Acquired Assets was not free and clear of the Liens, Claims, Encumbrances, and Interests (other than Permitted Liens, Assumed Liabilities, and as otherwise provided in the APA) or if Buyer would be liable for such Liens, Claims, Encumbrances, and Interests, including, without limitation and as applicable, liabilities that are not expressly assumed by Buyer as set forth in the APA or pursuant to this Order.

P.      The transfer of the Acquired Assets and the Sale Transaction is a legal, valid, and effective transfer of all of the legal, equitable, and beneficial right, title, and interest in and to the Acquired Assets free and clear of the Liens, Claims, Encumbrances, and Interests, except for Permitted Liens, Assumed Liabilities, and as otherwise provided in the APA.

Q.      **Satisfaction of Section 363(f) Standards.**  The Debtors are authorized to sell the Acquired Assets free and clear of the Liens, Claims, Encumbrances, and Interests, other than Permitted Liens, Assumed Liabilities, and as otherwise provided in the APA (with such Liens,

Claims, Encumbrances, and Interests attaching to the proceeds with the same nature, validity, priority, extent, perfection, and force and effect that the Liens, Claims, Encumbrances, and Interests encumbered the Acquired Assets immediately prior to the entry of this Order) because, with respect to each creditor or other person or entity asserting a Lien, Claim, Encumbrance, or Interest, one or more of the standards set forth in section 363(f)(l)–(5) of the Bankruptcy Code has been satisfied.  Each creditor or other person or entity asserting a Lien, Claim, Encumbrance, or Interest in the Acquired Assets (i) has, subject to the terms and conditions of this Order, consented to the Sale Transaction or is deemed to have consented to the Sale Transaction, (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Lien, Claim, Encumbrance, or Interest, or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code.  Those holders of the Liens, Claims, Encumbrances, and Interests who did not object (or who ultimately withdrew their objections, if any) to the Sale Transaction or the Motion are deemed to have consented to the Motion and Sale Transaction pursuant to section 363(f)(2) of the Bankruptcy Code.  Creditors or other persons or entities asserting a Lien, Claim, Encumbrance, or Interest in or against the Acquired Assets could be compelled in a legal or equitable proceeding to accept money satisfaction of such Lien, Claim, Encumbrance, or Interest.

      R.     **No Successor Liability.**  Neither Buyer nor any of its affiliates are successors to the Debtors or their estates by reason of any theory of law or equity, and neither Buyer nor any of its affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates except to the extent explicitly provided in the APA.  Without limiting the generality of the foregoing, and except as otherwise expressly provided herein or in the APA, neither Buyer nor any of its affiliates shall not be liable for any claims against the Debtors or any of their predecessors or affiliates, and neither Buyer nor any of its affiliates shall have any

8

successor or vicarious liabilities of any kind or character, including, without limitation, under any theory of antitrust, environmental, successor, or transfer liability, labor law, de facto merger, mere continuation, or substantial continuation, whether known or unknown as of Closing, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, without limitation, liabilities on account of warranties, intercompany loans, receivables among the Debtors and their affiliates, environmental liabilities, any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of any of the Acquired Assets prior to the Closing.  Buyer is not, and the consummation of the Sale Transaction will not render Buyer, a mere continuation, and Buyer is not holding itself out as a mere continuation, of any of the Debtors or their respective estates, enterprise, or operations, and there is no continuity or common identity between Buyer and the Debtors.  Accordingly, the Sale Transaction does not amount to a consolidation, merger, or de facto merger of Buyer with or into any of the Debtors or their estates and Buyer is not, and shall not be deemed to be, a successor to any of the Debtors or their estates as a result of the consummation of the Sale Transaction.

S.    **Assumption and Assignment Procedures.**  The Assumption and Assignment Procedures are reasonably calculated to provide counterparties to the Contracts to be assumed or assumed and assigned with proper notice of the intended assumption or assumption and assignment of their Contracts, any Cure Costs, and the Assumption and Assignment Procedures, and no other or further notice of such intention, the Cure Costs, or the Assumption and Assignment Procedures shall be required.  The Debtors shall have until **August 28, 2025**, in order to file and serve a Cure Notice with respect to the Contracts covered by the APA, and contract counterparties shall have 10 days from the date of service of such Cure Notice to file a response.

T.      **Assumed Contracts.**  All counterparties of the Assumed Contracts that do not timely file a Cure Objection (as defined herein) to the assumption and assignment of the Assumed Contract(s) to which they are a counterparty as required by the Assumption and Assignment Procedures will be deemed to consent to the assumption and assignment by the Debtors of their Assumed Contract to Buyer, and Buyer shall enjoy all of the rights and benefits under each such Assumed Contract as of the applicable date of assumption and assignment without the necessity of obtaining such non-Debtor party's consent to the assumption or assignment thereof.  If a Cure Objection is timely filed with respect to an Assumed Contract and cannot be resolved by the parties, the Debtors may assume and assign the applicable contract(s) or lease(s) pending resolution of the Cure Objection in accordance with the Assumption and Assignment Procedures and this Order.  Any properly filed Cure Objections will be adjudicated or otherwise resolved in accordance with the Assumption and Assignment Procedures and this Order.  Upon the assignment of an Assumed Contract to Buyer in accordance with the terms of the APA, the Assumption and Assignment Procedures, and this Order, the Assumed Contract shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order, notwithstanding any provision in the Assumed Contracts prohibiting or otherwise restricting assignment or transfer, and the Debtors, their estates, or any of their affiliates, predecessors, successors, or assigns, shall have no further liability or obligation under the Assumed Contracts. To the extent any Assumed Contract is not an executory contract within the meaning of section 365 of the Bankruptcy Code, it shall be transferred to Buyer in accordance with the terms of the APA and, other than with respect to Assumed Liabilities, Buyer shall have no liability or obligation for any (i) defaults or breaches under such agreement that relate to acts or omissions that occurred in the period, or otherwise arose, prior to the Closing Date and (ii) claims, counterclaims, offsets,

or defenses (whether contractual or otherwise, including any right of recoupment) with respect to such Assumed Contract, that relate to any acts or omissions that arose or occurred prior to the Closing Date.

U.     **Cure Costs and Adequate Assurance.**   Pursuant to the APA and subject to compliance with the Assumption and Assignment Procedures, the Cure Costs will be paid by Buyer in accordance with the terms of the APA, except with respect to Nordblom (as defined herein) as set forth in paragraph 14.   Upon satisfaction of the Assignment and Assumption Procedures, the Cure Costs will be deemed the amounts necessary to "cure" (within the meaning of section 365(b)(l) of the Bankruptcy Code) all "defaults" (within the meaning of section 365(b) of the Bankruptcy Code) under such Assumed Contracts that are assumed by the Buyer.   Subject to compliance with the Assumption and Assignment Procedures, Buyer's payment of Cure Costs in accordance with the terms of the APA and promise under the APA to perform the obligations under the Assumed Contracts as of the Closing, after the Closing Date, shall constitute adequate assurance of future performance under such Assumed Contracts.   The Court finds that with respect to all Assumed Contracts, and subject in all respects to compliance with the Assignment and Assumption Procedures, the payment of the Cure Costs as provided in the APA is reasonable and appropriate and is deemed to fully satisfy the Debtors' obligations under sections 365(b) and 365(f) of the Bankruptcy Code.

V.     **No Sub Rosa Plan.**  The APA and the Sale Transaction do not constitute a *sub rosa* chapter 11 plan.  The APA neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates a chapter 11 plan for the Debtors.

W.     **Final Order; Immediate Effect.**   This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to

any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and, sufficient cause having been shown, waives any such stay, and expressly directs entry of judgment as set forth herein.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

1.      **Objections Overruled.**  All objections, if any, to the relief sought in the Motion that have not been withdrawn, waived, settled, or otherwise dealt with herein are hereby overruled on the merits, with prejudice.  All objections to the entry of this Order or to the relief granted herein that were not timely filed are hereby forever barred.

2.      **Approval of Sale Transaction.**  Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Motion is granted, and the Sale Transaction and the APA are approved in their entirety.  The Debtors have satisfied all requirements of sections 363(b) and 363(f) of the Bankruptcy Code, and all other requirements and standards applicable to a sale outside the ordinary course of business, free and clear of the Liens, Claims, Encumbrances, and Interests.  The Debtors, as well as their directors, managers, officers, employees, and agents, are authorized to execute, deliver, and perform their obligations under and comply with the terms of the APA and to consummate the Sale Transaction, including by taking any and all actions as may be reasonably necessary or desirable to implement the Sale Transaction and each of the transactions contemplated thereby pursuant to and in accordance with the terms and conditions of the APA and this Order. The Debtors are further authorized, but not directed, to pay, without further order of the Court, whether before, at or after Closing, any expenses or costs required to be paid to consummate the Sale Transaction or for the Debtors to perform their obligations solely in accordance with the APA. All persons and entities are prohibited and enjoined from taking any action to adversely affect or

interfere with the ability of the Debtors to transfer the Acquired Assets to Buyer in accordance with the APA and this Order.

3.      The relevant Debtors, their affiliates, and their respective directors, managers, officers, employees, and agents, are authorized to execute and deliver, and authorized to perform under, consummate, and implement all additional notices, assumptions, conveyances, releases, acquittances, instruments, and documents that may be reasonably necessary or desirable to implement the APA, including the transfer and, as applicable, the assignment of all the Acquired Assets, the assumption of the Assumed Liabilities, and the assumption and assignment of all the Assumed Contracts in accordance with the Assumption and Assignment Procedures, and to take all further actions as may be necessary or appropriate to the performance of the obligations contemplated by the APA without further order of this Court.

4.      **Sale and Transfer of Acquired Assets Free and Clear.** Pursuant to sections 105(a), 363(b), 363(f), and 365(b) of the Bankruptcy Code, the Debtors are authorized to transfer, and upon the Closing shall transfer to Buyer all of the Debtors' right, title, and interest in and to, and possession of, the Acquired Assets, which shall immediately vest in Buyer, and, to the extent provided in the APA, such title to the Acquired Assets shall be transferred to Buyer free and clear of the Liens, Claims, Encumbrances, and Interests (other than Permitted Liens, Assumed Liabilities, and as otherwise provided in the APA), including, without limitation:

>    (a)     liens (including, without limitation, mechanics', materialmens', and other consensual and non-consensual liens and statutory liens) mortgages, restrictions, hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, security interests, conditional sale or other title retention agreements, property interests, pledges, judgments, demands, encumbrances, easements, and servitudes;
>
>    (b)     interests, obligations, liabilities, causes of action, demands, guaranties, options, restrictions, and contractual or other commitments;

(c)     rights, including, without limitation, rights of first refusal, rights of offset (except for offsets exercised prior to the Petition Date), contract rights, and recovery;

(d)     decrees of any court or foreign or domestic government entity (to the extent permitted by law);

(e)     charges or restrictions of any kind or nature, including, without limitation, any restriction on the use, transfer, receipt of income, or other exercise of any attributes of ownership of the Acquired Assets, including, without limitation, consent of any person to assign or transfer any of the Acquired Assets;

(f)     debts arising in any way in connection with any agreements, acts, or failures to act, of the Debtors or any of the Debtors' predecessors or affiliates;

(g)     claims (as that term is defined in the Bankruptcy Code), including claims for reimbursement, contribution claims, derivative, vicarious, transferee, or successor liability claims, indemnity claims, exoneration claims, alter-ego claims, product liability claims, employee retirement or benefit plan claims, severance claims, retiree healthcare or life insurance claims, environmental claims (to the fullest extent allowed by applicable law), including claims that may be secured or entitled to priority under the Bankruptcy Code, tax claims, reclamation claims, and pending litigation claims; and

(h)     matters of any kind or nature whatsoever, whether at law or in equity and whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or nonmaterial, disputed or undisputed, whether arising prior to or during the Debtors' bankruptcy cases, and whether imposed by agreement, understanding, law, equity, or otherwise;

in each case, whether in law or in equity, known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, direct or indirect, and whether arising by agreement, understanding, law, equity or otherwise, and whether occurring or arising before, on or after the Petition Date, or occurring or arising prior to the Closing (each, a "Lien, Claim, Encumbrance, or Interest," and collectively, the "Liens, Claims, Encumbrances, and Interests").

Except to the extent a Permitted Lien, an Assumed Liability, or as otherwise provided in the APA, the Liens, Claims, Encumbrances, and Interests shall attach to the proceeds with the same nature, validity, priority, extent, perfection, and force and effect that such Liens, Claims, Encumbrances, and Interests encumbered the Acquired Assets immediately prior to the entry of this Order, subject to any Claims, defenses, and objections, if any, that the Debtors or their estates may possess with respect thereto.

5.     **Binding Effect of Order.**  This Order and the APA shall be binding in all respects upon the Debtors, their estates, all creditors of, and holders of equity interests in, the Debtors, any holders of the Liens, Claims, Encumbrances, and Interests in, against, or on all or any portion of the Acquired Assets (whether known or unknown), Buyer and all successors and assigns of Buyer, notwithstanding the dismissal of any of the Debtors' cases or any subsequent appointment of any trustees, examiners, "responsible persons," or other fiduciaries in these chapter 11 cases or upon a conversion to case under chapter 7 of the Bankruptcy Code, and the APA shall not be subject to rejection or avoidance under any circumstances.  If any order under section 1112 of the Bankruptcy Code is entered, such order shall provide, or be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that this Order, including the rights granted to Buyer hereunder, shall remain effective and, notwithstanding such dismissal, shall remain binding on parties in interest.  To the extent of any conflict between this Order and the APA, the terms of this Order shall control.

6.     **No Material Modifications.**  The APA and any related agreements, documents, or other instruments in effect as of the date hereof may be modified, amended, or supplemented in accordance with the terms thereof without further order of this Court; *provided*, *however*, that any such modification, amendment, or supplement does not have a material adverse effect on the

Debtors or their estates.  For the avoidance of doubt, all other modifications, amendments, or supplements that have a material adverse effect on the Debtors' estates or their creditors shall require Court approval.

7.     **No Bulk Sales.**  No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale Transaction, the Motion, and this Order.

8.     **Valid Transfer.**  Effective upon the Closing, the transfer to Buyer of the Debtors' right, title, and interest in the Acquired Assets pursuant to the APA shall be, and hereby is deemed to be, a legal, valid, and effective transfer of the Debtors' right, title, and interest in the Acquired Assets, and vests with or will vest in Buyer all right, title, and interest of the Debtors in the Acquired Assets, free and clear of the Liens, Claims, Encumbrances, and Interests, other than Permitted Liens, Assumed Liabilities, and as otherwise provided in the APA.

9.     **Good Faith Purchaser.**  The Sale Transaction contemplated by the APA is undertaken by Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and Buyer has acted without collusion in undertaking the Sale Transaction contemplated by the APA.  Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the sale of the Acquired Assets to Buyer (including the assumption and assignment by the Debtors of any of the Assumed Contracts), unless such authorization is duly stayed pending such appeal.  Buyer is a buyer in good faith of the Acquired Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

10.     Further, the APA and the transactions contemplated thereby cannot be avoided under section 363(n) of the Bankruptcy Code.  None of the Debtors, Buyer, or any of their respective affiliates, officers, directors, members, partners, principals, or shareholders (or

equivalent) or any of their respective current and former members, managers, officers, directors, employees, advisors, professionals, agents, predecessors, successors, or assigns have engaged in any conduct that would cause or permit the APA or the consummation of the transactions contemplated thereby to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

11.     **Governmental Authorization to Effectuate Sale and Assignments.**  Each and every federal, state, and local governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Sale Transaction.  Except as otherwise provided in this Order, to the greatest extent available under applicable law upon the Closing, Buyer shall be authorized, as of the Closing, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Acquired Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to Buyer as of the Closing.

12.     Nothing in this Order or the APA releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability to a Governmental Unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order. Nothing in this Order or the APA authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

13. **Assumption and Assignment of Assumed Contracts.** Notwithstanding any provision of any contract (including any Assumed Contract) governing the Acquired Assets, or applicable non-bankruptcy law that prohibits, restricts, or conditions the assignment of the Acquired Assets (including any Assumed Contract) at the Closing, the Debtors are authorized in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code to (i) assign the Acquired Assets to Buyer and (ii) assume and assign the Assumed Contracts to Buyer as of the Closing, in each case, which assignments shall take place on and be effective as of the Closing or such other date after the Closing Date, in each case, as provided in, and subject in all respects to, this Order, the Assignment and Assumption Procedures, the APA, or as otherwise provided by a separate order of this Court. Notwithstanding the foregoing, and for the avoidance of doubt, the Debtors may amend the list of Assumed Contracts to add or remove any Assumed Contract to or from such list in accordance with the terms of this Order and the APA.

14. All Cure Costs that have not been waived shall be determined in accordance with this Order and the Assignment and Assumption Procedures and paid by Buyer in accordance with the terms of the APA. Assumption and payment of the Cure Costs shall be in full satisfaction and cure of any and all defaults under the Assumed Contracts and, subject to compliance with the Assumption and Assignment Procedures, will be deemed to fully satisfy the Debtors' obligations under sections 365(b) and 365(f) of the Bankruptcy Code. Upon the assumption by a Debtor and the assignment to Buyer of any Assigned Contract, and the payment of any applicable Cure Costs, each non-Debtor counterparty to such Assigned Contract is forever barred, estopped, and permanently enjoined from (i) asserting against the Debtors or Buyer, their affiliates, estates, successors, or assigns, or the property of any of them, any default existing as of the Closing, and (ii) exercising any rights or remedies against any Debtor or Buyer based on an asserted default that

occurred on, prior to, or as a result of, the Closing, including the type of default specified in section 365(b)(1)(A) of the Bankruptcy Code, except that Nordblom,[4] the landlord under that certain Northwest Park Office Lease dated as of August 23, 2016, as amended, modified, or supplemented (the "Building 27 Lease"), shall be entitled to assert an unsecured claim against the Debtors for pre-petition amounts due under the Building 27 Lease (subject to all rights of the Debtors or any successor thereto to object to any such claim on grounds other than that such claim was waived pursuant to this Order with respect to cure amounts); and the Cure Costs for that certain Northwest Park Office Lease dated as of December 19, 2019, as amended, modified, or supplemented (the "Building 38 Lease") shall be satisfied in full by application of the Security Deposit (as defined in the Building 38 Lease) in the amount of $6,500.00 held in connection with the Building 38 Lease. Subject to compliance with the Assumption and Assignment Procedures, Buyer will be deemed to have provided adequate assurance of future performance under the Assumed Contracts within the meaning of sections 365(b)(1)(c) and 365(f)(2)(B) of the Bankruptcy Code, provided that, solely with regard to the Building 27 Lease, the Buyer complies with its obligations to Nordblom pursuant to a certain side letter and amendment to be executed by the Buyer and Nordblom prior to or promptly following the Closing that (i) requires Buyer to post a $153,063 letter of credit, (ii) provides for an extension of the lease term by one year, and (iii) contains such other terms as may be agreed by Buyer and Nordblom. Accordingly, subject to the Assignment and Assumption Procedures, all of the requirements of sections 365(b) and 365(f) of the Bankruptcy Code have been satisfied for the assumption by the Debtors, and the assignment by the Debtors to Buyer, of each of the Assumed Contracts.

---

[4] The landlords under the Building 27 Lease and the Building 38 Lease is referred to herein as "Nordblom."

15.     In accordance with the Assumption and Assignment Provisions, to the extent a non-Debtor counterparty to an Assumed Contract fails to timely object to the assumption and assignment of an Assumed Contract (including on the basis of Cure Cost), such party is deemed to have consented to the assumption and assignment of such Assumed Contract (including the related Cure Cost).  Such party shall be forever barred and estopped from objecting to the assumption and assignment of the Assumed Contract (including, without limitation, on the basis of the amount of the Cure Cost and adequate assurance of future performance), whether applicable law excuses such counterparty from accepting performance by, or rendering performance to, Buyer for purposes of section 365(c)(1) of the Bankruptcy Code, and from asserting any additional cure or other amounts against the Debtors or Buyer with respect to such party's Assumed Contract.

16.     **No Successor Liability.**  Buyer has given substantial consideration under the APA, which consideration shall constitute valid, valuable, and sufficient consideration for the absolution from any potential claims of successor liability of Buyer to the greatest extent allowed by applicable law, and neither Buyer nor any of its affiliates shall be deemed to: (a) be a legal successor, or otherwise deemed to be a successor, to any of the Debtors under any theory of law or equity; (b) have, de facto or otherwise, merged with or into any or all of the Debtors or their estates; (c) have a common identity or a continuity of enterprise with the Debtors; or (d) be a mere continuation or substantial continuation, or be holding itself out as a mere continuation, of the Debtors or any business, enterprise, or operation of the Debtors.  Upon the Closing, to the maximum extent available under applicable law, Buyer's acquisition of the Acquired Assets shall be free and clear of any "successor liability" claims and other types of transferee liability of any nature whatsoever, whether known or unknown and whether asserted or unasserted at the time of Closing (other than, to the extent applicable, any Assumed Liabilities or as otherwise provided in

the APA), and the Acquired Assets shall not be subject to any Liens, Claims, Encumbrances, and Interests arising under or in connection with any Excluded Assets or Excluded Liabilities (each as defined in the APA).  The operations of Buyer and its affiliates shall not be deemed a continuation of the Debtors' business as a result of the acquisition of the Acquired Assets.

17.      **Retention of Jurisdiction.**  The Court retains jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order, the APA, the Sale Transaction, and the Assumption and Assignment Procedures.

18.      **Immediate Effect.**  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.  In the absence of any person or entity obtaining a stay pending appeal, the Debtors and Buyer are free to close the Sale Transaction under the APA at any time pursuant to the terms thereof.

19.      **Failure to Specify Provisions.**  The failure to specifically reference any particular provisions of the APA or other related documents in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the APA and other related documents be authorized and approved in their entirety.

20.      **Release of Liens, Claims, Encumbrances, and Interests.**  Effective upon the Closing Date, this Order is and shall be (i) effective as a determination that all Liens, Claims, Encumbrances, or Interests (other than Permitted Liens, Assumed Liabilities, and as otherwise provided in the APA) of any kind or nature whatsoever existing as to the Acquired Assets prior to the Closing Date have been unconditionally released, discharged, and terminated (with such Liens, Claims, Encumbrances, or Interests attaching to the proceeds with the same nature, validity, priority, extent, perfection, force, and effect that such claims, encumbrances, liens, or liabilities

encumbered the Acquired Assets immediately prior to the entry of this Order) and that the conveyances described herein have been effected, and (ii) binding upon and shall govern the acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Acquired Assets conveyed to Buyer (all such entities being referred to as "Recording Officers"), and all recorded claims, encumbrances, liens or liabilities (other than Permitted Liens, Assumed Liabilities, and as otherwise provided in the APA) against the Acquired Assets shall be deemed stricken from such entities' records, official and otherwise. All Recording Officers are authorized to strike recorded encumbrances, claims, liens, pledges, and other interests against the Acquired Assets recorded prior to the date of this Order. A certified copy of this Order may be filed with the appropriate Recording Officers to evidence cancellation of any recorded encumbrances, claims, liens, pledges, and other interests against the Acquired Assets recorded prior to the date of the Closing. All Recording Officers are authorized to accept for filing any and all of the documents and instruments necessary, advisable, or appropriate to consummate the transactions contemplated by the APA, subject to the payment of any filing or other fee imposed under non-bankruptcy law.

21. Notwithstanding anything to the contrary contained herein or in the APA: (x) any Liens, Claims, Encumbrances, and Interests on any assets sold by the Sellers (including, the Acquired Assets) shall attach to the proceeds of the Sale Transaction in the same nature, validity, priority, extent, perfection, force, and effect that such Liens, Claims, Encumbrances, and Interests

encumbered such assets or equity immediately prior to the entry of this Order and the Debtors will use such proceeds in accordance with the budget dated September 3, 2025 circulated to the secured parties in the Debtors' cases and the Official Committee of Unsecured Creditors, including paying off in full the First Lien AHG Secured Note in accordance with the terms of the First Lien AHG Secured Note and First Lien GSA (as such terms are used in the *Second Interim Order (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing*, entered on August 18, 2025 [Docket No. 210]) within two (2) business days after the Closing Date and (y) the assets sold by the Sellers shall not include, and there shall be no release of, any claims and causes of action belonging to any of the Debtors (including, without limitation, any commercial tort claims, any avoidance actions, any right, or claim arising under, pursuant to, or set forth in sections 362, or Chapter 5 of the Bankruptcy Code or any state law equivalent thereof) of any character or nature whatsoever, whether known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of liability (including under any state or federal securities laws) against any of the Debtors' pre-petition officers, directors, or equity holders (including, for the avoidance of doubt, Nano Dimension), or any other person or entity involved in Nano Dimension's acquisition of Desktop Metal, and in each case, any of their affiliates, subsidiaries, related parties, predecessors, successors, assigns, advisors (including legal or financial advisors), representatives, agents, partners, shareholders, officers or directors, and/or members.

22.    **Resolution with Oracle America, Inc.**  Oracle America, Inc. asserts a postpetition claim against the applicable Debtors for the service period July 29, 2025 through October 28, 2025, arising under its Assumed Contract in the amount of  approximately $213,944.95, which shall be pro-rated as of the Closing Date such that the Debtors will pay for the period through the Closing Date and Buyer will pay for the period after the Closing Date, and all such payments shall be made by the Debtors and Buyer, respectively, to Oracle Corporation within five (5) business days after the Closing Date.

Signed:  September 04, 2025

_____
Christopher Lopez
United States Bankruptcy Judge

**<u>Exhibit 1</u>**

Asset Purchase Agreement

ASSET PURCHASE AGREEMENT

dated as of August 26, 2025

by and among

ARC IMPACT ACQUISITION CORP., as Buyer,

and

DESKTOP METAL, INC.,

and

THE SUBSIDIARIES SIGNATORY HERETO,
as Sellers

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS ..................................................................................... 1

    1.1     Defined Terms ........................................................................ 1
    1.2     Interpretation ......................................................................... 9

ARTICLE 2 TRANSFER OF ASSETS AND ASSUMPTION OF LIABILITIES .................................. 10

    2.1     Assets to be Acquired .......................................................... 10
    2.2     Excluded Assets ................................................................... 11
    2.3     Liabilities to be Assumed by Buyer ..................................... 13
    2.4     Excluded Liabilities ............................................................ 13
    2.5     Identification of Assumed Contracts ................................... 13

ARTICLE 3 CLOSING; PURCHASE PRICE ..................................................................... 14

    3.1     Closing; Transfer of Possession; Certain Deliveries ........... 15
    3.2     Consideration ....................................................................... 15

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLERS ..................................... 16

    4.1     Organization ........................................................................ 16
    4.2     Due Authorization, Execution and Delivery; Enforceability ... 16
    4.3     Material Customers. ............................................................. 16

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF BUYER ...................................... 17

    5.1     Organization ........................................................................ 17
    5.2     Due Authorization, Execution and Delivery; Enforceability ... 17
    5.3     Availability of Funds ........................................................... 17
    5.4     Adequate Assurances Regarding Executory Contracts ......... 17
    5.5     Exclusive Representations and Warranties ........................... 17

ARTICLE 6 COVENANTS OF THE PARTIES .................................................................. 17

    6.1     Conduct of Business Pending the Closing ............................ 18
    6.2     Notification of Certain Matters ............................................ 18
    6.3     Access .................................................................................. 18
    6.4     Tax Matters .......................................................................... 18
    6.5     Commercially Reasonable Efforts ........................................ 19
    6.6     WARN Act .......................................................................... 19
    6.7     Further Assurances .............................................................. 19
    6.8     Bankruptcy Court Filings ..................................................... 19
    6.9     Cure Costs ............................................................................ 20
    6.10    Preservation of Records ....................................................... 20

|       | 6.11 | Bulk Transfer Laws | 20 |
| --- | --- | --- | --- |

**ARTICLE 7 CONDITIONS TO OBLIGATIONS OF THE PARTIES** ........................................ 20

|       | 7.1 | Conditions Precedent to the Obligations of Buyer | 20 |
| --- | --- | --- | --- |
|       | 7.2 | Conditions Precedent to the Obligations of Sellers | 21 |

**ARTICLE 8 TERMINATION** ...................................................................................... 21

|       | 8.1 | Termination of Agreement | 21 |
| --- | --- | --- | --- |
|       | 8.2 | Consequences of Termination | 23 |

**ARTICLE 9 MISCELLANEOUS** ................................................................................. 23

|       | 9.1 | Expenses | 23 |
| --- | --- | --- | --- |
|       | 9.2 | Assignment | 23 |
|       | 9.3 | Parties in Interest | 23 |
|       | 9.4 | Releases | 23 |
|       | 9.5 | Notices | 24 |
|       | 9.6 | Choice of Law | 25 |
|       | 9.7 | Entire Agreement; Amendments and Waivers | 25 |
|       | 9.8 | Counterparts; Facsimile and Electronic Signatures | 25 |
|       | 9.9 | Severability | 25 |
|       | 9.10 | Headings | 25 |
|       | 9.11 | Exclusive Jurisdiction and Specific Performance | 25 |
|       | 9.12 | WAIVER OF RIGHT TO TRIAL BY JURY | 26 |
|       | 9.13 | Computation of Time | 26 |
|       | 9.14 | Time of Essence | 26 |
|       | 9.15 | Disclosure Schedules | 26 |
|       | 9.16 | Mutual Drafting | 26 |
|       | 9.17 | Prevailing Party. | 26 |

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT, dated as of August 26, 2025 (the "<u>Agreement Date</u>"), by and among Desktop Metal, Inc., a Delaware corporation ("<u>DM</u>"), and each of DM's Subsidiaries listed on the signature page hereto (together with DM, "<u>Sellers</u>" and each a "<u>Seller</u>"), and Arc Impact Acquisition Corp., a Delaware public benefit corporation ("<u>Buyer</u>"). Each Seller and Buyer are referred to herein individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>".

### WITNESSETH:

**WHEREAS**, Sellers are currently engaged in the Business;

**WHEREAS**, on July 28, 2025, DM and certain other Sellers filed voluntary petitions and commenced cases (collectively, the "<u>Chapter 11 Cases</u>") under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the Bankruptcy Court; and

**WHEREAS**, Sellers wish to sell to Buyer, and Buyer wishes to purchase from Sellers, the Business as a going concern as of the Closing on the terms and subject to the conditions set forth herein and subject to the approval of the Bankruptcy Court and, in furtherance of the foregoing, (a) Sellers wish to sell to Buyer, and Buyer wishes to purchase from Sellers, the Acquired Assets as of the Closing, and (b) Buyer is willing to assume from Sellers the Assumed Liabilities as of the Closing, in the case of <u>clause (a)</u> and <u>(b)</u> above, on the terms and subject to the conditions set forth herein.

**NOW, THEREFORE**, in consideration of the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereto agree as follows:

### ARTICLE 1
### DEFINITIONS

1.1 <u>Defined Terms</u>. As used herein, the terms below shall have the following respective meanings:

"<u>Acquired Assets</u>" shall have the meaning specified in <u>Section 2.1</u>.

"<u>Affiliate</u>" shall, with respect to any Person, mean any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Person specified, where "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, through ownership of voting securities or rights, by contract, as trustee, executor or otherwise.

"<u>Agreement</u>" shall mean this Asset Purchase Agreement, together with the exhibits and the Disclosure Schedules, in each case as amended, restated, supplemented or otherwise modified from time to time.

"<u>Agreement Date</u>" shall have the meaning specified in the preamble.

"<u>Allocation</u>" shall have the meaning specified in <u>Section 6.4(d)</u>.

"Alternative Transaction" shall mean (i) any investment in, financing of, capital contribution or loan to, or restructuring or recapitalization of all or a substantial portion of a Seller or any Affiliate of a Seller (including any exchange of all or a substantial portion of a Seller's or its Affiliates' outstanding debt obligations for equity securities of one or more Seller or their respective Affiliates), (ii) any merger, consolidation, share exchange or other similar transaction to which a Seller or any of its Affiliates is a party that has the effect of transferring, directly or indirectly, all or a substantial portion of the assets of, or any issuance, sale or transfer of equity interests in, a Seller, the Acquired Assets or the Business, (iii) any direct or indirect sale of all or a substantial portion of the assets of, or any issuance, sale or transfer of equity interests in, a Seller, the Acquired Assets or the Business or (iv) any other transaction, including a plan of liquidation or reorganization (in any jurisdiction, whether domestic, foreign, international or otherwise), in each instance that transfers or vests ownership of, economic rights to, or benefits in all or a substantial portion of the assets of Sellers, the Acquired Assets or the Business to any party other than Buyer.

"Anzu Agreement" shall mean the Asset Purchase Agreement dated July 27, 2025, between Desktop Metal, Inc., Desktop Metal Operating, Inc., ExOne Operating LLC, and EnvisionTec US LLC, as sellers, and Anzu Special Acquisition Corp II, as buyer (as amended, revised, or modified).

"Assignment and Assumption Agreement" shall mean the assignment and assumption agreement to be entered into by Sellers and Buyer concurrently with the Closing in a form mutually agreed to by the Parties.

"Assumed Contracts" shall have the meaning specified in Section 2.1(c).

"Assumed Liabilities" shall have the meaning specified in Section 2.3.

"Avoidance Actions" shall mean any and all avoidance, recovery, subordination, or other claims, actions, rights, or remedies that may be brought by or on behalf of Seller or its estate or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including, but not limited to, actions or remedies under sections 510, 542, 543, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

"Bankruptcy Code" shall have the meaning specified in the recitals.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the Southern District of Texas (Houston Division).

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general, local and chambers rules of the Bankruptcy Court.

"Benefit Plan" shall mean any employee benefit plan (as defined in Section 3(3) of ERISA), whether or not subject to ERISA, and whether or not for employees or service providers in the United States or outside of the United States, and each bonus, stock, stock option or other equity based compensation arrangement or plan, incentive, deferred compensation, retirement or supplemental retirement, severance, employment, change-in-control, profit sharing, provident funds (including pension funds, managers' insurance policies, further education funds or other similar funds), vacation, cafeteria, dependent care, medical care, employee assistance program, education or tuition assistance programs, and each insurance and other similar fringe or employee benefit plan, policy, program, agreement or arrangement, in each case, for the benefit of current or former employees, directors, consultants or other individual service providers (or any dependent or beneficiary thereof) of Sellers or any of their ERISA Affiliates and which is sponsored, maintained and/or contributed by Sellers or with respect to which Sellers have or may have any obligation

or liability (whether actual or contingent), but excluding any plan, program, agreement, contract, policy or arrangement sponsored by a Governmental Entity.

"Bill of Sale" shall have the meaning specified in Section 3.2(a)(i).

"Business" shall mean the business of DM and the other Sellers, as conducted as of the Agreement Date, including (i) the design, manufacture, sale and support of Studio, Shop System, MHD, P1, P50, SMAX Flex, PureSinter, InnoventX, X25Pro, X160Pro products and related consumables, including commercial and Government programs utilizing the foregoing products and consumables (the "Metal Business"), and (ii) the design, formulation and production of photopolymer resins and the design and production of the Xtreme 8K and Lightbar photopolymer printer, including commercial and Government programs utilizing the foregoing products (the "Adaptive3D Business"), but excluding (i) the assets of EnvisionTEC US LLC, Figur Machine Tools, LLC, and the subsidiaries of Desktop Labs, Inc., (ii) the entities EnvisionTec GmbH, ExOne GmbH, ExOne KK, A.I.D.R.O Srl, and the other assets set forth in the Anzu Agreement, and (iii) one X25 Pro machine sold, or to be sold, to IperionX Limited, along with any related printing and binder applications licenses.

"Business Day" shall mean any day other than a Saturday, Sunday or a legal holiday on which banking institutions in the State of New York are not required to open.

"Buyer" shall have the meaning specified in the preamble.

"Buyer Released Parties" shall have the meaning specified in Section 9.4.

"Chapter 11 Cases" shall have the meaning specified in the recitals.

"Claim" shall mean all actions, claims, counterclaims, suits, proceedings, rights of action, causes of action, Liabilities, losses, damages, remedies, penalties, judgments, settlements, costs, expenses, fines, disbursements, demands, reasonable costs, fees and expenses of counsel, including in respect of investigation, interest, demands and actions of any nature or any kind whatsoever, known or unknown, disclosed or undisclosed, accrued or unaccrued, matured or unmatured, choate or inchoate, legal or equitable, and arising in tort, contract or otherwise, including any "claim" as defined in the Bankruptcy Code.

"Closing" shall have the meaning specified in Section 3.1(a).

"Closing Date" shall have the meaning specified in Section 3.1(a).

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" shall mean any confidentiality agreements between Buyer and Sellers.

"Contract" shall mean any contract, lease, license, purchase order, sales order, indenture, note, bond, loan, instrument, obligation, promise or other agreement, arrangement, understanding or commitment, whether or not in written form, that is legally binding upon a Person or its property.

"Cure Costs" shall mean all monetary liabilities, including pre-petition monetary liabilities, of Sellers that must be paid or otherwise satisfied to cure all of Sellers' monetary defaults under the Assumed Contracts, and any other amounts that must be paid pursuant to section 365 of the Bankruptcy Code, at the

time of the assumption thereof and assignment to Buyer or an Affiliate of Buyer as provided hereunder, in each case as such amounts are determined by the Bankruptcy Court.

"D&O Policies" shall mean any insurance policy held by any Seller as of the Agreement Date that provides coverage in respect of Claims against any director or officer of a Seller.

"Deposit" shall have the meaning specified in Section 3.2(b).

"Disclosure Schedules" shall mean the disclosure schedules delivered by each of Sellers and Buyer (as applicable), in each case, concurrently with the execution and delivery of this Agreement, as the same may be amended from time to time in accordance with and subject to the terms hereof.

"DM" shall have the meaning specified in the preamble.

"DM Intellectual Property Rights" shall mean any Intellectual Property Rights that are owned, used or practiced, or held for use or practice, by Sellers in or relating to the Business, including any Intellectual Property Rights incorporated into, embodied in or otherwise used or practiced, or held for use or practice, in connection with (or planned by any Seller to be incorporated into or otherwise used or practiced, or held for use or practice, in connection with) the Business, including with respect to the design, development, marketing, sale, offering, and provision of any products or services of the Business, together with (i) the right to sue and recover damages and payments for past, present, and future infringement, misappropriation, violation, or conflict of or any of the foregoing and all rights to protection of interests therein, (ii) all income, royalties and payments receivable with respect to any of the foregoing, (iii) rights of recovery with respect to any of the foregoing, (iv) any and all corresponding rights throughout the world with respect any of the foregoing, and (v) all tangible embodiments of any such Intellectual Property, including software, works of authorship, product design data, machine configurations and settings, marketing and advertising materials, training materials, documentation, websites, website content, and technology.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" shall mean any Person that, by reason of its relationship with any Seller or any Subsidiary of any Seller, is aggregated with such Seller or its applicable Subsidiary under Section 414 of the Code.

"Excluded Assets" shall have the meaning specified in Section 2.1(k).

"Excluded Liabilities" shall have the meaning specified in Section 2.4.

"Executory Contract" shall have the meaning specified in Section 2.5(a).

"Executory Contract List" shall have the meaning specified in Section 2.5(a).

"Facilities" shall mean all buildings, tanks, pipelines, terminals, docks and fixtures owned or leased by Sellers, located on the Leased Real Property and used primarily in the Business, but excluding for the avoidance of doubt (i) power lines, pipelines, telephone lines and other improvements and fixtures owned by public utilities furnishing utilities to the Leased Real Property, and (ii) rail lines, pipelines and other improvements and fixtures owned by third parties and located on existing easements for such purpose which encumber the Leased Real Property.

"GAAP" shall mean generally accepted accounting principles as in effect from time to time in the United States.

4

"Government Contracts" means, collectively, (i) that certain Collaboration Agreement Number 2023141-142330 between National Center for Manufacturing Sciences, Inc. Ann Arbor, Michigan and Desktop Metal Operating, Inc., Burlington, Massachusetts, (ii)  that certain Collaboration Agreement Number 2024177-143094 between National Center for Manufacturing Sciences, Inc. Ann Arbor, Michigan and Desktop Metal Operating, Inc., Burlington, Massachusetts, and Exone Operating, LLC Huntingdon, Pennsylvania, and (iii) Solicitation/Contract/Order For Commercial Products and Commercial Services, Contract No. 36C10X22C0053, Effective Sept. 27, 2022, as amended on September 12, 2024 and June 9, 2025.

"Governmental Entity" shall mean any federal, state, provincial, local, municipal, foreign, multinational, international or other (a) government; (b) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); or (c) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitration tribunal or stock exchange, including the Bankruptcy Court.

"Indebtedness" of any Person shall mean, without duplication:  (i) the principal of and premium (if any) in respect of (A) all indebtedness of such Person for money borrowed and (B) all indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable or secured by any Lien on property owned by such Person; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property or services (including all interest, penalties, fees, expenses, indemnities and breakage costs), all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable that have not been outstanding longer than thirty (30) days and other accrued current liabilities arising in the Ordinary Course of Business); (iii) all obligations of such Person as lessee under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) accrued but unpaid Taxes; (vi) customer deposits and advances (other than deposits and advances related to Assumed Contracts); (vii) all Liabilities to any direct or indirect (including past or current) stockholders or holders of any other equity interests of any Seller; (viii) all obligations of the type referred to in clauses (i) through (vii) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (ix) all obligations of the type referred to in clauses (i) through (viii) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Intellectual Property Right" means any and all worldwide industrial, proprietary, and intellectual property rights (including all common law and statutory rights, registrations and applications therefor, and renewals, extensions, and restorations thereof, as applicable), of every kind and nature, whether existing now or in the future, including but not limited to: (i) trademarks, service marks, corporate names, trade names, trade dress, slogans, brand names, designs and logos, including all applications and registrations related to the foregoing, together with the goodwill of the business connected with the use of, and symbolized by, the foregoing; (ii) copyrights or similar rights in works of authorship, regardless of the medium of fixation or means of expression, including all applications and registrations related to the foregoing, works of authorship, graphics, mask works, drawings, schematics, blueprints, flow charts, models, analyses, graphs, reports, files, data, databases, algorithms, firmware, software, code, programming, and documentation; (iii) trade secrets, confidential information, proprietary information (including, without limitation, all forms, brochures and marketing materials), inventions, discoveries, concepts, designs, technology, formulae, algorithms, know-how, techniques, prototypes, specifications, materials, compositions, devices, methods, procedures, processes, ideas, improvements and compilations of information (whether or not patentable and whether or not reduced to practice), strategies, and customer lists; (iv) patent applications, patent rights, invention and patent disclosures, and industrial designs and applications, including all reissues, divisionals,

provisionals, continuations and continuations-in-part, reexaminations, renewals, substitutions and extensions thereof; (v) websites, internet domain name registrations, accounts with Twitter, Facebook and other social media companies, and the content found thereon and related thereto; (vi) licenses to the foregoing; (vii) rights of privacy and publicity and moral or other rights in the foregoing; (viii) any and all royalties, fees, income, payments and other proceeds now or hereafter due or payable with respect to any and all of the foregoing; and (ix) any and all claims and causes of action with respect to any of the foregoing, including all rights to and claims for damages, restitution and injunctive and other legal and equitable relief for past, present, and future infringement, dilution, misappropriation, violation, misuse, breach or default, with the right to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages.

"Interim Period" shall have the meaning specified in Section 6.1.

"Inventory" shall have the meaning specified in Section 2.1(e).

"IT Assets" shall mean computers, software, servers, workstations, associated data, routers, hubs, switches, circuits, networks, data communications lines and all other information technology equipment.

"Law" shall mean any federal, state, provincial, local, foreign, international or multinational constitution, statute, law, ordinance, regulation, rule, code, Order, principle of common law, or decree enacted, promulgated, issued, enforced or entered by any Governmental Entity, or court of competent jurisdiction, or other requirement or rule of law.

"Leased Machinery and Equipment" shall have the meaning specified in Section 2.1(b).

"Leased Real Property" shall have the meaning specified in Section **Error! Reference source not found.**.

"Liabilities" shall mean, as to any Person, all debts, adverse Claims, liabilities, commitments, responsibilities, and obligations of any kind or nature whatsoever, direct or indirect, absolute or contingent, whether accrued or unaccrued, vested or otherwise, liquidated or unliquidated, whether known or unknown, and whether or not actually reflected, or required to be reflected, in such Person's balance sheet or other books and records.

"Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code and shall include any Claim, pledge, option, charge, lien, debentures, trust deeds, hypothecation, easement, security interest, right-of-way, encroachment, mortgage, deed of trust, defect of title, restriction on transferability, restriction on use or other encumbrance, in each case whether imposed by agreement, law, equity or otherwise.

"Local Bankruptcy Rules" shall mean, collectively: (i) the Bankruptcy Local Rules for the Southern District of Texas, and (ii) the Procedures for Complex Cases in the Southern District of Texas, as shall be in effect from time to time.

"Machinery and Equipment" shall have the meaning specified in Section 2.1(a).

"Material Breach" means a breach, violation, or failure to perform any representation, warranty, covenant, or agreement under this Agreement that (i) individually or in the aggregate with other breaches, would or would reasonably be expected to result in a failure of a condition to Closing set forth in Article 7; or (ii) substantially frustrates or defeats the principal purpose of this Agreement. For the avoidance of doubt, a breach shall not be deemed "material" solely due to its technical nature or if it has no material adverse effect on the ability of the breaching party to perform its obligations under this Agreement or on the benefits reasonably expected to be received by the non-breaching party.

"<u>Nonassignable Asset</u>" shall have the meaning specified in <u>Section 2.5(d)</u>.

"<u>Notices</u>" shall have the meaning specified in <u>Section 9.5</u>.

"<u>Order</u>" shall mean any judgment, order, injunction, writ, ruling, decree, stipulation, determination, decision, verdict, or award of any Governmental Entity.

"<u>Ordinary Course of Business</u>" shall mean that an action taken by a Person will be deemed to have been taken in the "Ordinary Course of Business" only if that action is consistent in nature, scope and magnitude with the past practices of such Person, subject to changes resulting from the filing and/or pendency of the Chapter 11 Cases or the requirements of any debtor in possession financing in the Chapter 11 Cases.

"<u>Owned Machinery and Equipment</u>" shall have the meaning specified in <u>Section 2.1(a)</u>.

"<u>Party</u>" or "<u>Parties</u>" shall have the meaning specified in the preamble.

"<u>Permits</u>" shall mean permits, licenses, registrations, certificates of occupancy, approvals, consents, clearances and other authorizations issued by any Governmental Entity.

"<u>Permitted Liens</u>" shall mean:  (a) Liens for Taxes not yet due and payable; (b) statutory liens of landlords, carriers, warehousemen, mechanics, and materialmen incurred in the Ordinary Course of Business for sums not yet due; (c) pledges and deposits made in the Ordinary Course of Business in compliance with workers' compensation, unemployment insurance and other types of social security; (d) applicable zoning, subdivision, building and other land use Laws and other land use restrictions that do not impair the present use or occupancy of the subject real property; (e) easements, covenants, conditions, restrictions and other similar encumbrances on real property that arise in the Ordinary Course of Business and that do not (together with all other encumbrances affecting the real property in question) materially detract from the value of the affected real property and do not materially interfere with the present use or occupation of such real property; (f) non-exclusive licenses granted in the Ordinary Course of Business; or (g) any Lien granted or incurred in connection with an Order of the Bankruptcy Court.

"<u>Person</u>" shall mean an individual, a partnership, a joint venture, a corporation, a business trust, a limited liability company, a trust, an unincorporated organization, a joint stock company, a labor union, an estate, a Governmental Entity or any other entity.

"<u>Proceeding</u>" shall mean any action, arbitration, audit, known investigation (including a notice of preliminary investigation or formal investigation), notice of violation, hearing, litigation or suit (whether civil, criminal, appellate, or administrative), other than the Chapter 11 Cases, commenced, brought, conducted or heard by or before any Governmental Entity.

"<u>Property Taxes</u>" shall mean all real property Taxes, personal property Taxes and similar ad valorem Taxes.

"<u>Purchase Price</u>" shall have the meaning specified in <u>Section 3.2(a)</u>.

"<u>Records</u>" shall have the meaning specified in <u>Section 2.1(g)</u>.

"<u>Representative</u>" shall mean, with respect to any Person, such Person's officers, directors, managers, employees, agents, representatives and financing sources (including any investment banker,

financial advisor, accountant, legal counsel, consultant, other advisor, agent, representative or expert retained by or acting on behalf of such Person or its Subsidiaries).

"Sale Hearing" shall mean the hearing conducted by the Bankruptcy Court to approve the Transactions and to seek entry of the Sale Order.

"Sale Motion" shall mean the motion of Sellers, in form and substance satisfactory to Buyer in its reasonable discretion, seeking entry of the Sale Order.

"Sale Order" shall mean an Order or Orders of the Bankruptcy Court, approving, without limitation, this Agreement and all of the terms and conditions hereof and authorizing Sellers to consummate the Transactions pursuant to sections 363 and 365 of the Bankruptcy Code, in any case, in form and substance satisfactory to Buyer.

"SEC" shall mean the U.S. Securities and Exchange Commission.

"Seller" or "Sellers" shall have the meaning specified in the preamble.

"Sellers Released Parties" shall have the meaning specified in Section 9.4.

"Straddle Period" shall have the meaning specified in Section 6.4(b).

"Subsidiary" shall mean, with respect to any Person (a) a corporation, a majority of whose capital stock with voting power, under ordinary circumstances, to elect directors is at the time, directly or indirectly, owned by such Person, by a subsidiary of such Person, or by such Person and one or more subsidiaries of such Person, (b) a partnership in which such Person or a subsidiary of such Person is, at the date of determination, a general partner of such partnership, or (c) any other Person (other than a corporation) in which such Person, a subsidiary of such Person or such Person and one or more subsidiaries of such Person, directly or indirectly, at the date of determination thereof, has (i) at least a majority ownership interest thereof or (ii) the power to elect or direct the election of a majority of the directors or other governing body of such Person.

"Tax" or "Taxes" shall mean any and all taxes, assessments, levies, duties or other governmental charge imposed by any Governmental Entity, including any income, alternative or add-on minimum, accumulated earnings, franchise, capital stock, environmental, profits, windfall profits, gross receipts, sales, use, value added, transfer, registration, stamp, premium, excise, customs duties, severance, real property, personal property, ad valorem, occupancy, license, occupation, employment, payroll, social security, disability, unemployment, withholding, corporation, inheritance, value added, stamp duty reserve, estimated or other tax, assessment, levy, duty (including duties of customs and excise), escheat or other governmental charge of any kind whatsoever, including any payments in lieu of taxes or other similar payments, chargeable by any Tax Authority together with all penalties, interest and additions thereto, whether disputed or not.

"Tax Authority" shall mean any taxing or other authority (whether within or outside the U.S.) competent to impose Tax.

"Tax Return" shall mean any and all returns, declarations, reports, documents, Claims for refund, or information returns, statements or filings which are supplied or required to be supplied to any Tax Authority or any other Person, including any schedule or attachment thereto, and including any amendments thereof.

"Transactions" shall mean the transactions contemplated by this Agreement and the other Transaction Documents, including the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities as provided for in this Agreement.

"Transaction Documents" shall mean this Agreement and any agreement, instrument or other document entered into pursuant to the terms hereof, including the Assignment and Assumption Agreement and Bill of Sale.

"Transfer Tax" or "Transfer Taxes" shall mean any sales, use, transfer, conveyance, documentary transfer, stamp, recording or other similar Tax imposed upon the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to Tax or interest with respect thereto, but such term shall not include any Tax on, based upon or measured by, the net income, gains or profits from such sale, transfer or assignment of the property or any interest therein.

"Transferable Permits" shall have the meaning specified in Section 2.1(d).

"WARN Act" shall mean the Worker Adjustment and Retraining Notification Act of 1988 and any similar Law, including any other Law of any jurisdiction relating to plant closings or mass layoffs.

1.2     Interpretation.

(a)     Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(b)     Words denoting any gender shall include all genders. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(c)     A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

(d)     The word "or" includes both the conjunctive and disjunctive.

(e)     The word "will" shall be construed to have the same meaning and effect as the word "shall".

(f)     All references to "$" and dollars shall be deemed to refer to United States currency.

(g)     The meanings given to terms defined herein shall be equally applicable to both singular and plural forms of such terms.

(h)     All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant thereto unless otherwise defined therein.

(i)     References to "day" or "days" are references to calendar days, unless the defined term "Business Days" is used.

(j)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day. All references herein to time are references to New York City time, unless otherwise specified herein.

(k)     Exhibits, Schedules and Annexes to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

## ARTICLE 2
## TRANSFER OF ASSETS AND ASSUMPTION OF LIABILITIES

2.1     <u>Assets to be Acquired</u>.  Subject to the entry of the Sale Order, and the terms and conditions of this Agreement and the Sale Order, at the Closing, Sellers shall sell, convey, assign, transfer and deliver to Buyer (or one or more designees of Buyer, as designated by Buyer in writing to DM prior to the Sale Hearing) and Buyer (or one or more designees of Buyer, as designated by Buyer in writing to DM prior to the Sale Hearing) shall purchase, acquire and accept, all of the right, title and interest, free and clear of all Liens (other than Permitted Liens or to the extent provided in the Sale Order), of Sellers in and to all properties, assets and rights of every nature, tangible and intangible, real or personal, now existing or hereafter acquired, whether or not reflected on the books or financial statements of Sellers as the same shall exist on the Closing Date, that are used or held for use in or relating to the Business, wherever located (collectively, the "<u>Acquired Assets</u>"), as follows (but excluding, for avoidance of doubt, all of the Excluded Assets):

(a)     all tangible personal property of Sellers, including all (i) Sellers' owned equipment (including cars, trucks, fork lifts, tanks and other industrial vehicles), machinery, furniture, spare parts, fixtures and improvements and tooling used or held for use in the Business, <u>excluding</u>, for the avoidance of doubt, one X25 Pro machine sold, or to be sold, to IperionX Limited, along with any related printing and binder applications licenses (the "<u>Owned Machinery and Equipment</u>"), (ii) rights of Sellers to the equipment (including cars, trucks, fork lifts and other industrial vehicles), machinery, furniture, spare parts, fixtures and improvements and tooling which are leased pursuant to an Assumed Contract (the "<u>Leased Machinery and Equipment</u>" and collectively with the Owned Machinery and Equipment, the "<u>Machinery and Equipment</u>"), and (iii) rights of Sellers to the licenses received from manufacturers and sellers of the Machinery and Equipment; without limitation of the foregoing, a summary of Sellers' Machinery and Equipment as of August 21, 2025 is attached hereto as <u>Schedule 2.1(a)</u> hereto (the "<u>Machinery and Equipment Schedule</u>").;

(b)     all of Sellers' rights to the warranties, express or implied, that continue in effect with respect to any Acquired Asset including, without limitation, any Machinery and Equipment;

(c)     all of Sellers' rights under the Contracts (including (i) all right, title and leasehold interest of Sellers in the real property (together with all buildings, structures, fixtures, and improvements erected thereon, including the Facilities, and all rights, privileges, easements, licenses and other appurtenances relating thereto set forth on the Executory Contract List (the "<u>Leased Real Property</u>"), and (ii) all Contracts entered into by any Seller and used or held for use in or relating to the Business (excluding any Benefit Plans, but including the Government Contracts)), in each case, listed on the Executory Contract List and which remains subject to Buyer's designation as an Excluded Asset pursuant to <u>Section 2.5(c)</u> (collectively, the "<u>Assumed Contracts</u>");

(d)     all Permits relating to the ownership or operation of the Facilities or the Business, but only if and to the extent that such Permits are transferable by Sellers to Buyer by assignment or otherwise (including upon request or application to a Governmental Entity, or that will pass to Buyer as successor in title to the Acquired Assets by operation of Law) (the "<u>Transferable Permits</u>");

(e)     all inventory (including in transit), finished goods, raw materials, work in progress, packaging, supplies, parts, components and other inventories used or held for use by Sellers in connection

with the Business (including the manufacture, sale or distribution of products) (collectively, "Inventory"); without limitation of the foregoing, a summary of the Sellers' Inventory as of August 21, 2025 is set forth on Schedule 2.1(e) hereto (the "Inventory Schedule"), excluding spare parts in inventory owned by ExOne Operating LLC relating to, and used solely for, sand printers (e.g., SMAX, SMAX Pro);

(f)       all accounts and notes receivable (whether current or non-current) relating to the Business; without limitation of the foregoing, a summary of Sellers' accounts and notes receivable as of August 21, 2025 is set forth on Schedule 2.1(f) hereto (the "AR Schedule");

(g)       except as set forth in Sections 2.2(d) and 2.2(h), and subject to the right of Sellers to retain copies (at their expense) for their use, all books, accounting records, operating records, engineering designs, blueprints, as-built plans, specifications, procedures, studies, reports and equipment repair, safety, maintenance or service records, information, files, data and plans (whether written, electronic or in any other medium), advertising and promotional materials and similar items (including customer and supplier lists, mailing lists, sales and promotional literature, other sales related materials related to the Business) of any Seller used or held for use in or relating to the operation of the Facilities and/or the Business ("Records");

(h)       all right, title or interest in and to (i) all Intellectual Property owned, used or held by any Seller in connection with the Business, (ii) all DM Intellectual Property Rights related thereto, to the fullest extent permitted by Law, and (iii) the IT Assets used or held for use in or relating to the Business;

(i)       all intangible property owned or held by Sellers for use in connection with the Business, including, without limitation, the customer and supplier relationships of the Business and the goodwill associated with the Business, the Acquired Assets and the Assumed Liabilities;

(j)       all deposits and prepaid expenses of Sellers, including (i) security deposits with third party suppliers, vendors, service providers or landlord and lease and rental payments, (ii) tenant reimbursements, (iii) prepaid Property Taxes, and (iv) pre-payments;

(k)       except as set forth in Section 2.2(j), all rights, Claims, credits, or rights of set off and/or recoupment, equity rights or defenses that Sellers may have relating to the Business (i) against third parties, including rights under vendors' and manufacturers' warranties, indemnities and guaranties and (ii) with respect to any Assumed Liabilities;

(l)       all rights to refunds of Taxes paid by any Seller relating to the Business; and

(m)       except as set forth in Section 2.2(j), all actions, rights of action, Claims, Avoidance Actions (provided that any such Avoidance Actions shall be extinguished and not pursued from and after the Closing), and remedies whatsoever, of every kind and nature, known or unknown, disclosed or undisclosed, accrued or unaccrued, matured or unmatured, choate or inchoate, legal or equitable, and arising in tort, contract, or otherwise, of any Seller against any Person and existing at any time, arising out of, in connection with, or relating to the events, circumstances, and conduct of the Business.

2.2       Excluded Assets.  The Acquired Assets do not include Sellers' right, title or interest in or to any of the following properties and assets of Sellers (collectively, the "Excluded Assets"):

(a)       each Seller's rights under this Agreement (including the right to receive the Purchase Price);

(b)       all of the assets covered by the Anzu Agreement;

11

(c)      all of Sellers' or any of their respective Affiliates' certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents relating to the organization, maintenance and existence of any Seller or any of its Affiliates as a corporation, limited liability company or other entity;

(d)      all Records related to Taxes paid or payable by any Seller or any of its Affiliates, other (and notwithstanding Section 2.2(g)) than Property Tax Returns relating to the Acquired Assets;

(e)      all shares of capital stock or other equity interests of any Seller or any of its Affiliates or securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of any Seller or any of its Affiliates;

(f)      any (i) privileged materials, documents, and records relating to this Agreement and the Chapter 11 Cases and (ii) Records that Sellers are required by Law to retain, including Tax Returns, taxpayer and other identification numbers, financial statements and corporate or other entity filings; provided that, to the extent permitted by applicable Law, Buyer shall have the right to obtain copies of any portions of such retained Records to the extent that such portions relate to the Business, any Acquired Asset, any Assumed Liability or are otherwise necessary for Buyer to comply with applicable Law;

(g)      any documents and agreements relating to the Chapter 11 Cases or to the sale or other disposition of the Business, the Acquired Assets or any other asset of any Seller other than those to be delivered to Buyer in accordance with this Agreement;

(h)      (i) all assets and rights of every nature in respect of the Benefit Plans or portions thereof, in each case including all associated funding media, assets, reserves, credits, insurance policies and service agreements related thereto, and all documents created, filed or maintained in connection therewith, together with any applicable insurance policies related thereto, and (ii) all employment, personnel and compensation records relating to any current or former employee of any Seller;

(i)      all Permits and pending applications therefor to the extent (i) not transferable by Sellers to Buyer by assignment or otherwise or (ii) related solely to any Excluded Asset or the Excluded Liabilities;

(j)      all actions, rights of action, Claims, Avoidance Actions and remedies whatsoever, of every kind and nature, known or unknown, disclosed or undisclosed, accrued or unaccrued, matured or unmatured, choate or inchoate, legal or equitable, and arising in tort, contract, or otherwise, of any Seller against any (i) current or former shareholder of DM or any Affiliates or Representatives thereof, (ii) current or former director or officer of Sellers or any Affiliates or Representatives thereof, (iii) any current or former professionals of Sellers or any Affiliates thereof, and (iv) third Person solely with respect to any Excluded Assets or Excluded Liabilities; provided that, as to the foregoing item (ii), Sellers irrevocably covenant (which covenant Sellers shall cause to be binding on any transferee of such claims, including a litigation trust) to limit any recovery on any such actions, rights of action, Claims, Avoidance Actions and remedies to the extent of available insurance proceeds against current or former directors or officers of Sellers who serve as directors, employees or other Representatives of Buyer after the Closing Date;

(k)      all cash and cash equivalents, securities, and security entitlements of Sellers and all bank accounts and securities accounts of Sellers, including any cash collateral that is collateralizing any letters of credit, or any obligation with respect thereto;

12

(l)      any Contract to which any Seller is a party that (i) is not an Assumed Contract or (ii) is an Assumed Contract but is not assumable and assignable pursuant to the terms thereof or as a matter of applicable law (including, without limitation, any Assumed Contract with respect to which any consent requirement in favor of the counter-party thereto is not satisfied and may not be overridden pursuant to Section 365 of the Bankruptcy Code);

(m)      all insurance policies and binders of Sellers, including D&O Policies, and all Claims, refunds and credits from insurance policies or binders of Sellers due or to become due with respect to such policies or binders, together with the amount of, and all rights to any, insurance proceeds received by any Seller; and

(n)      spare parts in inventory owned by ExOne Operating LLC relating to, and used solely for, sand printers (*e.g.*, SMAX, SMAX Pro).

2.3      Liabilities to be Assumed by Buyer.  Subject to the entry of the Sale Order, and the terms and conditions of this Agreement, the Sale Order, the Bill of Sale and the Assignment and Assumption Agreement, at the Closing, Sellers shall assign to Buyer (or one or more Affiliates of Buyer, as designated by Buyer in writing to Sellers prior to the submission of the Sale Order) and Buyer (or one or more Affiliates of Buyer, as designated by Buyer in writing to Sellers prior to the submission of the Sale Order) shall assume from Sellers and pay when due, perform and discharge, in due course, without duplication, only the following Liabilities of Sellers (the "Assumed Liabilities"):

(a)      all Liabilities of Sellers under each of the Assumed Contracts to the extent first arising or occurring from and after the Closing Date, including Cure Costs required to be paid pursuant to the Sale Order as a condition to Buyer's assumption of the Assumed Contracts; and

(b)      all Liabilities (other than any Excluded Liabilities) to the extent first arising or occurring from and after the Closing relating to any environmental, health or safety matter to the extent arising out of or relating to the operation of the Business or leasing, ownership or operation of the Acquired Assets.

2.4      Excluded Liabilities.  Except for the Assumed Liabilities described in Section 2.3, Buyer shall not assume, nor be obligated to pay, perform, satisfy or discharge, any Liability of any Seller Party or any Affiliate of any Seller Party of any kind or nature whatsoever (collectively, the "Excluded Liabilities"). The Excluded Liabilities shall include, but not be limited to:

(a)      all costs and expenses incurred or to be incurred by Sellers in connection with this Agreement and the consummation of the Transactions;

(b)      all Liabilities relating to or arising, whether before, on or after the Closing, out of, or in connection with, any of the Excluded Assets;

(c)      all Liabilities of any Seller or any of its Affiliates in respect of Indebtedness; and

(d)      any other Liability of Seller or any of its Affiliates that arises in relation to the period prior to the Closing and is not expressly included among the Assumed Liabilities.

2.5      Identification of Assumed Contracts.

(a)      Sellers have delivered to Buyer a true, correct and complete list (the "Executory Contract List") of all Contracts related to the Acquired Assets and/or the Business or otherwise used, or

13

held for use, in connection with the Acquired Assets, Assumed Liabilities and/or the Business (each, an "Executory Contract").  The Executory Contract List shall describe, in reasonable detail, the applicable Cure Costs.  Sellers will provide Buyer with (i) copies of each Executory Contract and (ii) information as to the Liabilities under each Executory Contract sufficient for Buyer to make a reasonably informed assessment whether to designate any Executory Contract as an Excluded Asset.

(b)     Upon approval by Buyer, Sellers shall file with the Bankruptcy Court and cause to be published on the case website a copy of the Executory Contract List, and shall serve on each Executory Contract counterparty a list of Executory Contracts that are relevant to them.  The Executory Contract List shall (i) identify the Cure Costs, if any, associated with each Contract listed therein, (ii) identify Buyer and indicate the proposed sale of the Acquired Assets to Buyer (subject to the submission of higher or otherwise better offers), and (iii) indicate that Buyer will, if necessary, provide evidence of adequate assurance of future performance.

(c)     Notwithstanding anything in this Agreement to the contrary, at any time prior to the Closing Date, (i) Buyer will be entitled, in its sole discretion, to designate any Contract of Sellers as an Excluded Asset by providing written notice thereof to Sellers and any Contract so designated will be deemed to be an "Excluded Asset" (and not an "Assumed Contract") for all purposes hereunder and (ii) Buyer will be entitled, in its sole discretion, to designate any Contract of Sellers as an Assumed Contract by providing written notice thereof to Sellers and any Contract so designated will be deemed to be an "Assumed Contract" and "Acquired Asset" (and not an "Excluded Asset") for all purposes hereunder. At the Closing, any Assumed Contract that is designated as an Excluded Asset in accordance with the foregoing sentence shall not be assumed and assigned to Buyer**Error! Reference source not found.**; any Assumed Contract that is designated as an Acquired Asset in accordance with the foregoing sentence shall be assumed by and assigned to Buyer.

(d)     Buyer and Sellers acknowledge and agree that the deadline for counterparties to the Assumed Contracts to object to the proposed assumption and assignment of such Contracts will not have passed by the Closing. Nothing in this Agreement, the Bill of Sale or the Assignment and Assumption Agreement or the consummation of the transactions contemplated hereby or thereby shall be construed as an attempt or agreement to assign or transfer any Acquired Asset (including any Assumed Contract or Permit) to Buyer which by its terms or by Law is not assignable or transferable without a consent or is cancelable by a third party in the event of an assignment or transfer (a "Nonassignable Asset"), unless and until such consent shall have been obtained (including by virtue of the effect of the Sale Order rendering certain consents to be unnecessary) or Law satisfied. Sellers and Buyer shall use diligent and reasonable best efforts to obtain any consent that may be required and satisfy any Law necessary to the assignment or transfer of a Nonassignable Asset to Buyer, and Sellers shall take all such commercially reasonable actions as may be necessary to effect the assignment or transfer of the Nonassignable Asset.  At the Closing, Buyer and Sellers will enter into a transition services agreement to, among other things, allow Buyer to have the benefit of the Assumed Contracts and Nonassignable Assets from and after Closing until the Sale Order is effective as to each Assumed Contract and Nonassignable Asset. If and when the applicable consents or approvals, the absence of which caused the deferral of transfer of any Assumed Contract or Nonassignable Asset pursuant to this Section, are obtained, the transfer of the applicable Assumed Contract and Nonassignable Asset to Buyer shall automatically and without further action be effected in accordance with the terms of this Agreement.

**ARTICLE 3
CLOSING; PURCHASE PRICE**

14

3.1    <u>Closing; Transfer of Possession; Certain Deliveries</u>.

(a)    Unless this Agreement shall have been terminated in accordance with <u>Section 8.1</u>, the consummation of the Transactions (the "<u>Closing</u>") shall take place on the first (1st) Business Day after the satisfaction of all of the conditions set forth in <u>Article 7</u> (or the waiver thereof by the Party entitled to waive that condition) or on such other date as the Parties hereto shall mutually agree.  The Closing shall be held virtually, unless the Parties hereto otherwise agree.  The actual date of the Closing is herein called the "<u>Closing Date</u>."  For purposes of this Agreement, from and after the Closing, the Closing shall be deemed to have occurred at 11:59 p.m. Eastern time on the Closing Date.

(b)    At the Closing, Sellers shall deliver to Buyer:

(i)    a duly executed bill of sale (the "<u>Bill of Sale</u>"), in a form mutually agreed to by the Parties, transferring the Acquired Assets to Buyer;

(ii)    subject to <u>Section 2.5(e)</u> above, the duly executed Assignment and Assumption Agreement;

(iii)    the Sellers Closing Certificate;

(iv)    a properly completed and duly executed IRS Form W-9 for each Seller;

(v)    a Machinery and Equipment Schedule, Inventory Schedule and AR Schedule, as of the latest date available; and

(vi)    such other documents, instruments and certificates as Buyer may reasonably request.

(c)    At the Closing, Buyer shall deliver to Sellers:

(i)    the Purchase Price, net of the Deposit which will be released to Sellers, in accordance with the provisions of <u>Section 3.2</u>; and

(ii)    subject to <u>Section 2.5(e)</u> above, the duly executed Assignment and Assumption Agreement.

3.2    <u>Consideration</u>.

(a)    <u>Purchase Price</u>.  Subject to the terms and conditions of this Agreement, the aggregate consideration to be paid by Buyer for the Acquired Assets and the assumption of the Assumed Liabilities shall be an amount equal to the sum of $7,000,000 in cash (the "<u>Purchase Price</u>"), plus the payment of the Cure Costs.

(b)    <u>Deposit</u>.  By no later than 12:00 p.m. Noon Eastern time on August 26, 2025, Buyer will pay to Sellers, to be held in the trust account of Sellers' counsel, a deposit equal to ten percent (10%) of the Purchase Price (the "<u>Deposit</u>").  At the Closing, the Deposit will be released to Sellers and applied against the amount payable by Buyer as the Purchase Price.  If this Agreement is terminated by Sellers pursuant to <u>Section 8.1(e)</u> as a result of a Material Breach by Buyer, the Deposit shall be released to Sellers. If this Agreement is terminated under <u>Section 8.1(e)</u> as a result of a breach by Buyer that is not a Material Breach or under any other provision of <u>Section 8.1</u>, the Deposit shall be released to Buyer.

(c)     Withholding. Notwithstanding any provision hereof to the contrary, each of Buyer, Sellers, and any of their Affiliates shall be entitled to deduct and withhold from any consideration otherwise payable under the terms of this Agreement such amounts as it is required to deduct and withhold pursuant to any provision of Law, including those related to or regarding Taxes. To the extent that amounts are so deducted and withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers jointly and severally hereby represent and warrant to Buyer, as of the Agreement Date, as follows:

4.1     Organization.  Each Seller is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization.  Subject to entry of the Sale Order, each Seller has all necessary corporate power and authority to own and operate its properties, to lease the property it operates under lease and to conduct the Business. Each Seller is duly licensed or qualified to transact business in all jurisdictions in which the nature of the business conducted by it requires such qualification.

4.2     Due Authorization, Execution and Delivery; Enforceability.  Each Seller has all requisite corporate or limited liability company power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is (or will become at Closing) a party and to perform its obligations hereunder and thereunder (in the case of the obligation to consummate the Transactions, subject to the entry of the Sale Order).  The execution, delivery and performance by each of Sellers of this Agreement and the other Transaction Documents to which it is (or will become at Closing) a party and the consummation of the Transactions have been duly and validly authorized by all requisite corporate or limited liability company action, as applicable, on the part of each such Seller and no other corporate or limited liability company action, as applicable, on the part of each such Seller is necessary to authorize this Agreement and such other Transaction Documents and to consummate the Transactions (subject, in the case of the obligation to consummate the Transactions, to the entry of the Sale Order).  This Agreement and the other Transaction Documents to which each of Sellers is (or will become at Closing) party have been (or will be) duly and validly executed and delivered by each such Seller and (assuming the due authorization, execution and delivery by all parties hereto and thereto, other than such Seller) constitute (or will constitute) valid and binding obligations of each such Seller enforceable against each such Seller in accordance with their terms (in the case of the obligation to consummate the Transactions, subject to the entry of the Sale Order).

4.3     Material Customers.  No federal or state government or any agency, branch or department thereof, including any branch of the military (collectively, a "Material Customer"), has cancelled or otherwise terminated, or made a material adverse change in its relationship with a Seller, or notified a Seller that such Material Customer is cancelling or otherwise terminating, or making a material adverse change in its relationship with one or more of the Sellers.

4.4     Exclusive Representations and Warranties.  Except for the representations and warranties contained in this Article 4, none of Sellers nor their respective Affiliates, nor any of their respective Representatives, makes or has made any other representation or warranty on behalf of Sellers or otherwise in respect of Sellers or the Business and the Transactions under this Agreement constitute an AS-IS, WHERE-IS sale.  Except for the representations and warranties contained in this Article 4, each Seller (a) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Acquired Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all liability and responsibility for any representation, warranty, projection,

forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any Representative of Sellers or any of their respective Affiliates). Sellers make no representations or warranties to Buyer regarding the probable success or profitability of the Business.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Sellers, as of the Agreement Date, except as set forth on the Disclosure Schedules, as follows:

5.1     Organization.  Buyer is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization.  Buyer has all necessary corporate power and authority to own and operate its properties, to lease the property it operates under lease and to conduct its business.

5.2     Due Authorization, Execution and Delivery; Enforceability.  Buyer has all requisite corporate power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is (or will become at Closing) a party and to perform its obligations hereunder and thereunder (in the case of the obligation to consummate the Transactions, subject to the entry of the Sale Order).  The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is (or will become at Closing) a party and the consummation of the Transactions have been duly and validly authorized by all requisite corporate action on the part of Buyer and no other corporate action on the part of Buyer is necessary to authorize this Agreement and such other Transaction Documents and to consummate the Transactions (subject, in the case of the obligation to consummate the Transactions, to the entry of the Sale Order).  This Agreement and the other Transaction Documents to which Buyer is (or will become at Closing) party have been (or will be) duly and validly executed and delivered by Buyer and (assuming the due authorization, execution and delivery by all parties hereto and thereto, other than Buyer) constitute (or will constitute) valid and binding obligations of Buyer enforceable against Buyer in accordance with their terms (in the case of the obligation to consummate the Transactions, subject to the entry of the Sale Order), in each case except as enforceability may be limited by applicable bankruptcy, insolvency or similar Laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

5.3     Availability of Funds.  Buyer, as of the Closing, will have sufficient funds available to it to pay the Purchase Price on the Closing Date and to enable Buyer to perform all of its obligations under this Agreement.

5.4     Adequate Assurances Regarding Executory Contracts.  Buyer (or such of Buyer's Affiliates which will be assuming any Assumed Contract) is and will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

5.5     Exclusive Representations and Warranties.  Except for the representations and warranties contained in this Article 5, none of Buyer, its Affiliates, nor any of their respective Representatives, makes or has made any other representation or warranty of any kind or nature whatsoever, whether oral or written, express or implied, relating to Buyer or its Affiliates, and Buyer hereby disclaims any such other representations or warranties.

## ARTICLE 6
## COVENANTS OF THE PARTIES

17

6.1     Conduct of Business Pending the Closing.  During the period from the Agreement Date and continuing until the earlier of (x) the termination of this Agreement in accordance with its terms and (y) the Closing (the "Interim Period"), except as may be required by Order of the Bankruptcy Court (provided that no Seller directly or indirectly petitioned, sought, requested or moved for such Order of the Bankruptcy Court or authorized, supported or directed any other Person to petition, seek, request or move for such Order of the Bankruptcy Court), Sellers shall carry on the Business in the Ordinary Course of Business and, to the extent consistent therewith, use commercially reasonable efforts to preserve the Business intact and preserve the goodwill of all relationships with Governmental Entities, customers, suppliers, employees and others having business dealings with the Business. For the avoidance of doubt, during the Interim Period, Seller shall not offer any discounts on accounts receivable or other incentives to accelerate the collection of any accounts receivable, even if it does so in the Ordinary Course of Business.

6.2     Notification of Certain Matters.  During the Interim Period, DM, on the one hand and for and on behalf of the Sellers, and Buyer, on the other hand, shall notify such other Party in writing of any event which would reasonably be expected to cause any of the conditions in Section 7.1 and Section 7.2, as applicable, not to be satisfied.

6.3     Access.  Subject to applicable Law and excluding any privileged materials, during the Interim Period, Sellers (a) shall give Buyer and its Representatives reasonable access during normal business hours to the offices, properties, officers, employees, accountants, auditors, counsel and other representatives, books and records of Sellers, (b) shall furnish to Buyer and its Representatives such financial, operating and property data related to the Acquired Assets and other information as Buyer and its Representatives reasonably request and (c) shall cooperate reasonably with Buyer in its investigation of the Business. It is acknowledged and understood that no investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or other agreement given or made by Sellers hereunder. Notwithstanding the foregoing, Buyer shall not (i) have any access or investigation right to the extent it relates to the negotiation of this Agreement or the Transactions or (ii) conduct or cause to be conducted any sampling, testing, or subsurface or otherwise invasive investigation of the air, soil, surface water, groundwater, building materials or other environmental media (commonly known as a Phase II environmental assessment) at any property of Sellers without the prior written consent of Sellers. All information obtained pursuant to this Section 6.3 shall be subject to the terms and conditions of the Confidentiality Agreement.

6.4     Tax Matters.

(a)     All Transfer Taxes arising out of the transfer of the Acquired Assets pursuant to this Agreement shall be borne by Buyer. Sellers shall cooperate with Buyer by delivering to Buyer such resale or similar certificates as may be applicable, but Buyer shall timely prepare and file any Tax Returns relating to such Transfer Taxes, including any Claim for exemption or exclusion from the application or imposition of any Transfer Taxes, and Sellers shall join in the execution of any such Tax Returns and other documentation. Buyer shall pay all such Transfer Taxes when due.

(a)     For all purposes of this Agreement, in the case of any Property Taxes with respect to a taxable period that includes (but does not end on) the Closing Date (a "Straddle Period"), such Taxes shall be allocated between the portion of such Straddle Period that ends on the Closing Date and the portion of such Straddle Period that begins after the Closing Date on a per diem basis and calculated as follows: (x) to the Sellers, an amount equal to the amount of such Taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days in the Straddle Period ending on and including the Closing Date and the denominator of which is the number of days in the entire Straddle Period, and (y) to Buyer, the balance of such Taxes attributable to such Straddle Period.

18

(b)     Each Seller shall cooperate fully, as and to the extent reasonably requested by Buyer, in connection with the preparation and filing of any Tax Return and any audit, litigation or other proceeding with respect to Tax Returns or Taxes relating to the Acquired Assets.

(c)     The Purchase Price and other items required to be included thereunder as consideration for income Tax purposes for the Acquired Assets of each Seller shall be allocated among such Acquired Assets by Buyer. No later than thirty (30) days following the Closing, Buyer shall prepare and provide to Sellers a proposed allocation (the "Allocation") for Sellers' review. Sellers shall have thirty (30) days to review the Allocation. If Sellers do not notify Buyer in writing of any objections within such thirty (30)-day period or if Sellers and Buyer resolve all such objections, none of the Parties, nor any of their respective Affiliates, shall take any position (whether in financial statements, audits, Tax Returns or otherwise) which is inconsistent with the Allocation, unless required to do so by applicable Law. If prior to the end of such thirty (30)-day period, Buyer and Sellers are unable to so agree on the Allocation, then such Allocation shall not be binding on the Parties. Sellers shall timely and properly prepare, execute, file and deliver all documents, forms and other information as Buyer may reasonably request to prepare the Allocation. In the event that the Allocation is binding on the Parties, if the Allocation is disputed by any Governmental Entity, the Party receiving notice of such dispute shall promptly notify the other Party.

6.5     Commercially Reasonable Efforts.  Subject to the terms and conditions of this Agreement, each Party shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper or advisable under applicable Law to consummate and make effective the Transactions.

6.6     WARN Act.  Buyer shall be solely responsible for compliance with and liabilities relating in any way to the WARN Act for any act or omission of Buyer after the Closing Date.

6.7     Further Assurances.  Subject to the terms and conditions herein provided, following the Closing Date, Sellers shall execute and deliver to Buyer such documents, instruments, certificates, bills of sale, endorsements, assignments and other good and sufficient instruments of assignment, transfer and conveyance, in form and substance reasonably satisfactory to Buyer, and take such additional actions as Buyer may reasonably request to vest in Buyer all of each one of Sellers' right, title and interest in and to the Acquired Assets.  Sellers and Buyer shall also cooperate in the transition of operational matters in respect of the Facilities and the Business.

6.8     Bankruptcy Court Filings.

(a)     Sellers shall use best efforts to pursue the entry of the Sale Order.  Sellers shall use best efforts to comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules in connection with obtaining approval of the Sale Order.  Sellers shall consult with Buyer and its Representatives concerning the Sale Order, any other Orders of the Bankruptcy Court relating to the Transactions, and the bankruptcy proceedings in connection therewith.  Sellers further covenant and agree that the terms of any plan of bankruptcy, insolvency, reorganization or liquidation, including any plan it submits to the Bankruptcy Court for confirmation shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the Transactions, including any transaction contemplated by or approved pursuant to the Sale Order.

(b)     Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyer, including furnishing affidavits or other documents or information for filing with the

19

Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.

6.9     Cure Costs. Subject to Section 2.5(e) above, Sellers shall transfer and assign all Assumed Contracts to Buyer or an Affiliate of Buyer designated by Buyer, and Buyer or such designated Affiliate of Buyer shall assume all Assumed Contracts from Sellers, as of the Closing Date pursuant to section 365 of the Bankruptcy Code and the Sale Order.  As promptly as practicable following the Agreement Date, Buyer and Sellers shall use commercially reasonable efforts to cooperate and determine the Cure Costs under each Assumed Contract, if any, so as to permit the assumption and assignment of each such Assumed Contract pursuant to section 365 of the Bankruptcy Code in connection with the Transactions.  In connection with the assignment and assumption of the Assumed Contracts, Buyer shall cure any defaults under the Assumed Contracts by payment of any Cure Costs (or create reserves therefor) as ordered by the Bankruptcy Court. Buyer or its designated Affiliate shall be responsible for demonstrating and establishing adequate assurance of future performance before the Bankruptcy Court with respect to the Assumed Contracts.  In the event that Buyer does not reach agreement with respect to any Cure Cost or demonstration of adequate assurance of future performance with the applicable counterparty, Buyer may seek to have such dispute resolved by the Bankruptcy Court, and if such dispute is not resolved in a manner satisfactory to Buyer, Buyer may thereafter designate such Assumed Contract as an Excluded Asset notwithstanding the occurrence of the Closing Date.

6.10     Preservation of Records.  After the Closing Date, Buyer shall provide to Sellers and their respective Affiliates and Representatives (after reasonable notice and during normal business hours and without charge to Sellers other than the costs of copying, if any) reasonable access to, including the right to make copies of, all Records included in and otherwise related to the Acquired Assets for periods prior to the Closing and shall preserve such Records until the later of (i) such period as shall be consistent with Buyer's records retention policy in effect from time to time, (ii) the retention period required by applicable Law, (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases or (iv) in the case of Records relating to Taxes, the expiration of the statute of limitations applicable to such Taxes.  Such access shall include access to any information in electronic form to the extent reasonably available.  Buyer acknowledges that Sellers have the right to retain originals or copies of all of Records included in or related to the Acquired Assets for periods prior to the Closing.

6.11     Bulk Transfer Laws.  Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer laws of any jurisdiction in connection with the Transactions, and hereby waives all Claims related to the non-compliance therewith.

## ARTICLE 7
## CONDITIONS TO OBLIGATIONS OF THE PARTIES

7.1     Conditions Precedent to the Obligations of Buyer.  The obligation of Buyer to consummate the Transactions is subject to the satisfaction (or, to the extent permitted by applicable Law, waiver by Buyer in Buyer's sole discretion) at or prior to the Closing Date of each of the following conditions:

(a)     Accuracy of Representations and Warranties.  Each of the representations and warranties of Sellers set forth in ARTICLE 4 shall be true and correct in all material respects at and as of the Agreement Date and at and as of the Closing as though made at and as of such date (in each case, to the extent expressly made as of another date, in which case as of such date as if made at and as of such date).

(b)      Performance of Obligations.  Sellers shall have performed and complied in all material respects with all obligations and agreements contained in this Agreement required to be performed by them on or prior to the Closing Date.

(c)      Sale Order.  The Bankruptcy Court shall have entered the Sale Order, and such Order shall not have been reversed, stayed, modified, amended, or vacated.

(d)      Sellers' Deliveries.  Sellers shall have delivered to Buyer a certificate, dated as of the Closing Date and signed by an authorized officer of each Seller, to the effect that the conditions set forth in Section 7.1(a) and 7.1(b) have been satisfied (the "Sellers Closing Certificate") and all of the items set forth in Section 3.1(a).

(e)      No Other Orders. No temporary restraining order, preliminary or permanent injunction or other Order preventing the consummation of the transactions contemplated by this Agreement shall be in effect, and there shall be no proceeding brought by any Governmental Entity pending before any court of competent jurisdiction seeking such an Order.

7.2      Conditions Precedent to the Obligations of Sellers.   The obligation of Sellers to consummate the Transactions is subject to the satisfaction (or, to the extent permitted by applicable Law, waiver by Sellers) at or prior to the Closing Date of each of the following conditions:

(a)      Accuracy of Representations and Warranties.  The representations and warranties of Buyer set forth in Article 5 shall be true and correct in all material respects at and as of the Agreement Date and at and as of the Closing as though made at and as of such date (in each case, except to the extent expressly made as of another date, in which case as of such date as if made at and as of such date).

(b)      Performance of Obligations.  Buyer shall have performed and complied in all material respects with all obligations and agreements contained in this Agreement required to be performed by it on or prior to the Closing Date.

(c)      Sale Order.  The Bankruptcy Court shall have entered the Sale Order, and such Order shall not have been reversed, stayed, modified, amended, or vacated.

(d)      Buyer's Deliveries.  Buyer shall have delivered to Sellers all of the items set forth in Section 3.1(c).

(e)      No Other Orders. No temporary restraining order, preliminary or permanent injunction or other Order preventing the consummation of the transactions contemplated by this Agreement shall be in effect, and there shall be no proceeding brought by any Governmental Entity pending before any court of competent jurisdiction seeking such an Order.

## ARTICLE 8
## TERMINATION

8.1      Termination of Agreement.  This Agreement may be terminated and the Transactions abandoned at any time prior to the Closing, solely as follows:

(a)      by written agreement of Sellers and Buyer;

(b)      by either Sellers or Buyer:

(i)     if there shall be any (A) Law that makes consummation of the Transactions illegal or otherwise prohibited, or (B) if any Order permanently restraining, prohibiting or enjoining Buyer or Sellers from consummating the Transactions is entered and such Order shall become final; provided, that in the case of subsection (B), the Party seeking to terminate this Agreement shall have used its reasonable best efforts to remove such Order, injunction, restraint or prohibition, and such Order, injunction, restraint or prohibition shall not have been principally caused by the breach by such Party of its covenants or agreements under this Agreement;

(ii)     upon the Bankruptcy Court's entry of an order approving an Alternative Transaction; provided, that Seller's termination right under this Section 8.1(b)(ii) may only be exercised with the prompt refund of the Deposit to Buyer;

(c)     by Buyer if (A) a trustee, receiver or an examiner with expanded powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code is appointed in any of the Chapter 11 Cases or (B) any of the Chapter 11 Cases are dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

(d)     by Buyer if (i) there shall have been a breach by any Seller of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 7.1, or (ii) any other event or condition shall result in any Seller being incapable of satisfying one or more conditions set forth in Section 7.1, and in either case such breach or other event or condition shall be incapable of being cured or, if capable of being cured, shall not have been cured within three (3) days after written Notice thereof shall have been received by Sellers; provided, that as of such date, Buyer is not in breach of this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 7.2;

(e)     by Sellers if (i) there shall have been a breach by Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 7.2, or (ii) any other event or condition shall result in Buyer being incapable of satisfying one or more conditions set forth in Section 7.2, and in either case such breach or other event or condition shall be incapable of being cured or, if capable of being cured, shall not have been cured within three (3) days after written Notice thereof shall have been received by Buyer; provided that as of such date, each Seller is not in breach of this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 7.1;

(f)     by Buyer or Sellers if the Closing shall not have occurred on or before August 29, 2025 (the "Outside Date"); provided, however, that the failure of the Closing to occur by the Outside Date did not result from or was caused by the failure of the Party seeking to terminate this Agreement to comply with any provisions of this Agreement;

(g)     by either Sellers or Buyer if the Bankruptcy Court shall not have entered the Sale Order in accordance with Section 6.8(a);

(h)     by Sellers, if all of the conditions set forth in Section 7.2 (not including conditions which are to be satisfied by actions taken at the Closing; provided, that such conditions shall have been capable of being satisfied as of the date of termination of this Agreement) have been satisfied or validly waived by Buyer, Sellers have given notice to Buyer in writing that Sellers are prepared to consummate the transactions contemplated by this Agreement (a "Seller Closing Notice"), and Buyer fails to consummate the transactions contemplated by this Agreement on the date the Closing should have occurred pursuant to Section 3.1, or, if later, on the first (1st) Business Day immediately following the date of delivery of such Seller Closing Notice; or

22

(i)     by Buyer, if all of the conditions set forth in <u>Section 7.1</u> (not including conditions which are to be satisfied by actions taken at the Closing; <u>provided</u>, that such conditions shall have been capable of being satisfied as of the date of termination of this Agreement) have been satisfied or validly waived by Sellers, Buyer has given notice to Sellers in writing that Buyer is prepared to consummate the transactions contemplated by this Agreement (a "<u>Buyer Closing Notice</u>"), and Sellers fail to consummate the transactions contemplated by this Agreement on the date the Closing should have occurred pursuant to <u>Section 3.1</u>, or, if later, on the first (1st) Business Day following the date of delivery of such Buyer Closing Notice.

8.2     <u>Consequences of Termination</u>.  In the event of any termination of this Agreement by either or both of Buyer and Sellers pursuant to <u>Section 8.1</u>, written Notice thereof shall be given by the terminating Party to the other Parties hereto, specifying the provision hereof pursuant to which such termination is made, and this Agreement shall thereupon terminate and become void and of no further force and effect (other than <u>Section 3.2</u> (*Deposit*), <u>Section 8.1</u> (*Termination of Agreement*), this <u>Section 8.2</u> (*Consequences of Termination*) and <u>Article 9</u> (*Miscellaneous*) and to the extent applicable in respect of such Sections and Article, <u>Article 1</u> (*Definitions*), each of which provision shall survive such termination and remain valid and binding obligations of the Parties), and the Transactions shall be abandoned without further action of the Parties hereto, except that, subject to <u>Section 0</u> such termination shall not relieve any Party of any Liability for fraud, gross negligence or willful breach of this Agreement.

## ARTICLE 9
## MISCELLANEOUS

9.1     <u>Expenses</u>.  Except as set forth in this Agreement and whether or not the Transactions are consummated, each Party hereto shall bear all costs and expenses incurred or to be incurred by such Party in connection with this Agreement and the consummation of the Transactions.

9.2     <u>Assignment</u>.  Neither this Agreement nor any of the rights or obligations hereunder may be assigned by Sellers (whether by operation of law or otherwise) without the prior written consent of Buyer, or by Buyer without the prior written consent of Sellers; <u>provided</u>, that Buyer may assign its rights and obligations under this Agreement to (a) any Affiliate so long as Buyer remains primarily liable for its obligations hereunder or (b) any of Buyer's financing sources as collateral security.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns including any liquidating trustee, responsible Person or similar representative for Sellers or Sellers' estate appointed in connection with the Chapter 11 Cases.

9.3     <u>Parties in Interest</u>.  This Agreement shall be binding upon and inure solely to the benefit of Sellers, Buyer and their respective successors or permitted assigns, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement except as expressly set forth herein.

9.4     <u>Releases</u>.  Effective as of the Closing, (i) Sellers hereby release Buyer and its Affiliates, equityholders, directors, managers, officers, employees, members, partners, limited partners, agents and representatives of Buyer and its Affiliates (collectively, the "<u>Buyer Released Parties</u>") from any and all Liabilities, actions, rights of action, contracts, indebtedness, obligations, Claims, causes of action, suits, damages, demands, costs, expenses and attorneys' fees whatsoever, of every kind and nature, known or unknown, disclosed or undisclosed, accrued or unaccrued, existing at any time, in all circumstances arising prior to Closing, that any Seller or its respective Affiliates and all such Persons' respective successors and assigns, have or may have against any of Buyer Released Parties; <u>provided</u>, that the foregoing shall not release any rights under this Agreement and other agreements contemplated hereby which expressly survive Closing; and (ii) Buyer hereby releases Sellers and their respective Affiliates, equityholders, directors,

23

managers, officers, employees, members, partners, limited partners, agents and representatives of Sellers and their respective Affiliates (collectively, the "Sellers Released Parties") from any and all Liabilities, actions, rights of action, contracts, indebtedness, obligations, Claims, causes of action, suits, damages, demands, costs, expenses and attorneys' fees whatsoever, of every kind and nature, known or unknown, disclosed or undisclosed, accrued or unaccrued, existing at any time, in all circumstances arising prior to Closing, that Buyer and its Affiliates and all such Persons' respective successors and assigns, have or may have against any of Sellers Released Parties; provided, that the foregoing shall not release any rights under this Agreement and other agreements contemplated hereby which expressly survive Closing.

     9.5    Notices.  All notices, demands, requests, consents, approvals or other communications (collectively, "Notices") required or permitted to be given hereunder or that are given with respect to this Agreement shall be in writing and shall be personally served, delivered by a nationally recognized overnight delivery service with charges prepaid, or transmitted by hand delivery, or facsimile or electronic mail, addressed as set forth below, or to such other address as such Party shall have specified most recently by written Notice.  Notice shall be deemed given on the date of service or transmission if personally served or transmitted by facsimile or electronic mail with confirmation of receipt; provided, that if delivered or transmitted on a day other than a Business Day or after 5:00 p.m. New York time, notice shall be deemed given on the next Business Day.  Notice otherwise sent as provided herein shall be deemed given on the next Business Day following timely deposit of such Notice with an overnight delivery service:

| | |
|---|---|
| If to any Seller: | Desktop Metal, Inc. |
| | 63 Third Avenue |
| | Burlington, MA 01803 |
| | Attention:    Andrew Hinkelman, CRO |
| | Email:    andrew.hinkelman@fticonsulting.com |
| | |
| With copies to: | Pachulski Stang Ziehl & Jones LLP |
| | 10100 Santa Monica Blvd., 13th Floor |
| | Los Angeles, CA 90067 |
| | Attention:    Richard M. Pachulski |
| |     Maxim B. Litvak |
| | Email:    rpachulski@pszjlaw.com |
| |     mlitvak@pszjlaw.com |
| | |
| If to Buyer: | Arc Impact Acquisition Corp. |
| | 767 3rd Avenue, 29th Floor |
| | New York, NY 10017 |
| | Attention:  Brian Wisk |
| | Email:  bwisk@arc-pbc.com |
| | |
| With copies to: | Cole Schotz, P.C. |
| | 1325 Avenue of the Americas, 19th Floor |
| | New York, NY 10019 |
| | Attention:    Dan Geoghan |
| | Email:    dgeoghan@coleschotz.com |

     Rejection of or refusal to accept any Notice, or the inability to deliver any Notice because of changed address of which no Notice was given, shall be deemed to be receipt of the Notice as of the date of such rejection, refusal or inability to deliver.

9.6     <u>Choice of Law</u>.  This Agreement shall be construed and interpreted, and the rights of the Parties shall be determined, in accordance with the Laws of the State of Texas, without giving effect to any provision thereof that would require or permit the application of the substantive laws of any other jurisdiction.

9.7     <u>Entire Agreement; Amendments and Waivers</u>.  This Agreement, the Confidentiality Agreement and all Transaction Documents and all certificates and instruments delivered pursuant hereto and thereto constitute the entire agreement among the Parties pertaining to the subject matter hereof and supersede all prior agreements, understandings, negotiations, and discussions, whether oral or written, of the Parties.  This Agreement may be amended, supplemented or modified, and any of the terms, covenants, representations, warranties or conditions may be waived, only by a written instrument executed by Buyer and Sellers, or in the case of a waiver, by the Party waiving compliance.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided.

9.8     <u>Counterparts; Facsimile and Electronic Signatures</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.  Counterparts to this Agreement may be delivered via facsimile or electronic mail.  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the Party against whom enforcement is sought.

9.9     <u>Severability</u>.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

9.10    <u>Headings</u>.  The table of contents and the headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

9.11    <u>Exclusive Jurisdiction and Specific Performance</u>.

(a)     Subject to <u>Section 9.11(b)</u>, without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all Proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive Notices at such locations as indicated in <u>Section 9.5</u>.  For the avoidance of doubt, this <u>Section 9.11</u> shall not apply to any Claims that Buyer or its Affiliates may have against any third party following the Closing.

(b)     Notwithstanding anything herein to the contrary, in the event the Chapter 11 Cases of Sellers are closed or dismissed and the Bankruptcy Court is unwilling or unable exercise jurisdiction, the Parties hereby agree that all Claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, shall be heard and determined exclusively in any federal court sitting in the City of Houston, Texas (and any appellate court thereof), and the Parties hereby consent to and submit to the jurisdiction and venue of such court.

(c)     Each Party acknowledges that the other Party would be damaged irreparably in the event that the terms of this Agreement are not performed by each Party in accordance with its specific terms

25

or otherwise breached or either Party fails to consummate the Closing and that, in addition to any other remedy that each Party may have under law or equity, each Party shall be entitled to seek injunctive relief to prevent breaches of the terms of this Agreement and to seek to enforce specifically the terms and provisions hereof that are required to be performed by the other Party.  Each Party further agrees that the other Party shall not be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this Section 9.11, and irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument.

      9.12   <u>WAIVER OF RIGHT TO TRIAL BY JURY</u>.  SELLERS AND BUYER HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY, OR THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE, AND ENFORCEMENT HEREOF (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  FOR THE AVOIDANCE OF DOUBT, THIS <u>SECTION 9.12</u> SHALL NOT APPLY TO ANY CLAIMS THAT BUYER OR ITS AFFILIATES MAY HAVE AGAINST ANY THIRD PARTY FOLLOWING THE CLOSING.

      9.13   <u>Computation of Time</u>.  In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

      9.14   <u>Time of Essence</u>.  Time is of the essence of this Agreement.

      9.15   <u>Disclosure Schedules</u>.  Except as set forth in this Agreement, the inclusion of any information (including dollar amounts) in Disclosure Schedules shall not be deemed to be an admission or acknowledgment by any Party that such information is required to be listed on such section of the relevant schedule or is material to or outside the Ordinary Course of Business of any Person.  The information contained in this Agreement, the exhibits hereto and the Disclosure Schedules is disclosed solely for purposes of this Agreement, and no information contained herein or therein shall be deemed to be an admission by any Party to any third party of any matter whatsoever (including any violation of any Law or breach of contract).  Unless the context otherwise requires, all capitalized terms used in the Disclosure Schedules shall have the respective meanings assigned in this Agreement.  The Disclosure Schedules set forth items of disclosure with specific reference to the particular Section or subsection of this Agreement to which the information in the Disclosure Schedules relates; <u>provided</u>, <u>however</u>, that any information set forth in one Section of the Disclosure Schedules will be deemed to apply to each other section or subsection thereof to which its relevance is reasonably apparent on its face.

      9.16   <u>Mutual Drafting</u>.  This Agreement is the result of the joint efforts of Buyer and Sellers, and each provision hereof has been subject to the mutual consultation, negotiation and agreement of the Parties and there is to be no construction against any Party based on any presumption of that Party's involvement in the drafting thereof.

      9.17   <u>Prevailing Party. In the event of any Proceeding in connection with this Agreement or any</u> Transaction Document, the prevailing Party in any such Proceeding shall be entitled to recover from the other Party its costs and expenses, including, without limitation, reasonable legal fees and expenses.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of Sellers and Buyer as of the date first above written.

**BUYER**:

ARC IMPACT ACQUISITION CORP.

By: _____
Name:  Bryan Wisk
Title:   Chief Executive Officer

**SELLERS**:

DESKTOP METAL, INC.
ADAPTIVE3D LLC
ADAPTIVE 3D TECHNOLOGIES, LLC
DESKTOP METAL OPERATING, INC.
DESKTOP METAL SECURITIES CORPORATION
EXONE AMERICAS LLC
EXONE OPERATING LLC

By: *Andrew Hinkelman*

Name: Andrew Hinkelman (Aug 26, 2025 11:06:13 PDT)
Andrew Hinkelman

Title:   Chief Restructuring Officer

## <u>FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT</u>

THIS FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT (this "<u>Amendment</u>") is made and entered into as of  August 29, 2025 by and Desktop Metal, Inc., a Delaware corporation ("<u>DM</u>"), and each of DM's Subsidiaries listed on the signature page hereto (together with DM, "<u>Sellers</u>" and each a "<u>Seller</u>"), and Arc Impact Acquisition Corp., a Delaware public benefit corporation ("<u>Buyer</u>").  Each Seller and Buyer are referred to herein individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>".

## <u>RECITALS:</u>

**WHEREAS,** the Parties entered into that certain Asset Purchase Agreement, dated August 26, 2025 (the "<u>Agreement</u>").

**WHEREAS,** the Agreement currently provides for an Outside Date of August 29, 2025, which the Parties desire to extend to September 5, 2025.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      **<u>Outside Date</u>**.  The Parties desire to amend Section 8.1(f) of the Agreement to delete the date "August 29, 2025" where in appears therein and insert the date "September 5, 2025" in replacement thereof.

2.      **<u>Miscellaneous</u>.**    Any reference to the term "Agreement" in the Agreement shall hereinafter be deemed to refer to the Agreement as amended by this Amendment.  Except as herein amended, the Agreement shall continue in full force and effect as of the Agreement Date and has not been otherwise modified or amended.  Any capitalized term not otherwise defined herein shall have the meaning ascribed to it in the Agreement. Section headings are for convenience only and not intended to be substantive. This Amendment may be executed in any number of counterparts each of which when so executed and delivered shall be deemed to be an original, but all such counterparts shall constitute one and the same agreement. Facsimile, portable document format (PDF), and other electronic signatures (including any executed via DocuSign or similar software) shall have the same force and effect as original signatures.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above but to be effective as of the Agreement Date.

**BUYER**:

ARC IMPACT ACQUISITION CORP.

*Bryan Wisk*

By:
Name:   Bryan Wisk
Title:    CEO

**SELLERS**:

DESKTOP METAL, INC.
ADAPTIVE3D LLC
ADAPTIVE 3D TECHNOLOGIES, LLC
DESKTOP METAL OPERATING, INC.
DESKTOP METAL SECURITIES
CORPORATION
EXONE AMERICAS LLC
EXONE OPERATING LLC

By:
Name:  Andrew Hinkelman
Title:   Chief Restructuring Officer

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above but to be effective as of the Agreement Date.

**BUYER**:

ARC IMPACT ACQUISITION CORP.

By: _____
Name:
Title:

**SELLERS**:

DESKTOP METAL, INC.
ADAPTIVE3D LLC
ADAPTIVE 3D TECHNOLOGIES, LLC
DESKTOP METAL OPERATING, INC.
DESKTOP METAL SECURITIES
CORPORATION
EXONE AMERICAS LLC
EXONE OPERATING LLC

By: _Andrew Hinkelman (Aug 29, 2025 12:05:15 PDT)_
Name: Andrew Hinkelman
Title:   Chief Restructuring Officer

70206/0001-51241107v1