**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| DESKTOP METAL, INC., *et al*., | Case No. 25-90268 (CML) |
| Debtors.[1] | (Jointly Administered) |

**THIRD AMENDED AND RESTATED COMBINED DISCLOSURE STATEMENT
AND PLAN OF LIQUIDATION OF DESKTOP METAL, INC. AND ITS
AFFILIATED DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**PACHULSKI STANG ZIEHL & JONES LLP**
Michael D. Warner (SBT 00792304)
Maxim B. Litvak (SBT 24002482)
Benjamin L. Wallen (SBT 24102623)
700 Louisiana Street, Suite 4500
Houston, TX 77002
Telephone: (713) 691-9385
Facsimile: (713) 691-9407
mwarner@pszjlaw.com
mlitvak@pszjlaw.com
bwallen@pszjlaw.com

       -and-

Richard M. Pachulski (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
rpachulski@pszjlaw.com
gdemo@pszjlaw.com

*Counsel to the Debtors and Debtors in Possession*

---

[1] The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are: Adaptive3D LLC (3990); Adaptive 3D Technologies, LLC (5893); Beacon Bio, Inc. (9005); Brewer Tafla Dental Technologies, LLC (6452); Dental Arts Laboratories, Inc. (8905); Desktop Labs, Inc. (5344); Desktop Metal Operating, Inc. (7659); Desktop Metal Securities Corporation (9007); Desktop Metal, Inc. (4042); EnvisionTEC US LLC (2483); ExOne Americas LLC (3443); ExOne Operating, LLC (8851); Figur Machine Tools LLC (2489); Larry Brewer Dental Lab Inc. (0215); May Dental Arts, LLC (8558); and The Syzygy Memory Plastics Corp. (8063). The location of the Debtors' corporate headquarters and the Debtors' service address is: 63 Third Avenue, Burlington, MA 01803.

## TABLE OF CONTENTS

SECTION I. INTRODUCTION ............................................................................................... 1

SECTION II. SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS
AND INTERESTS UNDER PLAN AND IMPORTANT SOLICITATION AND
CONFIRMATION DATES AND DEADLINES ............................................................... 3

    A.    Summary of Classification and Treatment of Claims and Interests. .................... 3

    B.    Important Dates and Deadlines ............................................................................. 7

SECTION III. DEFINED TERMS ...................................................................................... 8

SECTION IV. BACKGROUND .......................................................................................... 21

    A.    General Background. ............................................................................................. 21

    B.    Prepetition Financing Facilities. ........................................................................... 23

    C.    The Quinn Claim and Attachment Order. ............................................................. 26

    D.    Other Trade Claims and Other Unsecured Claims. ............................................... 26

    E.    Events Leading to the Bankruptcy Filings. ........................................................... 26

    F.    Chapter 11 Goals .................................................................................................. 27

SECTION V. THE CHAPTER 11 CASES ......................................................................... 28

    A.    First Day and Other Early Relief. .......................................................................... 28

    B.    Private Sale Motion; Use of Cash Collateral. ...................................................... 29

    C.    Bid Procedures and Sales .................................................................................... 29

    D.    Formation of the Committee. ................................................................................ 29

    E.    Retention of Professionals. .................................................................................. 29

    F.    Debtors' Schedules and Statements of Financial Affairs. .................................... 30

SECTION VI. CONFIRMATION AND VOTING PROCEDURES .................................. 30

    A.    Hearing on Confirmation and Final Approval of Disclosure Statement. ........... 30

    B.    Procedures for Objections. ................................................................................... 30

    C.    Requirements for Confirmation. ........................................................................... 30

    D.    Classification of Claims and Interests. ................................................................. 31

    E.    Impaired Claims or Interests. ................................................................................ 32

    F.    Confirmation Without Necessary Acceptances; Cramdown. ............................... 33

    G.    Feasibility. ............................................................................................................ 34

    H.    Best Interests Test and Liquidation Analysis. ...................................................... 34

    I.    Eligibility to Vote on the Combined Plan and Disclosure Statement. ................. 35

    J.    Solicitation Package. ............................................................................................ 36

4923-8655-1404.3 18041.00002

K.   Voting Procedures, Voting Deadline, and Applicable Deadlines. ...................... 36

L.   Acceptance of the Combined Plan and Disclosure Statement. ........................... 37

SECTION VII. CERTAIN RISK FACTORS, TAX CONSEQUENCES, AND OTHER
DISCLOSURES ................................................................................................... 38

A.   Certain Risk Factors to be Considered. ................................................................. 38

B.   The Combined Plan and Disclosure Statement May Not Be Accepted. ............. 38

C.   The Combined Plan and Disclosure Statement May Not Be Confirmed. ........... 38

D.   Distributions to Holders of Allowed Claims Under the Combined Plan and
Disclosure Statement May be Inconsistent with Projections. ............................. 39

E.   Objections to Classification of Claims. ................................................................. 39

F.   Failure to Consummate the Combined Plan and Disclosure Statement. ............. 40

G.   The Plan Releases May Not Be Approved. ........................................................... 40

H.   Reductions to Estimated Creditor Recoveries. ..................................................... 40

I.   Certain U.S. Federal Income Tax Consequences. ................................................ 40

J.   Tax Consequences for U.S. Holders of Certain Claims. ..................................... 41

K.   Tax Consequences in Relation to Administration Trust. ..................................... 42

L.   Information Reporting and Withholding. ................................................................ 44

M.   Releases, Exculpations, and Injunctions. .............................................................. 45

N.   Alternatives to the Combined Plan and Disclosure Statement. ........................... 45

SECTION VIII. UNCLASSIFIED CLAIMS ................................................................ 46

A.   Unclassified Claims. ................................................................................................ 46

B.   Administrative Claims. ............................................................................................. 46

C.   Professional Fee Claims. ......................................................................................... 47

D.   Priority Tax Claims. ................................................................................................. 48

E.   Convertible Senior Notes Trustee Expenses. ........................................................ 48

SECTION IX. CLASSIFICATION OF CLAIMS AND INTERESTS ......................... 48

A.   Summary of Classification. ..................................................................................... 48

B.   Special Provision Governing Unimpaired Claims. ............................................... 49

C.   Vacant and Abstaining Classes. ............................................................................. 49

SECTION X. TREATMENT OF CLAIMS AND INTERESTS ................................... 50

A.   Class 1—Priority Non-Tax Claims. ....................................................................... 50

B.   Class 2—Other Secured Claims ............................................................................. 50

C.   Class 3—First Lien AHG Claims ........................................................................... 51

D.   Class 4—Nano Claims. ............................................................................................ 51

E.   Class 5—Third Lien AHG Claims. ........................................................................ 51

F.   Class 6—Quinn Claim..............................................................................52

G.   Class 7—Unsecured Claims.....................................................................52

H.   Class 8—Intercompany Claims................................................................53

I.   Class 9—Interests....................................................................................53

SECTION XI. DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS ...............53

A.   Distribution Dates; Subsequent Distributions. ......................................53

B.   Distribution Record Date.........................................................................54

C.   Manner of Cash Payments Under the Plan or Administration Trust Agreement.54

D.   Time Bar to Cash Payments by Check. ...................................................54

E.   Administration Account. .........................................................................54

F.   Tax Identification Numbers.....................................................................55

G.   Claims Paid or Payable by Third Parties.................................................55

SECTION XII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND
REDISTRIBUTIONS ...................................................................................................57

A.   No Distributions Pending Allowance......................................................57

B.   Resolution of Disputed Claims................................................................57

C.   Objection Deadline..................................................................................57

D.   Estimation of Claims...............................................................................57

E.   Disallowance of Claims...........................................................................58

F.   Claims Register .......................................................................................58

G.   Reserve Provisions for Disputed Claims.................................................59

H.   *De Minimis* Distributions, Rounding......................................................59

I.   Unclaimed and Undeliverable Distributions. .........................................60

J.   Books and Records and Vesting of Privileges. .......................................60

SECTION XIII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES .......................................................................................................................61

A.   Rejection..................................................................................................61

B.   Rejection Claims. ....................................................................................61

C.   Insurance Policies....................................................................................61

SECTION XIV. MEANS FOR IMPLEMENTATION OF THE PLAN.........................62

A.   Summary. .................................................................................................62

B.   Debtors' Corporate Existence; Corporate Action by Debtors..................62

C.   The Administration Trust. .......................................................................63

D.   The Litigation Trust.................................................................................64

E.   Appointment of the Plan Administrator and Litigation Trustee..............64

F.      Rights and Powers of the Plan Administrator and Litigation Trustee................ 64

G.      Fees and Expenses of the Administration Trust and Litigation Trust. ............... 66

H.      Transfer of Beneficial Interests in the Administration Trust. ........................... 67

I.      Administration Account. ................................................................................... 67

J.      Limited Substantive Consolidation. ................................................................. 67

K.      Litigation / Causes of Action............................................................................ 68

L.      Dissolution of the Committee............................................................................ 68

M.      Cancellation of Prepetition Loan Documents; Distributions. ........................... 69

N.      Termination After Five Years and Extension..................................................... 69

SECTION XV. EFFECT OF CONFIRMATION ............................................................... 70

A.      Binding Effect of the Plan. ................................................................................ 70

B.      Vesting of Assets. .............................................................................................. 70

C.      Property Free and Clear. .................................................................................... 70

SECTION XVI. EXCULPATIONS, INJUNCTIONS, AND RELEASES ..................... 71

A.      Exculpation........................................................................................................ 71

B.      Debtor Releases. ................................................................................................ 71

C.      Injunction. ......................................................................................................... 73

D.      Survival of Exculpation and Indemnification. .................................................. 74

E.      Preservation of Rights of Action. ...................................................................... 74

F.      Preservation of All Causes of Action Not Expressly Settled or Released. ......... 74

G.      Reservation of Governmental Unit Rights ......................................................... 75

SECTION XVII. CONDITIONS PRECEDENT TO CONFIRMATION AND
CONSUMMATION OF THE PLAN .............................................................................. 75

A.      Conditions to Confirmation of the Plan. ........................................................... 75

B.      Conditions to the Effective Date. ...................................................................... 75

C.      Waiver of Conditions Precedent......................................................................... 76

SECTION XVIII. RETENTION OF JURISDICTION ..................................................... 76

SECTION XIX. MISCELLANEOUS PROVISIONS...................................................... 77

A.      Payment of Statutory Fees................................................................................. 77

B.      Revocation of the Combined Plan and Disclosure Statement. ........................... 77

C.      Severability of Plan Provisions. ........................................................................ 78

D.      Exhibits.............................................................................................................. 78

E.      Notices............................................................................................................... 78

F.      Reservation of Rights. ....................................................................................... 80

G.      Defects, Omissions and Amendments................................................................ 80

H.    Filing of Additional Documents. ................................................................. 81

I.     Successors and Assigns. ........................................................................... 81

J.     Setoffs and Recoupments. ........................................................................ 81

K.    Tax Exemption. ........................................................................................ 81

L.     Securities Exemption. .............................................................................. 81

M.   Implementation. ....................................................................................... 82

N.    Record Date. ............................................................................................ 82

O.    Certain Actions. ....................................................................................... 82

P.     Substantial Consummation. ...................................................................... 82

Q.    Waiver of Fourteen-Day Stay ................................................................. 82

R.    Governing Law. ....................................................................................... 82

S.     Entire Agreement. .................................................................................... 83

SECTION XX. RECOMMENDATION ................................................................. 83

EXHIBIT A: ORGANIZATIONAL CHART (as of the Petition Date)

EXHIBIT B: LIQUIDATION ANALYSIS

## DISCLAIMERS

EACH HOLDER OF A CLAIM AGAINST THE DEBTORS ENTITLED TO VOTE TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT SHOULD READ THE COMBINED PLAN AND DISCLOSURE STATEMENT IN ITS ENTIRETY BEFORE VOTING. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT MAY BE MADE EXCEPT PURSUANT TO THE TERMS HEREOF AND SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE. IF YOU ARE ENTITLED TO VOTE TO ACCEPT THE COMBINED PLAN AND DISCLOSURE STATEMENT, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THE COMBINED PLAN AND DISCLOSURE STATEMENT. THE DEBTORS URGE YOU TO VOTE TO ACCEPT THE COMBINED PLAN AND DISCLOSURE STATEMENT.

THE COMBINED PLAN AND DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 3016 AND 3017, AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST OR INTERESTS IN THE DEBTORS SHOULD EVALUATE THE COMBINED PLAN AND DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED. THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS. YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.

THE COMBINED PLAN AND DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT, ANTICIPATED EVENTS IN THE CHAPTER 11 CASES, AND FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT THE STATEMENTS AND DESCRIPTIONS CONTAINED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE TRUE AND ACCURATE, THEY ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT AND APPLICABLE STATUTORY PROVISIONS. THE TERMS OF THE DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT AND APPLICABLE STATUTES GOVERN IN THE EVENT OF ANY DISCREPANCY WITH THE COMBINED PLAN AND DISCLOSURE STATEMENT. CREDITORS AND OTHER INTERESTED PARTIES SHOULD READ THE COMBINED PLAN AND DISCLOSURE STATEMENT, THE DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT, AND THE APPLICABLE

1

STATUTES THEMSELVES FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE FACTUAL STATEMENTS AND REPRESENTATIONS CONTAINED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE MADE BY THE DEBTORS AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED, AND THE DEBTORS DISCLAIM ANY OBLIGATION TO UPDATE ANY SUCH STATEMENTS AFTER THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT. THE DELIVERY OF THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

ALL FORWARD-LOOKING STATEMENTS CONTAINED HEREIN OR OTHERWISE MADE BY THE DEBTORS INVOLVE MATERIAL RISKS AND UNCERTAINTIES AND ARE SUBJECT TO CHANGE BASED ON NUMEROUS FACTORS, INCLUDING FACTORS THAT ARE BEYOND THE DEBTORS' CONTROL. ACCORDINGLY, THE DEBTORS' FUTURE PERFORMANCE AND FINANCIAL RESULTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED IN ANY SUCH FORWARD-LOOKING STATEMENTS. SUCH FACTORS INCLUDE, BUT ARE NOT LIMITED TO, THOSE DESCRIBED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT. THE DEBTORS DO NOT INTEND TO UPDATE OR REVISE THEIR FORWARD-LOOKING STATEMENTS EVEN IF EXPERIENCE OR FUTURE CHANGES MAKE IT CLEAR THAT ANY PROJECTED RESULTS EXPRESSED OR IMPLIED THEREIN WILL NOT BE REALIZED.

ANY PROJECTED RECOVERIES TO CREDITORS SET FORTH IN THIS DISCLOSURE STATEMENT ARE BASED UPON THE ANALYSES PERFORMED BY THE DEBTORS AND THEIR ADVISORS. ALTHOUGH THE DEBTORS AND THEIR ADVISORS HAVE MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN, THE DEBTORS AND THEIR ADVISORS CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THIS INFORMATION.

IN CONNECTION WITH THE DEBTORS' SOLICITATION OF ACCEPTANCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT PURSUANT TO SECTION 1126(b) OF THE BANKRUPTCY CODE, THE DEBTORS ARE FURNISHING A SOLICITATION PACKAGE, CONSISTING OF THE COMBINED PLAN AND DISCLOSURE STATEMENT, THE EXHIBITS HERETO, CONFIRMATION NOTICE, AND A BALLOT, AS APPLICABLE, TO EACH RECORD HOLDER OF CLAIMS ELIGIBLE TO VOTE OR ITS COUNSEL. THE COMBINED PLAN AND DISCLOSURE STATEMENT IS TO BE USED BY EACH SUCH ELIGIBLE HOLDER SOLELY IN

**CONNECTION WITH ITS EVALUATION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT; USE OF THE COMBINED PLAN AND DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE IS NOT AUTHORIZED. NOTHING STATED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY.**

## SECTION I.
## INTRODUCTION

Desktop Metal, Inc. and its affiliated debtors, the debtors and debtors-in-possession in the above-captioned chapter 11 cases (the "Debtors" or the "Company"), hereby propose the following combined disclosure statement and plan of liquidation pursuant to sections 1121(a) and 1125(b) of title 11 of the United States Code (the disclosure statement portion hereof, the "Disclosure Statement" and the chapter 11 plan portion hereof, the "Plan," as may be modified and/or amended from time to time, and collectively, the "Combined Plan and Disclosure Statement"). Capitalized terms used in the Combined Plan and Disclosure Statement and not otherwise defined have the meanings ascribed to such terms in Section III.

The Debtors are a pioneer in the additive manufacturing, or 3D printing, business, providing innovative products and services related thereto. Although the Company has generated significant revenue, it has historically struggled to generate a profit or positive operating cash flow. Notwithstanding its challenges, the Company attracted significant investment and, in July 2024, the Company and Nano executed the Merger Agreement, pursuant to which Nano agreed to purchase the Company for $183 million (subject to adjustment). Nano, however, refused to consummate the Merger, forcing the Company to sue for specific performance. The Company prevailed in its suit, and the Merger closed in April 2025. The Company, however, still faced significant liquidity issues following the Merger; the Merger also caused an event of default under the Convertible Senior Notes Indenture.

Although Nano and certain of the Company's prepetition lenders initially advanced financing, they ultimately determined that they would no longer support the Company. The Company found a potential buyer who was willing to acquire the Company's assets and finance the bankruptcy process, but, on July 24, 2025, the potential acquiror withdrew its proposal. The Company was left facing an imminent liquidity cliff, the inability to pay employees, and potential insolvency proceedings of its foreign subsidiaries.

To address its immediate liquidity needs, the Company entered into an agreement with Anzu Special Acquisition Corp. ("Anzu"), pursuant to which Anzu would acquire the Company's German, Italian, and Japanese subsidiaries, including certain related U.S. assets, in a private sale for total consideration of $10 million (the "Private Sale Transaction"). Concurrently, the Company filed the Cash Collateral Motion (addressed further below) seeking to use a portion of the proceeds from the Private Sale Transaction to fund the Chapter 11 Cases and the sale of the Company's remaining assets. The Court approved the Private Sale Transaction and the Cash Collateral Motion (on an interim basis) on July 31, 2025. Docket Nos. 81; 117. The Court set a hearing to consider approval of the Cash Collateral Motion on a final basis on September 11, 2025, at 1:00 (prevailing Central Time).[2] Docket No. 120. The Private Sale Transaction with Anzu has closed.

On July 31, 2025, the Company also sought and obtained approval of the Bid Procedures [Docket No. 83], pursuant to which the Company sold its dental labs businesses at an auction held on August 11, 2025 for total consideration of approximately $7.8 million in the aggregate pursuant

---

[2] The hearing to consider final approval of the Cash Collateral Motion has been adjourned until the date and time of the Confirmation Hearing.

to the Sale Orders. The Debtors also sold certain of their remaining assets pursuant to the Additional Sale Orders.

After selling the foregoing assets, the Debtors are seeking to effectuate an orderly wind down of their remaining operations and assets, including the investigation and prosecution of any viable Causes of Action, and to disburse the proceeds therefrom to their Creditors. On the Effective Date, the Debtors will transfer the remaining unliquidated assets—the Administration Trust Assets and Litigation Trust Assets—to the Administration Trust and Litigation Trust, as applicable. The Administration Trust and Litigation Trust will investigate the Estate's Causes of Action as set forth in the Administration Trust Agreement and Litigation Trust Agreement, as applicable, and will liquidate, collect, prosecute, sell, settle, or otherwise dispose of the transferred assets. The Litigation Trust will transfer Litigation Recoveries to the Administration Trust, which will distribute all net proceeds to Creditors in accordance with the priority scheme under the Bankruptcy Code and the Plan. There will be no distributions to Holders of Interests.

The Plan provides limited Debtor releases for the Independent Directors, the Committee, and the individual members thereof in their capacity as such, the CRO, the CTO, employees that received under fifty-thousand dollars on account of restricted stock units,  the RSU Specified Parties, and other postpetition officers of the Debtors, and the Professionals. The Plan does not contain third party releases.

The Plan further provides for the limited substantive consolidation of the Debtors' Estates solely for the purposes of voting on the Plan by the Holders of Claims and making Distributions to Holders of Claims.

The Debtors submit that the Combined Plan and Disclosure Statement and/or notice thereof will be distributed to all holders of Claims and Interests in accordance with section 1125(b) of the Bankruptcy Code; Rules 2002, 3016, and 3017 of the Federal Rules of Bankruptcy Procedure; and the Court's order conditionally approving the Combined Plan and Disclosure Statement. The Combined Plan and Disclosure Statement and the exhibits hereto include a discussion of: (i) the nature and history of the Debtors' business and liabilities; (ii) events during the Chapter 11 Cases; (iii) the requirements for confirmation of the Plan and procedures for voting to accept or reject the Plan; (iv) additional factors and disclosures to be considered, including risk factors and certain U.S. federal income tax consequences of the Plan; and (v) the terms of the Plan, including the treatment of holders of Claims and Interests under the Plan. The Disclosure Statement was prepared with the intent to provide "adequate information" (as defined in the Bankruptcy Code) to enable holders of Claims against and Interests in the Debtors to make informed judgments about the Plan.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, if any, the Debtors expressly reserve the right to alter, amend, or modify the Combined Plan and Disclosure Statement, including the Plan Supplement, one or more times, before substantial consummation thereof, in consultation with the Committee and the Ad Hoc Noteholder Group.

***Please read the Combined Plan and Disclosure Statement, the exhibits, other supporting materials, and any ballot that you receive carefully and follow the instructions set forth below***

*and on the appropriate ballot to vote on the Combined Plan and Disclosure Statement. The Debtors believe that the Combined Plan and Disclosure Statement provides the best method of maximizing the recoveries for the holders of Claims against the Debtors. Therefore, the Debtors recommend that all creditors who are entitled to vote should vote in favor of the Combined Plan and Disclosure Statement.*

Unless otherwise specified, all section or exhibit references in the Combined Plan and Disclosure Statement are to the respective section in, or exhibit to, the Combined Plan and Disclosure Statement, as the same may be amended, waived, or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Combined Plan and Disclosure Statement as a whole and not to any particular section, subsection, or clause contained herein. The headings in the Combined Plan and Disclosure Statement are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; and (c) unless otherwise noted above, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply.

**SECTION II.**
**SUMMARY OF CLASSIFICATION AND TREATMENT OF**
**CLAIMS AND INTERESTS UNDER PLAN AND IMPORTANT**
**SOLICITATION AND CONFIRMATION DATES AND DEADLINES**

**A. <u>Summary of Classification and Treatment of Claims and Interests.</u>**

All Claims against or Interests in the Debtors, other than Administrative Claims, and Priority Tax Claims, are classified for purposes of voting and distributions under the Combined Plan and Disclosure Statement. A summary of the classification of these Claims and Interests, the proposed treatment of each Class of Claims or Interests, and the voting status of each Class of Claims or Interests is set forth below. **For the avoidance of doubt, (a) all rights of the Debtors, the Estates, the Committee, the Plan Administrator, the Litigation Trustee, and all other Persons, as applicable, to object, dispute, challenge, or compromise the enforceability, perfection, priority, avoidability, or validity of all Liens, Interests, and Claims are preserved and fully enforceable prior to, on, and after the Effective Date; (b) the relative priorities described herein may be the subject of a Priority Dispute, and nothing herein shall be considered binding on any parties to any Priority Dispute with respect thereto; and (c) nothing in the Plan or Confirmation Order shall affect the outcome of any Priority Disputes.**

| Class | Treatment | Status | Entitled to Vote? |
|---|---|---|---|
| Unclassified: Priority Tax Claims, estimated to total approx. $211,118 | Unless a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Priority Tax Claim, the | Unimpaired | No |

| Class | Treatment | Status | Entitled to Vote? |
|---|---|---|---|
| **Estimated Recovery: 100%** | Debtors or Administration Trust, as applicable, shall pay each holder of an Allowed Priority Tax Claim, from Available Cash, the full unpaid amount of such Allowed Priority Tax Claim (as of the Effective Date) via either, at the Plan Administrator's sole discretion, (a) a single lump sum payment on or as soon as practicable after the later of (i) the Effective Date, (ii) the date such Priority Tax Claim becomes an Allowed Claim, and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law; or (b) regular cash installment payments over a period ending not later than five years after the Petition Date with interest at the rate determined under non-bankruptcy law in accordance with 11.U.S.C. §§ 1129(a)(9)(c) and 511. | | |
| Class 1: Priority Non-Tax Claims, estimated to total approx. $0.00<br><br>**Estimated Recovery: 100%** | The Debtors or Administration Trust, as applicable, shall pay, from Available Cash, the Allowed amount of each Priority Non-Tax Claim to each Entity holding a Priority Non-Tax Claim as soon as practicable following the later of: (a) the Effective Date and (b) the date such Priority Non-Tax Claim becomes an Allowed Claim (or as otherwise permitted by law). The Debtors or the Administration Trust, as applicable, shall pay each Entity holding a Priority Non-Tax Claim in Cash in full, in respect of such Allowed Claim without interest from the Petition Date; *provided however*, that such Entity may be treated on such less favorable terms as may be agreed to in writing by such Entity. | Unimpaired | No |

| Class | Treatment | Status | Entitled to Vote? |
|---|---|---|---|
| Class 2: Other Secured Claims, estimated amount $0.00<br><br>**Estimated Recovery: 100%** | Except to the extent previously paid in full, at the option of the Debtors or Administration Trust, as applicable, one of the following treatments shall be provided: (i) the Holder of an Allowed Class 2 Claim will retain any valid and enforceable existing lien, claim, or encumbrance in or on its Collateral and will receive the proceeds, if any, from the Administration Trust's sale or liquidation of such Collateral in the order of priority of its interest in such Collateral (senior to Class 3, Class 4, Class 5, and Class 6) up to the value of its Allowed Class 2 Claim; (ii) on or as soon as practicable after the later of (a) the Effective Date, or (b) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, or as otherwise agreed between the Holder of such Claim and the Debtors or Administration Trust, as applicable, the Holder of such Other Secured Claim will receive a Cash payment equal to the amount of its Allowed Other Secured Claim in full satisfaction and release of such Other Secured Claim; (iii) the Collateral securing the Creditor's Other Secured Claim (subject to any applicable intercreditor rights or obligations) shall be abandoned to such Creditor, in full satisfaction and release of such Other Secured Claim; or (iv) such other treatment as may be agreed to in writing by the Debtors or the Administration Trust, as applicable, and the Holder of such Class 2 Claim, in each case in full satisfaction and release of such Class 2 Claim. | Unimpaired | No |
| Class 3: First Lien AHG Claims, estimated amount $11,006,777<br><br>**Estimated Recovery: 100%** | Unless previously paid in full, the Holder of an Allowed Class 3 Claim will retain any valid and enforceable existing lien, claim, or encumbrance in or on its Collateral and will receive the proceeds, if any, from the Administration Trust's or Litigation Trust's sale or liquidation of such Collateral in the order of priority of its interest in such Collateral (senior to Class 4, Class 5, Class 6, and Class 7) up to the value of its Allowed Class 3 Claim or such other treatment as may be agreed to in writing by the Debtors or the Administration Trust or the Litigation Trust, as applicable, and the Holder of such Class 3 Claim, in each case in full satisfaction and release of such Class 3 Claim. All Allowed Deficiency Claims, if any, will be classified and treated as Class 7 Unsecured Claims.<br><br>Following the Petition Date, the First Lien AHG Claims were paid in full. | Unimpaired | No |
| Class 4: Nano Claims, estimated amount $12,256,667 | Unless previously paid in full, the Holder of an Allowed Class 4 Claim will retain any valid and enforceable existing lien, claim, or encumbrance in or on its Collateral and will receive the proceeds, if any, from the Administration Trust's or Litigation Trust's, | Impaired | Yes |

| Class | Treatment | Status | Entitled to Vote? |
|---|---|---|---|
| **Estimated Recovery: Unknown (contingent on litigation recoveries)** | as applicable, sale or liquidation of such Collateral in the order of priority of its interest in such Collateral (junior to Class 2, Class 3, and, subject to the Intercreditor Letter Agreement, Class 5 with respect to certain Collateral, and senior to Class 5 with respect to certain other Collateral, Class 6 and Class 7) up to the value of its Allowed Class 4 Claim or such other treatment as may be agreed to in writing by the Debtors or the Administration Trust or the Litigation Trust, as applicable, and the Holder of such Class 4 Claim, in each case in full satisfaction and release of such Class 4 Claim. All Allowed Deficiency Claims, if any, will be classified and treated as Class 7 Unsecured Claims. | | |
| Class 5: Third Lien AHG Claims, estimated amount $31,776,447<br><br>**Estimated Recovery: Unknown (contingent on litigation recoveries)** | Unless previously paid in full, the Holder of an Allowed Class 5 Claim will retain any valid and enforceable existing lien, claim, or encumbrance in or on its Collateral and will receive the proceeds, if any, from the Administration Trust's or Litigation Trust's, as applicable, sale or liquidation of such Collateral in the order of priority of its interest in such Collateral (junior to Class 2, Class 3, and, subject to the Intercreditor Letter Agreement, Class 4 with respect to certain Collateral, and senior to Class 4, with respect to certain Collateral, Class 6 and Class 7) up to the value of its Allowed Class 5 Claim or such other treatment as may be agreed to in writing by the Debtors, the Administration Trust, or the Litigation Trust, as applicable, and the Holder of such Class 5 Claim, in each case in full satisfaction and release of such Class 5 Claim. All Allowed Deficiency Claims, if any, will be classified and treated as Class 7 Unsecured Claims. | Impaired | Yes |
| Class 6: Quinn Claim, estimated amount $29,187,503<br><br>**Estimated Recovery: Unknown (contingent on litigation recoveries)** | Unless previously paid in full, the Holder of an Allowed Class 6 Claim will retain any valid and enforceable existing lien, claim, or encumbrance in or on its Collateral and will receive the proceeds, if any, from the Administration Trust's or Litigation Trust's sale or liquidation of such Collateral in the order of priority of its interest in such Collateral (junior to Class 2, Class 3, Class 4, and Class 5) up to the value of its Allowed Class 6 Claim or such other treatment as may be agreed to in writing by the Debtors, the Administration Trust, or the Litigation Trust, as applicable, and the Holder of such Class 6 Claim, in each case in full satisfaction and release of such Class 6 Claim. All Allowed Deficiency Claims, if any, will be classified and treated as Class 7 Unsecured Claims. | Impaired | Yes |
| Class 7: Unsecured Claims, estimated amount $130,875,250 | Holders of Class 7 Claims shall receive a Pro Rata share of the Administration Trust Interests in exchange for their Allowed Class 7 Claims, which entitle the Beneficiaries thereof to a Pro Rata share of | Impaired | Yes |

| Class | Treatment | Status | Entitled to Vote? |
|---|---|---|---|
| **Estimated Recovery: Unknown (contingent on litigation recoveries)** | any net proceeds of the Administration Trust Assets, after payment of all Administration Trust Expenses, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, any Allowed adequate protection claims, and net of any proceeds of Collateral payable to the Holders of Allowed Secured Claims. Unsecured Claims are subject to all statutory, equitable, and contractual subordination claims, rights, and grounds available to the Debtors, the Estates, the Plan Administrator, and the Litigation Trustee, which subordination claims, rights, and grounds are fully enforceable prior to, on, and after the Effective Date. | | |
| Class 8: Intercompany Claims, estimated amount is unknown[3]<br><br>**Estimated Recovery: 0%** | There shall be no Distribution on account of Class 8 Intercompany Claims. Upon the Effective Date, all Intercompany Claims will be deemed, at the option of the Debtors or the Plan Administrator, as applicable, converted to equity, otherwise set off, settled, canceled, released, or discharged without any distribution on account of such Claims. | Impaired | No |
| Class 9: Interests<br><br>**Estimated Recovery: 0%** | There shall be no Distribution on account of Class 9 Interests. Upon the Effective Date, all Interests in Desktop will be deemed cancelled and will cease to exist, and all Interests in Debtors other than Desktop shall be retained at the option of the Debtors or the Administration Trust, as applicable. | Impaired | No |

## B. Important Dates and Deadlines

| Event | Proposed Date[4] |
|---|---|
| Conditional Disclosure Statement Hearing | August 18, 2025 at 1:00 p.m. |
| Voting Record Date | August 18, 2025 |
| Solicitation Deadline | August 20, 2025 |
| Deadline to file Plan Supplement | August 29, 2025 |
| Objection Deadline | September 9, 2025 at 5:00 p.m., as extended to September 26, 2025 at 5:00 p.m. |
| Voting Deadline | September 9, 2025[5] |
| Deadline to File Voting Tabulation Affidavit | September 10, 2025 |

---

[3] Class 8 (Intercompany Claims) only includes Claims between Debtor entities.

[4] All times noted are in prevailing Central Time.

[5] The Voting Tabulation Affidavit was filed on September 24, 2025.

| Event | Proposed Date[4] |
|---|---|
| Briefs in Support of Confirmation | September 10, 2025, as extended from time to time |
| Hearing on Confirmation and Final Approval of Disclosure Statement | September 30, 2025, at 1:00 p.m. |

## SECTION III.
## DEFINED TERMS

As used in the Combined Plan and Disclosure Statement, capitalized terms not otherwise defined have the meanings set forth below. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

"Ad Hoc Noteholder Group" means that certain group of secured and unsecured noteholders represented by Paul Hastings LLP and Ducera Capital Partners LLC.

"Additional Sale Orders" the Orders approving (i) the sale of the Debtor's Figur Machine Tools, LLC, and Desktop Metal Operating, Inc., businesses to Pollard Industries LLC [Docket No. 252] and (v) the sale of certain of Desktop's and its Subsidiaries operations to Arc Impact Acquisition Corp. [Docket No. 253].

"Administration Account" means an interest-bearing bank account or money-market account to be established and held in trust by the Plan Administrator on or after the Effective Date for the purpose of holding any Cash that constitutes an Administration Trust Asset.

"Administration Trust" means the grantor trust to be created upon the Effective Date as set forth in Section XIV for the benefit of the Beneficiaries.

"Administration Trust Agreement" means the agreement, substantially in the form specified in the Plan Supplement governing the Administration Trust, which shall be in form and substance reasonably acceptable to the Committee, Ad Hoc Noteholder Group, the Nano Lender, and Quinn, as it may be subsequently modified from time to time.

"Administration Trust Assets" means (i) Available Cash; (ii) any Causes of Action and Litigation included in the Administration Trust Agreement, which shall include, at a minimum, all Lien Avoidance Actions, other than against Nano; and (iii) any other assets held by the Debtors as of the Effective Date (excluding any funds in the Professional Fee Account), including as to each of the foregoing items, any Cash, Litigation Recoveries, or any other consideration paid to or realized by the Debtors, the Administration Trust, or any successor to any of the foregoing parties from any settlement, litigation, sale or other disposition of the foregoing; *provided, however*, that the Administration Trust Assets shall not include (i) the Litigation Trust Assets and (ii) any funds in the Professional Fee Account until all Allowed Professional Fee Claims have been paid in full. Any remaining excess funds in the Professional Fee Account after all Allowed Professional Fee Claims have been paid in full shall be turned over to the Plan Administrator.

"Administration Trust Expenses" means any fees, costs, and expenses incurred by the Plan Administrator or the Administration Trust from and after the Effective Date. The Administration

Trust may incur litigation funding obligations secured by Litigation Recoveries upon notice to the Beneficiaries of the Administration Trust that have filed requests for notice in the Chapter 11 Cases and subject to the approval of the Court.

"Administration Trust Interests" means the interests in the Administration Trust, distributions of which will be made to the Beneficiaries of the Administration Trust.

"Administrative Claim" means a Claim for an expense of administration of the Chapter 11 Cases arising under Sections 503(b), 507(b), 503(b)(9) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates; (b) the value of any goods received by the Debtors within 20 days before the Petition Date to the extent that goods were sold to the Debtors in the ordinary course of the Debtors' business; (c) Professional Fee Claims; (d) all fees and charges assessed against the Estates under 28 U.S.C. §§ 1911-1930; (e) all obligations designated as Allowed Administrative Claims pursuant to an order of the Court; (f) administrative claims that were timely filed prior to the Administrative Expense Bar Date; and (g) any Tax Claims incurred by the Debtor after the Petition Date or relating to a tax year or period which occurs after the Petition Date.

"Administrative Expense Bar Date" means the applicable last date, at 5:00 p.m. Central time, set by the Court for a Claimant to file a request for payment of any Administrative Claim (excluding Professional Fee Claims) arising on or after the Petition Date, through and including the Effective Date. **The Administrative Expense Bar Date shall be thirty (30) days after the Effective Date.**

"Affiliate" means an affiliate of a Debtor, as defined in Section 101(2) of the Bankruptcy Code.

"AHG Financing Transaction" has the meaning set forth in Section IV.B.3.

"Allowed" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that has been scheduled by the Debtors on the Schedules as other than disputed, contingent, or unliquidated and, as to which, the Debtors, the Plan Administrator or other party in interest has not filed an objection on or before the Claims Objection Deadline; (b) a Claim that is set forth in a timely filed Proof of Claim as to which no objection has been filed and which is not otherwise a Disputed Claim; (c) a Claim that has been allowed by a Final Order; (d) a Claim that is allowed: (i) in any stipulation of amount and nature of Claim executed by the Debtors prior to the Effective Date and approved by the Court; (ii) in any stipulation of amount and nature of Claim executed by the Plan Administrator on or after the Effective Date; (iii) in any stipulation of amount and nature of any Administrative Claim, Priority Non-Tax Claim, or Priority Tax Claim executed by (y) the Debtors and approved by the Court, or (z) the Plan Administrator; or (iv) in any contract, instrument, indenture or other agreement entered into or assumed by Debtors in connection with and in accordance with the Plan; (e) a Claim relating to a rejected executory contract or unexpired lease that either (i) is not a Disputed or Disallowed Claim or (ii) has been allowed by a Final Order, in either case only if a Proof of Claim has been timely filed by the Claimant before the applicable rejection Bar Date for such claim or has otherwise been deemed timely filed under applicable law; or (f) a Claim that is allowed pursuant to the terms of the Plan. For the purpose of determining distributions pursuant to the Plan, allowance under subsections (a) and (b) only is applicable once

any of the following occur (1) before the Claims Objection Deadline, the Debtors, or the Plan Administrator, as applicable, determine not to object to the Claim, (2) the Claims Objection Deadline passes without an objection being filed, or (3) after the Debtor, or the Plan Administrator timely objects to the Claim, the Claim is allowed as provided in subparagraphs (c), (d) or (e) above.

"Allowed Claim" or "Allowed … Claim" means a Claim that has been Allowed.

"Available Cash" means the aggregate amount of all Cash held by the Debtors on the Effective Date, excluding any funds in the Professional Fee Account.

"Avoidance Actions" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies which any of the Debtors, the Estates, or other appropriate party in interest has asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

"Ballots" mean the ballots upon which the Holders of Impaired Claims shall indicate their acceptance or rejection of the Plan in accordance with the Plan and the Voting Instructions.

"Bankruptcy Code" means title I of the Bankruptcy Reform Act of 1978, as amended from time to time, as set forth in Sections 101 *et seq.* of title 11 of the United States Code, and applicable portions of titles 18 and 28 of the United States Code.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Cases, promulgated under 28 U.S.C. § 2075 and the General and Local Rules of the Court.

"Bar Date" means, as applicable, the General Claims Bar Date, the Administrative Expense Bar Date, or any other applicable deadline to file Claims referenced in the Plan or as may be defined in the Bar Date Order.

"Bar Date Order" means the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Notice of Bar Dates* [Docket No. 118], which established the General Claims Bar Date and certain other deadlines and procedures.

"Beneficiaries" means holders of Allowed Unsecured Claims in Class 7 entitled to receive Administration Trust Interests under the Plan, whether or not such Claims were Allowed on the Effective Date, including the Holders of any Allowed Deficiency Claims, and Holders of Allowed Claims in Class 4 (Nano Claims), Class 5 (Third Lien AHG Claims), and Class 6 (Quinn Claims).

"Bid Procedures Motion" means *Debtors' Emergency Motion for Entry of Orders (a)(i) Approving Bidding Procedures for Sale of Debtors' Assets, (ii) Scheduling Certain Dates with Respect Thereto, (iii) Approving the Form and Manner of Notice Thereof, and (iv) Approving Contract Assumption and Assignment Procedures; (b) Approving (i) Sale of Remaining Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, and (ii) Assumption and Assignment of Certain Contracts and Leases; and (c) Granting Related Relief* [Docket No. 61].

"Bid Procedures Order" means the Order [Docket No. 83] approving the Bid Procedures Motion.

"Business Day" means any day, other than a Saturday, Sunday or legal holiday as defined in Bankruptcy Rule 9006(a).

"Cash" means cash and cash equivalents, including, but not limited to, bank deposits, wire transfers, checks, and readily marketable securities, instruments, and legal tender of the United States of America or instrumentalities thereof.

"Cash Collateral Motion" means *Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing* [Docket No. 71].

"Causes of Action" means all claims, actions, causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of setoff, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims, including, without limitation, all claims and any avoidance, preference, recovery, subordination or other actions of the Debtors and/or the Estates (unless the context expressly states that such Causes of Action belong to another Entity) against Creditors, insiders, and/or any other Persons or Entities, based in law or equity, including, without limitation, all Avoidance Actions and any other causes of action under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the Effective Date, including as identified, described, or otherwise referenced in the Schedule of Causes of Action.

"Chapter 11 Cases" means the Chapter 11 cases commenced when the Debtors filed their respective voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on the Petition Date, being administered under Case No. 25-90268 (CML).

"Charging Lien" has the meaning ascribed to such term in Section IV.C.

"Claim" means a claim (as defined in Section 101(5) of the Bankruptcy Code) against the Debtors, including, but not limited to: (a) any right to payment from the Debtors whether or not such right is reduced to judgment, liquidated, unliquidated, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance if such performance gives rise to a right of payment from the Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"Claimant" means the Holder of a Claim.

"Claims Agent" means Kroll Restructuring Administration LLC which was appointed as the Debtors' claims, noticing, and balloting agent.

"Claims Objection Deadline" means, with respect to all Claims other than Professional Fee Claims, (a) 545 days after the Effective Date, or (b) such other period as may be fixed by an order of the Court for objecting to Claims upon request of the Plan Administrator.

"Class" means a category of Holders of Claims or Interests, as set forth in Article IX of the Plan.

"Collateral" means any property or interest in property of the Debtors' Estates that is subject to a valid and enforceable Lien to secure a Claim, or equitable title.

"Combined Plan and Disclosure Statement" means this Plan and Disclosure Statement, as modified and/or amended from time to time.

"Committee" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Chapter 11 Cases.

"Confirmation" means the entry of the Confirmation Order, subject to all conditions specified in Section XVII hereof having been (a) satisfied or (b) waived pursuant to Section XVII.

"Confirmation Date" means the date upon which the Confirmation Order is entered by the Court on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

"Confirmation Order" means the Order confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

"Consummation" or "Consummate" means the occurrence of the Effective Date.

"Contingent Claim" means any Claim for which a Proof of Claim has been filed with the Court but was not filed in a sum certain and which Claim has not been estimated, fixed, or liquidated by the Court at a sum certain as of the Effective Date, or a Claim that has accrued but nonetheless remains dependent on the occurrence of a future event that may never occur.

"Convertible Senior Noteholders" has the meaning given to it in Section IV.B.1.

"Convertible Senior Notes" has the meaning given to it in Section IV.B.1.

"Convertible Senior Notes Documents" has the meaning given to it in Section IV.B.1.

"Convertible Senior Notes Indenture" has the meaning given to it in Section IV.B.1.

"Convertible Senior Notes Trustee" has the meaning given to it in Section IV.B.1.

"Convertible Senior Notes Trustee Expenses" means the reasonable and documented fees and expenses of the Convertible Senior Notes Trustee not previously paid by, or on behalf of, the Debtors.

"Court" means the United States Bankruptcy Court for the Southern District of Texas having jurisdiction over the Chapter 11 Cases.

"Creditor" means any Holder of a Claim against the Debtors as specified in Section 101(10) of the Bankruptcy Code.

"CRO" means Andrew Hinkelman, solely in his capacity as Chief Restructuring Officer.

"CTO" means Chas Harvick, solely in his capacity as Chief Transformation Officer.

"Debtors" means Desktop and its affiliated debtors and debtors-in-possession in the Chapter 11 Cases.

"Debtor/Estate Release" has the meaning set forth in Section XVI.B. hereof.

"Debtor/Estate Releasors" has the meaning set forth in Section XVI.B hereof.

"Deficiency Claim" means any unsecured portion of a Claim of a Holder of an Allowed Secured Claim, including as a result of the successful avoidance of a Lien by a Final Order.

"Desktop" means Debtor Desktop Metal, Inc.

"Disallowed Claim" means a Claim, or any portion thereof, that has been disallowed by a Final Order or by other agreement of a Claimant, any Claim that is listed by the Debtors in the Schedules as zero or as disputed and as to which no Proof of Claim has been timely filed, or any Claim that is deemed disallowed pursuant to the terms of the Plan.

"Disclosure Statement" means the portion of this Combined Plan and Disclosure Statement that satisfies the disclosure requirements of section 1125 of the Bankruptcy Code.

"Disputed" means, with respect to any Claim or Interest, any Claim or Interest: (a) listed on the Schedules as unliquidated, disputed, or contingent and as to which no Proof of Claim has been filed; (b) as to which the Debtors, the Plan Administrator, or any other party in interest has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules or is otherwise disputed by the Debtors, or the Plan Administrator in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order; or (c) held by a Debtor or any Affiliate or Insider of a Debtor other than the CRO, the CTO, and any Independent Director.

"Disputed Claim" means: (i) any Claim or portion of a Claim as to which an objection to the allowance thereof has been interposed as of any deadline fixed under the Plan or by order of the Court, which objection has not been withdrawn or determined by Final Order; (ii) any Claim that is not a Disallowed Claim that is scheduled by the Debtors in the Schedules as disputed, contingent, or unliquidated and as to which no Proof of Claim has been timely filed; or (iii) any Claim that is not a Disallowed Claim that is not listed in the Schedules and as to which no Proof of Claim has been timely filed. To the extent an objection relates to the allowance of only a part of a Claim, such Claim shall be a Disputed Claim only to the extent of the objection.

"Disputed Claim Reserve" has the meaning set forth in Section XII.G. hereof.

"Distributions" means the distributions of Cash to be made in accordance with the Plan and the Administration Trust Agreement.

"Distribution Dates" means collectively the Initial Distribution Date, any Subsequent Distribution(s) Date, and the date of the Final Distribution.

"Distribution Record Date" means the close of business on the Business Day immediately preceding the Effective Date; *provided, however*, that the foregoing shall not apply to any publicly held securities held in the name of, or by a nominee of, the Depository Trust Company as to which distributions may be made first to a Prepetition Agent and then promptly after the Distribution Date in accordance with the applicable procedures of the Depository Trust Company.

"Effective Date" means the date selected by the Debtors, in consultation with the Committee and the Ad Hoc Noteholder Group, which is a Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect, and (b) all conditions specified in Section XVII hereof have been satisfied, unless waived by the Debtors. Notice of the Effective Date shall be filed with the Court by the Debtors and served only on the Debtors' Master Service List.

"Entity" means an entity as defined in Section 101(15) of the Bankruptcy Code and, where applicable, the Committee.

"Estates" means the bankruptcy estates of the Debtors in the Chapter 11 Cases created pursuant to Section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

"Exculpated Parties" means (a) the Debtors, (b) the Independent Directors, (c) the Committee, and (d) the members of the Committee, each of the foregoing in items (b) through (d) solely in their capacities as such.

"Final Cash Collateral Order" means any final Order of the Court approving the Cash Collateral Motion.

"Final Decree(s)" means the decree contemplated under Bankruptcy Rule 3022.

"Final Distribution" means the last payment to Holders of Allowed Claims in accordance with the provisions of the Plan and/or the Administration Trust Agreement.

"Final Order" means an order or judgment of the Court or other court of competent jurisdiction: (i) that has not been reversed, stayed, modified, or amended; (ii) as to which the time to or the right to appeal or seek reconsideration, review, rehearing, or certiorari has expired or been waived (without regard to whether the time to seek relief from a judgment under Bankruptcy Rule 9024 has expired); and (iii) as to which no appeal or petition for reconsideration, review, rehearing, or certiorari is pending.

"First Lien Agent" has the meaning set forth in Section IV.B.3.

"First Lien AHG Claim" means the Claim in favor of the AHG Lenders arising from the First Lien AHG Secured Note.

"First Lien AHG Secured Note" has the meaning set forth in Section IV.B.3.

"FTI" means FTI Consulting, Inc.

"General Claims Bar Date" means September 9, 2025, at 5:00 p.m. prevailing Central Time, which was the general deadline set pursuant to the Bar Date Order for filing proofs of claim for any Claims against the Debtors that arose prior to the Petition Date.

"Governmental Unit" means the United States; State; Commonwealth, District, Territory, municipality, foreign state, department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under Chapter 11), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

"Holder" means a Person or Entity holding a Claim or Interest.

"Impaired" means with respect to a Claim or Class of Claims, a Claim or Class of Claims that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

"Independent Directors" means Robert Warshauer and Paul Aronzon.

"Initial Distribution Date" means the Effective Date, or as soon as practicable thereafter when the initial Distribution shall be made to the Holders of Allowed Claims, as determined by the Plan Administrator in his or her reasonable discretion.

"Insider" means an insider of the Debtors, as defined in Section 101(31) of the Bankruptcy Code.

"Insurance Policies" means all insurance policies maintained by the Debtors as of the Petition Date, specifically including, but not limited to, director and officer insurance policies.

"Interest" means any equity interest in the Debtors including, but not limited to, all issued, unissued, authorized, or outstanding shares or stock, whether vested or non-vested, together with any warrants, options, or contract rights to purchase or acquire such interests at any time, but not an Intercompany Interest.

"Intercreditor Letter Agreement" means that certain Letter Agreement, dated June 5, 2025, by and among the Nano Lender, the AHG Lenders, and Wilmington Savings Fund Society, FSB.

"Intercompany Claim" means any Claim held by a Debtor against another Debtor.

"Interim Cash Collateral Order" means any interim Order of the Court approving the Cash Collateral Motion, including Docket No. 117.

"Lien" means any charge against or interest in property (including, but not limited to, any mortgage, lien, pledge, charge, security interest, judicial, attachment, encumbrance, or other security device of any kind) to secure payment of a debt or performance of an obligation.

"Lien Avoidance Action" means any Cause of Action to avoid a Lien.

"Liquidation Proceeds" means any Cash or other consideration paid to or realized upon the collection, sale, transfer, assignment, or other disposition of the Administration Trust Assets.

"Litigation" means the interest of the Estates, the Debtors, the Litigation Trust, or the Administration Trust, as applicable, in any and all claims, rights, and Causes of Action that have been or may be commenced by the Debtors, the Litigation Trust, or the Administration Trust, as applicable, except to the extent concerning any Released Parties with respect to any Claim released pursuant to this Plan. Litigation includes, without limitation not otherwise stated herein, any action: (i) to avoid and recover any transfers of property determined to be preferential, fraudulent, or avoidable pursuant to Sections 544, 545, 547, 548, 549(a), and 550 of the Bankruptcy Code or under similar or related state or federal statutes or common law; (ii) for the turnover of property to the Debtors, the Administration Trust, or the Litigation Trust, as applicable; (iii) for the recovery of property or payment of money that belongs to or can be asserted by the Debtors, the Administration Trust, or the Litigation Trust, as applicable; (iv) for compensation for damages incurred by the Debtors, the Administration Trust, or the Litigation Trust; (iv) equitable subordination actions against Creditors; and (v) any available challenges to the Liens and Claims of any Holder of an asserted Secured Claim, subject to the terms of the Interim Cash Collateral Order, the Final Cash Collateral Order, or any other applicable order of the Court.

"Litigation Recovery" means any Cash or other property received by the Debtors, the Administration Trust, or the Litigation Trust, as applicable, from all or any portion of the Litigation, including, but not limited to, awards of damages, attorneys' fees and expenses, interest, and punitive damages, whether recovered by way of settlement, execution on judgment, or otherwise. If any Litigation is pursued on a contingent-fee basis, the Litigation Recovery will be net of any contingent fee paid to legal counsel.

"Litigation Trust" means the trust to be created upon the Effective Date in accordance with Section XIV. The Litigation Trust will be a subsidiary trust of the Administration Trust.

"Litigation Trust Agreement" means the agreement, substantially in the form included in the Plan Supplement governing the Litigation Trust, which shall be in form and substance acceptable to the Ad Hoc Noteholder Group and the Committee, as it may be subsequently modified from time to time.

"Litigation Trust Assets" means all Causes of Action and Litigation other than those Causes of Action in the Administration Trust, which shall include, at the minimum, all Causes of Action or Litigation against any of the Debtors pre-petition management, officers, directors, or equity holders (including, for the avoidance of doubt, Nano but excluding, for the avoidance of doubt, Causes of Action against the Released Parties released by this Plan), or any other person or entity involved in Nano's acquisition of Desktop, and, in each case, any of their affiliates, subsidiaries, related parties, predecessors, successors, assigns, advisors (including legal or financial advisors), representatives, agents, partners, shareholders, officers or directors, and/or members, and all documents, communications, information and other materials, in any way related to such Causes of Action and Litigation, as may be further set forth in the Liquidating Trust Agreement (including any Lien Avoidance Actions against Nano) and any Cash, Litigation

Recoveries, or any other consideration paid to or realized by the Debtors, the Litigation Trust, or any successor to any of the foregoing parties from any settlement, litigation, sale or other disposition of the foregoing.

"Litigation Trust Expenses" means any fees, costs, and expenses incurred by the Litigation Trustee or the Litigation Trust from and after the Effective Date. The Litigation Trust may incur litigation funding obligations secured by Litigation Recoveries upon notice to the Beneficiaries of the Administration Trust that have filed requests for notice in the Chapter 11 Cases and subject to the approval of the Court, and the terms of the litigation funding, if available, will be disclosed in the Plan Supplement.

"Litigation Trust Interests" means the non-transferable interests in the Litigation Trust, distributions of which will be made to the Administration Trust.

"Litigation Trustee" means Stephen Sorenson.

"Merger" means the merger transaction contemplated by the Merger Agreement.

"Merger Agreement" means that certain merger agreement between Desktop, Nano, and Merger Sub, dated July 2, 2024.

"Merger Sub" means Nano US I, Inc.

"Nano" means Nano Dimension Ltd.

"Nano Lender" has the meaning given to it in Section IV.B.2.

"Nano Claim" is the Claim in favor of the Nano Lender arising from the Nano Secured Note.

"Nano Secured Note" has the meaning given to it in Section IV.B.2.

"Other Secured Claim" means all Secured Claims other than the First Lien AHG Claims, Nano Claims, Third Lien AHG Claims, and Quinn Claim.

"Person" means any individual, corporation, limited liability company, general partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, Governmental Unit, or other Entity.

"Petition Date" means July 28, 2025, the date on which the Debtors filed their respective voluntary Chapter 11 petitions.

"Piper" means Piper, Sandler, & Co.

"Plan" means the portion of this Combined Plan and Disclosure Statement that constitutes the chapter 11 plan for the Debtors.

"Plan Administrator" means Province Fiduciary Services, LLC.

"Plan Documents" means the Plan, the Disclosure Statement, the Plan Supplement, the Administration Trust Agreement, the Litigation Trust Agreement, any plan support letters, or other documents or pleadings filed by the Debtors relating to the Plan.

"Plan Injunction" means the injunction set forth in Section XVI.C hereof.

"Plan Objection Deadline" means the deadline established by the Court for filing and serving objections to Confirmation of the Plan.

"Plan Supplement" means the pleading or pleadings identified in the Plan or Disclosure Statement for filing with the Court not later than five (5) Business Days prior to the Plan Objection Deadline, which shall include certain exhibits and schedules to the Plan, as well as documents, agreements, and instruments evidencing and effectuating the Plan.

"Prepetition Agents" means, collectively, the Convertible Senior Notes Trustee, the First Lien Agent, and the Third Lien Agent.

"Prepetition Loan Documents" means, collectively, the Convertible Senior Notes Documents, the Nano Secured Note, the First Lien AHG Secured Note, and the Third Lien AHG Secured Note.

"Priority Dispute" means any dispute related to the relative priority among Claimants asserting Secured Claims to any of the Debtors' property, including, without limitation, any Litigation, Litigation Recoveries, Administration Trust Assets or Litigation Trust Assets. For the avoidance of doubt, any dispute related to the Charging Lien and the Attachment Order asserted by Quinn, the First Lien AHG Secured Note, the Nano Secured Note, and the Third Lien AHG Secured Note shall be considered Priority Disputes.

"Priority Dispute Parties" means Claimants asserting Secured Claims to or property interests in any of the Debtors' property including, without limitation, any Litigation, Litigation Recoveries, Administration Trust Assets, or Litigation Trust Assets.

"Priority Non-Tax Claim" means any Claim, other than an Administrative Claim or a Priority Tax Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

"Priority Tax Claim" means a Claim of a Governmental Unit of the kind specified in Sections 502(i) and 507(a)(8) of the Bankruptcy Code.

"Private Sale Motion" means *Debtors' Emergency Motion for Entry of an Order (i) Authorizing and Approving the Private Sale of the Debtors' Purchased Assets and Purchased Equity Fere and Clear of Liens, Claims, Encumbrances, and Interests; and (ii) Granting Related Relief* [Docket No. 13].

"Private Sale Order" means the Order [Docket No. 81] approving the Private Sale Motion.

"Pro Rata" means proportionately so that, with respect to a Claim, the ratio of: (a) (i) the amount of property distributed on account of a particular Claim to (ii) the Allowed amount of the Claim, is the same as the ratio of (b) (i) the amount of property distributed on account of all

Allowed Claims in the Class or Classes entitled to share in the applicable distribution to (ii) the amount of all Allowed Claims in such Class or Classes.

"Professional" means an Entity: (a) employed pursuant to a Final Order in accordance with Sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to Sections 327, 328, 329, 330, and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Court pursuant to Section 503(b)(4) of the Bankruptcy Code.

"Professional Fee Account" means the Professional Fee Account funded pursuant to (and as defined in) the Interim Cash Collateral Order [Docket No. 117] or the Final Cash Collateral Order. as applicable, to pay fees of the Professionals.

"Professional Fee Claim" means those fees and expenses claimed by Professionals pursuant to Sections 330, 331, or 503 of the Bankruptcy Code, and accrued and unpaid as of the Effective Date.

"Proof of Claim" means a proof of claim filed pursuant to Section 501 of the Bankruptcy Code or any order of the Court, together with supporting documents.

"Quinn" has the meaning given to it in Section IV.A.2.

"Quinn Claim" has the meaning given to it in Section IV.C.

"Record Date" has the meaning set forth in Section XIX.N. hereof.

"Rejection Bar Date" means the last date for any Entity whose claims arise out of the Court approved rejection of an executory contract or unexpired lease to file a proof of claim for damages related to such rejection. The Rejection Bar Date for such Claims will be, (i) with respect to executory contracts and unexpired leases rejected pursuant to a Court order other than the Confirmation Order, the date provided by an order approving the rejection, and (ii) with respect to executory contracts and unexpired leases rejected pursuant to the Confirmation Order, the date that is thirty (30) days after the Effective Date.

"Released Parties" means, collectively, (a) the Independent Directors; (b) the Committee and the individual members thereof, in their capacities as such; (c) the CRO; (d) the Chief Transformation Officer; (e) any other officer or employee of the Debtors holding such position as of (i) the Petition Date and (ii) solely as to the RSU Payment Releases (as defined in Section XVI.B), from and after April 10, 2025; and (f) the following Professionals of the foregoing acting in their capacity as such (1)(i) Pachulski Stang Ziehl & Jones LLP, (ii) Weil, Gotshal & Manges LLP, (iii) FTI Consulting, (iv) Piper Sandler, (v) Kroll, (vi) Province, LLC, (vii) Munch Hardt Kopf & Harr, P.C., and (viii) Lowenstein Sandler LLP, and (2) solely from the time period starting on April 10, 2025, Vinson & Elkins LLP.

"RSU Specified Employees" has the meaning ascribed to it in Section XVI.B.

"Sale Orders" means the Orders authorizing, *inter alia*, (i) the sale of the Debtors' Dental Arts Laboratories business to Maro Enterprises, LLC [Docket No. 175]; (ii) the sale of the Debtors'

Larry Brewer Dental Labs business to Specialty Appliances, LLC [Docket No. 176] ; and (iii) the sale of the Debtors' May Dental Arts business to May Dental Arts Holdings LLC [Docket No. 177].

"Schedules" means the respective schedules of assets and liabilities and statements of financial affairs filed by the Debtors pursuant to Section 521 of the Bankruptcy Code, the Official Bankruptcy Forms, and the Bankruptcy Rules, as they may be amended and supplemented from time to time.

"Schedule of Causes of Action" means the Causes of Action identified in the Plan Supplement, as amended, modified, or supplemented.

"Secured Claim" means any Claim that is secured in whole or part, as of the Petition Date, by a Lien which is valid, perfected, and enforceable under applicable law and has not been found pursuant to a Final Order that it is subject to (i) avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or subject to setoff under Section 553 of the Bankruptcy Code, to the extent of the value of such Lien or right of setoff as determined under Sections 506(a) or 1129(b) of the Bankruptcy Code, as applicable, or (ii) subordination, recharacterization, or other legal challenge or compromise.

"SIR" means self-insured retention.

"Subsequent Distribution Date" means any date after the Initial Distribution Date upon which the Plan Administrator makes a distribution to any Holders of Allowed Administrative, Secured, Priority, or Unsecured Claims.

"Supplemental Indenture" has the meaning given to it in Section IV.B.1.

"Tax" means any tax, charge, fee, levy, impost, or other assessment by any federal, state, local, or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, *ad valorem*, estimated, severance, stamp, occupation, and withholding tax. "Tax" shall include any interest or additions attributable to, imposed on, or with respect to such assessments.

"Tax Claim" means all or that portion of an Allowed Claim held by a Governmental Unit for a Tax assessed or assessable against the Debtors.

"Third Lien Agent" has the meaning given to it in Section IV.B.4.

"Third Lien AHG Claim" is the Claim in favor of the Ad Hoc Noteholder Group arising from the Third Lien AHG Secured Note.

"Third Lien AHG Secured Note" has the meaning given to it in Section IV.B.4.

"Unimpaired Claim" means an unimpaired Claim within the meaning of Section 1124 of the Bankruptcy Code.

"Unsecured Claim" means any Claim against the Debtors or Estates that is not a Secured Claim, an Administrative Claim, a Priority Tax Claim, a Priority Non-Tax Claim, or an Intercompany Claim. For the avoidance of doubt, any Allowed Deficiency Claims are Unsecured Claims.

"U.S. Trustee" means the Office of the United States Trustee for Region 7 (Southern District of Texas).

"V&E" means Vinson & Elkins LLP.

"Voting Instructions" means the instructions for voting on the Plan contained on the Ballots.

"Voting Record Date" means the date as of which the identity of Holders of Claims is set for purposes of determining the Entities entitled to receive and vote on the Plan.

**SECTION IV.**
**BACKGROUND**

**A.  General Background.**

**1.  Debtors' Business and Operations.**

Desktop was formed in 2020 through the de-SPAC merger of the pre-combination Desktop Metal Operating, Inc. and Trine Acquisition Corp. The Company rapidly expanded in late 2020 and 2021, acquiring FIGUR, EnvisionTEC, Adaptive 3D, Dental Arts Lab, A.I.D.R.O. Srl, Brewer Dental Lab, May Dental Lab, ExOne, and Meta Additive.

As of the Petition Date, the Company provided its customers with products and services related to additive manufacturing. These products and services fell into silos comprising: manufacturing – including metal additive manufacturing systems, photopolymer additive manufacturing systems, digital casting additive manufacturing systems, and biofabrication additive manufacturing systems; consumable materials; software; and dental products. In addition to manufacturing, the Company focused heavily on research and development and marketed its products and services through its in-house sales and marketing departments.

The Company's manufacturing systems used additive manufacturing technology to print products made of materials like metal, resin, sand, and photopolymer (a polymer that changes its properties when exposed to light), among others, for use across a variety of industries. Its biofabrication additive manufacturing systems processed biocompatible and photopolymer materials for potential computer-aided tissue engineering applications, like bone and cartilage regeneration, soft tissue fabrication, drug release, and organ printing.

In addition to its manufacturing business, the Company also sold consumable materials to be used with its additive manufacturing systems, including proprietary resins, steel, titanium, copper, ceramics, sands, binders, and biocompatible materials. Sales of these consumable materials provided the Company with recurring revenue streams from its additive manufacturing

customers. The Company also provided software products for use as part of its additive manufacturing processes.

As of the Petition Date, the Company's Desktop, ExOne, A.I.D.R.O., and FIGUR businesses were engaged, both domestically and internationally, in metal manufacturing, including metal and fiber 3D printing. The ExOne business also provided digital (sand) casting products and services. The EnvisionTEC, Dental Arts Lab, Brewer Dental Lab, and May Dental Lab businesses provided products and services within the healthcare industry. EnvisionTEC, along with the Adaptive 3D business, was also engaged in industrial polymer manufacturing.

### 2. The Company's Merger with Nano

On July 2, 2024, Desktop entered into the Merger Agreement with Nano and Merger Sub. The closing of the Merger Agreement was subject to certain conditions, including receipt of certain regulatory approvals. After the Merger Agreement was executed, Nano failed to comply with its obligation to satisfy certain conditions to closing and refused to close the Merger. The Company filed suit against Nano in the Delaware Court of Chancery in December 2024, seeking specific performance of Nano's closing obligations.[6] As directed by the Delaware Court of Chancery, on April 2, 2025, the Merger closed, Nano paid to the exchange agent under the Merger Agreement the per-share merger consideration of $5.295, or approximately $179.3 million in total, and Desktop and its subsidiaries became indirect, wholly owned subsidiaries of Nano.

### 3. Corporate/Equity Structure

As of the Petition Date, the Company's headquarters were located in Burlington, Massachusetts, and its operations were conducted through its subsidiaries, with operations in Texas, Oklahoma, Michigan, Missouri, Illinois, New Jersey, and Pennsylvania, and in five foreign jurisdictions consisting of Canada, Germany, Italy, Taiwan, and Japan.

As of the Petition Date, the Company's organizational structure consisted of twenty-four entities as set forth in the organizational chart attached hereto as **Exhibit A**. Sixteen of the Company entities (all U.S. entities) are Debtors in these Chapter 11 Cases, which include the borrower and entity that is a guarantor under the Debtors' secured funded debt (as discussed below). The Company entities incorporated outside of the United States are not Debtors (the "Foreign Non-Debtors"). None of the Foreign Non-Debtors are guarantors or borrowers under the Debtors' funded debt.

### 4. Corporate Governance

Immediately post-Merger, Desktop's board of directors (the "Board") consisted of Ofir Baharav and Julien Lederman, two officers of Nano. On April 10, 2025, the Board appointed Robert Warshauer as an Independent Director to serve as a member of the Board and formed a

---

[6] In March 2025, after a lengthy trial, the Delaware Court of Chancery awarded specific performance. Ultimately, the Company's attorneys at Quinn Emanuel Urquhart & Sullivan LLP ("Quinn") asserted a claim for approximately $30.1 million in unpaid legal fees incurred in connection with this lawsuit. Latham & Watkins, LLP ("Latham") and Stifel Financial Corp. ("Stifel") also asserted claims for outstanding professional fees in the approximate amount of $8.6 million and $2.8 million, respectively.

special committee of the Board (the "Special Committee"), with Mr. Warshauer as the sole initial member, to, among other things, evaluate and negotiate potential strategic transactions involving the Company.

On May 5, 2025, the Board appointed Paul Aronzon as a second Independent Director to serve as a member of the Board and of the Special Committee. On May 7, 2025, the Company appointed the CRO and CTO.

On May 14, 2025, all members of the Board resigned other than the Independent Directors (Mr. Warshauer and Mr. Aronzon).[7] Consequently, on May 27, 2025, the Board determined it was no longer necessary to maintain the Special Committee and dissolved the Special Committee and granted all powers, authority, and responsibilities previously delegated to the Special Committee back to the Board.

### 5. Prepetition Investigation

In mid-May 2025, the Board began investigating any potential claims held by the Company. To facilitate that investigation, the Board retained Weil, Gotshal & Manges LLP ("Weil") as special counsel to, among other things, investigate and assess potential claims arising out of (i) the governance and management of the Debtors and transactions between or among the Debtors, their affiliates, and/or any related parties, including requesting and reviewing documents from the Debtors and their advisors, interviewing witnesses and seeking cooperation of third parties and (ii) Nano's conduct in connection with the Merger. Weil's investigation was paused in light of the Company's ongoing liquidity challenges and the Debtors' bankruptcy filings.

### B. Prepetition Financing Facilities.

As of the Petition Date, the Debtors' funded debt liabilities total approximately $143 million in principal and interest outstanding. The Debtors' significant funded debt obligations include:

| Facility | Maturity | Total Approx. Principal and Interest Outstanding |
|---|---|---|
| First Lien AHG Secured Note | June 12, 2025 | $11,006,777 |
| Nano Secured Note | April 14, 2026 | $12,256,667 |
| Third Lien AHG Secured Note | June 12, 2025 | $31,776,447 |
| Convertible Senior Notes (Unsecured) | May 15, 2027 | $87,932,960 |
| Total Debt | | $142,972,851 |

---

[7] The Independent Directors are also the sole members of the board of directors of the following Debtors in addition to Desktop: Desktop Metal Operating, Inc.; The Syzygy Memory Plastics Corp.; Desktop Metal Securities Corporation; Beacon Bio, Inc.; Desktop Labs, Inc.; Dental Arts Laboratories, Inc.; and Larry Brewer Dental Lab, Inc.

### 1.   Convertible Senior Note

Pursuant to that certain indenture (the "Convertible Senior Notes Indenture") for the 6.0% convertible senior notes due 2027 (the "Convertible Senior Notes"), dated as of May 13, 2022, as supplemented by that certain supplemental indenture, dated as of April 2, 2025 (the "Supplemental Indenture") (the Convertible Senior Notes Indenture, the Convertible Senior Notes, and the Supplemental Indenture, collectively with any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time prior to the Petition Date, the "Convertible Senior Notes Documents") by and among Desktop and U.S. Bank Trust Company, National Association (the "Convertible Senior Notes Trustee"), as trustee for the benefit of the holders of the Convertible Senior Notes (the "Convertible Senior Noteholders") under the Convertible Senior Notes Indenture, Desktop issued the Convertible Senior Notes in the aggregate original principal amount of $115 million. The only obligor on the Convertible Senior Notes is Desktop.

The Convertible Senior Notes are unsecured. Interest on the Convertible Senior Notes is 6.0% per annum, accruing and paid in arrears semi-annually. The maturity date of the Convertible Senior Notes is May 15, 2027. As of the Petition Date, the aggregate principal and interest outstanding under the Convertible Senior Notes totaled approximately $88 million. The Debtors did not pay a semi-annual interest payment on the Convertible Senior Notes when due in May 2025, and an Event of Default under the Convertible Senior Notes Indenture then occurred.

In addition, the closing of the Merger was a "Fundamental Change," a "Business Combination Event," a "Common Stock Change Event," and a "Make-Whole Fundamental Change" under and as defined in the Convertible Senior Notes Indenture, upon which Desktop was required to both (1) provide the Convertible Senior Noteholders with the option to convert their Convertible Senior Notes into the right to receive a cash payment equal to the product of the per-share merger consideration in the Merger Agreement and the conversion ratio then in effect pursuant to the Supplemental Indenture, and (2) make an offer to purchase the entire outstanding issue of the Convertible Senior Notes at a price equal to par plus accrued interest. On April 2, 2025, the Convertible Senior Noteholders were notified of their right to convert their Convertible Senior Notes for a payment of approximately $318.50 per $1,000 principal amount of Convertible Senior Notes. On April 22, 2025, the Convertible Senior Noteholders were notified of the offer to purchase the Convertible Senior Notes at par plus accrued interest and the procedures to accept such offer. The deadline to request either conversion or repurchase was June 10, 2025.

### 2.   The Nano Secured Note

On April 14, 2025, Desktop, as borrower, and Nano USA, a subsidiary of Nano, as lender (the "Nano Lender"), entered into that Secured Promissory Note (as amended, supplemented or otherwise modified prior to the Petition Date, the "Nano Secured Note"), pursuant to which the Nano Lender agreed to extend up to $12 million in delayed draw term loans with a maturity of one year. On the same day, the Company drew $5 million on the Nano Secured Note. On April 24, 2025, the Special Committee requested an additional $7 million of discretionary availability under the Nano Secured Note. The Nano Lender agreed and provided an additional $7 million in funding to the Company on April 29, 2025.

Interest under the Nano Secured Note accrues daily at a rate of 8.0% per annum, which interest is payable at the borrower's election as PIK interest. As set forth in the Intercreditor Letter Agreement, among other documents, the Nano Secured Note is secured by second priority liens and security interests in substantially all of the Debtors' assets.

As of the Petition Date, the Debtors' aggregate principal and interest outstanding under the Nano Secured Note totaled approximately $12.26 million, and an Event of Default existed under the Nano Secured Note.

### 3. The AHG Financing Transaction

In early May 2025, certain of the Convertible Senior Noteholders formed an ad hoc group (the "Ad Hoc Noteholder Group"). The Company's professionals engaged in discussions with the Ad Hoc Noteholder Group, Nano, and various third parties around potential bridge and/or DIP financing. These discussions ultimately resulted in a comprehensive transaction between the Company and certain members of the Ad Hoc Noteholder Group (such transaction, the "AHG Financing Transaction").

#### a) First Lien AHG Secured Note

The first part of the AHG Transaction involved entry into that certain First Lien Secured Promissory Note dated June 5, 2025 (as amended, supplemented or otherwise modified prior to the Petition Date, the "First Lien AHG Secured Note"), by and among Desktop, as borrower, certain members of the Ad Hoc Noteholder Group, as lenders (the "AHG Lenders"), and Wilmington Savings Fund Society, FSB, solely in its capacity as administrative agent and collateral agent (the "First Lien Agent"), pursuant to which the AHG Lenders agreed to provide a term loan in the aggregate principal amount of $10 million. Interest under the First Lien AHG Secured Note accrues daily at a rate of SOFR plus 10.0% and is payable at the borrower's election as PIK interest. As set forth in the Intercreditor Letter Agreement, among other documents, the First Lien AHG Secured Note is secured by first priority liens and security interests in substantially all of the Debtors' assets.

As of the Petition Date, the Debtors' aggregate principal and interest outstanding funded debt obligations under the First Lien AHG Secured Note totaled approximately $11 million. The First Lien AHG Secured Note matured on June 12, 2025, and an Event of Default has occurred.

#### b) Third Lien AHG Secured Note

As the second part of the AHG Financing Transaction, the AHG Lenders required and Desktop agreed to roll up $30 million in aggregate principal amount of the Convertible Senior Notes held by the AHG Lenders, plus $1,035,163 in accrued interest, into that certain Third Lien Secured Promissory Note dated June 5, 2025 (as amended, supplemented or otherwise modified prior to the Petition Date, the "Third Lien AHG Secured Note"), made by Desktop in favor of the AHG Lenders and administered by Wilmington Savings Fund Society, FSB, solely in its capacity as administrative agent and collateral agent (the "Third Lien Agent"). Interest under the Third Lien AHG Secured Note accrues daily at a rate of SOFR plus 10.0% per annum, which interest is payable at the borrower's election as PIK interest. As set forth in the Intercreditor Letter

Agreement, among other documents, the Third Lien AHG Secured Note is secured by third priority liens and security interests in substantially all of the Debtors' assets.

As of the Petition Date, the Debtors' aggregate principal and interest outstanding funded debt obligations under the Third Lien AHG Secured Note total approximately $31.7 million. The Third Lien AHG Secured Note matured on June 12, 2025, and an Event of Default has occurred.

### C. The Quinn Claim and Attachment Order.

As discussed above, Quinn seeks approximately $30.1 million in legal fees incurred representing Desktop in its litigation to compel Nano to comply with its obligations under the Merger Agreement (the "Quinn Claim").

On July 24, 2025, the Supreme Court of the State of New York, County of New York (the "New York Court") entered an order of attachment (Index No. 652274/2025, Seq. No. 004), which granted Quinn's amended petition for an attachment in aid of arbitration (the "Attachment Order"). The Attachment Order authorized Quinn, through the Sheriff of the City of New York or any County of the State of New York, to levy upon Desktop's tangible or intangible property interests in the amount of $34 million, including Desktop's patents, patent licenses, and other intellectual property, as well as manufacturing machinery, equipment, component parts, spare parts, systems, utilities, tools, raw materials, inventory, supplies, furniture, computers, or vehicles located at certain of Desktop's facilities. The Attachment Order expressly excludes real property outside the State of New York, assets owned by Desktop's subsidiaries, and Desktop's cash, bank accounts, and receivables.

In addition, Quinn asserts a charging lien under section 475 of the New York Judiciary Law on all proceeds realized as a result of the litigation to compel Nano to comply with its obligations under the Merger Agreement (the "Charging Lien"). Quinn asserts (and other parties dispute) that this vested property interest attaches to any proceeds of the Merger Agreement litigation and is superior to other claimed interests in these proceeds including any proceeds of any Avoidance Action relating to the closing of the Merger Agreement pursuant to 11 U.S.C. § 551.

### D. Other Trade Claims and Other Unsecured Claims.

As discussed above, Latham has asserted a claim against Desktop for outstanding professional fees in the approximate amount of $8.6 million, and Stifel has asserted a claim for outstanding professional fees in the approximate amount of $2.8 million. As of the Petition Date, approximately $40.0 million in unsecured claims on account of trade and other obligations exist against the Debtors, exclusive of the amounts associated with the Convertible Senior Notes or the amounts asserted by Quinn, Latham, and Stifel described above.

### E. Events Leading to the Bankruptcy Filings.

The Company has historically struggled to achieve profitability in a highly competitive industry. Despite its expansion and efforts to acquire a portfolio of subsidiaries with valuable assets and operations in the additive manufacturing space, Desktop and its subsidiaries struggled to effectively integrate their operations, and, up to and including the Petition Date, the Company has remained largely a "roll-up" business comprised of multiple subsidiaries operating mostly

independently. In addition to its internal challenges, the Company faced challenging macroeconomic conditions, including supply chain disruptions and delays as a result of the COVID-19 pandemic, rising interest rates and inflation, and reduced access to capital due to volatility in the global capital markets. These financial challenges resulted in the Company regularly experiencing high "cash burn," as its costs of business well exceeded revenues brought in by the Company's various operations.

In June 2022, the Company launched an initiative intended to address these issues by better integrating its newly acquired subsidiaries and minimizing its costs via various cost-saving measures, including a global workforce reduction, facilities consolidation, and other operational savings measures. The Company overhauled its purchase order and collections processes and increased its focus on cash management while continuing to consolidate its operations and trim its workforce. Although these efforts significantly reduced the Company's deficit, it continued to operate with negative cash flows. By the end of 2022, Desktop's senior management had begun to consider a sale of the Company in the hope that the business could become profitable through a consolidation with a more profitable buyer.

Nano initially approached Desktop about acquiring its business in 2022, but negotiations stalled. Nano resumed the merger discussions in late September 2023, resulting in the execution of the Merger Agreement in July 2024. As discussed above, Nano refused to honor its obligations under the Merger Agreement or close the Merger, which required the Company to seek, and obtain, an order from the Delaware Chancery Court, requiring Nano to comply with its obligations under the Merger Agreement. On April 2, 2025, the parties closed the Merger, but it did not alleviate Desktop's difficult financial position. Desktop had incurred significant professional fees, and such fees were not paid in connection with the closing of the Merger. Additionally, following the Merger, certain officers of the Company resigned their positions.

As noted, the closing of the Merger also triggered the 'Fundamental Change' provision of the Convertible Senior Notes Indenture, which triggered Desktop's obligation to make an offer to repurchase the entire outstanding issue of the Convertible Senior Notes at a price equal to par plus accrued interest.

## F. **Chapter 11 Goals**

Starting prepetition, the Debtors worked with their constituents to sell all, or substantially all of their assets. These efforts resulted in the Private Sale Transaction pursuant to which the Debtors sold their German, Italian, and Japanese subsidiaries, including certain related U.S. assets, in a private sale for total consideration of $10 million. Subsequently, the Court approved the sale of the Debtors' dental labs businesses following an auction for total consideration of approximately $7.8 million pursuant to the Sale Orders. The Debtors also sold certain of their remaining assets pursuant to the Additional Sale Orders.

After selling the foregoing assets, the Debtors are seeking to effectuate an orderly wind down of their remaining operations and assets, including the investigation and prosecution of any viable Causes of Action, and to disburse the proceeds therefrom to their Creditors. On the Effective Date, the Debtors will transfer and assign the remaining unliquidated assets—the Administration Trust Assets and Litigation Trust Assets—to the Administration Trust and Litigation Trust, as

applicable. The Administration Trust and Litigation Trust will investigate the Estate's Causes of Action as set forth in the Administration Trust Agreement and Litigation Trust Agreement and will liquidate, collect, prosecute, sell, settle, or otherwise dispose of the transferred assets and distribute all net proceeds to Creditors in accordance with the priority scheme under the Bankruptcy Code and the Plan. There will be no distributions to Holders of Interests.

The Plan provides limited Debtor releases for the Independent Directors, the Committee, and the individual members thereof in their capacity as such, the CRO, the CTO, any employees that received under fifty-thousand dollars on account of restricted stock units, the RSU Specified Parties, and other postpetition officers of the Debtors, and the Professionals. The Plan does not contain third party releases.

**SECTION V.**
**THE CHAPTER 11 CASES**

The following is a brief description of certain material events that have occurred thus far during the Chapter 11 Cases.

### A.  First Day and Other Early Relief.

In order to facilitate the Chapter 11 Cases, minimize disruption to the Debtors' affairs, and preserve the value of the Estates, the Debtors filed motions with the Court on or shortly after the Petition Date seeking certain relief (and obtained such relief by order of the Court), including, without limitation:

- authority to honor and pay certain prepetition workforce compensation including for independent contractors and commissions, expenses and other related obligations, subject to certain caps, which was granted pursuant to an order entered on July 31, 2025 [Docket No. 82];

- authority to continue using the Debtors' existing cash management system and the provision of other related relief, which was granted pursuant to an interim order entered on July 31, 2025 [Docket No. 84];

- authority to continue insurance coverage and renew, amend, supplement, extend, or purchase insurance policies, which was granted on July 31, 2025 [Docket No. 87];

- approval of certain procedures for the Debtors to redact from any Court filing certain personally identifiable information, which motion was granted pursuant to an order entered on July 31, 2025 [Docket No. 88];

- authority to pay certain taxes and fees, which was granted pursuant to an order entered on July 31, 2025 [Docket No. 85];

- approval of adequate assurance procedures for utility providers, which was granted pursuant to an order entered on July 31, 2025 [Docket No. 86];

- the appointment of Kroll Restructuring Administration LLC as the claims and noticing agent in the Chapter 11 Cases, which was granted July 30, 2025 [Docket No. 58].

### B.  Private Sale Motion; Use of Cash Collateral.

On the Petition Date, the Company filed the Private Sale Motion seeking approval of its agreement with Anzu pursuant to which Anzu would acquire the Company's German, Italian, and Japanese subsidiaries, including certain related U.S. assets, in a private sale for total consideration of $10 million. Concurrently, the Company filed the Cash Collateral Motion seeking to use a portion of the proceeds from the Private Sale Transaction to fund the Chapter 11 Cases and the sale of the Company's remaining assets. The Court entered the Private Sale Order approving the Private Sale Transaction on July 31, 2025, and the Private Sale Transaction has closed. As authorized by the Court, subject to applicable challenge rights, a portion of the proceeds of the Private Sale Transaction totaling $5.5 million were used to pay down the First Lien AHG Claim.

Also on July 30, 2025, the Debtors filed the Cash Collateral Motion seeking interim and final orders authorizing the Debtors to use cash collateral—primarily the proceeds from the Private Sale Transaction—pursuant to an agreed upon budget and to provide them with adequate protection. The Court approved the Cash Collateral Motion (on an interim basis) on July 31, 2025 (Docket No. 81) and August 18, 2025 (Docket No. 210). A hearing to consider final approval of the Cash Collateral Motion was scheduled for September 11, 2025 at 1:00 (prevailing Central Time).

### C.  Bid Procedures and Sales

On July 31, 2025, the Company sought and obtained approval of the Bid Procedures [Docket No. 83]. Pursuant the Bid Procedures, the Debtors solicited bids and held an auction for their remaining assets on August 11, 2025, which resulted in binding offers for the Debtors' dental labs businesses from Maro Enterprises, LLC, Specialty Appliances, LLC, and May Dental Arts Holdings LLC for total consideration of approximately $7.8 million in the aggregate, plus the assumption of certain liabilities. On August 13, 2025, the Court entered the Sale Orders approving the sale of the Debtors' dental labs businesses. On September 4, 2025, the Court entered the Additional Sale Orders approving the sale of certain of the Debtors' remaining assets.

### D.  Formation of the Committee.

On August 6, 2025, the U.S. Trustee formed the Committee, comprised of (i) U.S. Bank Trust Company, National Association, in its capacity as the Convertible Senior Notes Trustee; (ii) Consilio, LLC; (iii) Henry Schein Inc; and (iv) OMNI Control Technology, Inc. Docket No. 126.

### E.  Retention of Professionals.

The Debtors anticipate filing applications or motions, as applicable, to employ or retain their Professionals in accordance with the Bankruptcy Code and the Bankruptcy Rules including, (i) Pachulski Stang Ziehl & Jones LLP as bankruptcy counsel; (ii) Andrew Hinkelman and Chas Harvick, of FTI, as CRO and CTO, respectively, and for the provision of additional personnel; (iii) Piper as investment banker; (iv) V&E as special corporate counsel; and (v) Weil as counsel to the Board.

The Committee has also retained, subject to Court approval, Lowenstein Sandler LLP and Munsch Hardt Kopf & Harr, P.C., as its counsel and Province, LLC, as its financial advisor.

### F. Debtors' Schedules and Statements of Financial Affairs.

The Debtors filed with the Court their respective Schedules D/E/F on August 12, 2025, in accordance with the Bar Date Order. The Debtors anticipate filing their remaining Schedules and Statements of Financial Affairs, no later than September 11, 2025, in accordance with Court Order. Docket No. 93.

### SECTION VI.
### CONFIRMATION AND VOTING PROCEDURES

### A. Hearing on Confirmation and Final Approval of Disclosure Statement.

On August 18, 2025, the Court conditionally approved the Combined Plan and Disclosure Statement (the "Conditional Approval and Procedures Order") for solicitation purposes only and authorizing the Debtors to solicit the Combined Plan and Disclosure Statement. The Confirmation Hearing has been scheduled for **September 11, 2025, at 1:00 p.m. (prevailing Central Time)** to consider (a) final approval of the Combined Plan and Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (b) confirmation of the Combined Plan and Disclosure Statement pursuant to section 1129 of the Bankruptcy Code. The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by filing a notice with the Court.

### B. Procedures for Objections.

Any objection to final approval of the Combined Plan and Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code and/or confirmation of the Combined Plan and Disclosure Statement must be made in writing and filed with the Court by no later than **September 9, 2025, at 5:00 p.m. (prevailing Central Time) (prevailing Central Time).**[8] **Unless an objection is timely filed and served, it may not be considered by the Court at the Confirmation Hearing.**

### C. Requirements for Confirmation.

The Court will confirm the Combined Plan and Disclosure Statement only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among the requirements for confirmation in the Chapter 11 Cases is that the Combined Plan and Disclosure Statement be: (i) accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, that the Combined Plan and Disclosure Statement "does not discriminate unfairly" against, and is "fair and equitable" with respect to, such Class; and (ii) feasible. The Court must also find that:

---

[8] The Objection Deadline was adjourned to September 26, 2025 at 5:00 p.m. Central Time.

- the Combined Plan and Disclosure Statement has classified Claims and Interests in a permissible manner;

- the Combined Plan and Disclosure Statement complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and

- the Combined Plan and Disclosure Statement has been proposed in good faith.

The Debtors believe that the Combined Plan and Disclosure Statement complies, or will comply, with all such requirements.

### D. **Classification of Claims and Interests.**

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Combined Plan and Disclosure Statement divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified).

Section 1122 of the Bankruptcy Code requires the Combined Plan and Disclosure Statement to place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests in such class. The Combined Plan and Disclosure Statement creates separate Classes to deal respectively with Priority Non-Tax Claims, various Secured Claims, Unsecured Claims, and Interests. The Debtors believe that the Combined Plan and Disclosure Statement's classifications place substantially similar Claims or Interests in the same Class and, thus, meet the requirements of section 1122 of the Bankruptcy Code.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Debtors believe that the Combined Plan and Disclosure Statement complies with such standard. If the Court finds otherwise, however, it could deny confirmation of the Combined Plan and Disclosure Statement if the holders of Claims or Interests affected do not consent to the treatment afforded them under the Combined Plan and Disclosure Statement.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving distributions pursuant to the Combined Plan and Disclosure Statement only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtors believe that the Combined Plan and Disclosure Statement has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a holder of a Claim or Interest may challenge the Debtors' classification of Claims or Interests and that the Court may find that a different classification is required for the Combined Plan and Disclosure Statement to be confirmed. If such

a situation develops, the Debtors intend, in accordance with the terms of the Combined Plan and Disclosure Statement, to make such permissible modifications to the Combined Plan and Disclosure Statement as may be necessary to permit its confirmation. Any such reclassification could adversely affect holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Combined Plan and Disclosure Statement.

**EXCEPT AS SET FORTH IN THE COMBINED PLAN AND DISCLOSURE STATEMENT, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE COMBINED PLAN AND DISCLOSURE STATEMENT BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE COMBINED PLAN AND DISCLOSURE STATEMENT'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.**

The amount of any Impaired Claim that ultimately is Allowed by the Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein or the actual Distribution received by creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized herein. The Debtors believe that the consideration, if any, provided under the Combined Plan and Disclosure Statement to holders of Allowed Claims reflects an appropriate resolution of their Allowed Claims taking into account the differing nature and priority of such Claims and Interests. The Court must find, however, that a number of statutory tests are met before it may confirm the Combined Plan and Disclosure Statement. Many of these tests are designed to protect the interests of holders of Claims or Interests who are not entitled to vote on the Combined Plan and Disclosure Statement, or do not vote to accept the Combined Plan and Disclosure Statement, but who will be bound by the provisions of the Combined Plan and Disclosure Statement if it is confirmed by the Court.

### E. **Impaired Claims or Interests.**

Pursuant to section 1126 of the Bankruptcy Code, only the holders of Claims in Classes Impaired by the Combined Plan and Disclosure Statement and receiving a payment or Distribution under the Combined Plan and Disclosure Statement may vote to accept or reject the Combined Plan and Disclosure Statement. Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims may be Impaired if the Combined Plan and Disclosure Statement alters the legal, equitable, or contractual rights of the holders of such Claims or Interests treated in such Class. The holders

of Claims not Impaired by the Combined Plan and Disclosure Statement are deemed to accept the Combined Plan and Disclosure Statement and do not have the right to vote on the Combined Plan and Disclosure Statement. The holders of Claims or Interests in any Class which will not receive any payment or Distribution or retain any property pursuant to the Combined Plan and Disclosure Statement are deemed to reject the Combined Plan and Disclosure Statement and do not have the right to vote. Finally, the holders of Claims or Interests whose Claims or Interests are not classified under the Combined Plan and Disclosure Statement are not entitled to vote on the Combined Plan and Disclosure Statement.

Under the Combined Plan and Disclosure Statement, Holders of Claims in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), and Class 3 (First Lien AHG Claims) are Unimpaired and, therefore, not entitled to vote on the Combined Plan and Disclosure Statement and are deemed to accept the Combined Plan and Disclosure Statement. Holders of Claims in Class 4 (Nano Claims), Class 5 (Third Lien AHG Claims), Class 6 (Quinn Claims), and Class 7 (Unsecured Claims) are Impaired and entitled to vote on the Plan. Holders of Claims and Interests in Class 8 (Intercompany Claims) and Class 9 (Interests) will not receive any payment or Distribution or retain any property pursuant to the Combined Plan and Disclosure Statement and, therefore, are deemed to reject the Combined Plan and Disclosure Statement and do not have the right to vote.

**ACCORDINGLY, BALLOTS FOR ACCEPTANCE OR REJECTION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE BEING PROVIDED TO HOLDERS OF CLAIMS IN CLASS 4 (NANO CLAIMS), CLASS 5 (THIRD LIEN AHG CLAIMS), CLASS 6 (QUINN CLAIMS), AND CLASS 7 (UNSECURED CLAIMS).**

### F. <u>Confirmation Without Necessary Acceptances; Cramdown.</u>

If any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, determined without including any acceptance of the plan by any insider holding a claim in that class, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests. Here, because holders of Claims and Interests in Class 8 (Intercompany Claims) and Class 9 (Interests) are deemed to reject the Combined Plan and Disclosure Statement, the Debtors will seek confirmation of the Combined Plan and Disclosure Statement from the Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Debtors believe that such requirements are satisfied, as no holder of a Claim or Interest junior to those in in Classes 3 through 7 is entitled to receive any property under the Combined Plan and Disclosure Statement.

The concept of "unfair discrimination" is not defined in the Bankruptcy Code, but has been suggested in recent case law to arise when a difference in a plan's treatment of two classes of equal priority results in a materially lower percentage recovery for the non-accepting class. Based upon their understanding of existing case law, the Debtors do not believe that the Plan unfairly discriminates against any Class of Claims.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors, and equity holders, as follows:

- <u>Secured Creditors</u>. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

- <u>Unsecured Creditors</u>. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of such unsecured creditors will not receive any property under the plan.

- <u>Interests</u>. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Debtors believe that the distributions provided under the Combined Plan and Disclosure Statement satisfy the absolute priority rule, where required.

### G. **Feasibility.**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Combined Plan and Disclosure Statement). Based on the Debtors' analysis and their existing cash on hand, the Administration Trust and Litigation Trust will have sufficient assets to accomplish their tasks and satisfy their obligations under the Combined Plan and Disclosure Statement. Therefore, the Debtors believe that the liquidation pursuant to the Combined Plan and Disclosure Statement will meet the feasibility requirements of the Bankruptcy Code.

### H. **Best Interests Test and Liquidation Analysis.**

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires the Court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses, and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

The Debtors, with the assistance of their advisors, have prepared a liquidation analysis that summarizes the Debtors' best estimate of recoveries by holders of Claims if the Chapter 11 Cases were converted to a case under chapter 7 (the "Liquidation Analysis"), which is attached hereto as **Exhibit B**. In this case, the Debtors have either sold, monetized and/or otherwise disposed of most of their assets. The Debtors' remaining assets, including potential Causes of Action, will be collected, prosecuted, liquidated or otherwise dealt with by the Plan Administrator or Litigation Trustee. Based upon the Debtors' current projections, Holders of Allowed Administrative and Priority Claims will be paid in full under the Plan, while Holders of Allowed Secured Claims and Unsecured Claims will receive less than full payments. **Exhibit B** (Liquidation Analysis) attached hereto.

If the Chapter 11 Cases were converted to a Chapter 7 proceeding, the Debtors' estates would incur the costs of payment of a statutorily allowed commission to the Chapter 7 trustee, as well as the costs of counsel and other professionals retained by the trustee. The Debtors believe that such amounts would exceed the amount of expenses that will be incurred in implementing the Plan and winding up the affairs of the Debtors in the Chapter 11 Cases. The Debtors contemplate an orderly administration and winding down of the Estates by parties that are already familiar with the Debtors, their remaining assets and affairs, and their creditors and liabilities. Such familiarity will allow the Administration Trust and Litigation Trust to complete liquidation of the remaining assets (including prosecution of the applicable Causes of Action), and distribute the net proceeds to creditors more efficiently and expeditiously than a Chapter 7 trustee. Additionally, the Estates would suffer additional delays, as a Chapter 7 trustee and his/her counsel took time to develop a necessary learning curve in order to complete the administration of the Estates (including the prosecution of the applicable Causes of Action). Also, a new time period for the filing of claims would commence under Bankruptcy Rule 1019(2), possibly resulting in the filing of additional Claims against the Estates.

Based upon the foregoing and **Exhibit B** (Liquidation Analysis) attached hereto, the Debtors believe that creditors will receive at least as much or more under the Plan than they would receive if the Chapter 11 Cases were converted to Chapter 7 cases.

## I.   Eligibility to Vote on the Combined Plan and Disclosure Statement.

Unless otherwise ordered by the Court, only holders of Allowed Claims in Class 4 (Nano Claims), Class 5 (Third Lien AHG Claims), Class 6 (Quinn Claims), and Class 7 (Unsecured

Claims) may vote on the Combined Plan and Disclosure Statement. Further, subject to the tabulation procedures that were approved by the Conditional Approval and Procedures Order, in order to vote on the Combined Plan and Disclosure Statement, you must hold an *Allowed* Claim in Class 4 (Nano Claims), Class 5 (Third Lien AHG Claims), Class 6 (Quinn Claims), or Class 7 (Unsecured Claims) , or be the holder of a Claim that has been temporarily Allowed for voting purposes only pursuant to the approved tabulation procedures or under Bankruptcy Rule 3018(a).

**J.   Solicitation Package.**

All holders of Allowed Claims in Class 4 (Nano Claims), Class 5 (Third Lien AHG Claims), Class 6 (Quinn Claims), and Class 7 (Unsecured Claims) will receive a Solicitation Package. The Solicitation Packages will contain: (i) the Combined Plan and Disclosure Statement; (ii) the Conditional Approval Order and Procedures Order; (iii) notice of the Confirmation Hearing; (iv) a form of Ballot; and (v) such other materials as the Court may direct or approve or that the Debtors deem appropriate. In the case of beneficial Holders of Claims arising from Convertible Senior Notes in Class 7 (Unsecured Claims), Solicitation Packages will be sent to the bank, broker, or other intermediary through which they hold their positions in such securities in 'street name' (each such intermediary, a "Nominee"), as applicable. The solicitation package will contain two forms of Ballots substantially in the form approved by the Court: (i) a Ballot for use by the Nominees to cast the votes of their beneficial Holder clients and (ii) a Ballot for use by the Beneficial Holders to submit their individual Plan votes.

All other Creditors and parties in interest not entitled to vote on the Combined Plan and Disclosure Statement will receive only a copy of the notice of Confirmation Hearing.

Copies of the Combined Plan and Disclosure Statement shall be available on the Claims and Balloting Agent's website at https://cases.ra.kroll.com/desktopmetal. Any creditor or party-in-interest can request a hard copy of the Combined Plan and Disclosure Statement be sent to them by regular mail by calling the Claims and Balloting Agent at (888) 958-4830 (U.S./Canada, toll-free) or (646) 969-6972 (international, toll) during regular business hours or by email at DesktopMetalInfo@ra.kroll.com.

**K.   Voting Procedures, Voting Deadline, and Applicable Deadlines.**

The Voting Record Date for determining which holders of Claims in Class 4 (Nano Claims), Class 5 (Third Lien AHG Claims), Class 6 (Quinn Claims), and Class 7 (Unsecured Claims) may vote on the Combined Plan and Disclosure Statement is August 18, 2025.

In order for your Ballot to count, you must (1) complete, date, and properly execute the Ballot and (2) properly deliver the Ballot to the Claims and Balloting Agent by either (a) mailing the Ballot to the Claims and Balloting Agent at the following addresses indicated below; or (b) submit the Ballot via the Claims and Balloting Agent's E-Ballot Portal by visiting https://cases.ra.kroll.com/DeskTopMetal and click on the "Submit E-Ballot" section of the website. Enter your Unique E-Ballot ID # as provided on your ballot and follow the instructions to submit your Ballot. Any Voting Holder in Class 7 whose Unsecured Claim is based on beneficial ownership of Convertible Senior Notes held through a Nominee should submit the Ballot in accordance with the instructions provided by their respective Nominee.

<u>If by First Class Mail (in the return envelope provided or otherwise),</u> <u>Overnight Courier or Hand Delivery:</u>
Desktop Metal, Inc., et al., Ballot Processing
c/o Kroll Restructuring Administration LLC
850 3rd Avenue, Suite 412
Brooklyn, NY 11232

(to arrange hand delivery of your Ballot, please email DesktopMetalBallots@ra.kroll.com (with "Desktop Metal Ballot Delivery" in the subject line) at least 24 hours prior to arrival at the Kroll address above and provide the anticipated date and time of delivery)

Ballots must be submitted electronically, or the Claims and Balloting Agent must actually receive physical, original Ballots by mail or overnight delivery, on or before the Voting Deadline, which is **September 9, 2025**. Subject to the tabulation procedures approved by the Conditional Approval and Procedures Order, you may not change your vote once a Ballot is submitted electronically or the Claims and Balloting Agent receives your original paper Ballot. Subject to the tabulation procedures approved by the Conditional Approval and Procedures Order, any Ballot that is timely and properly submitted electronically or received physically will be counted and will be deemed to be cast as an acceptance, rejection or abstention, as the case may be, of the Combined Plan and Disclosure Statement.

**IF YOU ARE ENTITLED TO VOTE ON THE COMBINED PLAN AND DISCLOSURE STATEMENT, YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT YOU RECEIVE. PLEASE BE SURE TO COMPLETE ALL BALLOT ITEMS PROPERLY AND LEGIBLY. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE COMBINED PLAN AND DISCLOSURE STATEMENT AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE COMBINED PLAN AND DISCLOSURE STATEMENT OR PROCEDURES FOR VOTING ON THE COMBINED PLAN AND DISCLOSURE STATEMENT, PLEASE CONTACT THE CLAIMS AND BALLOTING AGENT BY (I) TELEPHONE AT (888) 958-4830 (U.S./CANADA, TOLL-FREE) OR (646) 969-6972 (INTERNATIONAL, TOLL) DURING REGULAR BUSINESS HOURS OR BY EMAIL AT DESKTOPMETALINFO@RA.KROLL.COM. THE CLAIMS AND BALLOTING AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

**L.** **Acceptance of the Combined Plan and Disclosure Statement.**

If you are a holder of a Claim in Class 4 (Nano Claims), Class 5 (Third Lien AHG Claims), Class 6 (Quinn Claims), or Class 7 (Unsecured Claims), your acceptance of the Combined Plan and Disclosure Statement is important. For the Combined Plan and Disclosure Statement to be accepted by an Impaired Class of Claims, a majority in number (*i.e.*, more than half) and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Combined Plan and Disclosure Statement. At least one Impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept the Combined Plan and Disclosure Statement. The Debtors urge that you vote to accept the Combined Plan and Disclosure Statement.

## SECTION VII.
## CERTAIN RISK FACTORS, TAX CONSEQUENCES, AND OTHER DISCLOSURES

### A. Certain Risk Factors to be Considered.

THE COMBINED PLAN AND DISCLOSURE STATEMENT AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE COMBINED PLAN AND DISCLOSURE STATEMENT SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE COMBINED PLAN AND DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE COMBINED PLAN AND DISCLOSURE STATEMENT AND ITS IMPLEMENTATION.

### B. The Combined Plan and Disclosure Statement May Not Be Accepted.

The Debtors can make no assurances that the requisite acceptances of the Combined Plan and Disclosure Statement will be received, and the Debtors may need to obtain acceptances of an alternative plan of liquidation for the Debtors, or otherwise, that may not have the support of the creditors and/or may be required to liquidate the Estates under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to creditors as those proposed in the Combined Plan and Disclosure Statement.

### C. The Combined Plan and Disclosure Statement May Not Be Confirmed.

Even if the Debtors receive the requisite acceptances, there is no assurance that the Court, which may exercise substantial discretion as a court of equity, will confirm the Combined Plan and Disclosure Statement. Even if the Court determined that the Combined Plan and Disclosure Statement and the balloting procedures and results were appropriate, the Court could still decline to confirm the Combined Plan and Disclosure Statement if it finds that any of the statutory requirements for confirmation had not been met. As is described in greater detail in Section VI.C., section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan. While, as more fully set forth Section VI, the Debtors believe that the Combined Plan and Disclosure Statement complies with or will comply with all such requirements, there can be no guarantee that the Court will agree.

Moreover, there can be no assurance that modifications to the Combined Plan and Disclosure Statement will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes. If the Combined Plan and Disclosure Statement is not confirmed, it is unclear what distributions holders of Claims ultimately would receive with respect to their Claims in a subsequent plan of liquidation. If an alternative could not be agreed to, it is possible that the Debtors would have to liquidate their remaining assets in chapter 7, in which case

it is likely that the holders of Allowed Claims would receive substantially less favorable treatment than they would receive under the Combined Plan and Disclosure Statement.

### D. Distributions to Holders of Allowed Claims Under the Combined Plan and Disclosure Statement May be Inconsistent with Projections.

Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution. There can be no assurance that the estimated Claim amounts set forth in the Combined Plan and Disclosure Statement are correct. These estimated amounts are based on certain assumptions with respect to a variety of factors. Both the actual amount of Allowed Claims in a particular Class and the funds available for distribution to such Class may differ from the Debtors' estimates. If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for distribution to such Class are lower than the Debtors' estimates, the percentage recovery to holders of Allowed Claims in such Class will be less than projected.

### E. Objections to Classification of Claims.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. As is described in greater detail in Section VI.D., the Debtors believe that the classification of Claims and Interests under the Combined Plan and Disclosure Statement complies with the requirements set forth in the Bankruptcy Code. Nevertheless, there can be no assurance the Court will reach the same conclusion.

To the extent that the Court finds that a different classification is required for the Combined Plan and Disclosure Statement to be confirmed, the Debtors would seek to (i) modify the Combined Plan and Disclosure Statement to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such holder was initially a member, or any other Class under the Combined Plan and Disclosure Statement, by changing the composition of such Class and the vote required for approval of the Combined Plan and Disclosure Statement. There can be no assurance that the Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Combined Plan and Disclosure Statement based upon such reclassification. Except to the extent that modification of classification in the Combined Plan and Disclosure Statement requires re-solicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Court that acceptance of the Combined Plan and Disclosure Statement by any holder of Claims pursuant to this solicitation will constitute a consent to the Combined Plan and Disclosure Statement's treatment of such holder, regardless of the Class as to which such holder is ultimately deemed to be a member. The Debtors believe that under the Bankruptcy Rules, they would be required to resolicit votes for or against the Combined Plan and Disclosure Statement only when a modification adversely affects the treatment of the Claim or Interest of any holder.

The Bankruptcy Code also requires that the Combined Plan and Disclosure Statement provide the same treatment for each Claim or Interest of a particular Class unless the holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtors believe that the Combined Plan and Disclosure Statement complies with the requirement of equal treatment. To the extent that the Court finds that the Combined Plan and Disclosure Statement does not satisfy such requirement, the Court could deny confirmation of the Combined Plan and Disclosure Statement. Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Combined Plan and Disclosure Statement and could increase the risk that the Combined Plan and Disclosure Statement will not be consummated.

### F. **Failure to Consummate the Combined Plan and Disclosure Statement.**

Although the Debtors believe that the Effective Date will occur and may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

### G. **The Plan Releases May Not Be Approved.**

There can be no assurance that the releases, as provided in Section XVI.B., will be granted. Failure of the Court to grant such relief may result in a plan that differs from the Combined Plan and Disclosure Statement or the Plan not being confirmed or being amended as necessary to obtain confirmation.

### H. **Reductions to Estimated Creditor Recoveries.**

The Allowed amount of Claims in any Class could be greater than projected, which, in turn, could cause the amount of distributions to creditors in such Class to be reduced substantially. The amount of cash realized from the monetization of the Debtors' remaining assets could be less than anticipated, which could cause the amount of distributions to creditors to be reduced substantially.

### I. **Certain U.S. Federal Income Tax Consequences.**

The following discussion is a summary of certain material U.S. federal income tax consequences of the Combined Plan and Disclosure Statement to the Debtors and to certain holders (which solely for purposes of this discussion means the beneficial owner for U.S. federal income tax purposes) of Claims. The following summary does not address the U.S. federal income tax consequences to holders of Claims or Interests not entitled to vote on the Combined Plan and Disclosure Statement. This summary is based on the Internal Revenue Code, Treasury Regulations promulgated and proposed thereunder, judicial decisions, and published administrative rules and pronouncements of the IRS, all as in effect on the date hereof and all of which are subject to change or differing interpretations, possibly with retroactive effect. No legal opinions have been requested or obtained from counsel with respect to any of the tax aspects of the Combined Plan and Disclosure Statement and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain holders of Claims in light of their individual circumstances, nor does the discussion deal with tax issues with respect to holders of Claims or Interests subject to special treatment under the U.S. federal income tax laws (including, for example, insurance companies; banks or other financial institutions; brokers, dealers, or traders in securities; real estate investment trusts; governmental authorities or agencies; tax-exempt organizations; retirement plans; individual retirement or other tax-deferred accounts; certain expatriates or former long-term residents of the United States; small business investment companies; regulated investment companies; S corporations, partnerships, or other pass-through entities for U.S. federal income tax purposes and their owners; persons whose functional currency is not the U.S. dollar; persons who use a mark-to-market method of accounting; persons required to report income on an applicable financial statement; persons holding Claims or Interests as part of a straddle, hedge, constructive sale, conversion transaction, or other integrated transaction; and persons who are not U.S. Holders (as defined below)). Furthermore, this discussion assumes that a holder of a Claim holds such claim as a "capital asset" within the meaning of Section 1221 of the Internal Revenue Code (generally property held for investment). This discussion does not address any U.S. federal non-income (including estate or gift), state, local, or foreign taxation, alternative minimum tax, or the Medicare tax on certain net investment income.

If a partnership (or other entity or arrangement classified as a partnership for U.S. federal income tax purposes) is a holder of Claims or Interests, the U.S. federal income tax treatment of a partner in the partnership will generally depend on the status of the partner and the activities of the partnership. A holder of a Claim or Interest that is a partnership and the partners in such partnership should consult their tax advisors with regard to the U.S. federal income tax consequences of the Combined Plan and Disclosure Statement.

**THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.**

### J.   Tax Consequences for U.S. Holders of Certain Claims.

A holder of a Claim should in most, but not all, circumstances recognize gain or loss equal to the difference between the "amount realized" by such holder in exchange for its Claim and such holder's adjusted tax basis in the Claim. The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under a plan of reorganization in respect of a holder's Claim. The tax basis of a holder in a Claim will generally be equal to the holder's cost therefor. To the extent applicable, the character of any recognized gain or loss (*e.g.*, ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the holder, the nature of the Claim in the holder's hands, the purpose and circumstances of its acquisition, the holder's holding period of the Claim, and the extent to which the holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. Generally, if the Claim is a capital asset in the holder's hands, any gain or loss realized will generally be characterized as capital gain

or loss, and will constitute long-term capital gain or loss if the holder has held such Claim for more than one year.

A creditor who receives Cash in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest. A creditor who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for U.S. federal income tax purposes as interest, regardless of whether such creditor realizes an overall gain or loss as a result of surrendering its Claim. A creditor who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such creditor realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim.

Under the Plan, the holders of certain Claims will likely receive only a partial distribution of their Allowed Claims. Whether the applicable holder of such Claims will recognize a loss or any other tax treatment will depend upon facts and circumstances that are specific to the nature of the holder and its Claims. Creditors should consult their own tax advisors.

### K.  **Tax Consequences in Relation to Administration Trust.**

As of the Effective Date, the Administration Trust will be established for the benefit of the holders of Allowed Unsecured Claims.

Allocations of taxable income of the Administration Trust (other than taxable income allocable to the Administration Trust's disputed claims reserves) among holders of Unsecured Claims will be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Administration Trust had distributed all of its assets (valued at their tax book value) to the holders of the beneficial interests in the Administration Trust, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Administration Trust. Similarly, taxable loss of the Administration Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining trust assets.

The tax book value of the trust assets for this purpose will equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The Plan Administrator may (a) elect to treat any trust assets allocable to, or retained on account of, Disputed Claims (the "Disputed Claims Reserve") as a "disputed ownership fund" governed by Treasury Regulation Section 1.468B-9, and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Accordingly, any Disputed Claims Reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the trust assets in such reserves, and all distributions from such

reserves will be treated as received by holders in respect of their Claims as if distributed by the Debtors. All parties (including, without limitation, the Plan Administrator and the holders of beneficial interests in the Administration Trust) will be required to report for tax purposes consistently with the foregoing.

The Administration Trust is intended to qualify as a liquidating trust for federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994.28 I.R.B. 124, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Administration Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan and Administration Trust Agreement, and in conformity with Revenue Procedure 94-45, *supra*, all parties (including the Plan Administrator and the holders of beneficial interests in the Administration Trust) are required to treat for federal income tax purposes, the Administration Trust as a grantor trust of which the holders of Allowed Unsecured Claims are the owners and grantors. While the following discussion assumes that the Administration Trust would be so treated for federal income tax purposes, no ruling has been requested from the IRS concerning the tax status of the Administration Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Administration Trust as a grantor trust. If the IRS were to challenge successfully such classification, the federal income tax consequences to the Administration Trust and the Beneficiaries thereof could materially vary from those discussed herein.

In general, each creditor who is a Beneficiary of the Administration Trust will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by such Beneficiary in satisfaction of its Allowed Unsecured Claim, and (ii) such Beneficiary's adjusted tax basis in such Claim. The "amount realized" by a Beneficiary will equal the sum of cash and the aggregate fair market value of the property received by such party pursuant to the Plan (such as a Beneficiary's undivided beneficial interest in the assets transferred to the Administration Trust). Where gain or loss is recognized by a Beneficiary in respect of its Allowed Unsecured Claim, the character of such gain or loss (i.e., long-term or short-term capital, or ordinary income) will be determined by a number of factors including the tax status of the party, whether the Claim constituted a capital asset in the hands of the party and how long it had been held, whether the Claim was originally issued at a discount or acquired at a market discount and whether and to what extent the party had previously claimed a bad debt deduction in respect of the Claim.

After the Effective Date, any amount that a creditor receives as a distribution from the Administration Trust in respect of its beneficial interest in the Administration Trust should not be included, for federal income tax purposes, in the party's amount realized in respect of its Allowed Unsecured Claim, but should be separately treated as a distribution received in respect of such party's beneficial interest in the Administration Trust.

In general, a Beneficiary's aggregate tax basis in its undivided beneficial interest in the assets transferred to the Administration Trust will equal the fair market value of such undivided beneficial interest as of the Effective Date and the Beneficiary's holding period in such assets will begin the day following the Effective Date. Distributions to any Beneficiary will be allocated first to the original principal portion of the Beneficiary's Allowed Unsecured Claim as determined for

federal tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim. However, there is no assurance that the IRS will respect such allocation for federal income tax purposes.

For all federal income tax purposes, all parties (including the Plan Administrator and the holders of beneficial interests in the Administration Trust) will treat the transfer of assets to the Administration Trust, in accordance with the terms of the Plan and Administration Trust Agreement, as a transfer of those assets directly to the holders of the applicable Allowed Unsecured Claims followed by the transfer of such assets by such holders to the Administration Trust. Consistent therewith, all parties will treat the Administration Trust as a grantor trust of which such holders are to be owners and grantors. Thus, such holders (and any subsequent holders of interests in the Administration Trust) will be treated as the direct owners of an undivided beneficial interest in the assets of the Administration Trust for all federal income tax purposes. Accordingly, each holder of a beneficial interest in the Administration Trust will be required to report on its federal income tax return(s) the holder's allocable share of all income, gain, loss, deduction or credit recognized or incurred by the Administration Trust.

The Administration Trust's taxable income will be allocated to the Beneficiaries in accordance with each such Beneficiary's Pro Rata share. The character of items of income, deduction and credit to any holder and the ability of such holder to benefit from any deductions or losses may depend on the particular situation of such holder.

The federal income tax reporting obligation of a holder of a beneficial interest in the Administration Trust is not dependent upon the Administration Trust distributing any cash or other proceeds. Therefore, a holder of a beneficial interest in the Administration Trust may incur a federal income tax liability regardless of the fact that the Administration Trust has not made, or will not make, any concurrent or subsequent distributions to the holder. If a holder incurs a federal tax liability but does not receive distributions commensurate with the taxable income allocated to it in respect of its beneficial interests in the Administration Trust it holds, the holder may be allowed a subsequent or offsetting loss.

The Plan Administrator will file with the IRS returns for the Administration Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a). The Administration Trust will also send to each holder of a beneficial interest in the Administration Trust a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct the holder to report such items on its federal income tax return.

Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, could also change the federal income tax consequences of the Plan and the transactions contemplated thereunder.

### L.  **Information Reporting and Withholding.**

In connection with the Combined Plan and Disclosure Statement, the Debtors will comply with all applicable withholding and information reporting requirements imposed by U.S. federal, state, local, and foreign taxing authorities, and all Distributions under the Combined Plan and Disclosure Statement will be subject to those withholding and information reporting requirements.

Holders of Claims may be required to provide certain tax information as a condition to receiving Distributions pursuant to the Combined Plan and Disclosure Statement.

In general, information reporting requirements may apply to Distributions pursuant to the Combined Plan and Disclosure Statement. Additionally, under the backup withholding rules, a holder may be subject to backup withholding with respect to Distributions made pursuant to the Combined Plan and Disclosure Statement, unless a U.S. Holder provides the applicable withholding agent with a taxpayer identification number, certified under penalties of perjury, as well as certain other information, or otherwise establish an exemption from backup withholding. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a credit against a U.S. Holder's U.S. federal income tax liability, if any, and may entitle a U.S. Holder to a refund, provided the required information is timely furnished to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders of Claims or Interests are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Combined Plan and Disclosure Statement would be subject to these regulations and require disclosure on the holder's tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.**

### M. Releases, Exculpations, and Injunctions.

This Combined Plan and Disclosure Statement contains certain releases, exculpations, and injunctions. Parties are urged to read these provisions carefully to understand how Confirmation and consummation of the Plan will affect any Claim, interest, right, or action with regard to the Debtor and certain third parties.

**THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS AGAINST THE DEBTORS TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND ALL OTHER APPLICABLE LAW.**

### N. Alternatives to the Combined Plan and Disclosure Statement.

If the requisite acceptances are not received or the Combined Plan and Disclosure Statement is not confirmed and consummated, the theoretical alternatives to the Combined Plan

and Disclosure Statement would be (a) formulation of an alternative chapter 11 plan, (b) conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (c) dismissal of the Chapter 11 Cases. The Debtors do not believe that any of these alternatives, even if viable, would afford holders of Claims or Interests a greater recovery than what is provided by the Combined Plan and Disclosure Statement.

If the Combined Plan and Disclosure Statement is not confirmed, then the Debtors or any other party in interest could attempt to formulate a different plan. The additional costs, including, among other amounts, additional professional fees, all of which would constitute Administrative Claims (subject to allowance thereof), however, may be so significant that one or more parties in interest could request that the Chapter 11 Cases be converted to chapter 7. At this time, the Debtors do not believe that there are viable alternative plans available to the Debtors.

If the Combined Plan and Disclosure Statement is not confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate and distribute the Debtors' remaining assets in accordance with the priorities established by the Bankruptcy Code. As discussed above and indicated in the Liquidation Analysis, the Debtors believe that the Combined Plan and Disclosure Statement provides a better outcome for holders of Claims than a chapter 7 liquidation would provide.

If the Combined Plan and Disclosure Statement is not confirmed, the Chapter 11 Cases also could be dismissed. Among other effects, dismissal would result in the termination of the automatic stay, thus permitting creditors to assert state-law rights and remedies against the Debtors and their assets, likely to the detriment of other creditors. While it is impossible to predict precisely what would happen in the event the Chapter 11 Cases are dismissed, it is unlikely that dismissal would result in a ratable distribution of the Debtors' assets among creditors as provided in the Combined Plan and Disclosure Statement. Thus, the vast majority of creditors, including general unsecured creditors, could expect to receive less in the dismissal scenario than they would receive under the Combined Plan and Disclosure Statement.

## SECTION VIII.
## UNCLASSIFIED CLAIMS

### A. Unclassified Claims.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified for purposes of voting or receiving Distributions. Rather, all such Claims are treated separately as unclassified Claims as set forth in this Section, and the holders thereof are not entitled to vote on the Combined Plan and Disclosure Statement.

### B. Administrative Claims.

Except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment, each Holder of an Allowed Administrative Claim, other than a Professional Fee Claim, shall receive from Available Cash payable by the Debtors or the Administration Trust, without interest, Cash equal to the Allowed amount of such Claim: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Court enters a Final Order

determining or approving such Claim; (b) in accordance with the terms and conditions of agreements between the Holder of such Claim and the Debtors or the Administration Trust, as the case may be; (c) with respect to any Administrative Claims representing obligations incurred in the ordinary course of the Debtors' business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtors' business or as otherwise provided in the Plan; or (d) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), as and when due under applicable law.

Unless otherwise provided in the Bankruptcy Code, Holders of Administrative Claims (including, without limitation, Professionals requesting compensation or reimbursement of such expenses pursuant to Sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code) that do not file such requests by the applicable deadline provided for herein may be subject to objection for untimeliness and may be prohibited by order of the Court from asserting such claims against the Debtors, the Estates, the Administration Trust, or their successors or assigns, or their property. Any objection to Professional Fee Claims shall be filed on or before the objection deadline specified in the application for final compensation or order of the Court.

All fees due and payable under 28 U.S.C. § 1930 that have not been paid shall be paid on the Effective Date or when due. After the Effective Date, the Plan Administrator shall pay as an expense of the Administration Trust all fees incurred under 28 U.S.C. § 1930(a)(6) by reason of the Administration Trust's disbursements as required under the Plan and Confirmation Order until all the Chapter 11 Cases are closed. After the Effective Date, the Plan Administrator shall prepare and serve on the Office of the U.S. Trustee such quarterly disbursement reports for the Administration Trust as required by applicable law for as long as each of Chapter 11 Cases remains open.

## C. Professional Fee Claims.

Professionals requesting compensation or reimbursement of expenses pursuant to Sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code (*i.e.*, Professional Fee Claims) or required to file fee applications by order of the Court for services rendered prior to the Effective Date must file and serve on the Debtors' master service list an application for final allowance of compensation and reimbursement of expenses **no later than forty-five (45) days after the Effective Date**. All such applications for final allowance of compensation and reimbursement of expenses will be subject to the authorization and approval of the Court and the agreed budgets annexed to the Interim Cash Collateral Order and Final Cash Collateral Order (as such budgets may be amended or revised).

Upon approval of the fee applications by the Court or as soon as reasonably practicable thereafter, the Debtors or Administration Trust, as applicable, shall pay applicable Professionals all of their respective accrued and Allowed fees and reimbursement of expenses arising prior to the Effective Date, plus reasonable fees for services rendered, and actual and necessary costs incurred, in connection with the filing, service and prosecution of any applications for allowance of Professional Fee Claims pending on the Effective Date or filed and/or served after the Effective Date.

### D. **Priority Tax Claims.**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Priority Tax Claim, the Debtors or Administration Trust, as applicable, shall pay each holder of an Allowed Priority Tax Claim, from Available Cash, the full unpaid amount of such Allowed Priority Tax Claim (as of the Effective Date) via either, at the Plan Administrator's sole discretion, (a) a single lump sum payment on or as soon as practicable after the later of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes an Allowed Claim, and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law; or (b) regular cash installment payments over a period ending not later than five years after the Petition Date with interest at the rate determined under applicable non-bankruptcy law, pursuant to 11 U.S.C. §§ 1129(a)(9)(C) and 511.

### E. **Convertible Senior Notes Trustee Expenses.**

An amount of $100,000 of Convertible Senior Notes Trustee Expenses will be paid in cash on the Effective Date. Convertible Senior Notes Trustee Expenses that remain outstanding will be paid pursuant to the Convertible Senior Notes Trustee's charging lien on any recoveries otherwise going to the Convertible Senior Notes under the Plan, Administration Trust Agreement, and Liquidating Trust Agreement, as applicable; *provided, however*, that, if the $100,000 is paid as set forth above on the Effective Date, the Convertible Senior Notes Trustee has agreed to limit additional Convertible Senior Notes Trustee Expenses (including any fees and expenses of its counsel and any fees related to its service as a member of the Committee) that are incurred prior to the Effective Date to $75,000. Fees and expenses of the Convertible Senior Notes Trustee, including legal fees and expenses, that may be incurred related to post-Effective Date work, including but not limited to making distributions under the Plan, remain subject to the Convertible Senior Notes Trustee's charging lien, and all rights of the Convertible Senior Notes Trustee are reserved with respect thereto.

### SECTION IX.
### CLASSIFICATION OF CLAIMS AND INTERESTS

### A. **Summary of Classification.**

The provisions of this Section IX govern Claims against and Interests in the Debtors. Any Class that is vacant will be treated in accordance with Section IX.C below.

The following table designates the Classes of Claims against, and Interests in, the Debtors and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept or reject the Combined Plan and Disclosure Statement in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to accept or reject the Combined Plan and Disclosure Statement. A Claim or portion thereof is classified in a particular Class only to the extent that such Claim or portion thereof qualifies within the description of such Class and is classified in a different Class to the extent that the portion of such Claim qualifies within the description of such different Class.

**For the avoidance of doubt, (a) all rights of the Debtors, the Estates, the Committee, the Plan Administrator, the Litigation Trustee, and all other Persons, as applicable, to object, dispute, challenge, or compromise the enforceability, perfection, priority, avoidability, or validity of all Liens, Interests, and Claims are preserved and fully enforceable prior to, on, and after the Effective Date; (b) the relative priorities described herein may be the subject of a Priority Dispute, and nothing herein shall be considered binding on any parties to any Priority Dispute with respect thereto; and (c) nothing in the Plan or Confirmation Order shall affect the outcome of any Priority Disputes.**

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | No (presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| 3 | First Lien AHG Claims[9] | Unimpaired | No (presumed to accept) |
| 4 | Nano Claims | Impaired | Yes |
| 5 | Third Lien AHG Claims | Impaired | Yes |
| 6 | Quinn Claims | Impaired | Yes |
| 7 | Unsecured Claims | Impaired | Yes |
| 8 | Intercompany Claims | Impaired | No (presumed to reject) |
| 9 | Interests | Impaired | No (presumed to reject) |

**B.  Special Provision Governing Unimpaired Claims.**

Except as otherwise provided in the Combined Plan and Disclosure Statement, nothing under the Combined Plan and Disclosure Statement shall affect the rights of the Debtors or the Plan Administrator, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

**C.  Vacant and Abstaining Classes.**

Any Class of Claims or Interests that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or Interest or a Claim or Interest temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the Combined Plan and Disclosure Statement for purposes of voting to accept or reject the Combined Plan and Disclosure Statement and for purposes of determining acceptance or rejection of the Combined Plan and Disclosure Statement by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

---

[9] Following the Petition Date, the First Lien AHG Claims were paid in full.

## SECTION X.
## TREATMENT OF CLAIMS AND INTERESTS

### A. Class 1—Priority Non-Tax Claims.

(a)    <u>Classification</u>. Class 1 consists of all Priority Non-Tax Claims.

(b)    <u>Treatment</u>. The Debtors or Administration Trust, as applicable, shall pay, from Available Cash, the Allowed amount of each Priority Non-Tax Claim to each Entity holding a Priority Non-Tax Claim as soon as practicable following the later of: (a) the Effective Date and (b) the date such Priority Non-Tax Claim becomes an Allowed Claim (or as otherwise permitted by law). The Debtors or the Administration Trust shall pay each Entity holding a Priority Non-Tax Claim in Cash in full in respect of such Allowed Claim without interest from the Petition Date; *provided however*, that such Entity may be treated on such less favorable terms as may be agreed to in writing by such Entity.

(c)    <u>Impairment and Voting</u>. Class 1 is Unimpaired. Holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code and, accordingly, are not entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

### B. Class 2—Other Secured Claims

(a)    <u>Classification</u>. Class 2 consists of the Other Secured Claims.

(b)    <u>Treatment</u>. Except to the extent previously paid in full, at the option of the Debtors or Administration Trust, as applicable, one of the following treatments shall be provided: (i) the Holder of an Allowed Class 2 Claim will retain any valid and enforceable existing lien, claim, or encumbrance in or on its Collateral and will receive the proceeds, if any, from the Administration Trust's sale or liquidation of such Collateral in the order of priority of its interest in such Collateral (senior to Class 3, Class 4, Class 5, and Class 6) up to the value of its Allowed Class 2 Claim; (ii) on or as soon as practicable after the later of (a) the Effective Date, or (b) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, or as otherwise agreed between the Holder of such Claim and the Debtors or Administration Trust, as applicable, the Holder of such Other Secured Claim will receive a Cash payment equal to the amount of its Allowed Other Secured Claim in full satisfaction and release of such Other Secured Claim; (iii) the Collateral securing the Creditor's Other Secured Claim (subject to any applicable intercreditor rights or obligations) shall be abandoned to such Creditor, in full satisfaction and release of such Other Secured Claim; or (iv) or such other treatment as may be agreed to in writing by the Debtors and the Holder of such Class 2 Claim, in each case in full satisfaction and release of such Class 2 Claim. Notwithstanding anything to the contrary herein, nothing in this section shall be deemed to determine the outcome of any Priority Dispute, and all rights of the Priority Dispute Parties with regard to any such Priority Dispute are expressly preserved.

(c)    <u>Impairment and Voting</u>. Class 2 is Unimpaired. Holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Combined Plan and Disclosure Statement pursuant to section 1126(f) of the Bankruptcy Code and, accordingly, are not entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

### C.  **Class 3—First Lien AHG Claims**

(a)      <u>Classification</u>. Class 3 consists of the First Lien AHG Claims.

(b)      <u>Treatment</u>. Unless previously paid in full, the Holder of an Allowed Class 3 Claim will retain any valid and enforceable existing lien, claim, or encumbrance in or on its Collateral and will receive the proceeds, if any, from the Administration Trust's or Litigation Trust's, as applicable, sale or liquidation of such Collateral in the order of priority of its interest in such Collateral (senior to Class 4, Class 5, Class 6, and Class 7) up to the value of its Allowed Class 3 Claim or such other treatment as may be agreed to in writing by the Debtors and the Holder of such Class 3 Claim, in each case in full satisfaction and release of such Class 3 Claim. All Allowed Deficiency Claims, if any, will be classified and treated as Class 7 Unsecured Claims. Notwithstanding anything to the contrary herein, nothing in this section shall be deemed to determine the outcome of any Priority Dispute, and all rights of the Priority Dispute Parties with regard to any such Priority Dispute are expressly preserved.

Following the Petition Date, the First Lien AHG Claims were paid in full.

(c)      <u>Impairment and Voting</u>. Class 3 is Unimpaired, and the Holders thereof are not entitled to vote on the Plan.

### D.  **Class 4—Nano Claims.**

(a)      <u>Classification</u>. Class 4 consists of all Nano Claims.

(b)      <u>Treatment</u>. Unless previously paid in full, the Holder of an Allowed Class 4 Claim will retain any valid and enforceable existing lien, claim, or encumbrance in or on its Collateral and will receive the proceeds, if any, from the Administration Trust's or Litigation Trust's, as applicable, sale or liquidation of such Collateral in the order of priority of its interest in such Collateral (junior to Class 2, Class 3, and, subject to the Intercreditor Letter Agreement, Class 5 with respect to certain Collateral, and senior to Class 5 with respect to certain other Collateral, Class 6 and Class 7) up to the value of its Allowed Class 4 Claim or such other treatment as may be agreed to in writing by the Debtors and the Holder of such Class 3 Claim, in each case in full satisfaction and release of such Class 4 Claim. All Allowed Deficiency Claims, if any, will be classified and treated as Class 7 Unsecured Claims. Notwithstanding anything to the contrary herein, nothing in this section shall be deemed to determine the outcome of any Priority Dispute, and all rights of the Priority Dispute Parties with regard to any such Priority Dispute are expressly preserved.

(c)      <u>Impairment and Voting</u>. Class 4 is Impaired, and the Holders thereof are entitled to vote on the Plan.

### E.  **Class 5—Third Lien AHG Claims.**

(a)      <u>Classification</u>. Class 5 consists of all Third Lien AHG Claims.

(b)      <u>Treatment</u>. Unless previously paid in full, the Holder of an Allowed Class 5 Claim will retain any valid and enforceable existing lien, claim, or encumbrance in or on its

Collateral and will receive the proceeds, if any, from the Administration Trust's or Litigation Trust's, as applicable, sale or liquidation of such Collateral in the order of priority of its interest in such Collateral (junior to Class 2, Class 3, and, subject to the Intercreditor Letter Agreement, Class 4 with respect to certain Collateral, and senior to Class 4, with respect to certain Collateral, Class 6 and Class 7) up to the value of its Allowed Class 5 Claim or such other treatment as may be agreed to in writing by the Debtors and the Holder of such Class 5 Claim, in each case in full satisfaction and release of such Class 5 Claim. All Allowed Deficiency Claims, if any, will be classified and treated as Class 7 Unsecured Claims. Notwithstanding anything to the contrary herein, nothing in this section shall be deemed to determine the outcome of any Priority Dispute, and all rights of the Priority Dispute Parties with regard to any such Priority Dispute are expressly preserved.

(c)      <u>Impairment and Voting</u>. Class 5 is Impaired, and the Holders thereof are entitled to vote on the Plan.

**F.   <u>Class 6—Quinn Claim.</u>**

(a)      <u>Classification</u>. Class 6 consists of the Quinn Claim.

(b)      <u>Treatment</u>. Unless previously paid in full, the Holder of an Allowed Class 6 Claim will retain any valid and enforceable existing lien, claim, or encumbrance in or on its Collateral and will receive the proceeds, if any, from the Administration Trust's or Litigation Trust's, as applicable, sale or liquidation of such Collateral in the order of priority of its interest in such Collateral (junior to Class 2, Class 3, Class 4, and Class 5) up to the value of its Allowed Class 6 Claim or such other treatment as may be agreed to in writing by the Debtors and the Holder of such Class 6 Claim, in each case in full satisfaction and release of such Class 6 Claim. All Allowed Deficiency Claims, if any, will be classified and treated as Class 7 Unsecured Claims. Notwithstanding anything to the contrary herein, nothing in this section shall be deemed to determine the outcome of any Priority Dispute, and all rights of the Priority Dispute Parties with regard to any such Priority Dispute are expressly preserved.

(c)      <u>Impairment and Voting</u>. Class 6 is Impaired, and the Holders thereof are entitled to vote on the Plan.

**G.   <u>Class 7—Unsecured Claims.</u>**

(a)      <u>Classification</u>. Class 7 consists of all Unsecured Claims. For the avoidance of doubt, Class 6 includes all Deficiency Claims.

(b)      <u>Treatment</u>. Holders of Class 7 Claims shall receive a Pro Rata share of the Administration Trust Interests in exchange for their Allowed Class 7 Claims, which entitle the Beneficiaries thereof to a Pro Rata share of any net proceeds of the Administration Trust Assets, after payment of all Administration Trust Expenses, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, any Allowed adequate protection claims, and net of any proceeds of Collateral payable to the Holders of Allowed Secured Claims. Unsecured Claims are subject to all statutory, equitable, and contractual subordination claims, rights, and grounds available to the Debtors, the Estates, and the Plan Administrator, which

subordination claims, rights, and grounds are fully enforceable prior to, on, and after the Effective Date.

(c) <u>Impairment and Voting</u>. Class 7 is Impaired, and the Holders thereof are entitled to vote on the Plan.

**H. <u>Class 8—Intercompany Claims.</u>**

(a) <u>Classification</u>. Class 8 consists of all Intercompany Claims.

(b) <u>Treatment</u>. There shall be no Distribution on account of Class 8 Intercompany Claims. Upon the Effective Date, all Intercompany Claims will be deemed, at the option of the Debtors or the Plan Administrator, as applicable, converted to equity, otherwise set off, settled, canceled, released, or discharged without any distribution on account of such Claims.

(c) <u>Impairment and Voting</u>. Holders of Class 8 Intercompany Claims are deemed to have rejected the Plan, and are not entitled to vote.

**I. <u>Class 9—Interests.</u>**

(a) <u>Classification</u>. Class 9 consists of all Interests.

(b) <u>Treatment</u>. There shall be no Distribution on account of Class 9 Interests. Upon the Effective Date, all Interests in Desktop will be deemed cancelled and will cease to exist, and all Interests in Debtors other than Desktop shall be retained at the option of the Debtors or Administration Trust, as applicable.

(c) <u>Impairment and Voting</u>. Holders of Interests are deemed to have rejected the Plan, and are not entitled to vote.

**SECTION XI.**
**<u>DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS</u>**

**A. <u>Distribution Dates; Subsequent Distributions.</u>**

The Debtor(s) shall make Distributions to Holders of Claims on the Initial Distribution Date. Subject to the terms of the Plan and the Administration Trust Agreement, the Plan Administrator may, in its sole discretion, make a full or partial Pro Rata Distribution to the Holders of Claims on a Subsequent Distribution Date.

Any Distribution not made on the Initial Distribution Date or a Subsequent Distribution Date because the Claim relating to such Distribution had not been Allowed on that Distribution Date shall be held by the Plan Administrator for Distribution on any Subsequent Distribution Date after such Claim is Allowed.

**B.  Distribution Record Date.**

Except as otherwise provided in a Final Order of the Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date will be treated as the Holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Distribution Record Date. The Plan Administrator shall have no obligation to recognize any transfer of any Claim occurring after the Distribution Record Date. In making any Distribution with respect to any Claim, the Plan Administrator shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the proof of claim filed with respect thereto or on the Schedules as the Holder thereof as of the close of business on the Distribution Record Date and upon such other evidence or record of transfer or assignment that is known to the Plan Administrator as of the Distribution Record Date.

**C.  Manner of Cash Payments Under the Plan or Administration Trust Agreement.**

Cash payments made pursuant to the Plan or Administration Trust Agreement shall be in United States dollars by checks drawn on a domestic bank selected by the Debtor(s) or the Plan Administrator or by wire transfer from a domestic bank, at the sole option of the Debtor(s) or Plan Administrator, as applicable. Any and all Distributions and/or written communications pertaining to Distributions shall be made to Creditors or Beneficiaries at each Creditor or Beneficiary's respective address listed in the Claims Register unless the Debtor(s) or Plan Administrator, as applicable, receives a written change of address form from a Creditor or Beneficiary consistent with the terms of the Plan or the Administration Trust Agreement, as applicable.

**D.  Time Bar to Cash Payments by Check.**

Distribution checks issued to Creditors or Beneficiaries shall be null and void if not negotiated within **ninety (90) days** after the date of issuance thereof. The Debtor(s) or the Plan Administrator, as applicable, shall not reissue any check except upon directly receiving a request in writing from the Creditor or Beneficiary that was originally issued such check within **ninety (90) days** of the disbursement of the Distribution. If the 90-day period elapses without the Creditor requesting the check be reissued, the unresponsive holder's Distribution shall be deemed unclaimed property as provided in the Plan or the Administration Trust Agreement, as applicable. The foregoing notwithstanding, **ninety (90) days** after the final Distribution under section 1194 of the Bankruptcy Code, the Debtor(s) or the Plan Administrator, as applicable, shall stop payment on any check remaining unpaid, the corresponding Distribution shall be deemed unclaimed property, and all unclaimed property shall be redistributed in accordance with the provisions of the Plan or the Administration Trust Agreement, as applicable.

**E.  Administration Account.**

Unless otherwise provided in the Confirmation Order, the Administration Trust Assets consisting of Cash may be invested by the Plan Administrator in a manner consistent with the objectives of Section 345(a) of the Bankruptcy Code and in its reasonable and prudent exercise of the Plan Administrator's discretion. The Plan Administrator shall have no obligation or liability to Beneficiaries in connection with such investments in the event of any unforeseeable insolvency of

any financial institution where such funds are held. The Plan Administrator shall be under no obligation to generate or produce, or have any liability for, interest or other income on any monies received by the Administration Trust and held for distribution or payment to the Beneficiaries, except as such interest or income shall be actually received by the Administration Trust.

### F.  Tax Identification Numbers.

The Debtor(s) or the Plan Administrator, as applicable, may require any Creditor or Beneficiary to furnish its taxpayer identification number as assigned by the Internal Revenue Service by submitting a Form W-8, Form W-9, or other form completed in writing to the Debtor(s) or the Plan Administrator, as applicable, and may condition any Distribution to any Creditor or Beneficiary upon receipt of such completed form. If a Creditor or Beneficiary does not timely provide the Plan Administrator with its taxpayer identification number in the manner and by the deadline established by the Debtor(s) or the Plan Administrator, as applicable—to be not less than **forty-five (45) days** from the service of the request to the Creditor or Beneficiary for its tax identification information—then the Debtor(s) or the Plan Administrator, as applicable, may set aside the holder's Distribution for a period of **sixty (60) days** following service of the request. If the Creditor or Beneficiary of the Distribution set aside provides the information in the manner requested in the 60-day period, the Debtor(s) or the Plan Administrator, as applicable, shall disburse the set aside Distribution, without interest, to the Creditor or Beneficiary. However, if the Creditor or Beneficiary fails to provide the requested information within the 60-day period, then the unresponsive Creditor's Distribution or Beneficiary's Distribution shall be irreversibly deemed "unclaimed property" and redistributed to the other Creditors or Beneficiaries in accordance with the provisions of the Plan or the Administration Trust Agreement, as applicable.

### G.  Claims Paid or Payable by Third Parties.

#### 1.  Claims Paid by Third Parties

The Debtors or the Administration Trust, as applicable, shall reduce a Claim, and such Claim (or portion thereof) shall be Disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Court, to the extent that the Holder of such Claim receives payment on account of such Claim from a party that is not a Debtor or the Administration Trust, as applicable. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and also receives payment from a party that is not a Debtor or the Administration Trust, as applicable, on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Debtor or Administration Trust, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor or Administration Trust, as applicable, annualized interest at the interest rate provided under 28 U.S.C. § 1961(a), calculated as of the Petition Date, on such amount owed for each Business Day after the fourteen-day grace period specified above until the amount is repaid.

### 2.    Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim against any Debtor, then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Court.

If an applicable insurance policy has or is subject to an SIR or deductible, the Holder of an Allowed Claim that is payable pursuant to such insurance policy shall, upon written approval of the Debtors or Plan Administrator, as applicable, have an Allowed Unsecured Claim against the applicable Debtor's Estate up to the amount of the SIR or deductible that may be established upon the liquidation of the Claim, and such Holder's recovery from the Debtors or Plan Administrator, as applicable, shall be solely in the form of its distribution on account of such Allowed Unsecured Claim under the Plan. Such SIR or deductible shall be considered satisfied in full pursuant to the Plan through allowance of the Unsecured Claim solely in the amount of the applicable SIR or deductible, if any; *provided however* that nothing herein obligates the Debtors or the Plan Administrator, as applicable, to actually disburse proceeds to satisfy any SIR or deducible in full under any insurance policy.

Any recovery on account of the Claim in excess of the SIR or deductible established upon the liquidation of the Claim shall be recovered solely from the Debtors' insurance, if any, and only to the extent of available insurance and any proceeds thereof. If an applicable insurance policy has a retrospective premium retention or a deductible, the Holder of an Allowed Claim that is payable pursuant to such insurance policy shall have a Claim that can be recovered solely from the Debtors' insurance, if any, and only to the extent of available insurance and any proceeds thereof.

For the avoidance of doubt: (a) nothing in this Plan shall be construed to limit, extinguish, or diminish the insurance coverage that may exist or shall be construed as a finding that liquidates any Claim payable pursuant to an insurance policy; and (b) nothing herein relieves any obligation to timely file a Proof of Claim by the applicable Claims Bar Date. For the further avoidance of doubt, the First Lien AHG Claim, the Third Lien AHG Claim, the Convertible Senior Notes Claim, and Quinn Claim are explicitly excepted from the terms of this section XI.G.2. Under no circumstances shall Quinn be required to seek compensation from any other source prior to pursuing its rights against the Debtors, and nothing in this Plan shall be construed to limit Quinn's ability to elect, in its sole discretion, from among any of its available remedies in respect of its Claim(s) until its claims are paid in full.

### 3.    No Waiver of Rights

Except as expressly released by the Plan, nothing contained herein shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including Insurers, under any Insurance Policies, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any rights or defenses, including coverage defenses, held by such Insurers.

## SECTION XII.
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND REDISTRIBUTIONS

### A. No Distributions Pending Allowance.

Notwithstanding any other provision of the Plan, the Plan Administrator shall not distribute any Cash or other property subject to a Priority Dispute on account of any Disputed Claim unless and until such Priority Dispute is resolved by Final Order and/or such Claim becomes Allowed. Nothing contained herein, however, shall be construed to prohibit or require payment or Distribution on account of any undisputed portion of a Claim after resolution of all Priority Disputes.

### B. Resolution of Disputed Claims.

Unless otherwise ordered by the Court after notice and a hearing, subject to the Plan and the Administration Trust Agreement, as applicable, the Debtor(s), to the Effective Date, and the Plan Administrator, after the Effective Date, shall have the right to make, file, prosecute, settle, withdraw, or resolve objections to Claims or Priority Disputes. The costs of pursuing the objections to Claims or Priority Disputes shall be borne by the Debtor(s), and Plan Administrator from Administration Trust Assets, or Litigation Trustee form Litigation Trust Assets, as applicable. From and after the Confirmation Date, all objections with respect to Disputed Claims and Priority Disputes shall be litigated to a Final Order except to the extent, the Plan Administrator elects to withdraw any such objection or the Plan Administrator and the Claimant elect to compromise, settle, or otherwise resolve any such objection or Priority Dispute, in which event they may settle, compromise, or otherwise resolve any Disputed Claim or Priority Disputes without approval of the Court. The Priority Dispute Parties shall have original standing to file objections to any filed or scheduled Claims of any other Priority Dispute Party.

### C. Objection Deadline.

All objections to Claims (other than Professional Fee Claims) shall be filed and served upon the Claimant not later than the Claims Objection Deadline, as such may be extended by order of the Court and served solely on the Debtors' master service list and those parties that have filed an appearance or request for notice in the Chapter 11 Cases. It is contemplated that multiple extensions of the Claims Objection Deadline will be sought by the Administration Trust and granted by the Court.

### D. Estimation of Claims.

At any time, (a) prior to the Effective Date, the Debtors, and (b) after the Effective Date, the Plan Administrator or, if applicable, the Litigation Trustee may request that the Court estimate any contingent or unliquidated Claim to the extent permitted by Section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Administration Trust has previously objected to such Claim or whether the Court has ruled on any such objection, and the Court shall have jurisdiction to estimate any Claim at any time during Litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection. If the Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Court.

If the estimated amount constitutes a maximum limitation on the Claim, the Debtors or the Administration Trust, as applicable, may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdraw, or resolved by any mechanism of the Court.

### E.  **Disallowance of Claims.**

Except as otherwise agreed or ordered by the Court, any and all proofs of claim filed after the Bar Date shall be treated as a Disputed Claim for purposes of Distribution without any further notice or action, and Holders of such Claims may not receive any Distributions on account of such Claims, unless on or before the Effective Date the Court has entered an order deeming such Claim to be timely filed; *provided however*, that such Claims' status as disputed shall not prohibit payment of such Claims after complete payment and satisfaction of all timely Allowed Unsecured Claims and payment of Administration Trust Expenses.

On the Confirmation Date, any Claim that is scheduled by the Debtors in the Schedules as disputed, contingent or unliquidated, or listed at zero and as to which no Proof of Claim has been timely filed (or deemed timely filed by Final Order entered by the Court) shall be deemed a Disallowed Claim without further order of the Court.

Any Claims held by Entities from which property is recoverable under Sections 542, 543, 550, or 553 of the Bankruptcy Code or Entities that are transferees of transfers avoidable under Section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, provided that such Cause of Action is retained by the Administration Trust shall be deemed disallowed pursuant to Section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any Distributions on account of such Claims until such time as such Causes of Action the Debtors hold or may hold against any Entity have been resolved or a Court order with respect thereto has been entered and all sums due, if any, to the Estates by that Entity have been turned over or paid to the Debtors or the Administration Trust; *provided* that, notwithstanding the foregoing, in no event shall payment to any holder of a First Lien AHG Senior Notes Claim or a Convertible Senior Notes Claim be delayed or shall such claims be disallowed pursuant to this paragraph, Section 502(d) of the Bankruptcy Code or otherwise, solely as a result of a claim the Debtors may have to recover property from holders of Third Lien AHG Claims.

### F.  **Claims Register**

At the Effective Date or as soon after as practicable, the Debtors' Claims Agent shall file a complete copy of the Claims Register on the docket of the Chapter 11 Cases. After the Effective Date, the Plan Administrator shall be responsible for maintaining a register of Beneficiaries' interests in the Administration Trust which shall be commensurate with the Holders' Allowed Claims as reported in the Claims Register. The Plan Administrator shall be entitled to initially rely on the Claims Register as reported in the Claim's Agent's filing on the Effective Date for all purposes as an accurate ledger of the status, amount, and class of all Claims. The Plan Administrator may engage a claims agent (including the Debtors' Claims Agent) to continue to maintain and update the Claims Register throughout the administration of the Plan Administrator,

and such claims register may serve as the Plan Administrator's register of beneficial interests held by Beneficiaries.

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register at the direction of the Debtors or the Plan Administrator, as applicable, without an objection filed and without further notice to or action, order, or approval of the Court.

### G.  Reserve Provisions for Disputed Claims.

Before making any Distribution, the Debtor(s) or Plan Administrator, as applicable, shall reserve Cash required for (i) distribution on Disputed Claims as if such Claims were Allowed as filed and a reasonable amount for Disputed Claims that are unliquidated or contingent, and (ii) payment of accrued or reasonably projected Administration Trust Expenses and Litigation Trust Expenses, in each case in an amount reasonably determined by the Plan Administrator or the Litigation Trustee (the "Disputed Claim Reserve"). On each Distribution date after the Effective Date in which the Plan Administrator makes Distributions to Holders of Allowed Claims, the Plan Administrator shall retain (i) on account of Disputed Claims an amount the Plan Administrator estimates is necessary to fund the Pro Rata Share of such Distributions to Holders of Disputed Claims if such Claims were Allowed, with any Disputed Claims that are unliquidated or contingent being reserved in an amount reasonably determined by the Plan Administrator and (ii) on account of accrued or projected Administration Trust Expenses and Litigation Trust Expenses, an amount that the Plan Administrator or the Litigation Trustee reasonably estimates is necessary to cover such expenses.

The Plan Administrator shall hold property in the Disputed Claim Reserve in trust for the benefit of the Holders of Disputed Claims that are ultimately determined to be Allowed. Each Disputed Claim Reserve shall be closed and extinguished by the Plan Administrator when all Distributions and other dispositions of Cash or other property required to be made hereunder will have been made in accordance with the terms of the Plan. Upon closure of a Disputed Claim Reserve, all Cash or other property held in that Disputed Claim Reserve shall revest in and become unrestricted property of the Plan Administrator. All funds or other property that vest or revest in the Plan Administrator, as applicable, pursuant to this paragraph shall be used to pay by the Plan Administrator in accordance with the Plan and the Administration Trust Agreement, as applicable.

Except as expressly set forth in the Plan, neither the Debtors nor the Plan Administrator shall have any duty to fund any Disputed Claim Reserve except from the Distributable Assets or the Administration Trust Assets, as applicable.

### H.  *De Minimis* Distributions, Rounding.

Notwithstanding anything herein to the contrary, the Debtor(s) or the Plan Administrator, as applicable, shall not be required to make: (i) partial Distributions or payments of fractions of dollars or (ii) a Distribution if the amount to be distributed is or has an economic value of less than one hundred dollars ($100). Any funds so withheld and not distributed shall be held in reserve and distributed in subsequent Distributions.

### I.  Unclaimed and Undeliverable Distributions.

If any Distribution to a Creditor or Beneficiary is returned to the Debtor(s) or Plan Administrator as undeliverable or is unclaimed, no further Distributions to such Creditor or Beneficiary shall be made unless and until the Creditor or Beneficiary claims the missed Distribution by timely notifying the Plan Administrator in writing of its current address along with any other information necessary to make the Distribution to the Creditor or Beneficiary in accordance with this Plan, the Administration Trust Agreement, and applicable law. If the Creditor or Beneficiary provides the Plan Administrator with its current address and such other information necessary to make the Distribution within **ninety (90) days** of the original disbursement, the missed Distribution shall be made to the Creditor or Beneficiary as soon as is practicable, without interest. However, if any Distribution that is undeliverable or otherwise unclaimed is not claimed within **ninety (90) days** of the original disbursement date, such Distribution shall be deemed "unclaimed property" under Bankruptcy Code section 347(b) and forfeited, and the forfeiter shall consequentially lose his status as a Creditor or Beneficiary of the Administration Trust. After the 90-day period to claim property has elapsed, the unclaimed property or interests in property shall revert to the Administration Trust for redistribution to Creditors or Beneficiaries or other disposition in accordance with the terms of the Plan and the Administration Trust Agreement, as applicable. The Claim to such unclaimed property or interest in property shall be forever barred, expunged, and deemed Disallowed, and the holder shall be enjoined from receiving any Distributions under this Agreement and from asserting such Disallowed Claim against the Plan Administrator.

The Plan Administrator may, in its sole discretion, attempt to determine a Creditor's or Beneficiary's current address or otherwise locate a Creditor or Beneficiary, but nothing in this Plan or the Administration Trust Agreement shall require the Plan Administrator to do so.

### J.  Books and Records and Vesting of Privileges.

On the Effective Date, the Debtors shall transfer complete electronic copies of their books and records relating to the Administration Trust Assets and Litigation Trust Assets regardless of original form, manner or media, to the Plan Administrator or Litigation Trustee, as applicable in a form accessible and viewable by the Plan Administrator or Litigation Trustee. The Debtors shall provide any and all digital account information, including passwords, necessary for the Plan Administrator or Litigation Trustee to access the Debtors' books and records relating to the Administration Trust Assets or Litigation Trust Assets on the Effective Date. For the avoidance of doubt, as provided in Section XIV.F, on the Effective Date, the attorney-client privilege, the attorney work product doctrine and any similar privilege against disclosure, and all other similar immunities (all together, "Privileges") belonging to the Debtors or the Estates that concern or in any way relate to any of the Administration Trust Assets or Litigation Trust Assets, or that would apply to communications, documents, or records recorded in magnetic, optical, or other form of electronic medium concerning or in any way relating to any Administration Trust Assets or Litigation Trust Assets, shall vest in the Administration Trust or Litigation Trust, as applicable. The Plan Administrator or Litigation Trustee, as applicable, shall have the sole right to waive Privileges that concern or in any way relate to any of the Administration Trust Assets or Litigation Trust Assets or that would apply to communications, documents, or electronic records concerning or in any way relating to any Administration Trust Assets or Litigation Trust Assets.

## SECTION XIII.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A. Rejection.

Except with respect to: (i) executory contracts or unexpired leases that were previously assumed or rejected by order of the Court, (ii) unexpired leases that were previously the subject of a stipulation filed with the Court, and (iii) executory contracts or unexpired leases that are the subject of a pending motion to assume or reject, pursuant to Section 365 of the Bankruptcy Code, on the Effective Date, each executory contract and unexpired lease entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to Section 365 of the Bankruptcy Code; *provided however,* that nothing in this Section shall cause the rejection, breach, or termination of any contract of insurance benefiting the Debtors and the Estates, the Debtors' officers, managers and directors, and/or the Administration Trust and/or the Litigation Trust. Nothing in this Section shall be construed as an acknowledgement that a particular contract or agreement is executory or is properly characterized as a lease. The Confirmation Order shall constitute an order of the Court approving such rejections pursuant to Section 365 of the Bankruptcy Code, as of the Effective Date. The non-Debtor parties to any rejected personal property leases shall be responsible for taking all steps necessary to retrieve the personal property that is the subject of such executory contracts and leases, and none of the Debtor(s), the Administration Trust, or the Litigation Trust shall bear any liability for costs associated with such matters.

### B. Rejection Claims.

All proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases pursuant to Confirmation of the Plan, if any, must be filed with the Claims Agent within thirty (30) days after the earlier of the Effective Date or an order of the Court approving such rejection. Any Claim arising from the rejection of an executory contract or unexpired lease pursuant to Confirmation of the Plan that is not filed within such times will be subject to objection. All such Claims for which Proofs of Claim are timely and properly filed and ultimately Allowed will be treated as Unsecured Claims.

### C. Insurance Policies.

Except as may be expressly set forth to the contrary herein, Confirmation of the Plan shall not discharge, impair or otherwise modify any obligations of the Insurance Policies. To the extent one or more of the Insurance Policies provide potential coverage related to one or more Causes of Action the Debtors hold or may hold against any Entity, all rights to collect insurance proceeds thereunder with respect to such Causes of Action are hereby assigned to the Plan Administrator as covered by any Insurance Policy (collectively, the "Assigned Insurance Rights"). All net proceeds of Insurance Policies received by the Plan Administrator or Litigation Trust, as applicable, shall be treated as proceeds of such Causes of Action for all purposes under the Plan.

Nothing herein shall diminish or impair the enforceability of the Insurance Policies and related agreements that may cover Claims and Causes of Action against the Debtors or any other Entity.

If the Debtors or the Estates are unable to transfer the Assigned Insurance Rights to the Administration Trust or Litigation Trust, as applicable, then the Debtors and/or any successor to the Debtors under the applicable Insurance Policy shall, at the sole cost and expense of the Administration Trust or Litigation Trust, as applicable, (a) take such actions reasonably requested by the Plan Administrator or Litigation Trustee, as applicable, to pursue any of the Assigned Insurance Rights for the benefit of the Administration Trust or Litigation Trust, as applicable, and (b) promptly transfer to the Administration Trust or Litigation Trust, as applicable, any amounts recovered under or on account of the Assigned Insurance Rights; *provided however*, that while any such amounts are held by or under the control of the Debtors, such amounts shall be held for the benefit of the Administration Trust or the Litigation Trust, as applicable.

## SECTION XIV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

### A. Summary.

As discussed above, on the Effective Date, the Administration Trust and the Litigation Trust will be formed. The Litigation Trust will be a subsidiary trust of the Administration Trust. On the Effective Date, the Debtors will transfer the Administration Trust Assets to the Administration Trust and the Litigation Trust Assets to the Litigation Trust. The Plan Administrator or Litigation Trustee, as applicable, will, among other things, investigate and prosecute those Causes of Action transferred to them. The Litigation Trust will transfer any of its Litigation Recoveries to the Administration Trust for distribution to the Beneficiaries of the Administration Trust. For the avoidance of doubt, Quinn asserts (and other parties dispute) a prior, vested interest in any recoveries of Avoidance Actions asserted against parties receiving any proceeds of the Merger Agreement litigation pursuant to its Charging Lien.

### B. Debtors' Corporate Existence; Corporate Action by Debtors.

On the Effective Date, all Interests in Desktop shall be deemed cancelled, released, and discharged, including all obligations or duties by Desktop relating to the Interests in any of Desktop's formation documents, and Desktop will cease to exist. All Interests in Debtors other than Desktop shall be retained at the option of the Debtors or Administration Trust, as applicable.

On the Effective Date, the matters under the Plan involving or requiring any corporate actions of the Debtors, including but not limited to actions requiring a vote or other approval of the board of directors, managers, members, partners, or other equity holders of the Debtors or the execution of any documentation incident to or in furtherance of the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Court or the managers, members, directors, or officers of the Debtors. Without limiting the generality of the foregoing, on the Effective Date and automatically and without further action, all matters provided under this Plan shall be deemed to be authorized and approved without further approval from the Court. The Confirmation Order shall act as an order modifying the Debtors' organizational documents and operating agreements such that the provisions of this Plan can be effectuated.

On the Effective Date, the employment, retention, appointment and authority of all managers, officers, directors, and employees of the Debtors, including the Independent Directors, the CRO, and the CTO, shall be deemed rejected and terminated. The Plan Administrator shall be deemed to have been admitted as the sole director, officer or manager (as applicable) of the Debtors under applicable non-bankruptcy law and shall be authorized to exercise all of the rights and powers of a sole director, officer or manager (as applicable) for purposes of carrying out the terms, intent, and purposes of this Plan, as more fully set forth herein.

From and after the Effective Date, (i) the Debtors, for all purposes, shall be deemed to have withdrawn their business operations from any states in which they were previously conducting or are registered or licensed to conduct business operations, and neither the Debtors nor the Administration Trust shall be required to file any document, pay any sum or take any other action, in order to effectuate such withdrawal, and (ii) none of the Debtors, the Administration Trust, or the Litigation Trust shall be liable in any manner to any taxing authority for franchise, business, license or similar taxes accruing on or after the Effective Date.

### C.   The Administration Trust.

On the Effective Date, the Administration Trust shall be established pursuant to the Administration Trust Agreement for the purpose of, *inter alia*, (a) administering the Administration Trust Assets, (b) prosecuting and/or resolving all Disputed Claims, (c) determining the validity and priority of any Lien on Collateral; (d) investigating and pursuing any Causes of Action that constitute Administration Trust Assets; and (e) making all Distributions to the Beneficiaries and Claimants provided for under the Plan. The Administration Trust is intended to qualify as a liquidating trust pursuant to Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of the trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Administration Trust. Accordingly, the Plan Administrator shall, in an orderly manner, liquidate and convert to Cash the Administration Trust Assets, and make timely Distributions to the Beneficiaries and Claimants, and not unduly prolong the duration of the Administration Trust. Neither the Administration Trust nor the Plan Administrator shall be or shall be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Administration Trust Agreement.

On the Effective Date, the Administration Trust Assets, including, but not limited to, all the Debtors' books and records related to the Administration Trust Assets, shall vest automatically in the Administration Trust, subject to any valid and enforceable Liens in favor of any Holder of an Allowed Claims in Class 3 (First Lien AHG Claims), Class 4 (Nano Claims), Class 5 (Third Lien AHG Claims), or Class 6 (Quinn Claims) . The Plan shall be considered a motion pursuant to Sections 105, 363 and 365 of the Bankruptcy Code for such relief. The transfer of the Administration Trust Assets to the Administration Trust shall be made for the benefit and on behalf of the Beneficiaries, but subject to the aforementioned Liens. The assets comprising the Administration Trust Assets will be treated as being transferred by the Debtors to the Beneficiaries pursuant to the Plan in exchange for their Allowed Unsecured Claims and then by the Beneficiaries to the Administration Trust in exchange for the beneficial interests in the Administration Trust. The Beneficiaries shall be treated as the grantors and owners of the Administration Trust. Upon the transfer of the Administration Trust Assets, the Administration Trust shall succeed to all the Debtors' rights, title and interest in the Administration Trust Assets, and the Debtors will have no

further interest in or with respect to the Administration Trust Assets. For the avoidance of doubt, upon vesting in the Administration Trust, the Debtors shall have no interest in or control over the Administration Trust Assets or any distributions therefrom to Beneficiaries or Claimants, as applicable.

As soon as possible after the Effective Date, the Plan Administrator shall make a good-faith valuation of the Administration Trust Assets. The valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Administration Trust, the Beneficiaries) for all federal income tax purposes.

### D. **The Litigation Trust.**

On the Effective Date, the Litigation Trust shall be established as a subsidiary trust of the Administration Trust pursuant to the Litigation Trust Agreement for the purpose of, *inter alia*, investigating and pursuing any Causes of Action that constitute Litigation Trust Assets and distributing the Litigation Recoveries to the Administration Trust for distribution to the Beneficiaries of the Administration Trust or other Claimants, as applicable. To facilitate the investigation and pursuit of the Litigation Trust Assets, the Debtors shall provide the Litigation Trust with all documents, communications, other information or materials necessary or desirable to prosecute the Litigation Trust Assets, including, without limitation, access to all of its books, records, and accounts, any and all documents, communications, other information or materials furnished to the independent directors or Weil as part of the prepetition investigation referenced in Section IV.A.5 and any work product prepared by Weil in connection with such investigation. The Litigation Trust is intended to qualify as a liquidating trust pursuant to Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of the trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Litigation Trust.

### E. **Appointment of the Plan Administrator and Litigation Trustee.**

The identity of the Plan Administrator and the Litigation Trustee will be disclosed in the Plan or the Plan Supplement prior to the Confirmation Hearing. From and after the Effective Date, professionals, including, without limitation, Professionals previously employed by the Debtors or the Committee, may be retained by the Plan Administrator and Litigation Trustee as set forth in the Administration Trust Agreement and Litigation Trust Agreement, as applicable, without further need for documentation or Court approval. All fees and expenses incurred by the professionals retained by the Plan Administrator and Litigation Trustee following the Effective Date shall be paid from the Administration Trust Assets or Litigation Trust Assets (including any interest or other income generated therefrom) in accordance with the Administration Trust Agreement and Litigation Trustee Agreement, without need for Court approval.

### F. **Rights and Powers of the Plan Administrator and Litigation Trustee.**

#### 1. **Plan Administrator**

The Plan Administrator shall be deemed the Estates' representative with respect to the Administration Trust Assets in accordance with Section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the Administration Trust Agreement, including, without limitation, the powers of a trustee under Sections 704 and 1106 of the Bankruptcy Code and Rule

2004 of the Bankruptcy Rules to act on behalf of the Administration Trust. Without limiting the foregoing, the Plan Administrator will have the right to, among other things, (a) effect all actions and execute all agreements, instruments and other documents necessary to implement the applicable provisions of the Plan and the Administration Trust Agreement; (b) liquidate, sell, abandon, or otherwise dispose of all Administration Trust Assets in accordance with the Plan and the Administration Trust Agreement; (c) make all Distributions to Beneficiaries or Claimants in accordance with the Plan and the Administration Trust Agreement; (d) administer the Administration Trust in accordance with the Plan and the Administration Trust Agreement; (e) establish and administer any necessary reserves for Disputed Claims that may be required; (f) object to Disputed Claims and prosecute, settle, compromise, withdraw or resolve such objections in any manner approved by the Court; (g) assert or waive any attorney-client privilege on behalf of the Debtors and Estates with regard to the Administration Trust Assets; (h) investigating and pursuing any Causes of Action that constitute Administration Trust Assets; (i) determine the extent and priority of any Lien on Collateral and bring any Cause of Action related thereto, including any Priority Disputes; and (j) employ and compensate professionals and other agents in accordance with the Administration Trust Agreement or the Plan, *provided however*, that any such compensation shall be made only out of the Administration Trust Assets (including any litigation financing provided and interest, or other income generated therefrom), to the extent not inconsistent with the status of the Administration Trust as a liquidating trust within the meaning of Treas. Reg. § 301.7701-4(d) for federal income tax purposes.

Except as otherwise provided in the Administration Trust Agreement, if, in the Plan Administrator's reasonable judgment, any Administration Trust Assets cannot be sold in a commercially reasonable manner or have inconsequential value to the Administration Trust and/or the Beneficiaries or Claimants, the Plan Administrator may cause the Administration Trust to abandon or otherwise dispose of such Administration Trust Assets (including, but not limited to, by way of donation to a non-profit 501(c)(3) organization that the Plan Administrator may select in his or her sole discretion) without further order of the Court, and with notice only to parties that are known to assert a Lien on such property, if any, which parties shall receive at least ten business days' written notice of the proposed abandonment in parties may object to such abandonment.

Except as otherwise expressly provided in this Plan or the Administration Trust Agreement, as applicable, from and after the Effective Date, the Plan Administrator may exercise all powers, rights, and discretion conferred under this Plan or the Administration Trust Agreement without further order or approval of the Court and without accounting to the Court. Notwithstanding the foregoing, the Plan Administrator shall have the right to submit to the Court any question or questions, disputes, or other issues regarding which the Plan Administrator may desire to have explicit approval of the Court for the taking of any specific action proposed to be taken by the Administration Trust with respect to any of the Administration Trust Assets, this Plan, or the Administration Trust Agreement (including, without limitation, the administration, or distribution of any Administration Trust Assets), and the Court shall retain jurisdiction and power for such purposes and shall approve or disapprove any such proposed action upon motion by the Administration Trust.

Any abatement, interruption, or tolling of the statutes of limitation pertaining to the Administration Trust Assets in favor of the Debtors or the Estates shall also apply to the benefit of

the Plan Administrator; for the avoidance of doubt, the Plan Administrator shall be construed to be a "trustee" for purposes of 11 U.S.C. § 108.

## 2. Litigation Trustee

The Litigation Trustee shall be deemed the Estates' representative with respect to the Litigation Trust Assets in accordance with Section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the Litigation Trust Agreement, including, without limitation, the powers of a trustee under Sections 704 and 1106 of the Bankruptcy Code and Rule 2004 of the Bankruptcy Rules to act on behalf of the Litigation Trust. Without limiting the foregoing, the Litigation Trustee will have the right to, among other things, (a) effect all actions and execute all agreements, instruments and other documents necessary to implement the applicable provisions of the Plan and the Litigation Trust Agreement; (b) investigate and pursue any Causes of Action that constitute Litigation Trust Assets, (c) distribute the Litigation Recoveries to the Administration Trust for distribution to the Beneficiaries of the Administration Trust or Claimants, as applicable; and (c) employ and compensate professionals and other agents in accordance with the Litigation Trust Agreement or the Plan, *provided however*, that any such compensation shall be made only out of the Litigation Trust Assets (including any litigation financing provided and interest, or other income generated therefrom), to the extent not inconsistent with the status of the Litigation Trust as a liquidating trust within the meaning of Treas. Reg. § 301.7701-4(d) for federal income tax purposes.

Except as otherwise expressly provided in this Plan or the Litigation Trust Agreement, as applicable, from and after the Effective Date, the Litigation Trustee may exercise all powers, rights, and discretion conferred under this Plan or the Litigation Trust Agreement without further order or approval of the Court and without accounting to the Court. Notwithstanding the foregoing, the Litigation Trustee shall have the right to submit to the Court any question or questions, disputes, or other issues regarding which the Litigation Trustee may desire to have explicit approval of the Court for the taking of any specific action proposed to be taken by the Litigation Trust with respect to any of the Litigation Trust Assets, this Plan, or the Litigation Trust Agreement (including, without limitation, the administration, or distribution of any Litigation Trust Assets), and the Court shall retain jurisdiction and power for such purposes and shall approve or disapprove any such proposed action upon motion by the Litigation Trust.

Any abatement, interruption, or tolling of the statutes of limitation pertaining to the Litigation Trust Assets in favor of the Debtors or the Estates shall also apply to the benefit of the Litigation Trustee; for the avoidance of doubt, the Litigation Trustee shall be construed to be a "trustee" for purposes of 11 U.S.C. § 108.

## G. Fees and Expenses of the Administration Trust and Litigation Trust.

The Administration Trust Expenses and Litigation Trust Expenses incurred on or after the Effective Date shall be paid in accordance with the Administration Trust Agreement and Litigation Trust Agreement, as applicable, without further order of the Court.

The Administration Trust and the Litigation Trust may incur litigation funding obligations secured by Litigation Recoveries upon notice to the Beneficiaries of the Administration Trust who have filed an appearance in the Chapter 11 Cases and subject to the approval of the Court.

### H.  Transfer of Beneficial Interests in the Administration Trust.

Any restrictions on the transferability of the Administration Trust Interests, if any, shall be included in the Administration Trust Agreement.

### I.  Administration Account.

On or as soon as practicable following the Effective Date, the Administration Account shall be opened by the Plan Administrator and funded with the Available Cash, which Cash shall constitute an Administration Trust Asset. Thereafter, from time to time, upon receipt of any Liquidation Proceeds relating to the Administration Trust Assets, the Plan Administrator shall deposit such funds into the Administration Account, and they shall become part of the Administration Trust Assets, subject to any Liens thereon.

### J.  Limited Substantive Consolidation.

Under the Plan, there shall be limited substantive consolidation of the Debtors' Estates solely for the purposes of voting on the Plan by the Holders of Claims, reconciling Claims, and making Distributions to Holders of Claims. Specifically, on the Effective Date, (i) all assets and liabilities of the Debtors will, solely for voting and Distribution purposes, be treated as if they were merged, (ii) each Claim against the Debtors will be deemed a single Claim against and a single obligation of the Debtors, (iii) any Claims filed or to be filed in the Chapter 11 Cases will be deemed single Claims against all of the Debtors, (iv) all guarantees of any Debtor of the payment, performance, or collection of obligations of any other Debtor shall be eliminated and canceled, (v) all transfers, disbursements and Distributions on account of Claims made by or on behalf of any of the Debtors' Estates hereunder will be deemed to be made by or on behalf of all of the Debtors' Estates, and (vi) any obligation of the Debtors as to Claims will be deemed to be one obligation of all of the Debtors. Holders of Allowed Claims entitled to Distributions under the Plan shall be entitled to their share of assets available for Distribution to such Claim without regard to which Debtor was originally liable for such Claim. Except as set forth herein, such limited substantive consolidation shall not (other than for purposes related to this Combined Disclosure Statement and Plan) affect the legal and corporate structures of the Debtors.

However, such deemed consolidation shall not (other than for purposes related to funding Distributions under the Plan) affect (i) the legal and organizational structure of the Debtors, (ii) executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been or will be assumed, assumed and assigned, or rejected (which, for the avoidance of doubt, shall be entitled to a single recovery as set forth in the preceding paragraph), (iii) any agreements entered into by the Administration Trust or the Litigation Trust on or after the Effective Date, (iv) the ability of the Debtors, the Committee, the Administration Trust, or the Litigation Trust to subordinate or otherwise challenge Claims on an entity by entity basis, and (iv) the ability of the Debtors, the Committee, the Administration Trust, or the Litigation Trust, as applicable, to commence and prosecute any Avoidance Actions, including but not limited to Lien Avoidance

Actions, preferential transfers, and fraudulent conveyances, against any Person or Entity as if there was no substantive consolidation, including payments or transfers by and among the Debtors and any related or affiliated Entity prior to the Petition Date.

The Plan shall serve as a motion seeking entry of an order substantively consolidating the Chapter 11 Cases for distribution and voting purposes as provided above. Unless an objection to substantive consolidation is made in writing by any Creditor or Interest holder affected by the Plan on or before the applicable objection deadline set by the Court, an order substantively consolidating the Chapter 11 Cases for distribution and voting purposes (which order may be the Confirmation Order) may be entered by the Court.

Notwithstanding the substantive consolidation herein, substantive consolidation shall not affect the obligation of each and every one of the Debtors under 28 U.S.C. § 1930(a)(6) until a particular case is closed, converted, or dismissed.

## K.  Litigation / Causes of Action.

Except as otherwise provided herein, all Litigation and/or Causes of Action are retained, preserved, and vested in the Administration Trust and Litigation Trust, as applicable, pursuant to the Plan and Section 1123(b) of the Bankruptcy Code. From and after the Effective Date, all Litigation and/or Causes of Action will be prosecuted or settled by the Plan Administrator or Litigation Trustee, as applicable, in accordance with the terms of the Plan, the Administration Trust Agreement, and the Litigation Trustee Agreement, as applicable. To the extent any Litigation and/or Causes of Action is already pending on the Effective Date, the Plan Administrator or Litigation Trustee, as applicable, will continue the prosecution of such Litigation and/or Cause of Action as successor to the Debtors and shall be substituted as plaintiff, defendant, or in any other capacity for the Debtors pursuant to the Plan and the Confirmation Order on the Effective Date, without need for any further motion practice or notice in any case, action, or matter. The Plan Administrator and Litigation Trustee, as applicable, shall have standing and authority to pursue, prosecute, settle, abandon, or compromise all Litigation and/or Causes of Action.

## L.  Dissolution of the Committee.

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Cases, except in connection with (i) final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto); and (ii) any appeals of the Confirmation Order. For the avoidance of doubt, the Administration Trust and the Plan Administrator have no responsibility or obligation to review or object to any fee applications of any Professionals for services rendered prior to the Effective Date. The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fee Claims pending on the Effective Date or filed and served after the Effective Date. Nothing in the Plan shall prohibit or limit the ability of any Professional to represent the Plan Administrator or Litigation Trust or to be

compensated or reimbursed per the Plan and the Administration Trust Agreement in connection with such representation.

### M. Cancellation of Prepetition Loan Documents; Distributions.

Other than as expressly set forth herein, the Prepetition Loan Documents shall be deemed cancelled, discharged, and of no force or effect on the Effective Date, except as necessary to (a) enforce the rights, claims, and interests of the Prepetition Agents; (b) allow the receipt of and to make distributions under the Plan in accordance with the terms of the Prepetition Loan Documents; and (c) preserve any rights of the Prepetition Agents and any predecessor thereof to seek compensation and reimbursement, to payment of fees, expenses, and indemnification obligations as against any property distributable to the Prepetition Loan Documents, including any rights to priority of payment and/or to exercise charging liens, and to enforce their rights, claims, and interests, vis-à-vis any party other than the Debtors.

For the avoidance of doubt, any cash distributions payable on a Convertible Senior Note, First Lien AHG Secured Note, Nano Secured Note, or Third Lien AHG Secured Note shall be paid to the applicable Prepetition Agent to be further distributed pursuant to and in accordance with the applicable Prepetition Loan Document, and all such distributions shall be subject to the applicable Prepetition Agent's charging lien, if any, under the applicable Prepetition Loan Document. All distributions under the Plan shall be deemed completed when made to the respective Prepetition Agent.

### N. Termination After Five Years and Extension.

If, by the fifth anniversary of the Effective Date, the Administration Trust or Litigation Trust has not been previously terminated in accordance with the terms of the Administration Trust Agreement or Litigation Trust Agreement, as applicable, then the Plan Administrator shall immediately distribute all Administration Trust Assets to the Beneficiaries in accordance with this Plan; immediately thereafter, the Administration Trust and the Litigation Trust shall terminate and neither the Plan Administrator nor the Litigation Trustee shall have no further responsibility in connection therewith except as otherwise set forth in the Administration Trust Agreement or Litigation Trust Agreement, as applicable.

Notwithstanding the foregoing, within 120 days of the expiration of the five-year period, the Plan Administrator or Litigation Trustee may file a motion with the Court requesting an extension of the term of the Administration Trust or Litigation Trust. An extension shall only be granted if the Court determines that: (i) an extension is necessary to facilitate or complete the recovery on Administration Trust Assets or Litigation Trust Assets and (ii) further extension would not adversely affect the status of the Administration Trust or Litigation Trust as a liquidating trust for federal income tax purposes. For purposes of this Section, a favorable letter ruling from the Internal Revenue Service shall be conclusive proof that further extension would not adversely affect the status of the Administration Trust or Litigation Trust as a liquidating trust for federal income tax purposes, but such ruling is not a prerequisite of such extension.

## SECTION XV.
## EFFECT OF CONFIRMATION

### A.  Binding Effect of the Plan.

The provisions of the confirmed Plan shall bind the Debtors, the Administration Trust, the Plan Administrator, the Litigation Trust, the Litigation Trustee, any Entity acquiring property under the Plan, any Beneficiary, and any Creditor or Interest Holder, whether or not such Creditor or Interest Holder has filed a Proof of Claim or Interest in the Chapter 11 Cases, whether or not the Claim of such Creditor or the Interest of such Interest Holder is impaired under the Plan, and whether or not such Creditor or Interest Holder has accepted or rejected the Plan. All Claims and Debts shall be fixed and adjusted pursuant to the Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, or Governmental Unit or parish in which any instrument related to under the Plan or related to any transaction contemplated under the Plan is to be recorded with respect to any taxes of the kind specified in Bankruptcy Code Section 1146(a).

### B.  Vesting of Assets.

Upon the Effective Date, title to all Administration Trust Assets and Litigation Trust Assets shall vest in the Administration Trust and Litigation Trust, respectively, and shall be retained by the Administration Trust and Litigation Trustee for the purposes contemplated under the Plan pursuant to the Administration Trust Agreement and Litigation Trust Agreement, as applicable. Without limiting the generality of the foregoing, all Causes of Action the Debtors hold or may hold against any Entity that constitute Administration Trust Assets or Litigation Trust Assets, Litigation Recoveries that constitute Litigation Trust Assets, rights to Liquidation Proceeds that constitute Litigation Trust Assets, and all resulting proceeds of the foregoing shall vest in the Administration Trust or Litigation Trust, as applicable, upon the Effective Date. Upon vesting in the Administration Trust or Litigation Trust, the Administration Trust Assets and Litigation Trust Assets shall no longer constitute property of the Estates.

### C.  Property Free and Clear.

Except as otherwise provided in the Plan or the Confirmation Order, all property that shall vest in the Administration Trust or Litigation Trust, as applicable, shall be free and clear of all Claims, Interests, Liens, charges, or other encumbrances of Creditors or Interest Holders, other than as set forth herein, in the Plan, the Administration Trust Agreement, the Litigation Trust Agreement, in relevant documents, agreements, and instruments contained in the Plan Supplement, or as provided by Law. Following the Effective Date, the Plan Administrator or Litigation Trustee may, subject to the terms of the Administration Trust Agreement and Litigation Trust Agreement, as applicable, transfer, abandon, or otherwise dispose of any such property free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Rules and without further approval of the Court or notice to Creditors, except as may otherwise be required under the Plan or the Confirmation Order.

## SECTION XVI.
## EXCULPATIONS, INJUNCTIONS, AND RELEASES

### A. Exculpation.

The Exculpated Parties will neither have nor incur any liability to any entity for any action in good faith taken or omitted to be taken between the Petition Date and Effective Date in connection with or related to the Chapter 11 Cases, the Sale Orders, the Additional Sale Orders, the sale or other disposition of the Debtors' assets or the formulation, preparation, dissemination, implementation, Confirmation, or Consummation of the Plan, the Disclosure Statement, or any agreement created or entered into in connection with the Plan; *provided however*, that this limitation will not affect or modify the obligations created under the Plan, or the rights of any Holder of an Allowed Claim to enforce its rights under the Plan, and shall not release any action (or inaction) constituting willful misconduct, fraud, or gross negligence (in each case subject to determination of such by Final Order of a court of competent jurisdiction); *provided however,* that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan, and such reasonable reliance shall form a defense to any such claim, Cause of Action, or liability. Without limiting the generality of the foregoing, each Exculpated Party shall be entitled to and granted the protections of Section 1125(e) of the Bankruptcy Code.

### B. Debtor Releases.

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, on and after and subject to the occurrence of the Effective Date, the Debtors and the Estates (collectively, the "Debtor/Estate Releasors") shall release each Released Party, and each Released Party is deemed released by the Debtor/Estate Releasors from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtor/Estate Releasors, as applicable, whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that the Debtor/Estate Releasors would have been legally entitled to assert in its own right, or on behalf of the Holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' liquidation, the Chapter 11 Cases, the Sale Orders, the Additional Sale Orders, the purchase, sale, transfer of any security, asset, right, or interest of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan or related agreements, instruments, or other documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on and before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, self-dealing, willful misconduct, or gross negligence (the "Debtor/Estate Release"); *provided however*, the foregoing Debtor/Estate Release shall not operate to waive or release**

any obligations of any party under the Plan or any other document, instrument, or agreement executed to implement the Plan.

Notwithstanding the foregoing, (x) the releases herein do not release and are not intended to affect in any manner the ability of the Administration Trust, the Litigation Trust, or the Debtors or Debtors' Estates to bring any and all Causes of Action arising out of claims associated with the acquisition of the Debtors by Nano or the movement of funds associated with that Merger, (y) nothing herein shall immunize any persons or entities whom/which received or are entitled to receive monies from the acquisition of Debtors by Nano with respect to such monies (except that each current or former employee who is a Released Party who received or is allocated to receive any payment(s) that, in the aggregate, do not exceed $50,000 from the acquisition of the Debtors by Nano on account of such employees' restricted stock units and those employees identified in the footnote to this sentence (the identified employees, the "RSU Specified Employees") who received or are allocated to receive payments from the acquisition of the Debtors by Nano on account of such employees' restricted stock units shall be released of any claims by the Debtors or their Estates solely relating to such payments (the "RSU Payment Releases"), and (z) without limiting the foregoing, Vison & Elkins LLP ("V&E") also shall not be released from any claims or causes of action arising from any actual conflict with respect to V&E's representation of the Debtors resulting from V&E's prepetition representation of Nano.[10]

In exchange for receipt of the RSU Payment Releases, each of the RSU Specified Employees agree to: (i) use commercially reasonable best efforts to cooperate with the Plan Administrator and the Administration Trust in the liquidation of the Administration Trust Assets, and (ii) with respect the RSU Specified Employees who currently serve as COO and Chief Technology Officer cooperate in good faith with the Litigation Trustee's investigation of any of the Litigation Trust Specified Causes of Action (as defined in the Litigation Trust Agreement), which cooperation shall include, at the minimum, (x) undertaking reasonable best efforts to assist in such investigation and (y) promptly after the Effective Date and without the need for a subpoena, (1) sitting for an interview with the Litigation Trustee and his counsel concerning any of the Litigation Trust Specified Causes of Action and (2) providing to the Litigation Trustee and his counsel copies of all text messages and emails in their personal possession or control relevant in any way to the Merger.

Entry of the Confirmation Order shall constitute the Court's approval of the Debtor/Estate Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Court's finding that the Debtor/Estate Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (c) fair, equitable, and reasonable; (d) given and made after due notice and opportunity for hearing; and (e) a bar to any of the Debtor/Estate Releasors asserting any Claim or Cause of Action released pursuant to the Debtor/Estate Release.

---

[10] "RSU Specified Employees" means (a) Thomas Nogueira, (b) Maor Ben David, (c) Jonah Myerberg, (d) Rick D. Lucas, (e) Christopher K. May, (f) Mark Adamske, (g) Adam Brewer, and (h) Patrick Morrissey.

C. **Injunction.**

In implementation of the Plan, except as otherwise expressly provided in the Confirmation Order or the Plan, as applicable, and except in connection with the enforcement of the terms of the Plan or any documents provided for or contemplated in the Plan, all entities who have held, hold or may hold Claims against or Interests in the Debtors, the Administration Trust, the Litigation Trust, or the Estates that arose prior to the Effective Date are permanently enjoined from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against the Debtors, the Estates, the Administration Trust, the Litigation Trust, or any of the Administration Trust Assets or Litigation Trust Assets, with respect to any such Claim or Interest; (b) the enforcement, attachment, collection, or recovery by any manner or means, directly or indirectly, of any judgment, award, decree, or order against the Debtors, the Estates, the Administration Trust, the Litigation Trust, or any of the Administration Trust Assets or Litigation Trust Assets with respect to any such Claim or Interest; (c) creating, perfecting, or enforcing, directly or indirectly, any Lien or encumbrance of any kind against the Debtors, the Estates, or the Administration Trust, the Litigation Trust, or any of the Administration Trust Assets or Litigation Trust Assets with respect to any such Claim or Interest; (d) commencing or prosecuting any action or proceeding that asserts or seeks recovery upon any Cause of Action that any of the Estates holds or may hold against any Entity as of Confirmation (or as of immediately before the occurrence of the Effective Date); and (e) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim or Interest or otherwise. Nothing contained in this Section shall prohibit the Holder of a timely filed Proof of Claim from litigating its right to seek to have such Claim declared an Allowed Claim and paid in accordance with the distribution provisions of the Plan, or enjoin or prohibit the interpretation or enforcement by the Claimant of any of the obligations of the Debtors, the Administration Trust, or Litigation Trust under the Plan. Nothing in this Section or the Plan is intended to, nor shall it be construed to, limit any party's rights against any party that is not a Released Party to the extent, and solely to the extent, that (i) such rights are direct rights of the party asserting a claim against the non-Released Party and are not derivative of any right or claim of any Debtor, Estate, the Administration Trust, or the Litigation Trust against such non-Released Party and (ii) such rights are not based on allegations of harm to any Debtor, Estate, the Administration Trust, or the Litigation Trust. For the avoidance of doubt, nothing herein shall preclude any party from intervening, in its own right, in any action or other proceeding commenced by or on behalf of the Debtors, the Estates, the Administration Trust, or the Litigation Trust, or from initiating any such action or other proceeding, solely in its own right and solely to the limited extent set forth in the previous sentence and otherwise in conformity with the provisions of the Plan, the Bankruptcy Code, and any other applicable law. The Bankruptcy Court shall have exclusive jurisdiction to determine whether the conditions in clauses (i) and (ii) above have been satisfied.

D.  **Survival of Exculpation and Indemnification.**

All rights of the Persons exculpated and indemnified pursuant hereto shall survive confirmation of the Plan.

E.  **Preservation of Rights of Action.**

Except as otherwise provided in the Plan or Confirmation Order, as applicable, in accordance with Section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtors hold or may hold against any Entity shall vest upon the Effective Date in the Administration Trust and Litigation Trust, as applicable.

Except as otherwise provided in the Confirmation Order, after the Effective Date, the Plan Administrator and Litigation Trustee, as applicable, shall have the exclusive right to institute, prosecute, abandon, settle, or compromise any Causes of Action the Estates hold or may hold against any Entity, in accordance with the terms of the Plan, the Administration Trust Agreement, and the Litigation Trust Agreement, as applicable, and without further order of the Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in the Chapter 11 Cases.

Administration Trust Assets, including the Litigation Trust Interests, and recoveries therefrom shall remain the sole property of the Administration Trust for the ratable benefit of the Beneficiaries of the Administration Trust or Claimants, and holders of Unsecured Claims shall have no direct right or interest in any such Administration Trust Assets or recovery therefrom.

F.  **Preservation of All Causes of Action Not Expressly Settled or Released.**

Unless a Cause of Action against a holder of a Claim or other Entity is expressly waived, relinquished, released, compromised, or settled in the Plan (including, without limitation, pursuant to the Debtor/Estate Release) and/or or any Final Order (including the Confirmation Order), the Debtors, the Plan Administrator, and Litigation Trustee expressly reserve such retained Cause of Action for later adjudication by the Plan Administrator or Litigation Trustee, as applicable (including, without limitation, Causes of Action not specifically identified or described in the Plan Supplement or elsewhere, or of which the Debtors may be presently unaware, or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time, or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, Plan, or Confirmation Order, except where such Causes of Action have been released or otherwise resolved by a Final Order (including the Confirmation Order). In addition, the Debtors, the Plan Administrator, and the Litigation Trustee expressly reserve the right to pursue or adopt claims alleged in any lawsuit in which the Debtors are defendants or interested parties against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Subject to the immediately preceding paragraph, any Entity to which the Debtors have incurred an obligation (whether on account of services, the purchase or sale of goods, or

otherwise), or that has received services from the Debtors or a transfer or money or property of the Debtors, or that has transacted business with the Debtors, or that has leased property from the Debtors, should assume and is hereby advised that any such obligation, transfer, or transaction may be reviewed by the Litigation Trustee subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether (i) such Entity has filed a proof of claim against the Debtors in the Chapter 11 Cases; (ii) the Debtors or Plan Administrator have objected to any such Entity's proof of claim; (iii) any such Entity's Claim was included in the Schedules; (iv) the Debtors or Plan Administrator have objected to any such Entity's scheduled Claim; (v) any such Entity's scheduled Claim has been identified by the Debtors or Plan Administrator as disputed, contingent, or unliquidated; or (vi) the Debtors have identified any potential claim or Cause of Action against such Entity herein or in the Disclosure Statement.

### G.  Reservation of Governmental Unit Rights

Nothing in this Order, the Plan, or Plan Documents discharges, releases, precludes, or enjoins any liability to a Governmental Unit of a non-debtor. Nothing in this Order, the Plan, or Plan Documents shall affect any setoff or recoupment rights of any Governmental Unit.

### SECTION XVII.
### CONDITIONS PRECEDENT TO CONFIRMATION
### AND CONSUMMATION OF THE PLAN

### A.  Conditions to Confirmation of the Plan.

Confirmation of the Plan is conditioned upon the satisfaction of each of the following conditions precedent, any one or more of which may be waived by the Debtors, in consultation with the Committee and the Ad Hoc Noteholder Group: (i) the Court shall have approved this Combined Disclosure Statement and Plan; and (ii) the Debtors shall have determined that there will be sufficient Cash on the Effective Date to pay (or with respect to Disputed Claims to reserve for as required pursuant to the Plan) Allowed Administrative Claims, Non-Tax Priority Claims, and Priority Tax Claims in full (or in such lesser amount as may be agreed to by the applicable Claimant).

### B.  Conditions to the Effective Date.

The occurrence of the Effective Date is conditioned upon the satisfaction of each of the following conditions precedent, any one or more of which may be waived by the Debtors, in consultation with the Committee and the Ad Hoc Noteholder Group: (i) a Confirmation Order in form and substance reasonably acceptable to the Debtors shall have been entered by the Court and become a Final Order which is not subject to any stay of effectiveness; (ii) the Debtors have determined (in consultation with the Committee and the Ad Hoc Noteholder Group) that all Estate assets that can be sold have been sold; (iii) the Administration Trust shall have been created pursuant to the terms of the Plan, the Plan Administrator shall have been appointed by order of the Court (which may be the Confirmation Order), and the Administration Trust Agreement shall have been executed by the Plan Administrator; (iv) the Litigation Trust shall have been created pursuant to the terms of the Plan, the Litigation Trustee shall have been appointed by order of the Court (which may be the Confirmation Order), and the Litigation Trust Agreement shall have been

executed by the Litigation Trustee; and (v) all other actions and documents determined by the Debtors to be necessary to implement the Plan shall have been effected and executed.

### C. **Waiver of Conditions Precedent.**

To the fullest extent permitted by law, the conditions to the Effective Date set forth in Section XVII. may be waived or modified in whole or in part at any time in writing by the Debtors without leave from or an order of the Court.

## SECTION XVIII.
## RETENTION OF JURISDICTION

From and after the Confirmation Date, the Court shall retain such jurisdiction as is legally permissible, including, but not limited to, for the following purposes:

- To hear and determine any and all objections to the allowance of a Claim, proceedings to estimate a Claim for any purpose, actions to equitably subordinate a Claim, proceedings seeking approval of any necessary claims reconciliation protocols, Priority Disputes, or any controversy as to the classification of a Claim in a particular Class under the Plan;

- To administer the Plan, the Administration Trust, the Administration Trust Assets, the Litigation Trust, and the Litigation Trust Assets, and the proceeds thereof;

- To estimate or liquidate any Disputed Claims;

- To hear and determine any and all adversary proceedings, contested matters or applications pending on the Effective Date or otherwise relating to, arising from, or in connection with the Litigation and/or Causes of Action (whether or not pending on the Effective Date); *provided however*, that the Plan Administrator and Litigation Trustee, as applicable, shall reserve the right to commence actions in all appropriate jurisdictions, including, but not limited to, the Court from and after the Effective Date;

- To enable the Plan Administrator and Litigation Trustee to commence and prosecute any Litigation and/or Causes of Action which may be brought after the Effective Date whether in the Court or another court of competent jurisdiction;

- To hear and determine any and all motions and/or objections to fix, estimate, allow and/or disallow any Claims arising therefrom;

- To hear and determine any and all applications by Professionals for an award on account of any Professional Fee Claims;

- To interpret and/or enforce the provisions of the Plan and the injunction provided for in the Plan and to determine any and all disputes arising under or regarding interpretation of the Plan or any agreement, document, or instrument contemplated by the Plan;

- To enter and implement such orders as may be appropriate in the event Confirmation is for any reason stayed, reversed, revoked, modified, or vacated;

- To modify any provision of the Plan to the extent permitted by the Bankruptcy Code and to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

- To enter such orders as may be necessary or appropriate in furtherance of Confirmation and the successful implementation of the Plan and to determine such other matters as may be provided for in the Confirmation Order or as may be authorized under the provisions of the Bankruptcy Code;

- To enter any orders as required by Rule 23 of the Federal Rules of Civil Procedure, to the extent made applicable to any adversary proceeding pursuant or contested matter pursuant to Bankruptcy Rules 7023 and 9014(c), as applicable;

- To close the Chapter 11 Cases when the administration of the Chapter 11 Cases has been completed;

- To adjudicate a motion to extend the term of the Administration Trust or Litigation Trust as provided under Section XIV.N hereof (whether or not the Chapter 11 Cases have been otherwise closed); and

- To hear and adjudicate any matters concerning the Administration Trust, the Litigation Trust, and any other matters related to the implementation of the Plan.

## SECTION XIX.
## MISCELLANEOUS PROVISIONS

### A.  Payment of Statutory Fees.

All fees payable under section 1930 of chapter 123 of title 28 of the United States Code shall be paid on the Effective Date, or when due.

As of the Effective Date, the Administrative Trust may seek to close any of the Debtors' cases by filing a motion for entry of a final decree. The Voting Agent is authorized to destroy all paper/hardcopy records related to this matter two years after the Effective Date has occurred.

### B.  Revocation of the Combined Plan and Disclosure Statement.

The Debtors, in consultation with the Committee and the Ad Hoc Noteholder Group, reserve the right to revoke and withdraw the Combined Plan and Disclosure Statement at any time on or before the Confirmation Date. If the Debtors revoke or withdraw the Combined Plan and Disclosure Statement, or if Confirmation or the Effective Date does not occur, then the Plan shall be deemed null and void and, in such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors.

C. **Severability of Plan Provisions.**

In the event that, prior to the Confirmation Date, any term or provision of the Plan is held by the Court to be invalid, void, or unenforceable, the Court shall, with the consent of the Debtors, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision hereof, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

D. **Exhibits.**

All exhibits attached to the Combined Plan and Disclosure Statement and the Plan Supplement are, by this reference, hereby incorporated herein. The Debtors, in consultation with the Committee and the Ad Hoc Noteholder Group, reserve the right to make non-substantive changes and corrections to such Exhibits in advance of the Confirmation Hearing. If any Exhibits are changed or corrected, the replacement Exhibits will be filed with the Court prior to the commencement of the Confirmation Hearing.

E. **Notices.**

All notices required or permitted to be made in accordance with the Plan shall be in writing and shall be delivered personally or by nationally recognized overnight or next-day courier service, first-class mail, electronic mail, or via facsimile with electronic confirmation of receipt as follows:

Counsel for Debtors:

PACHULSKI STANG ZIEHL & JONES LLP
Michael D. Warner (SBT 00792304)
Maxim B. Litvak (SBT 24002482)
Benjamin L. Wallen (SBT 24102623)
700 Louisiana Street, Suite 4500
Houston, TX 77002
Telephone: (713) 691-9385
Facsimile: (713) 691-9407
mwarner@pszjlaw.com
mlitvak@pszjlaw.com
bwallen@pszjlaw.com

-and-

Richard M. Pachulski (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor

Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
rpachulski@pszjlaw.com
gdemo@pszjlaw.com

Counsel for the Committee:

MUNSCH HARDT KOPF & HARR, P.C.
Deborah Perry (SBT 24002755)
Brenda L. Funk (SBT 24012664)
700 Milam St., Suite 800
Houston, TX 77002
Telephone: (713) 222-1470
Facsimile: (713) 222-1475
dperry@munsch.com
bfunk@munsch.com

-and-

LOWENSTEIN SANDLER LLP
Eric S. Chafetz (admitted *pro hac vice*)
Daniel B. Besikof (admitted *pro hac vice*)
Gianfranco Finizio (admitted *pro hac vice*)
Eric James Seltzer (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 262-6700
Facsimile: (212) 262-7402
echafetz@lowenstein.com
dbesikof@lowenstein.com
gfinizio@lowenstein.com
eseltzer@lowenstein.com

Plan Administrator:

Paul Navid
Amanda (Demby) Swift
Province Fiduciary Services, LLC
11111 Santa Monica Blvd, #525
Los Angeles, CA 90025
Telephone: (702) 685-5555
pnavid@provincefirm.com
ademby@provincefirm.com

**F.   Reservation of Rights.**

Neither the filing of the Combined Plan and Disclosure Statement nor any statement or provision contained in the Combined Plan and Disclosure Statement, nor the taking by any party in interest of any action with respect to the Plan, shall: (a) be or be deemed to be an admission against interest and (b) until the Effective Date, be or be deemed to be a waiver of any rights any party in interest may have (i) against any other party in interest, or (ii) in or to any of the assets of any other party in interest, and, until the Effective Date, all such rights are specifically reserved. In the event that the Plan is not confirmed or fails to become effective, neither the Combined Plan and Disclosure Statement nor any statement contained in the Combined Plan and Disclosure Statement may be used or relied upon in any manner in any suit, action, proceeding, or controversy within or without the Chapter 11 Cases involving the Debtors, except with respect to Confirmation of the Plan.

Notwithstanding anything to the contrary contained herein, nothing herein shall prevent Quinn from arguing that its Liens, Interests, and Claims (prepetition or post-petition) are senior and/or of equal ranking to the Liens, Interests, and claims of the Convertible Senior Noteholders, the Nano Lender, or the AHG Lenders, and all other parties' rights are reserved with respect to the enforceability, perfection, priority, avoidability, or validity of Quinn's Liens, Interests, and Claims. Nothing herein shall be deemed to be determinative of any Priority Dispute, and all assets subject of a Priority Dispute shall be reserved until such Priority Dispute is settled by the parties thereto, or adjudicated by a Final Order.

**G.   Defects, Omissions and Amendments.**

The Debtors, in consultation with the Committee and the Ad Hoc Noteholder Gorup, may, with the approval of the Court and without notice to all Holders of Claims or Interests, insofar as it does not materially and adversely affect Holders of Claims, correct any defect, omission, or inconsistency in the Plan in such manner and to such extent as may be necessary or desirable to expedite the execution of the Plan. The Plan may be altered or amended before or after Confirmation as provided in Section 1127 of the Bankruptcy Code if, in the opinion of the Court, the modification does not materially and adversely affect the interests of Holders of Claims so long as the Plan, as modified, complies with Sections 1122 and 1123 of the Bankruptcy Code and the Debtors have complied with Section 1125 of the Bankruptcy Code. The Plan may be altered or amended before or after the Confirmation Date but, prior to substantial Consummation in a manner

which, in the opinion of the Court, materially and adversely affects Holders of Claims, so long as the Plan, as modified, complies with Bankruptcy Code Sections 1122 and 1123, the Debtors have complied with Bankruptcy Code Section 1125 and, after notice and a hearing, the Court confirms such Plan, as modified, under Bankruptcy Code Section 1129.

### H. **Filing of Additional Documents.**

The Debtors shall file with the Court such agreements, instruments, pleadings, orders, papers, or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### I. **Successors and Assigns.**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and/or assigns of such Entity.

### J. **Setoffs and Recoupments.**

The Debtor(s) or Administration Trust, as applicable, may, but shall not be required to, set off against or recoup from the payments to be made pursuant to the Plan in respect of a Claim, any claim or cause of action of any nature whatsoever that the Debtors, the Administration Trust, or the Estates, as applicable, may have against the Holder of such Claim (pursuant to section 553 of the Bankruptcy Code or other applicable bankruptcy or non-bankruptcy law), but neither the failure to do so or the allowance of any Claim hereunder shall constitute a waiver or release of any such claim by the Debtors, the Administration Trust, or the Estates, against such Holder.

### K. **Tax Exemption.**

Pursuant to Section 1146 of the Bankruptcy Code, the issuance, transfer, or exchange of any security under the Plan, or the execution, delivery, or recording of an instrument of transfer pursuant to, in implementation of, or as contemplated by the Plan, including, without limitation, any transfers to or by the Debtors, if on the Effective Date, and the Plan Administrator, if after the Effective Date, of the Debtors' property in implementation of or as contemplated by the Plan (including, without limitation, any subsequent transfer of property by the Administration Trust) shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

### L. **Securities Exemption.**

To the extent the Administration Trust Interests are deemed or asserted to constitute securities, the Administration Trust Interests and the issuance and distribution thereof shall be exempt from Section 5 of the Securities Act of 1933, if applicable, and from any state or federal securities laws requiring registration for offer or sale of a security or registration or licensing of an

issuer of, underwriter of, or broker or dealer in, a security, and shall otherwise enjoy all exemptions available for distributions of securities under a plan of reorganization in accordance with all applicable law, including without limitation, Section 1145 of the Bankruptcy Code.

### M. **Implementation.**

Upon Confirmation, the Debtors shall be authorized to take all steps and execute all documents necessary to effectuate the provisions contained in the Plan.

### N. **Record Date.**

To the extent a "Record Date" is required for implementation of the Plan, the record date shall be the Voting Record Date established by the Court in the order conditionally approving the Disclosure Statement or such other date as the Court may set.

### O. **Certain Actions.**

By reason of entry of the Confirmation Order, prior to, on, or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of directors, members, managers or other Interest Holders of the Debtor under the Plan, including, without limitation, (i) the Distribution of Cash pursuant to the Plan, (ii) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Plan, (iii) the cancellation, annulment, and extinguishment of all Interests; and (iv) the adoption, execution, and implementation of other matters provided for under the Plan involving the company or organizational structure of the Debtors, shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant to applicable corporation/limited liability company laws, without any requirement of further action by the directors, members, managers or other Interest Holders of the Debtors, irrespective of whether the Confirmation Order specifically authorizes any such action.

### P. **Substantial Consummation.**

On the Effective Date, the Plan shall be deemed substantially consummated under Bankruptcy Code Sections 1101 and 1127(b).

### Q. **Waiver of Fourteen-Day Stay.**

The Debtors request as part of the Confirmation Order a waiver from the Court of the 14-day stay of Bankruptcy Rule 3020(e) and, to the extent applicable, a waiver of the 14-day stay of Bankruptcy Rule 6004(g).

### R. **Governing Law.**

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas, without giving effect to the principles of conflict of laws thereof.

### S.  **Entire Agreement.**

On the Effective Date, the Plan and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**SECTION XX.**
**RECOMMENDATION**

The Debtors strongly recommend that all creditors receiving a Ballot vote in favor of the Plan. The Debtors believe that the Plan is in the best interests of creditors. The Plan as structured, among other things, allows creditors with Allowed Claims to participate in distributions believed to be in excess of those that would otherwise be available were the Chapter 11 Cases dismissed or converted under Chapter 7 of the Bankruptcy Code and minimizes delays in recoveries to creditors.

**FOR ALL THE REASONS SET FORTH IN THIS DISCLOSURE STATEMENT, THE DEBTORS BELIEVE THAT THE CONFIRMATION AND CONSUMMATION OF THE PLAN IS PREFERABLE TO ALL OTHER ALTERNATIVES. THE DEBTORS URGE ALL CREDITORS ENTITLED TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR BALLOTS SO THAT THEY WILL BE RECEIVED BY SEPTEMBER 9, 2025.**

Dated: September 29, 2025          Respectfully submitted,

DESKTOP METAL, INC. AND ITS DEBTOR AFFILIATES

*/s/ Andrew Hinkelman*
Andrew Hinkelman
Chief Restructuring Officer

**<u>EXHIBIT A</u>**
Organizational Chart
(as of the Petition Date)

## EXHIBIT A

### Organizational Chart of the Company



## **EXHIBIT B**

Liquidation Analysis

**Desktop Metal, Inc. and its Debtor Affiliates**
*Exhibit B: Liquidation Analysis*

| ($ '000s) | | Chapter 7 | | Chapter 11 |
|---|---|---|---|---|
| **(A)** | Cash | $ | 554 | $ | 554 |
| **(B)** | AR | $ | 224 | $ | 224 |
| **(C)** | Inventory | $ | 1,103 | $ | 1,297 |
| **(D)** | Causes of Action | | TBD | | TBD |
| | **Gross Liquidation Proceeds** | $ | **1,881** | $ | **2,076** |
| | Chapter 7 Trustee Fee (3%) | $ | (56) | $ | - |
| | **Net Liquidation Proceeds** | $ | **1,825** | $ | **2,076** |
| **(E)** | Post-Confirmation Operating & Recovery Expense | $ | (1,803) | $ | (1,443) |
| **(F)** | **Estimated Creditor Recovery** | $ | **22** | $ | **633** |

**NOTES:**

**(A)** Reflects projected ending cash balance as of the Effective Date of 9/30/25 based on the budget dated September 26, 2025.

**(B)** Reflects balances of remaining ETEC AR and assumes recovery range of 0% - 60% based on aging of receivables, net of any ARC fees.

**(C)** Liquidation value of remaining ETEC and certain sand inventory, net of any ARC fees, is estimated to be at least 15% lower in a Chapter 7 versus a Chapter 11.

**(D)** Represents proceeds from potential causes of action, the value of which is TBD.

**(E)** Includes post-confirmation costs required to effectuate a liquidation including wind-down employees, contractors, and professional fees. Cost of professional fees are estimated to be higher in a Chapter 7 versus a Chapter 11. Chapter 11 also includes Plan Administrator fees. Additional costs may be required to litigate potential causes of action.

**(F)** Estimated creditor recovery for all claim classes.